**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Southern Division**

<table>
<tr>
<td valign="top">

**UNITED STATES OF AMERICA,** *ex rel.*
Elgasim Mohamed Fadlalla, Ramzi Zinnekah,
Maher Al-Masri, Majdi Abdulghani, Haidar
Al-Saidi, Sadiq Al-Saidi, Sinan Marrogy,
Neil Magi, Faycal Maroufi, Kidar Mohammad
Al-Safar, Mahmoud Ali Luttfi, Nimna L.
Jayasinghe Mudalige, Naveep Kaur Tucker,
Waiel Samy Mansour, Samah Fikri, Hamid
Skili, Saad Kabbaj, Nada Malek, Louai Salim,
Antonio Antar, Akhtar Hayat, Haider
Al-Nakash, Parcham Khoshaba Mikhaiel,
Edward Youkhana, Dr. Ali Al-Taie, Ali
Elsebaey, Noureldin Muhsen, Maryan Mure
and Tebyan Al Nawasreh,

**ELGASIM MOHAMED FADLALLA**
1104 Tiffany Road
Silver Spring, Maryland 20904,

**RAMZI ZINNEKAH**
433 Zephyr Avenue
Erie, Pennsylvania 16505,

**MAHER AL-MASRI**
3023 Idyllbrook Lane
Erie, Pennsylvania 16506,

**MAJDI ABDULGHANI**
2404 River Ridge Drive
West Des Moines, Iowa 50265,

**SADIQ AL-SAIDI**
6010 North Newburgh Road
Westland, Michigan 48185,

**HAIDAR AL-SAIDI**
6010 North Newburgh Road
Westland, Michigan 48185,

</td>
<td valign="top">

**FIRST AMENDED COMPLAINT**

**CASE NO. GJH-15-1806**

<u>**FILED UNDER SEAL**</u>

**DO NOT PLACE IN PRESS BOX**
**DO NOT ENTER ON PACER**

**JURY DEMAND**

</td>
</tr>
</table>

1

**SINAN MARROGY**
7005 Yarmouth Drive
West Bloomfield, Michigan 48322,

**NEIL MAGI**
7832 West Molly Drive
Peoria, Arizona 85383,

**FAYCAL MAROUFI**
5808 Hermitage Circle
Milton, Florida 32570,

**KIDAR MOHAMMAD AL-SAFAR**
Post Office Box 741072
Arvada, Colorado 80006-1072,

**MAHMOUD ALI LUTTFI**
828 Hidden Point Drive
Fort Worth, Texas 76120,

**NIMNA L. JAYASINGHE MUDALIGE**
120 Flushing Meadows Drive
Rineyville, Kentucky 40162,

**NAVDEEP KAUR TUCKER**
528 Rahway Avenue
Suite 203
Woodbridge, New Jersey 07095,

**WAIEL SAMY MANSOUR**
83-20 60th Avenue
Middle Village, New York 11379,

**SAMAH FIKRI**
3033 38th Street
Astoria, New York 11103,

**HAMID SKILI**
8149 Colquitt Road
Apartment F
Atlanta, Georgia 30350,

**SAAD KABBAJ**
1109 Winding Water Way
Clermont, Florida 34714,

**NADA MALEK**
1171 Grove Park Street
Henderson, Nevada 89002,

**LOUAI SALIM**
6200 Painted Canyon Drive
Fort Worth, Texas 76131,

**ANTONIO ANTAR**
7868 South Castle Bay Street
Tucson, Arizona 857457,

**AKHTAR HAYAT**
24 Dover Drive
Richmond Hill, GA  31324

**HAIDER AL-NAKASH**
4403 Kingston Street
Dearborn Heights, Michigan 48125,

**PARCHAM KHOSHABA MIKHAIEL**
22430 North 69th Avenue
Glendale, Arizona 85310,

**EDWARD YOUKHANA**
4435 Wilson Terrace
Skokie, Illinois 60076-1348,

**DR. ALI AL-TAIE**
10704 Pendragon Place
Raleigh, North Carolina 27614,

**ALI ELSEBAEY**
126 Marlin Lane
Mays Landing, New Jersey 08330,

**NOURELDIN MUHSEN**
11122 Balata Court
Charlotte, North Carolina 28269,

**MARYAN MURE**
3839 Bodio Drive
Warren, Michigan 48091

**TEBYAN AL NAWASREH**
11869 Southwest 3rd Street
Kuwait City, Kuwait,

<em>Plaintiffs</em>

v.

**DYNCORP INTERNATIONAL LLC**
1700 Old Meadow Road
McLean, Virginia 22102

**AECOM NATIONAL SECURITY
PROGRAMS, INC.**
6564 Loisdale Court Suite 500
Springfield, Virginia, 22150

**GLOBAL LINGUIST SOLUTIONS, LLC**
1155 Herndon Parkway, Suite 100
Herndon, Virginia 20170**,**

**GLOBAL LINGUIST SOLUTIONS**
1155 Herndon Parkway
Suite 100
Herndon, Virginia 20170**,**

**SHEE ATIKA LANGUAGES, LLC**
315 Lincoln Street, Suite 300
Sitka, Alaska 99835,

**INVIZION, INC.**
1650 Tysons Boulevard, Suite 1580
McLean, Virginia 22102,

**TIGERSWAN, INC.**
3452 Apex Peakway
Apex, North Carolina 27502

**THOMAS WRIGHT, INC.**
7190 SW Fir Loop
Tigard, Oregon 97223-8070,

**KMS SOLUTIONS, LLC**
205 South Whiting Street, Suite 400
Alexandria, Virginia 22304

<em>Defendants</em>

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................... 1

II.     PARTIES ........................................................................................................................ 5

III.    JURISDICTION AND VENUE ................................................................................... 14

IV.     DEFENDANTS' MATERIAL REPRESENTATIONS IN THEIR BID FOR
        CONTRACT 1 ............................................................................................................... 15

V.      DEFENDANTS' MATERIAL REPRESENTATIONS IN THEIR BID FOR
        CONTRACT 2 ............................................................................................................... 23

VI.     DEFENDANTS' PERFORMANCE OF CONTRACT 1 ................................................. 24

VII.    GLS'S CORRUPT RELATIONSHIP WITH ALSHORA ............................................. 28

VIII.   GLS'S VIOLATION OF NISPOM REGULATIONS ..................................................... 35

IX.     GLS'S MISREPRESENTATIONS TO THE COMMISSION ON WARTIME
        CONTRACTING REGARDING PERFORMANCE OF CONTRACT 1 ....................... 36

X.      DEFENDANTS' PERFORMANCE OF CONTRACT 2 ................................................. 40

XI.     WRONGDOING EXPERIENCED BY INDIVIDUAL RELATORS ............................ 41

XII     CLAIMS ......................................................................................................................... 89

        COUNT I: Violation of the False Claims Act – Presentation of False Claims, 31 U.S.C.
                §3729(a)(1)(A) – Against All Defendants .......................................................... 89

        COUNT II:  Violation of the False Claims Act – Material False Records and Statements, 31
                U.S.C. §3729(a)(1)(B) – Against All Defendants .............................................. 95

        COUNT III:  Violation of the False Claims Act – Reverse False Claims, 31 U.S.C.
                §3729(a)(1)(G) – Against All Defendants .......................................................... 98

        COUNT IV: Violation of the Trafficking Victims Protection Reauthorization Act, 18 U.S.C.
                §1581, *et seq*. – Against All Defendants .......................................................... 99

PRAYER FOR RELIEF ............................................................................................................ 108

## FIRST AMENDED COMPLAINT

(False Claims Act, 31 U.S.C. §3729 *et seq.*; Trafficking
Victims Protection Reauthorization Act, 18 U.S.C. §1581, *et seq.*)

## I.  INTRODUCTION

1.     The United States of America ("U.S."), by and through  Elgasim Mohamed

Fadlalla, Ramzi Zinnekah, Maher Al-Masri, Majdi Abdulghani, Haidar Al-Saidi, Sadiq Al-Saidi,

Sinan Marrogy, Neil Magi, Faycal Maroufi, Kidar Mohammad Al-Safar, Mahmoud Ali Luttfi,

Nimna L. Jayasinghe Mudalige, Naveep Kaur Tucker, Waiel Samy Mansour, Samah Fikri,

Hamid Skili, Saad Kabbaj, Nada Malek, Louai Salim, Antonio Antar, Akhtar Hayat, Haider Al-

Nakash, Parcham Khoshaba Mikhaiel, Edward Youkhana, Dr. Ali Al-Taie, Ali Elsebaey,

Noureldin Muhsen, Maryan Mure and Tebyan Al Nawasreh (collectively, "Relators" for

purposes of the False Claims Act counts herein, and "Plaintiffs" for purposes of the Trafficking

Victims Protection Reauthorization Act ("TVPRA") count herein), brings this action under the

False Claims Act, 31 U.S.C. §3729, *et seq.*, against Defendants DynCorp International, LLC

("DynCorp"), AECOM National Security Programs, Inc. ("AECOM"), Global Linguist

Solutions, LLC, Global Linguist Solutions (both Global Linguist Solutions entities are referred to

as "GLS"), Shee Atika Languages, LLC ("Shee Atika"), Invizion, Inc. ("Invizion"), TigerSwan,

Inc. ("TigerSwan"), Thomas Wright, Inc. ("Wright"), and KMS Solutions, LLC ("KMS")

(collectively, "Defendants").

2.     Defendants' false claims against the U.S. were made in the course of performance

of two government contracts issued by the Commander, Headquarters, U.S. Army Intelligence

and Security Command ("INSCOM").  GLS was the prime contractor and signatory to both

contracts. The first was Contract No. W911W4-08-D-0002, awarded to GLS on or about

December 5, 2007 ("Contract 1"), and continuously performed by GLS through its duration.  The

second was Contract No. W911W4-11-D-0004, which was awarded to GLS on or about July 11, 2011, and under which GLS commenced performance in January 2013 ("Contract 2"). Upon information and belief, Contract 2 remains in effect. Defendants Shee Atika, Invizion, TigerSwan, Wright, and KMS were subcontractors on Contract 1.

3.     Contract 1 called for provision of foreign language linguistic, interpretation and translation services for the U.S. Army and other agencies supporting Operation Iraqi Freedom in the Middle East. Contract 1 was of indefinite duration and for an indefinite quantity. Ultimately, $4.6 billion in payment to GLS and its subcontractors was authorized under Contract 1.

4.     Upon information and belief, Contract 2 was awarded to GLS, in part, on the basis of its claim to have properly performed Contract 1. Upon further information and belief, Contract 2 calls for provision of similar linguistic, interpretation and translation services for U.S. military personnel and other agencies, only on a global basis. Contract 2 is worth up to $9.7 billion.

5.     Relators worked for GLS under Contract 1 and/or Contract 2 as security-cleared linguists, translators and interpreters for U.S. military and intelligence-gathering operations in the Middle East. Among their many tasks, Relators accompanied U.S. military forces into combat, assisted in the translation of captured enemy documents, assisted in the interrogation of prisoners, and served as liaisons between U.S. troops and foreign nationals, including foreign national military forces.

6.     Relators are original sources who provided evidence to the U.S. of such misconduct.

7.     Defendants' false claims to the U.S. under Contract 1 consisted, *inter alia*, of misrepresentations in GLS's bid for Contract 1; overbilling on Contract 1 based on knowing misrepresentations regarding contract performance; misrepresentation of the *bona fides* of Shee Atika, Invizion, TigerSwan, Wright, and KMS as small businesses, and small disadvantaged businesses for purposes of contract award, performance and payment; false representions to the U.S. that GLS was in compliance with Kuwaiti immigration and labor laws in order to receive payment under Contract 1; and continuous false representations to the U.S. that GLS was in compliance with the TVPRA, 18 U.S.C. §1581 *et seq*., to the prejudice of Relators and in violation of requirements for payment under Contract 1.

8.     Defendants Shee Atika, Invizion, TigerSwan, Wright, and KMS ("Small Business Defendants") colluded with GLS in its false claims to the U.S. under Contract 1, and facilitated such false claims, pursuant to which the U.S. made contract payments to GLS.  Further, the Small Business Defendants profited from GLS's false claims by receiving payment from GLS for services they knew they had not performed.

9.     Based on its misconduct, GLS should have been declared ineligible for award of Contract 2.  But for GLS's misrepresentations concerning its performance of Contract 1, the U.S. would not have awarded Contract 2 to GLS.

10.     The U.S. and Relators have suffered damages due to Defendants' perfidy.

11.     In violation of U.S. law, GLS confiscated Relators' passports while in-country, restricted their movement and compelled them to provide services through the abuse of Kuwaiti laws and legal processes.

12.     GLS's abuse of Kuwaiti immigration and labor laws triggered the arrests of some Relators in 2013, their subsequent physical and mental abuse, and their detention in-country for

months. While detained, Relators were forced to live in overcrowded and unsanitary housing, and were denied medical care for contagious ailments and injuries caused by their confined conditions of detention. Many Relators were then coerced into signing confessions to crimes they did not commit, and were then expelled from Kuwait, barred from re-entry, and blacklisted by the member countries of the Gulf Cooperation Council (Bahrain, Kuwait, Oman, Qatar, Saudi Arabia and the United Arab Emirates). Defendants profited from this misconduct at U.S. taxpayers' and Relators' expense.

13.      The U.S. was further injured when important government contract policies and objectives – including maximization of subcontracting to independent Small Business and Small Disadvantaged Business Entities – were systematically thwarted by Defendants as they wrongfully collected contract payments based on false statements and misrepresentations. In addition, when Relators were arrested and detained in 2013, U.S. military and intelligence-gathering operations were temporarily frozen for want of interpreters and translators; U.S. military readiness was temporarily jeopardized; and U.S. intelligence operations were temporarily deafened.

14.      In the end, billions of dollars in U.S. taxpayer funds were squandered on payments to Defendants who had purposefully thwarted important contract goals and policy objectives, undermined the rule of law, engaged in human trafficking, disrupted diplomatic relations with the State of Kuwait, and degraded military and intelligence operations.

15.      The TVPRA claims, brought pursuant to 18 U.S.C. §1595, are premised on Defendants' violations of 18 U.S.C. §1589 (a) (*inter alia*, provision of services through the abuse of law or legal process); 18 U.S.C. §1592 (a) (removal of passport to restrict liberty to travel in

order to maintain services); and 18 U.S.C. §1592(b) (benefiting from participating in a venture that has removed passports to restrict liberty to travel in order to maintain services).

## II.    <u>PARTIES</u>

16.     Relators/Plaintiffs are all U.S. citizens, domiciled at the addresses indicated below, who worked for GLS as linguists, interpreters and translators under Contract 1 and/or Contract 2 and were based in Kuwait while so employed:

1. **Elgasim Mohamed Fadlalla**
   1104 Tiffany Road
   Silver Spring, Maryland 20904

2. **Ramzi Zinnekah**
   433 Zephyr Avenue
   Erie, Pennsylvania 16505

3. **Maher Al-Masri**
   3023 Idyllbrook Lane
   Erie, Pennsylvania 16506

4. **Majdi Abdulghani**
   2404 River Ridge Drive
   West Des Moines, Iowa 50265

5. **Sadiq Al-Saidi**
   6010 North Newburgh Road
   Westland, Michigan 48185

6. **Haidar Al-Saidi**
   6010 North Newburgh Road
   Westland, Michigan 48185

7. **Sinan Marrogy**
   7005 Yarmouth Drive
   West Bloomfield, Michigan 48322

8. **Neil Magi**
   7832 West Molly Drive
   Peoria, Arizona 85383

9. **Faycal Maroufi**
   5808 Hermitage Circle

Milton, Florida 32570

10. **Kidar Mohammad Al-Safar**
    Post Office Box 741072
    Arvada, Colorado 80006-1072

11. **Mahmoud Ali Luttfi**
    828 Hidden Point Drive
    Fort Worth, Texas 76120

12. **Nimna L. Jayasinghe Mudalige**
    120 Flushing Meadows Drive
    Rineyville, Kentucky 40162

13. **Navdeep Kaur Tucker**
    528 Rahway Avenue, Suite 203
    Woodbridge, New Jersey 07095

14. **Waiel Samy Mansour**
    83-20 60th Avenue
    Middle Village, New York 11379

15. **Samah Fikri**
    3033 38th Street
    Astoria, New York 11103

16. **Hamid Skili**
    8149 Colquitt Road, Apartment F
    Atlanta, Georgia 30350

17. **Saad Kabbaj**
    1109 Winding Water Way
    Clermont, Florida 34714

18. **Nada Malek**
    1171 Grove Park Street
    Henderson, Nevada 89002

19. **Louai Salim**
    6200 Painted Canyon Drive
    Fort Worth, Texas 76131

20. **Antonio Antar**
    7868 South Castle Bay Street
    Tucson, Arizona 857457

21. **Akhtar Hayat**
280 Blue Moon Crossing, Apartment 736
Pooler, Georgia 31322

22. **Haider Al-Nakash**
4403 Kingston Street
Dearborn Heights, Michigan 48125

23. **Parcham Khoshaba Mikhaiel**
22430 North 69th Avenue
Glendale, Arizona 85310

24. **Edward Youkhana**
4435 Wilson Terrace
Skokie, Illinois 60076-1348

25. **Dr. Ali Al-Taie**
10704 Pendragon Place
Raleigh, North Carolina 27614

26. **Ali Elsebaey**
126 Marlin Lane
Mays Landing, New Jersey 08330

27. **Noureldin Muhsen**
11122 Balata Court
Charlotte, North Carolina 28269

28. **Maryan Mure**
3839 Bodio Drive
Warren, Michigan 48091

29. **Tebyan Al Nawasreh**
11869 Southwest 3rd Street
Kuwait City, Kuwait

17. Defendant **DynCorp** is a Delaware limited liability company, with its principal place of business at 1700 Old Meadow Road, McLean, Virginia 22102. DynCorp provides support services to the U.S. military, non-military U.S. government agencies, and foreign governments – including the foreign language interpretation and translation services provided by its GLS business segment.

18.     Defendant **AECOM**, formerly known as McNeil Technologies Inc. is a Virginia corporation with its principal place of business at 281 Centennial Avenue, Piscataway, New Jersey 08854.  On August 27, 2010, it was announced that AECOM Technology Corporation (NYSE: ACM) had completed its acquisition of McNeil Technologies, Inc.  Thereafter, ACM changed McNeil Technologies, Inc.'s name to AECOM National Security Programs Inc.  AECOM provides technical, management, and professional consulting services to the U.S.  AECOM self-describes as a company offers intelligence support, language, mission support, information technology (IT), national security, energy, labor, and logistical services.

19.     Defendant **Global Linguist Solutions, LLC**, in which DynCorp holds the majority interest, and whose affairs DynCorp dominates, is a Delaware-registered limited liability company headquartered at 1155 Herndon Parkway, Suite 100, Herndon, Virginia 20170.

20.     Defendant **Global Linguist Solutions** is a joint venture between DynCorp and AECOM, and upon information and belief, is headquartered at 1155 Herndon Parkway, Suite 100, Herndon, Virginia 20170.

21.     Under the laws of the Commonwealth of Virginia, the rules of law governing the rights, duties, and liabilities of joint venturers are substantially the same as those that govern partnerships.  Both general partnership law and Va. Code Ann. §50-12 provide that the knowledge of general partners is imputed to the partnership and its members. Further, since every partner is an agent of the partnership, the act of every partner for conducting the business of the partnership of which he is a member binds the partnership.  Thus DynCorp and AECOM are each liable for the misconduct of GLS alleged herein.

22.     During contract performance, GLS was at times referred to as a limited liability company, and at other times as a joint venture between DynCorp and AECOM. Allegations herein against "GLS" are intended to encompass both entities.

23.     In its June 11, 2009 Security and Exchange Commission Form 10-Q, DynCorp describes GLS as "a 51% owned joint venture." DynCorp further disclosed therein that "[o]ur effective tax rate was impacted by the tax treatment of our GLS and DIFZ joint ventures, which are not consolidated for tax purposes but are instead taxed as partnerships under the Internal Revenue Code."

24.     DynCorp again characterized GLS as a joint venture in SEC Form 10-K, June 4, 2010: "Global Linguist Solutions ('GLS') . . . is a 51% owned joint venture."

25.     On July 11, 2011, DynCorp issued a press release announcing "DynCorp International (DI) and AECOM today announced that Global Linguist Solutions (GLS), a joint venture between DI and AECOM's NSP unit, has been selected as one of six providers that will compete for task orders on the $9.7 billion Defense Language Interpretation Translation Enterprise (DLITE) contract."

26.     A November 14, 2011 SEC Form 10-Q filed by DynCorp and a November 21, 2011 SEC Form 10-K filed by AECOM Technology Corp. both repeatedly state that GLS is a joint venture.

27.     The GLS joint venture is not identified as a limited liability company. For example, all Relators' Foreign Service Employment Agreements ("FSAs") were entered into with GLS, with no mention of GLS, LLC, or GLS being a limited liability company.

28.     GLS, when it was not functioning in its capacity as a joint venture during the relevant period of time alleged herein, but rather, was functioning in its capacity as an LLC, was

the alter ego of DynCorp for purposes of liability hereunder. Any corporate veil that purports to shield DynCorp from the liabilities of GLS, in its capacity as an LLC, should be pierced, and DynCorp should be held liable for GLS's unlawful actions alleged herein.

29. DynCorp listed the value of the GLS contract with the U.S. Army on its June 4, 2010 SEC 10-K disclosure statement, and DynCorp refers therein to GLS as one of its own "segments."

30. In its June 11, 2009 SEC 10-K, DynCorp stated, "Global Linguist Solutions: Revenue was $709.1 million for the INSCOM contract through our GLS joint venture, which began in the fourth quarter of fiscal year 2008. Revenue also benefited from the recognition of the INSCOM contract award fee of $30.4 million for fiscal year 2009. The award fee is based on achieving specific contract performance criteria, such as operational fill rates. Based on our contract performance history to date, we anticipate the ability to accrue award fees through the remaining life of the INSCOM contract."

31. At least as of 2009, GLS financial statements were consolidated with DynCorp financial statements.

32. GLS's operating agreement authorized DynCorp to designate managers to oversee the business and affairs of GLS, and DynCorp personnel were responsible for the day-to-day management of GLS and all instructions given to GLS employees.

33. In 2009 testimony before the Commission on Wartime Contracting in Afghanistan and Iraq, DynCorp stated that it funded GLS's operating capital.

34. At all times relevant to the allegations in the Complaint, DynCorp exercised management control over GLS.

35.     In 2009, DynCorp considered its finances to be so commingled with GLS's finances that DynCorp auditors closely examined GLS internal controls as part of the DynCorp Sarbanes-Oxley ("SOX") audit.

36.     At all times relevant to the allegations in the Complaint, upon information and belief, DynCorp and GLS shared the same business address.

37.     DynCorp controlled all "back office" support for the linguists hired in the name of GLS, including time recording expense reimbursement, and *per diem* reimbursement.

38.     In performing Contract 1, DynCorp controlled distribution of the employee handbooks to the Small Business Defendants.

39.     DynCorp controlled the 401K investment plans offered to GLS employees.

40.     All persons purportedly in the employ of GLS accessed their time through DynCorp controlled systems: https://myjourney.dyn-intl.com.

41.     DynCorp hired and fired key GLS personnel.

42.     DynCorp controlled the recordation and reimbursement of Relators' expenses.

43.     DynCorp asserted proprietary rights to the content of GLS emails.  Almost all emails sent by GLS contain the following assertion of property rights: "This message may contain DynCorp International Privileged/Proprietary information.  If this email is not intended for you, and you are not responsible for the delivery of this email message to the addressee, do not keep, copy or deliver this email message to anyone.  Please destroy this email in its entirety and notify the sender by reply email.  Your cooperation is appreciated."

44.     DynCorp developed all of the training policies for GLS personnel.

45.     Samuel de Sidmed ("Sidmed") identified himself to Relators as the Middle East Operations Manager for GLS; however, during contract performance, Sidmed's email address

was "Samuel.Sidmed@dyn-intl.com" and all of the web-based information he required from Relators was owned and controlled by DynCorp (e.g., DYN My Journey https://myjourney.dyn-intl.com; TLS Timesheet https://tls.dyn-intl.com; DELTEK:https://dte.dyn-intl.com/DeltekTC/welcome.msv).

46.    In 2008 correspondence to GLS's linguists, including Relators, they were instructed that if they had questions for Iraq in-country human resource personnel, they should contact "Greg Williams or greg.williams@dyn-intl.com VOIP 555-402."

47.    In listing its property assets for the benefit of investors, DynCorp listed "Herndon, VA Offices — GLS recruiting center GLS 11,400 [sq. ft.] [and] San Diego, CA Offices — GLS recruiting center GLS 9,400 [sq. ft.]."

48.    At all times relevant hereto, DynCorp personnel, including Sidmed, Todd Lawrence, Cheryl Robinson, and Greg Williams directly supervised Relators who were, in turn, represented to the U.S. Army as being under GLS management. However, on information and belief, Sidmed, Lawrence, Robinson, and Williams were, at all relevant times, employees of DynCorp.

49.    Email correspondence indicates that Bader Sultan, with email address Bader.Sultan@dyn-intl.com, was in control of certain linguists' visa compliance.

50.    Defendant **Shee Atika**, at all times relevant hereto, was a limited liability company organized under the laws of the State of Alaska with its principal place of business in Sitka, Alaska. Shee Atika described itself as an "Alaska Native Corporation" ("ANC") within the meaning of Federal Acquisition Regulation ("FAR") 19.701 (48 C.F.R. §19.701), which defines *Alaska Native Corporation as* "any Regional Corporation, Village Corporation, Urban Corporation, or Group Corporation organized under the laws of the State of Alaska in

accordance with the Alaska Native Claims Settlement Act, as amended (43 U.S.C.A. 1601, *et seq.*) and which is considered a minority and economically disadvantaged concern under the criteria at 43 U.S.C. 1626(e)(1)." Upon information and belief, per agreement between GLS and Shee Atika, GLS offered Shee Atika to INSCOM as an Alaska Native-owned small business that would participate in performance of Contract 1 as a *bona fide*, independent subcontractor of GLS, consistent with Contract 1's small business set-aside requirements. Upon information and belief, Shee Atika is no longer active as an LLC, but according to available records, retains an agent for service of process.

51. Defendant **Invizion**, at all times relevant hereto, was a Virginia corporation that describes itself as a small disadvantaged business, "SDB Certified 8(a)," which is 100% minority owned. On information and belief, *per* agreement between GLS and Invizion, GLS represented Invizion to INSCOM as a small disadvantaged business that would participate in performance of Contract 1 as a *bona fide*, independent subcontractor of GLS, consistent with Contract 1's small business set-aside requirements. Upon information and belief, Invizion is no longer active as a corporation, but according to available records, retains an agent for service of process.

52. Defendant **TigerSwan** is a North Carolina corporation that represents itself as a service-disabled, veteran-owned business. On information and belief, per agreement between GLS and TigerSwan, GLS represented TigerSwan to INSCOM as a service-disabled, veteran-owned small business that would participate in performance of Contract 1 consistent with its small business set-aside requirements as a *bona fide*, independent subcontractor of GLS, consistent with Contract 1's small business set-aside requirements.

53. Defendant **Wright**, incorporated in the State of Oregon, describes itself as a woman-owned small business under GSA Schedule 871. On information and belief, per

agreement between GLS and Wright, GLS represented Wright to INSCOM as a woman-owned small business that would participate in performance of Contract 1 consistent with its small business set-aside requirements as a *bona fide*, independent subcontractor of GLS, consistent with Contract 1's small business set-aside requirements.

54. **KMS** is a Virginia limited liability company that holds itself out as a minority and woman-owned business enterprise dedicated to providing consulting and technical services to commercial and Government clients. On information and belief, per agreement between GLS and KMS, GLS represented KMS to INSCOM as a woman- and minority-owned small business that would participate in performance of Contract 1 consistent with its small business set-aside requirements as a *bona fide*, independent subcontractor of GLS, in conformity with Contract 1's small business set-aside requirements.

## III. <u>JURISDICTION AND VENUE</u>

55. The subject matter jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§1331 and 3730(b), and 18 U.S.C. §§1595(a) and 1596(a).

56. Venue lies in this District pursuant to 28 U.S.C. §§1391(b)(3) and 3732(a), as DynCorp and AECOM, independently and through GLS, conducts a continuous course of business in the State of Maryland, including business at Joint Base Andrews in Prince George's County, Maryland.

57. Any statute of limitations that might otherwise bar any portion of the claims herein is tolled by virtue of Defendants' concealment of their unlawful actions at the time they occurred. Further, due to their misconduct, Defendants are equitably estopped to invoke any statute of limitations that might otherwise bar any portion of these claims.

58.     Likewise, there is no procedural bar to recovery by Relators under the False Claims Act, 31 U.S.C. §3730(e).    Relators have direct, independent knowledge of the information on which the allegations herein are based, and are original sources of the allegations herein, as that term is defined in the statute.    The primary allegations herein have not been publicly disclosed in the media; in a federal criminal, civil, or administrative hearing in which the U.S. or its agent was a party; or in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation.    Relators' knowledge and disclosures materially adds to any existing allegations and transactions that have already been publicly disclosed.

## IV.     DEFENDANTS' MATERIAL REPRESENTATIONS IN THEIR BID FOR CONTRACT 1

59.     On or about June 30, 2006, INSCOM issued solicitation W911W4-05-R-0001 for the provision of linguists to support U.S. military and intelligence-gathering efforts in the Middle East.

60.     GLS was selected as the proposed awardee of Contract W911W4-08-D-0002 (Contract 1) on or about December 5, 2007, and was awarded Contract 1 in early 2008.

61.     Contract 1 was a Cost Plus Award Fee, Indefinite Duration, Indefinite Quantity ("IDIQ"), Labor Hours contract structured with authorization of $4.645 billion divided into as-needed task orders.    Its purpose was delineated in an "Executive Summary" on pp. 18 and 19 of the 57-page contract:

> . . . The purpose of this requirement is to procure performance-based services for the rapid recruitment and deployment of foreign language Interpretation and Translation type services in support of the U.S. Army, acting as the Executive Agent for DoD for translator and interpreter services. . . . Linguist services are required to permit our forces to communicate effectively with the local populace, gather information for force protection, and interact with foreign military units. Since these operations do not have predefined or predictable work locations,

hours, or duration, the contractor shall provide interpretation and translation services as required by the supported forces up to 24 hours per day, 7 days per week for all operations. Linguists shall be at the specified site for a minimum of 8 hours per day, and may be extended for up to 12 hours, and on call for the remaining 12 hours, depending on mission requirements.

62.     Contract 1 provided that "[t]he specific linguist services [would] be bought on the basis of man-hours, man-days, man-months, man-years, task completion or linguists based on the specific task order."

63.     Section 2.1.1 of Contract 1 required GLS to "provide translation and interpretation services for various specified contract required languages (SCRL)" listing thirty-seven different languages for which GLS was to provide linguists, as required up to 24 hours per day, 7 days a week.

64.     Under Contract 1, the Government paid GLS for the service of having linguists available in-theater for translation and interpretation.

65.     Section 2.2, "Deployment," required "[t]he contractor [to] . . . ensure that the following tasks are performed for each deployed employee: All personnel obtain and maintain the necessary travel documents (i.e., passport, travel documents, visas, country clearances, work permits, etc.). All personnel are briefed on adherence to all laws and regulations of the host nation(s). All personnel are provided appropriate transportation, if Government transportation is not available. All personnel, including subcontractors, shall comply with all . . . (ii) US Host Country, local and international laws and regulations and (iii) treaties and international agreements . . . that are applicable to the contractor in the area of operations."

66.     Through Section 2.3, GLS was to keep INSCOM informed of "any other information the Contractor deems pertinent and important" and "provide highlights or areas of concerns or problems in the contract, if any."

67.     Section 3.0, at paragraph 7, stated "Management of Small Business Sub-Contracting. . . . [GLS] shall meet standard 100% of the time."

68.     Section H.1, "Security Requirement," made plain that GLS "shall maintain and administer a security program in accordance with the National Industrial Security Program Operations Manual (NISPOM) DoD 5220.22M."

69.     Small business participation was an important objective, and therefore formed a critical component, of Contract 1.  Section H.14, entitled "Small Business Subcontracting Plan," explained that "[T]here are multiple objectives for subcontracting emphasis, which shall be documented in a subcontracting plan and performed in accordance with the terms of this contract," as follows:

> (a)     US Small business concerns, veteran-owned small business concerns, service-disabled veteran-owned small business concerns, HUBZone small business concerns, small disadvantaged business concerns, and women-owned small business concerns shall have *the maximum practicable opportunity to participate in performing contract(s) resulting from this solicitation*.  Prime contractors shall establish procedures to ensure the timely payment of amounts due pursuant to the terms of their subcontracts with small business concerns, veteran-owned small business concerns, service-disabled veteran-owned small business concerns, HUBZone small business concerns, small disadvantaged business concerns, and women-owned small business concerns.
>
> *   *   *
>
> (c)     Subcontracting.
>
> > 1.     Contractors will be required to achieve minimum levels of Small Business Participation as a requirement of the IDIQ Contract.  Specifically, the following Small Business Participation is required:
>
> 25% to Small Business
>
> 5% to Small Disadvantaged Businesses
>
> 5% to Women-Owned Small Businesses
>
> 3% to HUBZone Small Businesses
>
> 3% to Service Disabled Veteran Small Businesses
>
> *   *   *

2. Contractor shall submit to the contracting officer the following reports: Standard Form (SF) 294, Subcontracting Report for Individual Contracts, *as a part of any submission for award fee determination*, and at contract completion. The report shall provide information on subcontract awards to small business concerns, veteran-owned small business concerns, service-disabled veteran-owned small business concerns, HUBZone small business concerns, small disadvantaged business concerns, women-owned small business concerns, and shall ensure that all US subcontractors agree to submit SF 294.

3. *The failure of the Contractor or subcontractor to comply in good faith with its subcontracting plan required by this contract shall be a material breach of the contract.*

(Emphasis added).

70. Pursuant to Section H.4 of Contract 1, and in compliance with Section H.14 above, an offeror for the contract was required to submit a Small Business Subcontracting Plan that satisfied the elements of FAR 52.219.9, including, where applicable, a subcontracting plan that separately addressed subcontracting with small business, veteran-owned small business, service-disabled veteran-owned small business, HUBZone small business concerns, small disadvantaged business, and women-owned small business concerns. The plan was to be incorporated as part of the contract. Failure to submit and negotiate the subcontracting plan would make the offeror ineligible for award of a contract. Thus, performance of the contract and fee awards under the contract were conditioned, among other things, on compliance with these provisions.

71. The offeror/contractor's subcontracting plan was required to include goals, expressed in terms of percentages of total planned subcontracting dollars, for the use of small business, veteran-owned small business, service-disabled veteran-owned small business, HUBZone small business, small disadvantaged business, and women-owned small business concerns as subcontractors.

72.     Subcontracts awarded to an ANC or Indian tribe would be counted towards the subcontracting goals for small business and small disadvantaged business concerns.

73.     The Aid to Small Business Act, 15 U.S.C. §631 *et seq*., establishes at §631 that:

> [t]he essence of the American economic system of private enterprise is free *competition*. Only through full and free *competition* can free markets, free entry into business, and opportunities for the expression and growth of personal initiative and individual judgment be assured. The preservation and expansion of such *competition* is basic not only to the economic well-being but to the security of this Nation. Such security and well-being cannot be realized unless the *actual and potential capacity of small business is encouraged and developed*. It is the declared policy of the Congress that the Government should aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns in order to preserve free competitive enterprise, to insure that a fair proportion of the total purchases and contracts or subcontracts for property and *services* for the Government . . . be placed with small business enterprises, to insure that a fair proportion of the total sales of Government property be made to such enterprises, and to maintain and strengthen the overall economy of the Nation."

(Emphasis added).   In sum, the purpose of small business subcontracting requirements in Contract 1 was to enhance the ability of small businesses to perform the contracts and provide the services needed to enhance the *competition* necessary to promote a free marketplace.

74.     Section 637(d) of the Aid to Small Business Act requires maximum practicable opportunity for small business concerns to participate in federal contracts, and, as a condition of award and continuing performance, §637(d)(4)(B) and (D) requires a representation by a contractor that it is in compliance, and will remain in compliance, with the Small Business Subcontracting Plan.

75.     Section 637(d)(8)(A) of the Aid to Small Business Act requires a representation that the contractor will carry out the requirements of clause (3) of §637(d) in good faith, and that failure to do so is a material breach of contract.   A contractor in violation of this provision is not entitled to payment under its contracts.

76.     Section 645, titled "Offenses and Penalties," provides in clause (d) that whoever misrepresents the status of any concern as a small business in order to obtain for oneself or for another any subcontract that is to be included as part of all of a goal contained in a subcontracting plan required pursuant to section 637(d), is subject to fines of not more than $500,000, subject to disbarment, and subject to administrative remedies under the Program Fraud Civil Remedies Act of 1986.

77.     Pursuant to FAR 52.219-9, incorporated by reference in Section H.4 of Contract 1, the offeror/contractor was required to submit a statement of total dollars planned to be subcontracted to small business concerns (including ANCs); veteran-owned small business concerns; service-disabled veteran-owned small businesses; HUBZone small business concerns; small disadvantaged business concerns (including ANCs) and women-owned small business concerns.

78.     FAR 52.219-9 also required that the contractor submit periodic reports to the government so that it could determine the contractor's extent of compliance with the subcontracting plan. Contract 1 required submission of reports on a semi-annual and annual basis. Further, all reports submitted at the close of each fiscal year must contain a Year-End Supplementary Report for Small Disadvantaged Businesses, to include subcontract awards to small disadvantaged business concerns by North American Industry Classification System (NAICS) Industry Subsector.

79.     FAR 52.219-9(k), incorporated into Section H.4, and made explicit in Section H.14 of Contract 1, provided that "failure . . . to comply in good faith with its subcontracting plan required by this contract shall be a material breach of the contract."

80.     A small business offeror is one that represents, through a written self-certification, that it is a small business concern in connection with a specific solicitation and has not been determined by the Small Business Administration ("SBA") to be other than a small business. The contracting officer accepts an offeror's representation unless that representation is challenged or questioned.  DoD Cost Accounting Standard 4-103.

81.     The affiliates of a non-SBA certified entity are not qualified to be treated as SBA entities.

82.     In determining whether an entity qualifies as a small business concern, the SBA counts the receipts of all of the entity's affiliates.  *See* 13 C.F.R. §121.103(a)(6).  "Affiliation" exists between businesses when one business, directly or indirectly, controls or has the power to control another business, or when a third party, directly or indirectly, controls or has the power to control both businesses.  *See* 13 C.F.R. §121.103(a); FAR 19.101.  Control may arise through ownership, management, or other relationships or interactions between the parties. *See* 13 C.F.R. §121.103(a).  If one or more officers, directors, managing members, or general partners of a business control the management of another business, the businesses are affiliates.  *See* 13 C.F.R. §121.103(e).  Firms that are economically dependent through contractual (or other) relationships are among those treated this way.  *See* 13 C.F.R. §121.103(f).

83.     During the competition for Contract 1, GLS entered into "Teaming Agreements" with Small Business Defendants so that those entities might be counted as small business participants pursuant to the small business participation requirement of the contract.

84.     Having secured the commitment of the Small Business Defendants, GLS then represented to INSCOM that it intended to utilize the Small Business Defendants in accordance

with the subcontracting requirements of Contract 1. GLS was awarded Contract 1 in part on the basis of those representations.

85. In fact, those representations were false when made. GLS did not intend to abide by the terms of the solicitation and Contract 1, nor the policies expressed in the Small Business Act, to promote the contract performance capabilities of these small businesses or enhance their ability to obtain the business experience necessary to ensure vigorous competition. Rather, GLS intended to usurp the independence of these small businesses for its own pecuniary gain.

86. While teaming agreements, depending on their terms, under certain circumstances might be appropriate in a subcontract between a small business and a prime contractor, *these* agreements, as reflected by their terms and the Defendants' subsequent course of conduct, so vitiated the capabilities of the Small Business Defendants that these entities were converted into GLS affiliates and lost their eligibility to be considered as *bona fide* independent small business entities.

87. In substance, GLS prevented the Small Business Defendants from participating in the performance of Contract No. 1 through a scheme, foreshadowed in the Teaming Agreements, to give the false impression that the Small Business Defendants were so situated to perform work that would enable them to gain valuable experience and compete for government contracts.

88. In fact, however, the Small Business Defendants performed virtually no work under the subcontracts – GLS itself performed that work.

89. For example, Shee Atika's Teaming Agreement with GLS delineates, at Exhibit B to such agreement, the division of responsibility between GLS and Shee Atika.

According to Exhibit B of the Teaming Agreement, GLS took over the following management functions of Shee Atika: recruitment of linguists and translators; linguist/translator screening;

deployment (to include CONUS Replacement Center ("CRC") processing; coordination, scheduling and payment for transportation); Quick Reaction Capability ("QRC") tasks; personnel security coordination; logistics; time and labor collection and approval; payroll distribution for local nationals; and On-Site Management.

90.     This Teaming Agreement, upon information and belief, was substantively the same agreement that GLS employed to manage the relations it had with all the Small Business Defendants utilized in its submission of its proposal for Contract 1.

## V.     DEFENDANTS' MATERIAL REPRESENTATIONS IN THEIR BID FOR CONTRACT 2

91.     On November 16, 2010, INSCOM requested proposals for Department of Defense Language Interpretation and Translation Enterprise ("DLITE") through contract solicitation W911W4-11-R0003.   Upon information and belief, this solicitation called for provision of similar services on a global basis.

92.     On July 11, 2011, INSCOM awarded to GLS the $9.7 billion Contract No. W911W4-11-D0004 (Contract 2).  Upon information and belief, GLS falsely represented that it had complied with Contract 1, including, but not limited to, the level of participation of the Small Business Defendants, in submitting its proposal for Contract 2.

## VI.          DEFENDANTS' PERFORMANCE OF CONTRACT 1

93.     As recited above, Contract 1 required GLS to submit a proposal demonstrating that small businesses, small disadvantaged businesses, woman-owned businesses, HUBZone businesses and Service Disabled Veteran Small Businesses would participate in contract performance as subcontractors directly employing the Relators who were to perform linguistic services.

94.     The gutting of Small Business Defendants' management functions, alleged above, was witnessed by Relators, who, in performing their responsibilities under Contract 1, directly dealt almost exclusively with, and were managed on a daily basis by, GLS management, rather than with one or another of the Small Business Defendants to whom they were ostensibly assigned and reassigned multiple times by GLS.

95.     GLS's pre-award intention to deny the Small Business Defendants any meaningful role in the performance of Contract 1 – and the Small Business Defendants' acquiescence to such a scheme – was actualized by the manner in which GLS seized for itself all meaningful performance of all the tasks necessary to perform Contract 1.

96.     For example, Relators learned of the job openings for linguists from advertisements placed by GLS, not by Small Business Defendants.

97.     Relators called the telephone number shown in the ads to obtain information about the jobs, and those numbers connected them to GLS, not Small Business Defendants.

98.     GLS, and not Small Business Defendants' representatives, instructed Relators to furnish their resumes and appropriate information about their language skills, professional experience and related information.

99.     Relators sent that information to DynCorp/GLS's address, indicating that DynCorp/GLS was the potential employer, not Small Business Defendants.

100.    GLS, not Small Business Defendants, screened the individuals who responded to its advertisements for linguists, and selected candidates, including Relators, for initial screening.

101.    GLS, not Small Business Defendants, paid Relators' expenses to visit Northern Virginia for several days to meet with GLS representatives for further evaluation for employment.

102.    GLS, not Small Business Defendants, paid for Relators' expenses to travel to U.S. Army Base Camp Atterbury for CRC training.

103.    GLS trainers, not Small Business Defendants' trainers, instructed the new recruits, including Relators, investigated their backgrounds for security issues, and gave them medical tests.

104.    GLS, not Small Business Defendants, arranged, and paid for, Relators' transportation to the Ali Al-Salem transit camp in Kuwait.

105.    GLS, not Small Business Defendants, managed Relators' obligation to keep time records showing "man-hours" of GLS work to be electronically reported to DynCorp.

106.    GLS, not Small Business Defendants, managed Relators at Camp Ali Al-Salem, Camp Arifjan, and Camp Buehring.

107.    GLS, not Small Business Defendants, produced, summoned personnel to sign, received, and processed executed linguist FSAs.

108.    GLS, not Small Business Defendants, cautioned Relators about the non-negotiability of the FSAs including position describing and job duties, salary/allowances,

proprietary and confidential information, background check and personal security clearances, and grounds for termination.

109.    GLS, not Small Business Defendants, controlled Relators' transportation to Kuwait.

110.    GLS, not Small Business Defendants, determined where Relators were deployed.

111.    GLS, not Small Business Defendants, determined whether Relators were managed by Cheryl Robinson or Sidmed, both employed by DynCorp, though represented to the public as GLS employees.

112.    One consequence (among many) of this usurpation of all meaningful functions of the Small Business Defendants was that they did not gain any meaningful experience in management of a large-scale government contract for the provision of linguist services overseas or in a combat zone.

113.    The perversion of SBA contracting policies designed and intended to diversify and strengthen the free market had a material impact on the U.S. and Relators.  GLS's use of Teaming Agreements and its organization of the "Integrated Team Management Approach" ("ITMA") group not only eviscerated the management functions and learning curves of the Small Business Defendants, it crippled their ability to compete with GLS in the future for provision of such services.

114.    With fewer viable competitors in the marketplace, GLS could, and did, dictate the terms for a linguist seeking to serve the U.S., and profiteered from an increasingly impregnable position relative to its competition.  Thus, even though Congress more than doubled funding from $4.6 billion of Contract 1 to $9.7 billion for Contract 2, GLS dramatically *cut* the

compensation for linguists, including Relators, by approximately $30,000.00 per linguist, with a parallel cut in benefits.

115. Another consequence of this usurpation of functions was that Small Business Defendants did not know, at any given time, which Relators were on their payrolls; the amount of their businesses' revenue; the percentage of work their businesses were ostensibly performing; whether the work was being satisfactorily performed; the status and locales of their work assignments; or what they were owed.

116. GLS's usurpation of the Small Business Defendants' subcontract performance, and assumption of total control over the Relators, who were ostensibly employed by the Small Business Defendants, was intentional, and enabled GLS to move the linguists' employment from one Small Business Defendant to another at will. This was done in order to create the illusion that the roster of a particular subcontractor was adequately populated with linguists.

117. This was also done for pecuniary reasons. Upon information and belief, GLS received unjustified payments from the U.S. by falsely representing its employees, including Relators, as working for the Small Business Defendants, outsourcing task orders to them, and earning fees for such outsourced work. In truth, however, as alleged herein, GLS was performing all of the requested work.

118. GLS never disclosed this to INSCOM. Had it been disclosed, GLS would have been disqualified as the contract awardee for failure to satisfy the small business subcontracting requirements of Contract 1, and would not have been entitled to payment thereunder. GLS also would have been disqualified from consideration for Contract 2.

119. Nor did GLS disclose to INSCOM GLS's toxic relationship with Alshora International General Trading and Contracting Company ("Alshora") (discussed *infra*), another

vehicle for false claims by GLS that it submitted to the U.S. for payment and, upon information and belief, were paid.

VII. **GLS'S CORRUPT RELATIONSHIP WITH ALSHORA**

120. Relators **Ramzi Zinnekah**, **Maher Al-Masri**, **Majdi Abdulghani**, **Haidar Al-Saidi**, **Sadiq Al-Saidi**, **Sinan Marrogy**, **Neil Magi**, **Faycal Maroufi**, **Kidar Mohammad Al-Safar**, **Elgasim Mohamed Fadlalla**, **Mahmoud Ali Luttfi**, **Nada Malek**, **Louai Salim**, **Antonio Antar**, **Akhtar Hayat**, **Haider Al-Nakash**, **Parcham Khoshaba Mikhaiel**, **Edward Youkhana**., **Dr. Ali Al-Taie**, **Ali Elsebaey**, **Noureldin Muhsen**, **Maryan Mure**, and **Tebyan Al Nawasreh** (hereinafter "Resident Visa Relators") are original sources regarding Defendants' corrupt relationship with Alshora – a relationship that caused Resident Visa Relators to be victimized by GLS and Alshora colluding to abuse Kuwaiti immigration and labor law by misrepresenting Resident Visa Relators as employees of Alshora when they were not, subjecting Resident Visa Relators to arrest, incarceration, and interrogation.

121. Resident Visa Relators were also victimized by GLS when it abused Kuwaiti legal processes by directing GLS-retained attorneys in Kuwait to file civil complaints in the names of Resident Visa Relators against Alshora where Resident Visa Relators had not given informed consent to such civil actions, and where the filing of such civil actions caused Resident Visa Relators to be named in counterclaims filed by Alshora.

122. Except where otherwise indicated *infra*, GLS further abused Kuwaiti law and legal processes when, in an effort to shield itself from the reach of Kuwaiti law, it coerced Resident Visa Relators to sign confessions to criminal conduct that Resident Visa Relators did not commit and that, in truth, GLS committed.

123. Except where specifically noted *infra*, based on these confessions, Resident Visa Relators were found guilty of violating Kuwaiti laws; were expelled from Kuwait; were barred from reentry; were blacklisted from entering the countries that are part of the Gulf Cooperation Council; lost their security clearances; and were rendered ineligible for rehire as linguists.

124. On December 9, 2009, GLS and Alshora entered into a contract for services in support of Contract 1. Under their contract, Alshora agreed to obtain Resident Visas for GLS's employees in consideration for payment of a per-month, per-employee "sponsorship" fee.

125. Upon information and belief, GLS passed these costs on to the U.S.

126. In truth, through this contract, the parties colluded to circumvent Kuwaiti immigration and labor laws and conceal from the U.S. the real purpose of the fees paid by GLS to Alshora.

127. The State of Kuwait, with few narrow exceptions, prohibits domestic employment of foreign nationals who lack a Resident Visa. The necessary predicate for a Resident Visa is *bona fide* employment in Kuwait.

128. With a few exceptions, foreign nationals cannot be employers in Kuwait. Rather, a Kuwaiti national must own at least 51% of any business entity operating in Kuwait. Only then can that entity's foreign national employees receive Resident Visas enabling them to work legally in Kuwait.

129. In an effort to create the appearance of compliance with this requirement, Alshora and GLS obtained Relators' signatures on documents purporting to identify Relators as Alshora employees. This was a sham, however, as Relators never worked for Alshora.

130. To further the appearance that Relators worked for Alshora, its contract with GLS required that "All [GLS] personnel maintain valid, functional bank accounts in Kuwait into

which their salaries can be directly deposited via electronic means." GLS monthly deducted money from Relators' pay and transferred that money to Alshora, which then deposited it into Kuwaiti banks to create the appearance that Alshora was compensating the Relators. GLS did not disclose to Relators the true purpose of these deductions, but instead falsely represented to them that such deductions were necessary in order to comply with Kuwaiti law.

131. The sums that GLS withdrew from Relators' pay, and then transferred to Alshora, were very modest – they were appropriate salaries for unskilled laborers of the sort employed by a general trading and contracting company such as Alshora. However, these sums bore no relationship to the actual salaries of the Relators, who were highly skilled professionals and earned considerably more than was reflected on Alshora's books and reported to Kuwaiti authorities.

132. Under Kuwaiti law, there are minimum salary eligibility requirements imposed on foreign nationals for bringing their dependents into the country to live with them and, upon information and belief, for obtaining a driver's license. The "salaries" that Alshora ostensibly paid Relators, as reflected in its records, were so low that they did not qualify for drivers' licenses or bringing their dependents into Kuwait to live with them.

133. Upon information and belief, GLS never disclosed to the U.S. the purpose of the sponsorship fees that GLS was paying to Alshora and passing on to the U.S., much less did GLS disclose the reduced salary payment scheme through Alshora. To the contrary, GLS made false claims to the U.S. for compensation under Contract 1, seeking reimbursement for the sponsorship fees under false pretenses; failing to disclose its corrupt arrangement for salary payments through Alshora; and affirmatively representing that it was in compliance with Kuwaiti labor and immigration laws as a prerequisite to payment under the contract.

134. The business relationship between GLS and Alshora began to shift at the close of 2012 when Contract 1, which was a cost-plus contract, was about to expire. Under Contract 2, which was a fixed fee contract, each dollar that GLS spent on Alshora's services would reduce GLS's profits. Losing its ability to pass the cost of the GLS/Alshora "sponsorship" fees to the U.S., GLS sought to terminate its relationship with Alshora in favor of a less expensive arrangement with another Kuwaiti company.

135. On information and belief, GLS informed Alshora on or about January 10, 2013, that February 17, 2013 would be the last day GLS would pay Alshora for any immigration-related services. In that circumstance, Alshora was no longer willing to (mis)represent to the Kuwaiti government that the linguists, including many Relators, were Alshora employees.

136. As February 17, 2013 was going to be the last day on which GLS paid Alshora, Alshora wanted to cancel all work permits and Resident Visas that it had obtained for GLS no later than that date.

137. Therefore, on or about January 10, 2013, Alshora notified GLS that all of its linguists who had been issued Resident Visas through Alshora, including many Relators, must report to Alshora to have those visas cancelled.

138. Upon information and belief, at a meeting during the first week of February 2013, between Alshora and GLS managers, Alshora advised that it intended to cancel all of the pertinent residency permits no later than February 17, 2013. Under Kuwaiti law, that would require the subject linguists to leave Kuwait and return to the U.S. Once they obtained valid Resident Visas, they could return to Kuwait.

139. On further information and belief, Alshora and GLS agreed that GLS would send up to 10 linguists a day to the Alshora office for cancellation of their Resident Visas.

140.     GLS did not honor that agreement, however, because it could not afford to lose the services of those linguists: Without them, GLS did not have enough linguists in-country to fulfill its contractual obligations under Contract 1, and would be in breach.

141.     When GLS's linguists, including certain Relators, failed to report to the Alshora office to have their Resident Visas cancelled, Alshora reported to Kuwaiti authorities that these linguists – its alleged "employees" – had abandoned their worksites.

142.     In Kuwait, it is a criminal offense – called "absconding" – for a foreign national worker to fail to report to the work site of his or her Kuwait-national employer without notice or a legitimate excuse.

143.     Contemporaneous with Alshora's criminal report, Alshora learned that there were at least 25 linguists employed by GLS in Kuwait, including Relators **Waiel Samy Mansour, Samah Fikri, Hamid Skili, Saad Kabbaj, Nimna L. Jayasinghe Mudalige, and Navdeep Kaur Tucker** (hereinafter "Non-Resident Visa Relators"), whom GLS had not referred to Alshora for processing for Resident Visas.

144.     Alshora had thus been deprived of anticipated revenue under its contract with GLS.

145.     Alshora thereupon reported the Non-Resident Visa Relators to Kuwaiti authorities as working illegally in Kuwait.

146.     In consequence, Kuwaiti Army Staff Major General Abd Al-Razak Mohammed Al-Awadi, on February 19, 2013, ordered that Relators immediately stop work for the U.S. military and intelligence forces in Kuwait.

147.    This order took the U.S. government by surprise and temporarily paralyzed critically important U.S. intelligence-gathering and military operations throughout the Middle East.

148.    Though the Stop Work Order was issued on February 19, 2013, GLS did not communicate to the linguists that they were obligated to stop all work until March 21, 2013.

149.    The criminal reports filed by Alshora prevented GLS's linguists from leaving the country, as arrest warrants had been issued for them, and they would have been subjected to arrest as they attempted to pass through immigration.

150.    Beginning on or about April 3, 2013, GLS transported Resident Visa Relators to the Kuwaiti Ministry of Labor and Social Affairs. They were told that in order to obtain new, valid Resident Visas, they would have to execute Powers of Attorney ("POAs") necessary for issuance of the new Visas.

151.    GLS told the linguists that those who refused to sign POAs would be "put on the street."

152.    When the Resident-Visa Relators were brought by bus to the Ministry, GLS instructed them not to speak to anyone (including each other) and not to identify themselves to anyone at the Ministry. They were further instructed to enter a room, one at a time, in which a 2-page POA for each of them lay on a table. They were told to sign it and leave the room. They were not allowed to read or ask questions about it. They were then ushered out of the building and onto a bus to return them to the U.S. bases.

153.    While GLS had advised Resident Visa Relators that the POA simply authorized the person vested with the POA to obtain a new Resident Visa for the grantor, in fact, it gave broad authority to GLS to act on behalf of the grantor.

154. The Resident Visa Relators later learned that once GLS had the signed POAs in hand, GLS instructed its counsel to file civil complaints in their names against Alshora, alleging that Alshora had violated Kuwait's Private Sector Labor Law by failing, *inter alia*, to pay wages due to them.

155. Resident Visa Relators were never informed that the POAs they had executed would be used to file lawsuits against Alshora, and such lawsuits were filed without their knowledge or consent.

156. On or about July 31, 2013, in response to the complaints filed on behalf of the Resident Visa Relators, Alshora filed counterclaims seeking damages based on the allegedly frivolous filing of the Resident Visa Relators' complaints.

157. The Resident Visa Relators first learned of their lawsuits against Alshora, and Alshora's counterclaims, when Alshora President and Owner, Reham Al-Jelewi, visited Camp Arifjan, where many of the Resident Visa Relators were confined. GLS has provided Resident Visa Relators with no information concerning the status of these cases.

158. With respect to the pending criminal charges of "absconding," GLS sought to coerce the Resident Visa Relators into signing false confessions to criminal acts they had not committed – namely, violation of Kuwaiti immigration and labor law, and absconding from their jobs – in order to be allowed to leave the country. GLS succeeded with all but four. The four who refused to sign were subject to indefinite detention.

159. The Resident Visa Relators who signed false confessions were then expelled from Kuwait, banned from re-entry into Kuwait and banished from entry into any member nation of the Gulf Cooperation Council. The four Resident Visa Relators who refused to sign false

confessions were detained for many months until finally they were released and allowed to return to the U.S.

## VIII. GLS'S VIOLATION OF NISPOM REGULATIONS

160. The U.S prohibits a contractor from performing a government contract that is intelligence-related if that contractor is under foreign influence or control. This restriction is explicit in Contract 1 at Section H.1, "Security Requirement," which states that GLS "shall maintain and administer a security program in accordance with the National Industrial Security Program Operations Manual (NISPOM) DoD 5220.22M." As provided in DoD 5220.22M, National Industrial Security Program, Operating Manual of February 28, 2006:

> A U.S. company is considered under foreign ownership, control or influence ("FOCI") whenever a foreign interest has the power, direct or indirect, whether or not exercised, and whether or not exercisable . . . by contractual arrangements or other means, to direct or decide matters affecting the management or operations of that company in a manner which . . . may adversely affect the performance of classified contracts. . . .
>
>        \*   \*   \*
>
> A company is required to complete a Certificate Pertaining to Foreign Interests . . . or when significant changes occur to information previously submitted.
>
> *See* http://www.dtic.mil/whs/directives/corres/pdf/522022m.pdf.

161. This restriction was in place for the duration of Contract 1 and is an on-going certification requirement regarding the lack of foreign interference.

162. NISPOM regulations required GLS to keep the U.S. informed of any circumstance that could cause foreign interference with performance of Contract 1.

163. GLS colluded with Alshora to misrepresent to Kuwaiti authorities that Relators were Alshora's employees. This false statement exposed Contract 1 to foreign influence and control. Indeed, actual interference occurred on February 19, 2013, when, based on Alshora's

accusation that Relators ("its" employees) had engaged in criminal conduct, the State of Kuwait issued its crippling "stop-work" order. The U.S. was damaged by GLS's false claim that it was not under the influence or control of a foreign entity when Alshora used its authority as Relators' "employer" to petition for and receive an order from the State of Kuwait for Relators to stop working.

## IX. GLS'S MISREPRESENTATIONS TO THE COMMISSION ON WARTIME CONTRACTING REGARDING PERFORMANCE OF CONTRACT 1

164. In response to allegations that billions of dollars had been misappropriated by U.S. government contractors in Iraq and Afghanistan, Congress, in Section 841 of the National Defense Authorization Act for Fiscal Year 2008, established the Commission on Wartime Contracting in Iraq and Afghanistan ("the Commission"). The Commission was charged to investigate fraud, waste, abuse and mismanagement of wartime government contracts.

165. On August 12, 2009, the Commission held a hearing on linguist support services provided by GLS. The Commission was focused on the high cost of the GLS contract. The Commission called John Houck, President of GLS, among other private sector witnesses, to testify under oath. The Commission also called John Isgrigg, Deputy Director of Contracting at INSCOM; Forrest Evans, Deputy Program Manager and Contracting Officer Representative at INSCOM; and April Stephenson, Director of the Defense Contract Audit Agency, to testify.

166. In his testimony, Houck, on behalf of GLS, made false statements in order to mislead the Commission and avoid further investigation of GLS and its relationship to the Small Business Defendants. GLS's goal in providing this false testimony was to ensure that the U.S. did not discover that GLS was in material breach of Contract 1, and that the U.S. would continue to make payments to GLS.

167.    Houck gave false testimony, and made false claims, on behalf of GLS, with respect to its relationship with the Small Business Defendants and the linguists, including Relators.   In his testimony, Houck created the erroneous impression that GLS was "leasing" linguists *from* the Small Business Defendants and then transferring funds to them so that they, in turn, could pay the linguists whom GLS had leased. The misrepresentation was captured in an exchange between Commissioner Gustitus and Houck:

> Commissioner Gustitus.  Okay.  My sense of this contract, by the way, is that in essence GLS is basically leasing the linguists **from** these subcontractors.  You are doing all of the work in identifying them, training them, managing – you said support but essentially you are doing all the work.
>
> Mr. Houck.  Yes, ma'am.
>
> Commissioner Gustitus.  And these subcontractors are essentially paying them.  And the essence it seems to me if you really cut through all of this is that you need a lot of linguists, they had the linguists, and you need to lease them to be able to perform under your contract.  Are they GLS employees or are they subcontractor employees?
>
> Mr. Houck.  Other than the 700-plus linguists that are working for L-3 or other subcontractors, they would be GLS employees.  Approximately 60 percent of the linguists that we provide are provided for our subcontractors and they are employees of those subcontractors.
>
> Commissioner Gustitus.  I thought you just said that they were employees of GLS but for L-3's linguists.  Did I miss something?
>
> Mr. Houck.  I am sure I misspoke, ma'am.  Sixty percent of the linguists we provide are provided through the subcontractors and they are employees of those subcontractors.  The other 40 percent are GLS employees.

(Emphasis added).

168.    These statements were false, and Mr. Houck knew them to be false when he made them.  All of the linguists credited as being provided through the Small Business Defendants were, in fact, GLS employees.

169.    Commissioner Green asked Houck, "For the other subcontractors, are there any functions – any functions that are subcontracted – further subcontracted?"  Houck responded, "No sir."  Commissioner Green asked again, "Okay.  Every one of these subcontractors is performing all of the functions that they have been responsible for performing?"  Houck responded, "Yes, sir.  To the best of my knowledge that is true."

170.    As is more fully described below, this statement was false and misleading for failure to tell the whole truth, and disclose that the subcontractors were not performing any meaningful functions to field or pay linguists, and that GLS itself was performing these functions.  Moreover, Houck failed to disclose that GLS had further subcontracted – to Alshora – many of the tasks related to Relators' work in Kuwait, including faux payroll functions and representations to Kuwaiti authorities regarding the employer affiliation of Relators.

171.    Later in the hearings, Commissioner Green returned to this issue to provide GLS with an additional opportunity to disclose fully any further payroll or human resource subcontracting beyond that included in its Contract 1 subcontracting plan.  He stated, "I do not want to beat a dead horse, Mr. Houck, but you just made a comment about the difficulty of a small company, a sub-contractor, managing the HR stuff I think was your term.  I just want to make sure that we do not have additional subcontractors, or if we do they are identified.  Because I, you know, having worked with a lot of small businesses, payroll is complicated, for example.  Many of these other administrative HR functions are complicated.  And many small businesses – and maybe yours are all exceptions – many small business [*sic*] do not have the technical

expertise to do those mechanical things."  Houck repeated his prior false statement by responding: "If one of our small businesses or any of our companies' subcontractors are using a third tier company to process payroll or anything else, I am not aware of it, sir."  This statement was false and Houck knew it to be false when he made it.

172.    During its testimony, INSCOM revealed that GLS had claimed that it had subcontracted 92% of all task orders under Contract 1.

173.    That claim was false, as all of the linguists and translators, at all times, were employed by GLS as alleged above.  Therefore, none of the task orders had been subcontracted.

174.    Elsewhere in its testimony, INSCOM expressed its ignorance as to why, when the SBA obligations under Contract 1 required 37.5% small business participation and GLS's bid-protest settlement with the prior contractor extracted an additional 12.5% for subcontracting, GLS had directed "approximately 92% of all contract dollars" to the subcontractors:

> Commissioner Henke. I would think of it like this. . . If the payroll was $100, [L-3] would add to that . . . 9.5 percent . . . as an award-fee, hand that number to [GLS], who takes the new number, adds [GLS's] indirect of 15.6 percent, and adds possibly a 7.5 percent fee, which includes the fee on the fee. Right?

> Mr. Houck. The concept is correct.

175.    In fact, upon information and belief, each time GLS purported to subcontract needed services to a Small Business Defendant, it would earn a fee, independent of GLS's fee, and then GLS would earn an additional fee upon this fee for the "cost" of subcontracting out this work (the "fee on fee").  Thus, GLS was incentivized to appear to be subcontracting services to the Small Business Defendants.

176. The Commission struggled to understand what actual services GLS's subcontractors were providing under Contract 1. Commissioner Henke reflected his perplexity in a colloquy with Director of the Defense Contract Audit Agency April Stephenson:

> Commissioner Henke. Ms. Stephenson, your testimony [is that] . . . GLS awarded $2.9 billion to 18 subs. If I am looking at the math right, about $2.8 billion was just payment for linguists. It was not medical exams or –
> Ms. Stephenson. Right.
> Commissioner Henke. -- testing or recruiting or –
> Ms. Stephenson. **It was the payroll function.** It was to take –
> Commissioner Henke. A linguists, right.
> Ms. Stephenson. Take what GLS said, these people need to be paid, and **then they turn around and pay them**.
> Commissioner Henke. Right. So, $2.8 billion just to move payroll around. That is 18 subcontractors, but 12 subcontractors do not hire, manage, or interact with the linguists other than to pay the amount stipulated by the prime contractor.
> Ms. Stephenson. That is correct.
>                       *   *   *
> Commissioner Henke. But, to me, if I am a linguist forward deployed, let us say I am an employee of L-3, I have a legal relationship with them, but GLS tells L-3 pay Bob his payroll, and then what happened? Who is moving the money to who?
> Ms. Stephenson. **GLS moves it to the subcontractor, who then moves it to the linguists**.

(Emphasis added).

177. GLS's false testimony to the Commission and to the Defense Auditing Agency was intended to, and did, thwart discovery by the U.S. of GLS's material breaches of Contract 1 and false claims thereunder.

## X.  DEFENDANTS' PERFORMANCE OF CONTRACT 2

178. GLS falsely claimed to the U.S. that GLS was qualified to submit a proposal for Contract 2 based, *inter alia*, on GLS's successful and legally-compliant performance of Contract 1.

179.    Had GLS disclosed its false claims, illegal conduct and breaches of contract under Contract 1, GLS would not have been qualified to submit a proposal for Contract 2.

180.    GLS was awarded Contract 2 in part on the basis of its representations that it had successfully performed Contract 1 in accordance with its requirements.

## XI.    WRONGDOING EXPERIENCED BY INDIVIDUAL RELATORS

181.    As discussed above, there are two categories of Relators: Resident Visa Relators and Non-Resident Visa Relators.

182.    Except where specifically indicated *infra*, all Resident Visa Relators: (1) were transported to Kuwait to provide linguist services for GLS to help satisfy its obligations under Contract 1, only without the Resident Visas necessary to work there legally; (2) worked illegally in Kuwait; (3) were misrepresented to Kuwaiti authorities as Alshora employees; (4) were misrepresented to Kuwaiti authorities as earning only 250KD per month; (5) were not eligible for the issuance of driver's licenses, nor were they permitted to bring family members into Kuwait, due to their misreported low 250KD salaries; (6) were reported to Kuwaiti authorities as having absconded from Alshora's workplace when they failed to appear at Alshora's office for cancellation of the Resident Visas issued in their names through Alshora; (7) were victimized by GLS when it misrepresented the purpose for the POAs that GLS insisted they sign; (8) were further victimized by GLS when it would not allow them to read the language of the referenced POAs; (9) were further victimized by GLS when it instructed its lawyers to file civil actions in their names against Alshora without their knowledge or informed consent; (10) were further victimized by GLS when Alshora filed counterclaims against them in response to their lawsuits; (11) were subject to a travel ban that prevented them from leaving Kuwait for months; (12) were subjects of a nation-wide manhunt for their apprehension that included advertisements in

Kuwaiti newspapers warning citizens not to provide aid or comfort to them; (13) were confined to Camps Arifjan and Buehring; (14) were subject to arrest if they strayed from those camps; (15) were subjected to inhumane and unconscionable treatment consisting of confinement in over-crowded, unsanitary, rodent-, lice-, mite-, and bed-bug infested living quarters that exposed them to, and caused them to contract, communicable illnesses and infection; (16) were denied medical care for illnesses and injuries caused by the overcrowded, unsanitary, and dangerous living conditions; (17) were subjected to emotional distress due to the length of their detention and their living conditions; (18) did not want to work under the inhumane and arduous conditions to which they were subjected by GLS, but reasonably believed that they had no choice, due to GLS's absolute control over their lives, as manifested, *inter alia*, by GLS's confiscation of their passports (which prevented their mobility while in-country, and deprived them of the ability to leave the country at will), GLS's denial of access to medical care, GLS's refusal to allow one Relator to quit, one member of GLS management telling a Relator that the linguists were "slaves," and GLS's refusal to allow one Relator to leave Kuwait even after she had been fired; (19) were subjected to legal proceedings without adequate legal representation; (20) were coerced by GLS into executing false confessions; (21) based on their false confessions, were convicted of violations of Kuwaiti laws and sentenced to probation and fines; (22) were expelled from Kuwait; (23) were barred from reentering the Kuwait; and (24) were blacklisted from entering any member country of the Gulf Cooperation Council.

183.    Except where specifically indicated *infra*, Non-Resident Visa Relators: (1) were transported to Kuwait to provide linguist services for GLS to help satisfy its obligations under Contract 1, only without the Resident Visa necessary to work there legally; (2) worked illegally in Kuwait; (3) were reported to Kuwaiti authorities as working illegally in Kuwait without

having obtained Resident Visas; (4) were subject to a travel ban that prevented them from leaving Kuwait for months; (5) were the subject of a nation-wide manhunt for their apprehension – a manhunt that included advertisements in Kuwaiti newspapers warning citizens of Kuwait not to provide aid or comfort to them; (6) were subject to arrest if they strayed from U.S. camps Buehring and Arifjan;  (7) were confined to those camps; (8) were subjected to inhumane and unconscionable treatment in that the they were confined to over-crowded, unsanitary, rodent-, lice-, mite-, and bed-bug infested living quarters that exposed them to, and caused them to contract, communicable illnesses and infection; (9) were denied medical care for illnesses and injuries suffered from the overcrowded, unsanitary, and dangerous living conditions; (10) were subjected to emotional distress from the length of their detention and their living conditions; (11) did not want to work under the inhumane and arduous conditions to which they were subjected by GLS, but reasonably believed that they had no choice, due to GLS's absolute control over their lives, as manifested, *inter alia*, by GLS's confiscation of their passports (which prevented their mobility while in-country, and deprived them of the ability to leave the country at will), GLS's denial of access to medical care, GLS's refusal to allow one Relator to quit, one member of GLS management telling a Relator that the linguists were "slaves," and GLS's refusal to allow one Relator to leave Kuwait even after she had been fired; and (12) were forced to leave Kuwait under the control of GLS, and be placed in the status of "leave without pay," while they awaited legally-issued Resident Visas that would authorize their return to Kuwait to work legally.

184.    There were three locations where Relators were housed – all of them unconscionable and in violation of Relators' rights.

185.    **Camp Ali Al-Salem** is located at 29°20′48″N 047°31′14″E, a fifty minute drive west from Kuwait City.  It was a transit camp for personnel on flights entering and leaving

Kuwait. The tents were designed for very short term shelter – for those awaiting transport out of the base. Because these tents hosted transients, the lights in these shelters were kept on twenty-four hours a day, seven days a week. Travelers would enter these facilities at all times of day and night making restful sleep difficult (or for some Relators impossible). The tents were not adequately equipped to withstand sandstorms and lacked sufficient air-conditioning. While such inconveniences were burdensome to transients, the constant exposure to heat and dust caused respiratory ailments and other health complications for Relators. On information and belief, GLS had Relators stay for long periods at Camp Ali Al-Salem because GLS did not have to pay for the privilege (much to the annoyance of U.S. military officers who openly questioned Relators about the length of their stay and the apparent "free-loading" of GLS in military facilities). Relators' experience during their lengthy stays at Camp Ali Al-Salem stood in stark contrast with the experience of other private contractors, who were moved off Camp Ali Al-Salem quickly by their employers and placed in private housing, hotels, and other non-military accommodations. GLS's officers and managers, for their part, lived in luxury seaside apartments just outside of Kuwait City.

186.    **Camp Buehring** is located at 29.6963° N, 47.4248° E, or a 1.5 hour drive north by west from Kuwait City. It is surrounded by weapons-proving grounds. Camp Buehring is a large base, and home to many military personnel and private contractors. Private contractors either lived off base or in structures built on the base by their employers. This was not true, however, for GLS personnel. On information and belief, GLS was unwilling to spend money to either house its workforce off base (and could not because so many of their personnel were not legally present in Kuwait) or provide its own housing on base. Instead, GLS forced Relators into two large tents that were quickly overcrowded. By Relators' estimates (and based on their

combat experience in Iraq), more than twice as many personnel were present in these tents than they were designed to hold. The overcrowded conditions caused Relators to be subjected to living conditions that they never experienced in the Iraq combat zone. Each linguist had only 10' x 6' of personal space. There was no privacy. The close quarters encouraged the transmission of viral and bacterial infections. The crowded conditions overwhelmed the tent's air-conditioning and the tents were hot. The close quarter living also encouraged the infestation of rodents and pests, including rats, bed-bugs, lice, and mites. For all the ailments suffered by Relators, there was no medical assistance. As civilians, Relators could not be treated by U.S. Army medics unless their conditions were life threatening. Thus, and is described in detail *infra*, broken legs, broken spines, skin rashes, respiratory ailments, and bacterial infections went untreated. The close-quarter living caused conflict and physical confrontation among linguists. These conditions – combined with the inability to leave Camp Buehring or Kuwait – caused extreme emotional distress among the linguists there, including all Relators.

187. **Camp Arifjan** is located south of Kuwait City. Generally better equipped than Camp Buehring, Relators originally stationed at Arifjan initially had use of well-accoutered facilities intended for use by U.S. Army officers. Again, GLS relied on the largesse of the U.S. military and, on information and belief, did not have to pay to house its employees in these facilities. This contrasted markedly with the experiences of other private contractors who either lived off the base in private housing or in facilities built or brought onto the base by their employers. On or about May 16, 2013, the linguists were forced out of their abodes and into an open-bay precast building ("PCB"). Though the PCB had exterior walls (distinguishing it from Camp Buehring), it was prone to flooding. Several inches of rain/sewer/toxic water inundated Relators' crowded living quarters, soaking their bedding, clothing, and personal possessions.

Relators living in the open bay were left hanging sheets between their bunk beds to create some semblance of privacy. Air conditioning and heating infrastructure could not keep up with the overcrowded conditions and interior temperatures frequently exceeded 100 degrees F (with exterior temperatures exceeding 120 degrees Fahrenheit. The overcrowded conditions, the flooded conditions, and the heat contributed to rodent-, bedbug-, lice- and mite-infestation causing contagious skin conditions, and disease. Relators experienced deprivation on the battlefield of Iraq; however, nothing compared to the decrepit, overcrowded, open bay housing of Arifjan.

188. Resident Visa Relator **Ramzi Zinnekah** was recruited by GLS shortly after returning from active duty as a member of the U.S. Navy's Riverine Force operating in the delta region of Southern Iraq. Throughout the recruitment process he interacted only with GLS and never interacted with, nor did he ever hear of, a company called Shee Atika.

189. On March 23, 2012, Zinnekah emailed GLS to ask how he could obtain his Kuwaiti visa. GLS assured him that GLS would obtain it.

190. On May 10, 2012, at his GLS orientation, GLS instructed Zinnekah to sign a contract identifying Shee Atika as his employer.

191. After he arrived in Kuwait, GLS took Zinnekah's passport, claiming that it was needed in order to obtain his Resident Visa.

192. Thereafter, GLS was not responsive to Zinnekah's repeated inquiries as to the status of his visa and whereabouts of his passport.

193. On June 12, 2012, GLS demanded that Zinnekah sign a second employment contract, identifying GLS as his employer.

194.    On June 25, 2012, after being without his passport for five weeks, Zinnekah emailed GLS: "I was wondering if there was any update on the commercial visa or residency timeline.  I was also curious if the commercial visa number will be the same one that ends up on the residency and whether or not this number is known to you yet.  Any information would be appreciated granted it is available."

195.    GLS Manager Sidmed responded, "Ramzi- We have you on a commercial visa, but you as an employee have no part in the visa process or renewals.  Everything will be done backstage and will be taken care of by our Kuwaiti sponsor."

196.    In August 2012, GLS demanded that Zinnekah execute yet a third employment contract – this one with a company called Engility (formerly known as Titan [the incumbent replaced by GLS that filed a bid protest that was withdrawn only after GLS agreed to subcontract significant work to it], which changed its name to "L-3 Communications" prior to spinning off Engility as a separate company).

197.    Also in August 2012, GLS, still holding Zinnekah's passport, asked him to sign a document that GLS represented was necessary for him to obtain his Resident Visa.  The document was in Arabic, and no translation was provided, nor was a copy given to Zinnekah, although he was later able to obtain one.

198.    The document turned out to be an employment contract, his fourth, which purported to make him an employee of Alshora.  Translated from Arabic, the contract stated: "The [Alshora] shall hereby individually appoint the worker for working with it as (Light Normal Worker) or as any other position which may be assigned by the [Alshora] from time to time in any place in or outside Kuwait where worker's services are required. . . . The worker shall

get for his work mentioned in Clause No. 1 a monthly salary of 250 KD [and] [t]he worker shall open an account in the bank which shall be chosen by the company."

199. Zinnekah never provided the described services to Alshora. He confronted GLS manager Sidmed about this document, asking him, "Who is Alshora and why did you have me sign a document that suggests I am an Alshora employee?"

200. Sidmed refused to answer his question or explain the relationship between Alshora and GLS.

201. GLS held Zinnekah's passport for approximately six months, during which time he could not leave Kuwait. Further, for much of that time he was not permitted to leave Camp Buehring, the U.S. Army installation in Kuwait where Zinnekah was based.

202. In February 2013, GLS demanded that Zinnekah sign yet a fifth employment contract – this one again with GLS.

203. GLS never provided Zinnekah a work permit identifying him as an employee of GLS, nor did he ever receive a work permit identifying him as an employee of Shee Atika or Engility.

204. Uncertain about his legal status in Kuwait, Zinnekah emailed GLS on April 22, 2013: "What is my situation as far as the Kuwaiti Government and Ministry of Labor? Am I in good legal standing to work in this country (Kuwait) or am I currently working in violation of Kuwaiti law and further jeopardizing myself legally?"

205. By responsive email the same day, GLS advised: "You are legal to work." This statement was false. Zinnekah was not authorized to work for GLS in Kuwait. To the contrary, as he has subsequently learned, for the duration of his tour in Kuwait he had only a non-resident visa – which did not authorize employment in Kuwait.

206.     Moreover, the Kuwaiti government authorizations he received identified him as an employee of Alshora.  However, this was never true.

207.     GLS knew, but did not disclose to Zinnekah, that Alshora was actively trying to cancel any and all association with GLS including, but not limited to, Alshora's representation that Zinnekah was its employee.

208.     GLS's failure to inform Zinnekah about the legal proceedings initiated against him led to his arrest, imprisonment, and expulsion from Kuwait.

209.     After a tour of duty working as a linguist for another company in Iraq from 2006-2008, Resident Visa Relator **Maher Al-Masri** was aggressively recruited by GLS, and returned to the Mideast war zone under GLS auspices to work as a linguist in late 2009.

210.     GLS required, as a condition of employment, that he sign an employment contract with Shee Atika. But throughout his tour in the Mideast, Al-Masri had no interaction with anyone at Shee Atika.

211.     Al-Masri returned to the U.S. on November 25, 2010, when the military unit to which he had been assigned completed its tour of duty.

212.     GLS thereupon aggressively recruited him to return to service.

213.     After being assured that he could move his family to Kuwait and that his daughter could attend the American University there, Al-Masri agreed to return to work for GLS.  When he returned to Kuwait, it was with the express understanding that he would be employed by GLS.

214.     Yet, after reprocessing through GLS's orientation, GLS required that Al-Masri execute a second employment agreement with Shee Atika.

215.     GLS transported Al-Masri to Camp Ali Al-Salem on or about May 5, 2012.  The next day, his passport was stamped with a Kuwait tourist visa.

216.    After he obtained his tourist visa, GLS took Al-Masri's passport from him. Two days later, GLS brought Al-Masri to Camp Buehring, returning his passport in the process to facilitate entry to the base.   After Al-Masri cleared Camp Buehring security, GLS took his passport away from him again.

217.    Less than two months later, GLS required that he execute an employment contract with GLS.  Approximately two months thereafter, a fourth employment contract was presented to Al-Masri for his signature – this time with Engility.

218.    Only four months later, GLS demanded that Al-Masri sign a fifth employment contract, this time identifying him as an employee of GLS.

219.    GLS did not return Al-Masri's passport to him until September, four months after it had been taken from him.  When he received it back, he saw that a non-resident visa, not a Resident Visa, had been stamped into it.

220.    Using the excuse that GLS was still attempting to secure a Resident Visa for him, GLS again took Al-Masri's passport from him.

221.    In October 2012, Al-Masri's passport was returned to him with the requisite Resident Visa.  On May 30, 2013, Al-Masri (accompanied by Zinnekah) ventured into the Al-Faihal section of Kuwait City. Two Kuwaiti police officers approached them and demanded identification documents.  The officers checked their identities against a national data base and, determining that arrest warrants had been issued for both of them, placed them under arrest.

222.    Al-Masri and Zinnekah were held in three Kuwaiti jails for seven days.  At times, they shared their jail cell with forty-five other men.

223.     On June 5, 2013, Al-Masri and Zinnekah were taken in handcuffs to the deportation center.  There, they were verbally abused and humiliated by Kuwait prison authorities who – after mocking their U.S. citizenship – threw their U.S. passports in their faces.

224.     At the deportation center, Al-Masri and Zinnekah were held in a large cell with over 100 other detainees in it.

225.     Finally, at 10:00 p.m. on June 6, 2013, Al-Masri and Zinnekah, unwashed and unshaven after seven days in captivity, were taken in handcuffs to the Kuwait International Airport and expelled from Kuwait.

226.     Zinnekah and Al-Masri have been blacklisted by Kuwait and are subject to arrest if they return to or transit through that country.  They are also banned from traveling to any Gulf Cooperation Council country.

227.     Resident Visa Relator **Majdi Abulghani** served as a linguist for the U.S. in Iraq. While returning to the U.S. through Camp Ali Al-Salem in Kuwait, he was approached by GLS about continuing his service as a linguist in Kuwait.  Abdulghani agreed.

228.     Although he was recruited by GLS and attended orientation at the GLS facility in Virginia, GLS required that Abdulghani execute a contract stating that he was an employee of TigerSwan.

229.     When Abdulghani arrived in Kuwait, GLS took his passport from him. Except to facilitate his access to U.S. Camp Buehring (and providing him his passport so that he could take emergency leave to visit his ailing mother in Jordan, *see infra*), GLS held Abdulghani's passport almost the entire time he was in Kuwait.

230.     In April 2011, GLS demanded that Abdulghani sign a contract identifying him as an employee of Shee Atika.

231.    GLS placed a third contract before Abdulghani on June 13, 2012, this time identifying him as an employee of GLS.

232.    Then, barely two months later, GLS demanded that Abdulghani sign a fourth contract, this time identifying him as an employee of Engility.

233.    Abdulghani was issued a Resident Visa on September 30, 2012.

234.    On February 1, 2013, a fifth contract was placed before Abdulghani – this one identifying him, once again, as an employee of GLS.

235.    On or about May 6, 2013, Abdulghani learned that his mother, who lived in Jordan, was ill.  He requested emergency leave from GLS, and that his passport be returned to him, so that he could visit his mother.

236.    Abdulghani interacted extensively with GLS management during this period. GLS did not disclose to Abdulghani that an arrest warrant had been issued by Kuwait based on Alshora's allegation that he had absconded from its workplace.

237.    When Abdulghani arrived at the airport in Kuwait City and checked into immigration control, he was arrested. He was initially taken to a holding cell at a local police station, and then transported to a large prison that with cells that housed between 50-60 other criminal suspects apiece.

238.    Abdulghani was interrogated by Kuwaiti law enforcement personnel who repeatedly asked such questions as "Why did you abscond from the workplace of your employer Alshora?" and "Why have you not reported to Alshora for thirty days?" Abdulghani was told that his employer Alshora had "reported you missing."

239.    Abdulghani had never worked for Alshora.

240.    He was transferred to a third prison that held thousands of people.

241.    After three days, Kuwaiti law enforcement authorities drove him to the airport and expelled him from the country.  He was provided a ticket and placed on a Lufthansa flight to the U.S., where he arrived on May 17, 2013. On information and belief, Abdulghani is banned from traveling to or transiting through Kuwait or any country that is a part of the Gulf Cooperation Council.

242.    Resident Visa Relators **Sadiq Al-Saidi** and his brother of **Haidar Al-Saidi** went to work as linguists in Iraq at the same time, and for the same company: Titan (which became L-3 Communications, which, in turn, became Engilty).  When GLS took over the linguists' contract from Titan in 2008, Sadiq and Haidar Al-Saidi entered into a contract with GLS.

243.    In 2009, GLS required Haidar and Sadiq Al-Saidi to sign a contract with a company they had never heard of, Shee Atika, or face immediate termination.

244.    At the close of 2011, Sadiq and Haidar Al-Saidi arrived in Kuwait expecting to transit back to the U.S.  However, GLS approached the brothers and offered them short-term assignment as linguists in Kuwait.  The Al-Saidi brothers were told that, because of the nature of life in Kuwait, they would consider their assignment in Kuwait to be "a vacation."

245.    Sadiq and Haidar Al-Saidi accepted the offer, whereupon GLS took their passports, claiming that it needed them in order to process their Kuwait immigration paperwork.

246.    Sadiq and Haidar Al-Saidi were held at Camp Ali Al-Salem for another month.

247.    GLS required Sadiq and Haidar Al-Saidi to sign in at the GLS office twice a day to prove that they were still at Camp Ali Al-Salem.

248.    In December 2011, GLS drove Sadiq and Haidar Al-Saidi to Camp Buehring.  At the entrance to the camp, GLS returned their passports to them so that they could clear gate

security.  However, immediately after clearing security, GLS took their passports from them once again.

249.    GLS did not return Sadiq or Haidar Al-Saidi's passports to them until November 13, 2013, when they were finally released from Kuwait, almost two years after GLS had taken their passports from them.

250.    When their passports were returned, they saw that Resident Visas had been applied.  However, both Sadiq and Haidar Al-Saidi now understand that their Resident Visas falsely identified them as employees of Alshora.

251.    Later, when they learned that GLS had abused the POA to file a lawsuit in their name against Alshora, Haidar and Sadiq Al-Saidi cancelled their POAs.  However, GLS would not pay the expense of a private Kuwait attorney for them; thus, they lacked the benefit of legal counsel to guide them in defending against Alshora's counterclaims or the criminal charges that had been lodged against them.

252.    In a "deal" arranged by GLS's Kuwaiti attorney, the Al-Saidis and the other Resident Visa Relators would be allowed to return home to the U.S. upon execution of false confessions to commission of immigration crimes while in Kuwait.

253.    The Al-Saidi brothers, **Sinan Marrogy**, and **Kidar Al-Safar** refused to sign these confessions.

254.    In consequence, these four Resident Visa Relators were held almost an additional month in Kuwait (though at the time they made this fateful decision, they thought they might be held indefinitely).

255.    **Sinan Marrogy** was recruited, trained, and deployed as a linguist by GLS. However, he was required to sign contracts that identified Shee Atika as his employer (January

2012 through August 2012), Engility (September 2012 through February 2013) and finally GLS (February 2013 through November 2013).

256.     When he learned that GLS had abused the POA it had coerced him into signing, to file a lawsuit in his name against Alshora, Marrogy cancelled his POA.  However, GLS would not pay the expense of a private Kuwaiti attorney for him; thus, he lacked the benefit of legal counsel to guide him in defending against Alshora's counterclaims or the criminal charges that had been lodged against him.

257.     In addition, Marrogy was subject to the demand that he sign a confession of criminal conduct.  Like Sadiq and Haidar Al-Saidi, Marrogy refused to sign this confession because he had not engaged in criminal conduct.

258.     In consequence, Marrogy remained detained in abominable living conditions at Camp Buehring – unable to leave the camp or to leave Kuwait – until late November 2013.

259.     Resident Visa Relator **Neil Magi** had been working in Iraq for incumbent Titan Corporation providing linguist services to the U.S. military, when GLS became the successor contractor.

260.     On February 19, 2010, GLS called Magi to come to a GLS field office in Iraq, where a GLS manager told him, "You are going to be a Thomas Wright employee," and gave him a Wright contract to sign.

261.     When Magi asked what Wright was, and why he was being told to sign an employment contract with it, the GLS manager said that Wright was a subcontractor to GLS and that he would be paid through Wright, but that nothing at all would change concerning his employment.  Magi never met anyone from Wright.

262.     On May 13, 2011, the process was repeated when GLS demanded that Magi sign an employment contract with Shee Atika.  Magi never met anyone who worked for Shee Atika.

263.     Magi arrived in Kuwait from Iraq on a U.S. military flight on November 30, 2011, expecting to catch a "freedom flight" back to the U.S.

264.     At Camp Ali Al-Salem, GLS asked Magi if he was willing to stay in Kuwait and continue to work as a linguist for the U.S. military.  GLS told him that he would lead a "good life and a comfortable life" in Kuwait.  On these representations, Magi said "Yes."

265.     GLS then confiscated his passport and held him at Camp Ali Al-Salem for over a month.

266.     As previously described, the conditions were unfit for such a lengthy stay.

267.     After a month, GLS transported Magi to Camp Buehring.  GLS returned Magi's passport to him so that he could clear security at Camp Buehring.  After Magi cleared security at Camp Buehring, GLS took his passport from him again.

268.     On June 12, 2012, GLS directed Magi to sign yet another contract, one that identified him as a GLS employee.

269.     After he worked (unknowingly) for six months illegally in Kuwait, Magi received a Resident Visa.  Magi noted that his work authorization identified him as a "light manual laborer" working for Alshora. Magi never worked as a light manual laborer and never worked for Alshora.  Magi was at all times an employee of GLS.

270.     Magi never received a Kuwaiti work permit or other document from the Kuwaiti government identifying him as an employee of GLS or, for that matter Shee Atika or Wright.

271.     When Magi asked GLS manager Sidmed why his work permit identified him as an employee of Alshora, Magi was told to "leave such matters to GLS."

272.    GLS never informed Magi that Alshora had asked GLS to send him and other linguists (who had been represented to Kuwaiti authorities as Alshora's employees) to Alshora's office so that their Resident Visas could be cancelled. As a consequence, and as with the other Resident Visa Relators, Magi was reported to the Kuwaiti authorities as having "absconded" from Alshora's work site, and he was one of the many linguists subject to arrest.  Held in Kuwait against his will and without his passport, Magi was finally allowed to leave Kuwait on November 3, 2013.

273.    Resident Visa Relator **Faycal Maroufi** was recruited, trained, and deployed as a linguist by GLS.  However, he was required to sign contracts that identified Shee Atika as his employer (April 2009 through June 2012), GLS as his employer (June 2012 through August 2012), Engility as his employer (August 2012 through January 2013) and, again, GLS as his employer (February 2013).

274.    Relator Maroufi suffered weight loss, insomnia, depression, skin damage from bed-bugs and mites, a lymph infection due to unsanitary conditions at Camp Buehring, and, on information and belief, is subject to a travel ban to Kuwait and the other members of the Gulf Cooperation Council, and still subject to legal claims made by Alshora.

275.    As Resident Visa Relator Maroufi has described the process of executing the POAs, "GLS took us from Camp Buehring to the court house [Ministry of Justice] where GLS lawyer was there waiting for us.  We stood there for [a] few hours, then they took us upstairs and we started getting shoved and pushed and were treated inhumanely.  We didn't get the chance to read what we signed, we were ordered to sign, [yet] we didn't have a clue."

276.    Later, when he found out that GLS had abused the POA to file a lawsuit in his name against Alshora, Resident Visa Relator Maroufi cancelled his POA.  However, GLS would

not pay the expense of a private Kuwait attorney for Resident Visa Relator Maroufi; thus, he lacked the benefit of legal counsel to guide him in the defense of Alshora's counterclaims or in the defense of the criminal charges that had been lodged against him.

277. **Kidar Mohammad Al-Safar** was recruited by GLS in 2009, but was instructed to sign an employment contract with Engility. The following day, however, GLS manager Sidmed called him and advised that he was not transferring to Engility, and that he would be staying with GLS.

278. In April 2009, Al-Safar signed a contract with GLS. Then, in April 2010, while working in Basara, Iraq, Al-Safar was instructed by his GLS manager to report to the GLS office. When he arrived, the GLS manager told him, "You are going to be transferred to Thomas Wright. Yet, don't worry nothing is going to change – everything will be the same – except you will be working for Thomas Wright." Al-Safar thereupon signed a Wright employment contract provided by GLS.

279. In May 2011, GLS manager Sidmed called Al-Safar into the office and told him that he would be switched to Shee Atika. Again, however, he was told "nothing is going to change." In reliance on that representation, Al-Safar signed the Shee Atika employment contract.

280. Al-Safar discovered one abuse by GLS of Kuwaiti immigration law only after he returned to the U.S. Specifically, he discovered that his passport, which GLS had confiscated, was stamped to indicate that he had left Kuwait for Bahrain on May 25, 2012, and then was stamped by Kuwaiti authorities to indicate that he had reentered the country on May 26, 2012. Such a return and reentry is a triggering event for the issuance of a new non-resident visa.

281. However, Relator Al-Safar made no such trip and that the immigration stamps, entered into his passport during a time when GLS had confiscated and concealed it from him, were fraudulent.

282. When Resident Visa Relator Al-Safar discovered the betrayal of GLS accomplished by the POA deception, he cancelled his POA. However, GLS would not pay the expense of a private Kuwait attorney for Resident Visa Relator Al-Safar; thus, he lacked the benefit of legal counsel to guide him in defending against Alshora's counterclaims or the criminal charges that had been lodged against him.

283. In 2008, **Elgasim Mohamed Fadlalla** applied to GLS for work as a linguist. Though he was then brought to the GLS facility in Virginia for orientation, was trained by GLS, and was deployed to Anbar Province in Iraq as a GLS employee, on February 18, 2010, he was called to a GLS field office in Iraq to and was instructed to sign an employment contract with TigerSwan. He was told that nothing whatsoever about his work would change.

284. On June 1, 2011, GLS demanded that Fadlalla execute a third contract, this time identifying him as an employee of Shee Atika.

285. The February 18, 2010 contract that Fadlalla signed with TigerSwan was virtually identical to the contract that he had signed with Shee Atika, including the same template ("GLS/ITMA FSA Template, Revised 01/04/10"). Fadlalla was identified by the same Employee Number ("951126"), and the layout was identical, both contracts containing the "Global Linguist Solutions" logo.

286. Further, Fadlalla's TigerSwan and Shee Atika contracts were identical to **Mahmoud Ali Luttfi's** Wright contract, except for the change in name of the Relator.

287.    Five months later, GLS demanded that Fadlalla sign a fourth contract, this time identifying him as a GLS employee.

288.    A fourth contract was placed before him on September 22, 2012 – this one identifying Fadlalla as an Engility employee.

289.    GLS required that Fadlalla execute a fifth contract on February 1, 2013, that identified him as a GLS employee.

290.    As with other Relators, Fadlalla was transported to Kuwait by GLS without GLS first obtaining for him a Kuwait Resident Visa.  Moreover, like other Relators, Fadlalla was misrepresented to Kuwaiti authorities as an employee of Alshora.  Fadlalla was never an employee of Alshora.

291.    Resident Visa Relator **Mahmoud Ali Luttfi** was working for Titan Corporation in Iraq when GLS became the successor contractor in April 2008.  Though GLS was clearly in charge of assuming Titan's responsibilities, he was instructed to sign a contract that identified Wright as his employer.

292.    Luttfi moved from Iraq to Kuwait in December 2011.  In Kuwait, he was asked if he might be interested in a temporary assignment in Kuwait.  He said yes.  When he accepted, GLS took his passport from him.

293.    Even though Luttfi had a Category 2 level security clearance ("CAT 2"), GLS stated that he could continue to work for GLS only if he agreed to be reclassified as having only achieved a Category 1 security clearance level ("CAT 1").  This seemed illogical and unfair to Luttfi as he viewed his CAT 2 classification as valuable and a high honor.  However, GLS told him that he would be fired if he did not agree to be reclassified at CAT 1 (and take the lower compensation afforded a CAT 1).

294. To move Luttfi into Camp Buehring, GLS returned his passport to him, but confiscated it again after he got onto the base.

295. Due to his obligations to the U.S. military in Iraq, Luttfi had not had a vacation in a year and a half. He wanted to take leave so that he could see his family and get some rest. However, GLS refused to allow him any paid time off, refused to return his passport to him, and demanded that he keep working as a linguist in Kuwait.

296. Like other Resident Visa Relators, Luttfi was coerced into signing a confession of criminal conduct while in Kuwait. He was finally released from Kuwait on October 12, 2013.

297. With respect to his experience in serial contract signing, and efforts to have him appear to be an employee of various Small Business Defendants at various times, GLS demanded that Luttfi sign a contract that identified Wright as his employer from November 8, 2008 through June 20, 2011. GLS then demanded that Luttfi sign a contract identifying Shee Atika as his employer from June 21, 2011 through September 30, 2011. Without any change to his responsibilities, GLS then directed him to sign a new contract in December 2011 that lowered his pay. Without warning, Luttfi was then told to sign a contract with Engility, and was subject to that contract from September 1, 2012 through January 31, 2013. Finally, on February 1, 2013, GLS demanded that he sign yet another contract, this last one identifying GLS as his employer.

298. Resident Visa Relator **Nada Malek** was recruited, tested, and trained by GLS in 2009. Yet, to her surprise, on May 8, 2009, she was asked by GLS to sign a contract identifying Invizion as her employer. Malek had never heard of Invizion: She had always identified GLS as her employer.

299. On October 13, 2010, during the time that she was purportedly an Invizion employee, Malek received the following message from DynCorp employee Anna Dupree,

emailing her using "Anna.Dupree@dyn-Intl.com": "Good morning Nada, I apologize for the delay. Attached is the expense report prepared today for your per diem while at the hotel from 11 June until 16 July the day you left for Kuwait. You do not get per diem for the days at CRC. Thank you for your patience and again I apologize for the delay in getting this taken care of."

300.    On March 18, 2011, GLS required that Malek sign a new employment contract, this one identifying GLS as her employer.  Less than three months later, however, on June 10, 2011, GLS had her sign another employment contract, this time with Shee Atika.  On June 15, 2012, GLS instructed Malek to sign another employment contract – this time, again, with GLS. On September 8, 2012, GLS demanded that Malek sign another contract, this time with Engility.

301.    On September 19, 2012, Malek logged into a DynCorp-maintained URL to check the status of her pay while she was purportedly an employee of Engility.

302.    Malek accessed this information through the URL, https//myjourney.dyn-intl.com/psc/myjourney/EMPLOYER. This "myjourney" URL was identified by GLS as an "employee self-service site" to be used, among other things, for the management of an employee's direct deposit.  This login identified Global Linguist Solutions as Malek's payer, not Shee Atika.  Moreover, the screenshot indicated that "Global Linguist Solutions" made direct deposits into Malek's bank accounts.  The URL and provided no indication that such funds were being passed through Shee Atika's accounts.

303.    On December 6, 2012, while allegedly an employee of Engility, Malek received an email from GLS employee Cheryl Robinson regarding how her time would be handled due to Malek's recent hospitalization.  Ms. Robinson (using her Cheryl.Robinson@dyn-intl.com email address) wrote, "I'm happy to hear that you have been released and feeling better. . . . Your

timesheet has been adjusted to show PTO [paid time off] hours for the days you were hospitalized."

304.    On January 23, 2013, GLS presented another GLS employment contract to Malek for her signature.

305.    As with other Relators, Malek was transported to Kuwait by GLS without GLS first obtaining for her a Kuwait Resident Visa.   Moreover, like other Relators, Malek was misrepresented to Kuwaiti authorities as an employee of Alshora.   Malek was never an employee of Alshora.

306.    At Resident Visa Relator **Louai Salim**'s GLS orientation in Northern Virginia, he and other trainee linguists were randomly dealt different colored cards.   The linguist trainees were then divided according to the color of the card they held.   After all the linguists with the same colored card as Salim were gathered together, the GLS trainer/managers informed them that they would "work" for TigerSwan.

307.    That same day, GLS introduced Salim, and those with the same colored cards, to a man who was represented as the CEO of TigerSwan.   Addressed by the CEO of TigerSwan, Salim and his new fellow "TigerSwan" employees were told that government regulations required that GLS allocate a certain number of its linguists to subcontractors.

308.    At the close of the introductory speech, Salim and the other newly minted "TigerSwan" employees were given some TigerSwan "swag," – T-shirts and caps.

309.    Thereafter, Salim never saw another TigerSwan manager or officer again. TigerSwan had no involvement in Relator Salim's day-to-day activities.   Everything related to his job was administered by GLS staff.

310.     On or about June 23, 2011, Salim was informed by GLS that he was now employed by Shee Atika. He was assured by GLS management that he would still report to GLS and that nothing about his work would change, other than that his paychecks would now come from Shee Atika. Though Salim did receive pay statements from Shee Atika, on information and belief, his pay was processed, and directly deposited to his account, by GLS. Salim never met anyone from Shee Atika prior to, or immediately after, becoming a Shee Atika employee. GLS continued to manage him on a daily basis.

311.     Salim's compensation arrangement with TigerSwan included an employer contribution to his Individual Retirement Account. Salim wanted to roll-over his 401k plan to his "new" employer, Shee Atika. He tried unsuccessfully, for weeks on end, to communicate with someone at TigerSwan about rolling over his 401K, and eventually gave up. Salim concluded that TigerSwan was not functioning as a *bona fide* company.

312.     During Salim's alleged employment with GLS subcontractor Engility, though his paystub had Engility's logo and address on it, his login through https//myjourney.dyn-intl.com/psc/myjourney/EMPLOYER only identified "Global Linguist Solutions, LLC" and the address of the payer in "Falls Church, VA 22402" (DynCorp's address), and indicated that GLS made direct deposits into accounts 7342035875 and 802990887. There was no indication that this pay was looped through Engility before being directly deposited into Salim's accounts.

313.     GLS hired Resident Visa Relator **Antonio Antar** in September 2009.

314.     On November 19, 2011, because of the U.S. drawdown in Iraq, Antar was in transit from Iraq back to the U.S.

315.     At the Ali Al-Salem Airbase transit camp, GLS approached him and proposed a new contract pursuant to which he would provide translation services for INSCOM in Qatar.

Antar accepted the offer. GLS removed Antar's U.S. passport from him, allegedly in order to secure for him a work permit for Qatar. However, GLS left Antar at the Camp Ali Al-Salem from November 2011 through February 2012.

316. On February 17, 2012, DynCorp employee Todd Lawrence called Antar and told him to be ready to move off Camp Ali Al-Salem. Four hours later, DynCorp employee Lawrence, accompanied by GLS employee Sidmed, drove Antar to a building in Kuwait City. There, a Kuwait national processed paperwork and issued Antar a tourist visa, whereupon Lawrence took the passport back.

317. From there, Antar was driven to Camp Arifjan. In order to gain access to that camp, Lawrence returned Antar's passport to him, and then immediately retrieved it after they cleared security.

318. Lawrence told Antar that Lawrence needed to keep Antar's passport in order to process him for a Resident Visa.

319. Antar worked at Camp Arifjan from February 2012 through December 2012 with only a tourist visa – unknowingly illegal conduct that made him subject to arrest, criminal charges and deportation.

320. Antar suffered a succession of physical injuries while at Camp Arifjan, yet was unable to have them treated because military medics were not authorized to treat civilian contracts, and GLS had no medical facilities on the base.

321. Antar complained repeatedly about the living conditions to which he was exposed, but when he did so, GLS management abused him with threats of being fired, withdrawal of employment benefits and inability to obtain unemployment insurance compensation.

322.     Due to injuries suffered during his detention in Kuwait, Antar had to have two surgeries on his cervical spine, and to date has been unable to regain his strength.  Moreover, insurance coverage for Antar's spinal injuries has been denied on the pretext that his injury did not occur on the job.

323.     GLS demanded, during his employment, that Antar sign successive contracts identifying GLS, Wright, Shee Atika and Engility as his employer without any change, whatsoever, in the day-to-day management of his activities by GLS.

324.     Resident Visa Relator **Akhtar Hayat** began working for GLS in November 2011.  He signed a GLS contract GLS (November 14, 2011 through September 7, 2012); an Engility contract (September 8, 2012 through January 31, 2013); and another GLS contract (February 1, 2013).

325.     When Hayat arrived in Kuwait on December 3, 2011, his passport was stamped with a tourist stamp.  GLS thereupon removed his passport, ostensibly to obtain a Resident Visa.  Hayat worked with only a tourist visa – a criminal offense in Kuwait.   Indeed, GLS had his passport stamped with a non-resident visa (a commercial visa, yet still not entitling its holder to work in Kuwait) four times.

326.     Hayat obtained a Resident Visa in May 2012.

327.     In March 2013, Hayat was told by GLS that he and other linguists were not allowed to leave Kuwait.

328.     Hayat's Resident Visa was scheduled to expire on May 9, 2013.  However, notwithstanding GLS's warning to Hayat and others that they would be arrested if they travelled, GLS ordered him, and others to travel to Bahrain, and then reverse course and re-enter Kuwait, in order to obtain a new Tourist Visa.

329.    A newly issued Tourist Visa would legalize these linguists' presence in Iraq, but would not qualify them to work.

330.    Hayat did not want to go to Bahrain because he feared that he would be arrested.  Though Hayat and others left Kuwait on May 8, 2013, without incident, they were stuck in Bahrain for two weeks because, according to GLS's attorneys, they were barred from reentering Kuwait.  After two weeks in Bahrain, GLS moved Hayat and the other linguists with him back into Kuwait notwithstanding that several of Relators' colleagues had been arrested there.

331.    Hayat was repeatedly told by GLS that if he ventured outside Camp Arifjan, he would be arrested.  Accordingly, Hayat did not leave the base on his own volition.

332.    Notwithstanding GLS's warnings to him, GLS insisted that Hayat make two additional Bahrain "visa runs" to get new, short-term tourists visas to validate his presence in Kuwait.  These visa runs took place on June 19, 2013 and July 17, 2013, and consisted of Hayat being brought to the airport in Kuwait, flown to Bahrain, and returned immediately to Kuwait so that a new tourist visa could be stamped into his passport.

333.    Since returning from Kuwait, Hayat has learned that because his Alshora-obtained Resident Visa expired on May 9, 2013, it did not have to be cancelled by Alshora, he was not counted as an absconder, and there existed no travel ban applicable to him.

334.    Notwithstanding that Hayat was not listed as an absconder, GLS's Kuwait attorneys coerced Hayat into executing a POA and then used it to file a lawsuit in his name.

335.    Alshora brought a counterclaim against Hayat.

336.    On August 16, 2013, without explanation, GLS ordered Hayat out of Kuwait.

337.    On August 19, 2013, Hayat sent an email to Kenneth Bellamy which stated, "I would like to know what steps GLS will be taking regarding the civil suit that is filed against me because of a lawyer that GLS has hired and had asked us to sign a power attorney to him. Since I am being forced to leave Kuwait before I go I need some reassurance in writing that my case will be represented and my name being cleared by GLS in my absence. So I may work in this region in the future."

338.    Despite his August 19, 2013 email and repeated efforts to obtain information about the lawsuit that GLS had initiated – which in turn caused him to be sued by Alshora in counterclaims, GLS never provided any additional information to Hayat.  The only information that GLS has given to him is that it could not guarantee his safety if he returned to Kuwait – a chilling message that has caused him not to travel to the Middle East.

339.    Resident Visa Relator **Haider Al-Nakash** was one of the few Relators who were not recruited by GLS.  He began as an employee of predecessor contractor Titan Corporation in April 2005, and transferred to L-3 Communications, Titan' successor, in March 2006.  He arrived in Kuwait in 2007 while still an employee of L-3 Communications, and receiving his Resident Visa through L-3.

340.    Al-Nakash was transferred to GLS when it began performance of Contract 1. GLS (DynCorp) employees Cheryl Robinson and Todd Lawrence were his managers at Camp Arifjan.   However, when GLS agreed to subcontract work to L-3 (to end L-3 Communication's bid protest), Cheryl Robinson and Todd Lawrence demanded that Al-Nakash sign a contract making him (on paper) an employee of L-3.  GLS demanded that he sign the contract without allowing him to read it.  When Al-Nakash started to question why they were demanding that he

sign a contract with L-3 when he had already migrated to GLS, they simply responded that nothing would change concerning his employment.

341.     Al-Nakash's Resident Visa was transferred from L-3 to GLS on August 21, 2013, without disclosure that the true sponsor of Al-Nakash's Resident Visa was Alshora.  He only learned of Alshora's role in the Visa scheme when, to his surprise and dismay, he was listed as one of the employees who had absconded from Alshora's workplace.

342.     In fact, Al-Nakash had been living in Kuwait for six years, for much of that time with his immediate family.

343.     When Al-Nakash learned that he was subject to arrest, he feared for the safety of his family because he was a Shia Muslim, born in Iraq, living in Kuwait – a Sunni-majority country with a history of animosity with Iraq.

344.     The U.S. military ordered him to take refuge at Camp Arifjan.

345.     Al-Nakash's wife and children had been issued Visas on the basis of Al-Nakash's ostensibly legal presence in Kuwait.  With Al-Nakash's status jeopardized, his wife, Stephanie Al-Nakash, and children also felt under threat: They fled to the airport, abandoning their apartment, their personal property in the apartment, and two cars they owned, with a total value of approximately $17,000.

346.     Back at Arijan, Al-Nakash was stuffed into the same cramped living space as thirty-five other men.  On August 26, 2013, he slipped coming out of the shower and ruptured a disk in his back and hurt his neck.  However, the Army medics did not think his injury to be life-threatening and refused to treat him.  He could not be removed from the base due to the arrest warrant that had been issued for him, and so he was stuck on base without access to medical care.

347.    After languishing in pain for days, Al-Nakash paid an Indian national driver to sneak him off the base so that he could see a private Kuwaiti doctor.  The doctor prescribed a variety of MRIs and X-rays, but Al-Nakash had no funds to pay for such diagnostic treatment.

348.    He appealed to GLS officer Ken Bellamy, but Bellamy told him that GLS would not pay for his medical treatment.

349.    In constant pain and in desperate need of medical treatment, Al-Nakash found sufficient funds to pay bribes to retrieve his passport and exit Kuwait.

350.    Al-Nakash was able to escape on September 26, 2013.  However, because he did not sign a confession, and because his Resident Visa was not cleared by Alshora, he remains subject to arrest if he should try to reenter Kuwait or any country in the Gulf Cooperation Council.

351.    **Parcham Khoshaba Mikhaiel**, acting on the recommendation of a friend, applied online for a job with GLS.  After providing GLS with the necessary information and speaking with its recruiters, Mikhaiel traveled to Northern Virginia for orientation at the GLS facility.

352.    Thereafter, GLS sent him to further training at Fort Benning, Georgia.

353.    Mikhaiel signed his contract with GLS in May 2009, and deployed to Iraq on June 20, 2009.

354.    Subsequently, on February 1, 2010, GLS instructed Mikhaiel to sign a contract with Shee Atika, and he did so.  Afterwards, however, he continued uninterrupted in the same work, reporting to the same GLS managers.

355.    GLS required Mikhaiel to sign an Engility contract on June 12, 2012.  Again, thereafter his work continued uninterrupted, and he reported to the same GLS managers.

356. On November 17, 2011, Mikhaiel transited through Camp Ali Al-Salem in Kuwait after leaving Iraq, expecting to board a "Freedom Flight" back to the U.S.

357. While he was in transit at Camp Ali Al-Salem, GLS approached Mikhaiel and asked him if he would be willing to work in Kuwait.

358. He agreed to do so, but was dismayed when told that as a condition of the new job, he would be down-graded from a CAT 2 linguist to a CAT 1 linguist, with a lower security clearance.

359. GLS told Mikhaiel that it would direct part of his pay for deposit in a Kuwait bank account in his name, but did not disclose that he would be shown as an Alshora employee.

360. Mikhaiel never worked for Alshora.

361. Later, Mikhaiel was transferred to Camp Arijfan and up-Graded to CAT 2 where, at least initially, he had adequate housing. After the stop work order was enforced, however, Mikhaiel was told to vacate his housing because it belonged to U.S. Army officers.

362. Mikhaiel was forced to move into decrepit living quarters which, elsewhere described in this complaint, were unconscionable.

363. Mikaeil was transported back to Camp Atterbury, Indiana for out-processing. He was then forced to arrange and pay for his own transportation back to his home in Arizona.

364. **Edward Youkhana** began working for GLS in July 2007. Like other Relators, Youkhana had his passport confiscated by GLS and was misrepresented to Kuwaiti authorities as an employee of Alshora; subject to arrest as an absconder; confined to U.S. military bases for fear of imminent arrest; subjected to over-crowded, unsanitary, demeaning, rodent-, lice-, and mite-infested living conditions; barred from leaving Kuwait; victimized by GLS's POA fraud wherein an unauthorized lawsuit was filed in his name against Alshora; named in a counterclaim

by Alshora; and further victimized by the fact that GLS did not disclose to him this counterclaim against him. In addition, Youkhana was subject to the demand that he sign a confession to criminal conduct in order to exit Kuwait. When he complained to GLS about his treatment, GLS regional manager dismissed his complaint by telling him to his face: "The linguists are slaves."

365. **Dr. Ali Al-Taie** was recruited and trained by GLS at its Northern Virginia location. However, after he completed his GLS training, on July 1, 2011, he was directed to sign a contract identifying him as an employee of Shee Atika, though he had never met anyone from Shee Atika. Less than a year later, June 12, 2012, Al-Taie was required to sign a contract with GLS.

366. Only three months later, on September 1, 2012, GLS required that Al-Taie sign yet another contract with GLS.

367. On January 31, 2013, GLS required that Al-Taie sign another contract with GLS. Until December 24, 2012, the living conditions for Al-Taie were acceptable – he was assigned an independent/separate room. However, after harassing treatment by GLS manager Cheryl Robinson, Al-Taie was forced into the crowded, unsanitary and rodent-infested common living quarters shared by three dozen linguists.

368. Moreover, Al-Taie was summarily downgraded from a CAT 2 security-cleared linguists to a lesser CAT 1-cleared linguist.

369. As the immigration/labor law violation crisis with the Kuwaiti government deepened, Al-Taie and the remaining Arifjan linguists were moved to Camp Buehring and forced into the already overcrowded living conditions of the Relators under siege from threat of arrest at that U.S. military base.

370.     Like other Relators, Al-Taie had his passport confiscated  by GLS, and was misrepresented to Kuwaiti authorities as an employee of Alshora; subject to arrest as an absconder; confined to U.S. military bases for fear of imminent arrest; subjected to over-crowded, unsanitary, demeaning, rodent-, lice-, and mite-infested living conditions; barred from leaving Kuwait; victimized by GLS's POA fraud wherein an unauthorized lawsuit was filed in his name against Alshora; named in a counterclaim by Alshora; and further victimized by the fact that GLS did not disclose to him the counterclaim against him.

371.     Resident Visa Relator **Ali Elsebaey** began working for GLS in 2010; yet, on the last day of his training at the GLS facility in Virginia, GLS demanded that he sign a contract identifying him as an L-3 employee.  During the entire time that he was allegedly employed by L-3, however, he never met anyone from the company.

372.     After serving in a variety of sensitive military and intelligence positions in Iraq, Elsebaey was transferred to Kuwait in December 2011 to provide interpretation and translation for LTG Vincent K. Brooks, USA then-Commanding General of the Third United States Army.

373.     As soon as he arrived in Kuwait, GLS took his passport from him and did not return it to him (except when LTG Brooks needed his accompaniment overseas [and GLS returned his passport only for that particular trip and retrieved it from him immediately upon his return]) until his expulsion from Kuwait, after relenting to GLS demands and signing a false confession to immigration and labor law crimes.

374.     When Elsebaey asked GLS why it had held his passport for so long, GLS advised that Alshora needed the passport in order to obtain his Resident Visa.  However, when Elsebaey asked Alshora staff the same question, he was told: "We don't keep your passports – we only

have them for a couple of days and only apply the Resident Visa. Otherwise, the passports are at the GLS office the entire time."

375. In order to serve Gen. Brooks, Elsebaey needed a Kuwait driver's license. However, he could not obtain one because his Resident Visa and work permit identified him as a "Conventional Light Worker" and the information available to Kuwaiti authorities, *i.e.*, that Relator Elsebaey only earned a salary of 250KD (ostensibly paid by Alshora), indicated that he did not have sufficient income to qualify for a driver's license.

376. Though Elsebaey repeatedly asked GLS to correct the misinformation on file, it refused to do so, and he was unable to obtain a driver's license.

377. Elsebaey lived at Camp Arifjan from December 2011 through October 2013 (though in the midst of the immigration/labor crisis, he was first forced into the overcrowded facilities that housed all of the Arifjan detainees trapped in the crisis and was then forced into the overcrowded tent facility at Camp Buehring).

378. The stop work order issued by Kuwaiti Army Staff Major General Abd Al-Razak Mohammed Al-Awadi on February 19, 2013, prevented Elsebaey from accompanying LTG Brooks to Jordan. As a consequence, extremely sensitive meetings that LTG Brooks had scheduled in Jordan had to be cancelled.

379. Ultimately, Elsebaey arranged for a Kuwait acquaintance to smuggle him out of Kuwait.

380. While serving as a linguist for GLS, Resident Visa Relator **Nourdelin Muhsen** was directed to sign three employment contracts: with GLS, L-3, and then GLS again. He was told that if he did not sign the successor contracts, he would be forced to resign, and would lose unemployment benefits and severance.

381.    The February 2013 stop work order hit CENTCOM hard.  All communications between CENTCOM and Kuwaiti Military command were disrupted.  For example, a previously scheduled training exercise between the Kuwaiti National Guard and U.S. soldiers had to be cancelled twice as a result of the stop work order.

382.    On or about June 25, 2013, Muhsen wanted to leave Kuwait so that he could go to Jordan to visit his father, who was dying of cancer.  He cleared everything through the military and was approved for travel.  Then his travel authorization was cancelled.  The CENTCOM Commander proposed a solution – the military would take Muhsen on a mission it was already planning in Jordan and give him a week to visit his father.  However, GLS would not allow Muhsen to go.  Muhsen not only was prevented from seeing his father during his illness, he was not able to help other family members with his father's medical care, he could not say goodbye to him, and he could attend his funeral.

383.    Muhsen and ten others, including Resident Visa Relators **Louai Salim** and **Ali Elsebaey**, bribed a staff member of Alshora to delete them temporarily from the State of Kuwait blacklist so that they could escape.  When they were given the "okay" by the bribed Alshora staffer, they went to the airport, and as promised, Kuwaiti customs did not see them in the database and they were allowed to leave.  They escaped Kuwait on October 10, 2013.

384.    As their cases were not resolved, however, and inasmuch as they left the country without being "cleared," their cases remain pending, and they cannot return without risk of being arrested.

385.    Resident Visa Relator **Maryan Mure** answered a GLS advertisement in March 2008.  Though she understood that she was to work for GLS, and was oriented for deployment and trained by GLS, inexplicably GLS directed her to sign an employment contract  with a

company she had never heard of, "Invizion." GLS told her that if she did not do so, she would be sent home.

386.    Mure never had any interaction with anyone from Invizion.

387.    In April 2011, GLS directed her to sign an employment contract with Shee Atika – with no notice and under threat of termination if she did not do so.

388.    Immediately upon Mure's arrival in Kuwait on November 16, 2011, GLS confiscated her passport.  She spent many months working illegally (without recognizing that at the time).

389.    On June 15, 2012, GLS instructed Mure to sign a new contract – with GLS.

390.    On one occasion, a GLS representative ordered Mure and other linguists to board a bus to take them to the Kuwait International Airport.  The GLS representative carried a cloth bag containing the passports of all the linguists on the bus.  They were driven to a remote portion of the airport facility.  Mure and the others were told to stay on the bus.  After several hours, the GLS representative got back on the bus with the bag of passports.  When Mure inspected her passport, she saw that it had been stamped "exit" to Bahrain and then stamped "entry" into Kuwait with a newly stamped tourist visa from the Kuwait.  These immigration stamps were fraudulent, as Mure had never left the bus, let alone traveled to Bahrain.

391.    On January 18, 2013, following a translation proficiency test, GLS fired Mure, yet refused to return her passport to allow her to exit Kuwait. She was held against her will in Kuwait until April 12, 2013.

392.    Resident-Visa Relator **Tebyan Al Nawasreh** was already a resident of Kuwait when she started working for GLS.  However, her Resident Visa was issued through Alshora as though she were its employee.

393.    When she learned that GLS had abused the POA to file a lawsuit in her name against Alshora, she cancelled her POA.  However, GLS would not pay the expense of a private Kuwait attorney for her.

394.    Al Nawasreh has suffered the consequences of GLS's abuse of the Kuwait legal process through June 2015, when a Kuwaiti court finally cleared her of all charges related to the legal dispute with Alshora.

395.    Non-resident Visa Relator **Waiel Samy Mansour** arrived in Kuwait to work as a translator for GLS on October 13, 2012, entering on a tourist visa.

396.    He never received a Resident Visa and thus worked, unknowingly, in violation of Kuwait's immigration and labor laws the entire time he was in Kuwait.

397.    Mansour's non-resident visa was renewed on December 13, 2012, January 12, 2013, and February 12, 2013.

398.    When GLS returned his passport to him after attempting to renew his tourist visa in February 2013, Mansour noticed that it had been stamped "Deport" with a notice that he had to leave the country within twenty-four hours.

399.    GLS instructed Mansour to ignore the deportation notice.

400.    On July 17, 2013, GLS took his passport again. On June 20, 2013, the non-resident visa holders, including Mansour (approximately 25 people in all), were taken from Camp Buehring by bus to Camp Ali Al-Salem to leave Kuwait. None of the linguists had passports with them or any credentials to be in the country. Given the threat of arrest that had been made, Mansour was afraid that they would be arrested and imprisoned.  The linguists received their passports back at Camp Ali Al-Salem.

401.    GLS manager Sidmed approached Mansour and Non-Resident Visa Relator Saad Kabbaj privately and asked if they wanted to continue working as linguists in Jordan.

402.    When all the other non-resident visa holders were shipped back to Camp Atterbury in the U.S. to await the issuance of *bona fide* work credentials, GLs sent Mansour and Kabbaj, by private taxi, from Camp Ali Al-Salem to Kuwait International Airport to catch a flight to Amman, Jordan.

403.    When returning their passports, GLS did not tell them that they had been stamped with a second deportation notice.  Neither one of them noticed the second deportation notice until they arrived in Jordan and Jordanian custom authorities called their attention to it.

404.    **Non-Resident Visa Relator Samah Fikri** acted on a friend's recommendation and called GLS about job opportunities.  A GLS recruiter named Emad Adwan contacted her in 2010.

405.    After two months of paperwork and training with GLS, on one of the last days of training, in March 2010, GLS randomly selected her and others and told them that they would be employees of L3.  This made no sense to her, as she had been dealing exclusively with GLS.  She asked why she had to sign a contract with L3.  She was told not to worry  – L3 was just a subcontractor – she would still be working for GLS.  She trusted GLS and signed the L3 contract.  She never met or interacted with anyone from L3.

406.    After waiting at home in New York for months, Relator Fikri was deployed to Bagdad on June 7, 2010.

407.    While she worked illegally in Kuwait, GLS obtained successive renewals of her non-resident visa: on October 18, 2012; December 18, 2012; January 20, 2013; February 2, 2013; March 20, 2013; April 20, 2013; and May 17, 2013.

408.     After a hiatus in the U.S., Fikri returned to Kuwait in September 2012.  When she reached Camp Ali Al-Salem, GLS confiscated her passport.   After two weeks, she was transported to Camp Buehring.  To clear Fikri through security at Camp Buehring, GLS returned her passport, but once she cleared security, GLS confiscated it again.

409.     GLS manager Sidmed noticed that Fikri's passport was almost out of clean pages. He then returned her passport to her and instructed her to contact the U.S. Embassy and make an appointment to obtain additional pages.  She did so, kept the appointment and got the additional pages – and when she did so, Sidmed confiscated her passport again.

410.     Fikri never received a Resident Visa, and spent the duration of her time in Kuwait on a non-resident visa.  However, Alshora did begin the process of obtaining a Resident Visa for Fikri as its own employee.  Though the full visa never issued, Alshora had advanced far enough in the process to have obtained a Kuwaiti work permit in her name.

411.     GLS redeployed Fikri to Kuwait on March 17 – only four days before the effective date of the stop work/no travel order – on a Tourist Visa that was valid for one month. In April and May 2013, GLS required her to travel to Bahrain so that she could turn around, reenter Kuwait, and obtain a new Tourist Visa.  Because a Resident Visa had not been issued in her, she was not subject to a travel ban.

412.     Nonetheless, after Kuwait issued the above described stop-work order, GLS warned her that if she left Camp Buehring she might be arrested because she was subject to the travel ban.

413.     With GLS's consent, Alshora took Fikri to the Kuwaiti passport office for the ostensible purpose of clearing her of any immigration and labor law violations.   She was

interrogated by Kuwaiti immigration officials, required to sign a statement acknowledging fault for working illegally in Kuwait, and was returned to the U.S.

414.    Thereafter, Fikri was issued a Resident Visa and returned to Kuwait.  Fikri now works for GLS in Jordan.

415.    Non-Resident Visa Relator **Hamid Skili** applied to GLS for employment in the early summer of 2012.  After his GLS orientation in Northern Virginia, and further training at Camp Atterbury, Indiana, Skili signed his GLS contract on August 2, 2012.

416.    He arrived in Kuwait on August 19, 2012.  GLS employee Sidmed met him and others at the airport and immediately confiscated their passports.  He and others were then driven to Camp Ali Al-Salem.

417.    Examining his passport later, Skili noted that it was not stamped as his having entered the country until August 28, 2012, which was inaccurate.

418.    Skili remained at Camp Ali Al-Salem for three weeks, at which point he was taken to Camp Buehring with other linguists.  At no point during the transfer process was his passport returned to him, nor was it returned to him after he cleared security at Camp Buehring.

419.    Though GLS returned Skili's passport to him periodically thereafter, GLS would invariably retrieve it, claiming that it was needed in order to obtain additional non-resident visa stamps.

420.    GLS never informed Skili that it was illegal for him to work while in Kuwait on a non-resident visa.

421.    Skili never received a Resident Visa.

422.    At Camp Buehring Skili provided linguist services for the Tactical Operations Command ("TOC").

423. After the stop-work order issued, Skili advised the Captain of TOC that he could not work. The TOC Captain was upset by the disruption caused by Skili's absence because he was a trusted communications conduit between U.S. and Kuwaiti military forces.

424. In explaining the stop work order, GLS told Skili and others that Alshora was trying to extort money from GLS.

425. On or about July 2, 2013, Alshora, with the authorization of GLS, transported Skili and the other Non-Resident Visa Relators from Camp Buehring to Alshora's office in Kuwait City. There, Alshora insisted that Skili and the others sign a one-page written statement that blamed GLS for the fact that they were working illegally in the country.

426. In response to this demand, Relators called GLS employee Ken Bellamy on his mobile phone and asked whether they should sign the statement, and if so, what the consequences would be. Bellamy refused to answer, stating, "Do what you want to do." Without guidance from GLS, and confronted with Alshora's insistence that he sign the document, Skili (and, on information and belief, all the others) signed the statement.

427. Afterwards, Alshora returned them to Camp Buehring.

428. Approximately one week later, GLS again ordered Skili and the other Non-Resident Visa Relators to board an Alshora bus. They were told that they were being returned to Alshora's office to sign a more formal version of the statement that they had already signed. This was not true.

429. Rather, the Non-Resident Visa Relators were taken to the Kuwaiti Passport Office.

430.     Skili and the other Non-Resident Visa Relators assumed that they were going to be arrested and incarcerated, as other linguists had been – including Resident Visa Relators Zinnekah, Masri, and Abulghani and Non-Resident Visa Relators Tucker and Mudalige.

431.     The Non-Resident Visa Relators reached Bellamy by phone.  He professed ignorance about what was happening and simply told them, "Just do the right thing."  He repeatedly stated, "I cannot advise you."

432.     Skili and the other Non-Resident Visa Relators were taken inside the Passport Office and held in a large room.  One-by-one, they were directed to a room where two Kuwaiti government officials were waiting for them.  Each linguist was questioned alone.  No GLS representative, nor any legal counsel, accompanied the linguists.

433.     Invariably, one of the officers took notes during each interview.  At the end of the interview, the notes were passed across the table and the linguists were instructed to sign them.  Not wanting to anger the officers, and without guidance on what else to do, Skili signed, as, on information and belief, did the other linguists.  Thereafter they were returned to Camp Buehring.

434.     One night GLS told the Non-Resident Visa Relators to prepare to leave in three days.  They packed their personal belongings, and left Camp Buehring on July 16, 2013 for Camp Ali Al-Salem.  The following day they departed for the U.S. and were taken to Camp Atterbury in Indiana.  There Skili awaited the issuance of a valid Resident Visa as a pre-condition to lawful return to Kuwait.

435.     Non-Resident Visa Relator **Saad Kabbaj** began working as a linguist in September 2007.

436.     In 2008, began working for GLS.

437.     Kabbaj worked from GLS from approximately September 2007 through March 2010.

438.     GLS then assigned Kabbaj to "work" for KMS.  Kabbaj was listed as a KMS employee from March 2010 through November 2011, when Kabbaj decided to return to the U.S. to take time away from the battle field in Iraq.

439.     When Kabbaj returned to work for GLS in October 2012, GLS assigned him to work for Engility.

440.     On October 13, 2012, GLS flew Kabbaj from the U.S. to Kuwait to work as a linguist.  GLS had not obtained a Resident Visa for Kabbaj to work legally in Kuwait prior to Kabbaj's departure.

441.     GLS confiscated Kabbaj's passport upon his arrival at Camp Ali Al-Salem.

442.     He was held at the Camp Ali Al-Salem transit tent camp until November 7, 2012.

443.     On about November 7, 2012, Kabbaj was transferred to Camp Buehring. GLS returned his passport to him to facilitate his entry onto Camp Buehring, and then confiscated it again as soon as he gained entry.  He noticed that is passport had only a Tourist Visa stamp.

444.     GLS held Kabbaj's passport (with the brief exception above) from October 13, 2012 through early February 2013.

445.     At times GLS demanded that Kabbaj, over his protest, travel within Kuwait without any immigration credentials at all – no passport and no visa. When Kabbaj protested to GLS he was told that he would be fired if he refused to go.

446.     On February 6, 2013, Kabbaj was given a one-month non-resident visa Tourist Visa that lasted until March 5, 2013.

447.     At the beginning of March, GLS took Kabbaj's passport again, presumably to renew his visa.

448.     On March 4, 2013, GLS manager Ken Tolleson returned Kabbaj's passport to him.  He saw that it had been stamped "deport" with a notice that he had to leave the country within 24 hours.

449.     Kabbaj asked GLS manager Sidmed about the deportation stamp.  He simply responded: "We're working on it."

450.     When Kabbaj and others complained to Ken Tolleson, President of GLS, about the way they had been treated by GLS, he warned them that if they continued to complain they would all be fired and returned to the U.S. "to deliver pizzas."  When one of the non-resident visa holders called Tolleson's bluff by resigning and demanding to go home, Tolleson refused his request and told him that only Resident Visa holders would be allowed to depart Kuwait.

451.     GLS told Kabbaj and the others that if they attempted to leave Camp Buehring, they would be arrested.

452.     On June 17, 2013, GLS confiscated Kabbaj's passport again. On June 20, 2013, the non-resident visa holders, including Kabbaj (a total of approximately 25 people) were taken from Camp Buehring by bus to Camp Ali Al-Salem to leave Kuwait. None of the linguists had passports with them or any credentials to be in the country.  Given the threat of arrest that had been made, Kabbaj was afraid that they would be arrested and imprisoned.  The linguists received their passports back at Camp Ali Al-Salem.

453.     On June 20, 2013, the non-resident visa holders were flown out of the country. However, GLS gave Kabbaj and Mansour their passports back, instructed them to take a taxi to

the Kuwait International Airport and take a flight to Jordan. GLS did not reveal to Kabbaj or Mansour that their passports had, again, been stamped with "deport" by Kuwait authorities.

454. On July19, 2013, GLS required Kabbaj sign a contract with Engility.

455. Kabbaj is worked for GLS in Jordan until February 2016, when he resigned due to progressively diminished pay.

456. GLS brought Non-Resident Visa Relator **Nimna L. Jayasinghe Mudalige** to Kuwait on October 27, 2012, without first having obtained a Resident Visa for her. Though she was issued a non-resident visa on December 12, 2012, by May 11, 2013, the date she was finally allowed to leave Kuwait, it had long expired.

457. Mudalige was required to live in the transit disembarkment site Camp Ali-Al-Salim for approximately a month after her arrival to Kuwait. The tents at the location were intended for brief – overnight at most – stays by service men and women awaiting flights back to the U.S. after deployment in Iraq. Given the length of time GLS required her to remain at this transit camp, Mudalige's health deteriorated dramatically. For example, the tents were inadequate to protect against the sandstorms. Mudalige suffered respiratory distress from having to live amid sandstorm dust – distress that lead to bronchial infection so severe she required hospitalization.

458. On May 7, 2013, GLS ordered Mudalige and Relator Navdeep Tucker to prepare for transport to the Kuwait Criminal Investigative Department ("CID") incident to processing out of the country. GLS did not tell either of them that in fact GLS was taking them to CID to be arrested and jailed.

459. On May 8, 2013, Mudalige and Tucker reported to the appointed place at the appointed time.

460. GLS manager Ken Bellamy picked them up and drove to the office of GLS's Kuwait lawyer. There, Mr. Bellamy inexplicably and quietly abandoned them.

461. Mudalige and Tucker became nervous about being abandoned by GLS – they were Hindi and Sinhala linguists and spoke no Arabic at all. The Kuwaiti lawyer did not say much as he was not fluent in English.

462. After 30-45 minutes of waiting in silence, Mudalige and Tucker were driven to the CID. Noting the nervousness of their driver, Mudalige and Tucker became apprehensive as something seemed amiss.

463. When they arrived at CID, GLS's lawyer kept assuring them, "don't worry, everything will be okay." This made them more apprehensive as they had no cause to suspect that things would not be okay.

464. Upon their arrival at CID, Kuwaiti police officers escorted Mudalige and Tucker upstairs without their lawyer.

465. The CID officers were abusive and angry. They placed Mudalige and Tucker in separate rooms. They questioned Mudalige and Tucker repeatedly about why they had allowed their visas to expire.

466. During her questioning, Mudalige attempted to explain that she was not in control of the visa process – that GLS handled that. While she was being questioned, another officer entered the room and mentioned "Alshora" to the officer conducting the interrogation.

467. The CID officer then asked Mudalige to sign a statement in Arabic, even though she neither spoke nor read Arabic. Feeling threatened (and without the benefit of counsel, who was not present), she signed.

468. Mudalige was then led to a jail cell and locked inside.

469. CID investigators also interrogated Tucker on May 8. No attorney was present for her interrogation, nor was any GLS present.

470. Tucker asked the investigators if she could use the bathroom. While in the bathroom, Tucker called GLS Kuwait country manager Bellamy and told him that she was being interrogated and was being threatened with arrest.

471. Her interrogation continued after she returned from the restroom. She was then led to a jail cell and, like Mudalige, was locked up.

472. Tucker's questioning continued the next day. The Kuwaiti authorities repeatedly asked her why she had violated Kuwaiti law, and repeatedly questioned her about Alshora. Tucker invariably answered that she had not violated Kuwaiti law and that she knew nothing about Alshora.

473. GLS knew that Tucker, Mudalige and other Relators had been arrested and jailed, but no GLS management or legal counsel appeared to assist them.

474. Mudalige was shocked at the level of mistreatment and despondent that she and the others had been abandoned by GLS. Recording her ordeal later in her diary, Mudalige wrote:

> I was so scared and felt so helpless. I cried so loud & begged them to let me make a phone call . . . I could not believe this was happening to me. Never ever in my dreams I thought I would go to jail for no fault of mine. I couldn't help myself but cry . . . I was crying, didn't want to talk to anybody in there, of course I couldn't because I didn't speak Arabic or understand the language. I was standing in front of the gate, walking back & forth crying & crying, looking out of the window which had a tiny hole . .

475. Mudalige and Tucker were released from jail on May 9, 2013. As a condition of their release, they were given five days to leave the country. She left Kuwait almost immediately, moving to Camp Ali Al-Salem (the transit camp used by U.S. personnel) on May 10, 2013, and then out of the country.

476.     Non-Resident Visa Relator **Navdeep Kaur Tucker** saw a GLS job listing on Craigslist.com, and contacted GLS to apply.

477.     Prior to departing for Kuwait, no one at GLS told her that she needed a Resident Visa prior to starting work in-country, and in fact, she had none.

478.     She never received a Resident Visa that would allow her to work legally in Kuwait.  On information and belief, GLS referred Tucker's passport to Alshora so that it could obtain a Resident Visa in her name, even though she never worked for Alshora.

479.     Tucker arrived in Kuwait on November 25, 2012, and stayed at the base Ali Al Salem/LSA for 3 1/2 weeks until she was moved to Camp Arifjan to begin working as a CAT II Punjabi Linguist.

480.     On February 1, 2013, GLS gave Tucker a language test.  She had passed one in Virginia, but failed it in Kuwait.  GLS promised that she could retake the test.

481.     When the test was re-administered, she again failed.  GLS told her that she would be sent home, leaving Camp Arifjan for Camp Ali Al-Salem on March 14, 2013, and then flying from Camp Ali Al-Salem to the U.S. on March 16, 2013.

482.     However, GLS did not return Tucker's passport to her and she was not allowed to leave Kuwait in mid-March.

483.     Though several weeks later GLS returned her passport to her, she learned from other linguists that she and they  had been blacklisted by Kuwait.

484.     In response to these rumors, Tucker queried senior GLS manager Kenneth Bellamy as to whether she had blacklisted and, if so, what that meant.

485.     Bellamy then confirmed that she, along with most of the GLS employees in Kuwait, had been blacklisted, and that Alshora was responsible as it had filed cases against the linguists alleging that they had absconded from work.

486.     On information and belief, Bellamy's statement to Tucker, that Alshora had filed an absconder case against her because a Resident Visa had not been issued in Tucker's name, was not true.

487.     However, Tucker was subject to arrest because she had been working illegally in Kuwait, as she lacked a Resident Visa.

## XII.    CLAIMS

### COUNT I
### (Violation of the False Claims Act – Presentation of False Claims,
### 31 U.S.C. §3729(a)(1)(A) – Against All Defendants)

488.     The allegations in Paragraphs 1-487 are incorporated in Count I by reference as though fully stated herein.

489.     By virtue of the acts and omissions described above, Defendants knowingly presented, or knowingly caused to be presented, false and/or fraudulent claims for payment or approval by the U.S. Government, in violation of 31 U.S.C. §3729(a)(1).

490.     Contract 1 required GLS to submit a bid demonstrating that small businesses, small disadvantaged businesses, women-owned businesses, HUBZone businesses and Service Disabled Businesses would participate in contract performance as *bona fide* subcontractors.

491.     In responding to the solicitation for Contract 1, GLS, upon information and belief, submitted a Small Business Subcontracting Plan, which represented that small businesses, small disadvantaged businesses, women-owned businesses, HUBZone businesses and Service Disabled Businesses would participate in contract performance as *bona fide* subcontractors.

492. Contrary to the requirements of Contract 1, however, GLS did not make a good faith effort to comply with the Small Business Subcontracting Plan, the FAR, and all applicable small business statutes.

493. Rather, GLS used such Small Business Defendants as "fronts" for services provided directly by GLS, including provision of linguists, which was the object of Contract 1. Thus, the subcontracts with the Small Business Defendants were a sham.

494. GLS rotated the Relators at will among the Small Business Defendants, requiring that Relators sign new employment contracts from time to time, to further the illusion that the Small Business Defendants employed Relators and were properly performing subcontract duties. Withal, GLS continued its direct management, control and employment of Relators in derogation of the requirements of Contract 1, and in disregard of the revolving employment contracts GLS required Relators to sign.

495. In so doing, GLS failed to satisfy GLS's Small Business Subcontracting Plan requirements and goals, the FAR and all applicable small business statutes.

496. This scheme contravened the small business subcontracting requirements of Contract 1, the FAR, and applicable federal small business statutes, and was unlawful.

497. GLS paid the Small Business Defendants for work not performed by them, and then illegally passed that cost on to the U.S. by making false claims for reimbursement.

498. GLS knowingly concealed its failure to comply in good faith with its Small Business Subcontracting Plan, the FAR, and applicable federal small business statutes. Further, GLS falsely certified that it had complied in good faith with its Small Business Subcontracting Plan, the FAR, and applicable federal small business statutes. Thus, each of the claims for

payment that GLS submitted to the U.S. under Contract 1 was a false claim. GLS is liable for all damages resulting from these claims.

499. By knowingly participating with GLS in this scheme, DynCorp, AECOM, Shee Atika, Invizion, TigerSwan, Wright, and KMS knowingly caused each of these false claims to be presented and are likewise liable for the resulting damages.

500. To the extent that DynCorp, independent of its joint venture with AECOM, was acting as the alter ego of GLS, DynCorp is directly liable for GLS's acts and omissions and for having reaped the profit and benefit of acts performed through GLS.

501. By knowingly, willfully or recklessly presenting or causing others to present claims for payment/reimbursement to the U.S. under Contract 1 for services performed by resources of GLS but disguised as work done by Small Business Subcontractors, Defendants have defrauded the U.S. in contravention of the False Claims Act, 31 U.S.C. §3729(a)(1)(A), to the damage of the treasury of the U.S., by causing the U.S. to pay out money it was not obligated to pay.

502. In committing these wrongful acts, Defendants have engaged in a protracted course and pattern of fraudulent conduct that was material to the U.S.'s decision to pay these false claims. Had the U.S. known of the falsity as to GLS's compliance with its Small Business Subcontracting Plan, the FAR, and applicable federal small business statutes, the Government may not have paid the invoices submitted under Contract 1.

503. GLS also made false claims under Contract 1 by seeking reimbursement for the alleged "sponsor payments" that it made to Alshora. As discussed, *supra*, these per-month per-employee payments made by GLS to Alshora were not legal "sponsorship" payments.

504.     By knowingly, willfully or recklessly presenting claims for payment/reimbursement to the U.S. under Contract 1 for "sponsorship" services performed contrary to the law of the U.S. and Kuwaiti labor and immigration law, GLS has defrauded the U.S. in contravention of the False Claims Act, 31 U.S.C. §3729(a)(1)(A), to the damage of the U.S. Treasury, by causing the U.S. to pay money it was not obligated to pay.

505.     In committing these wrongful acts, GLS has engaged in a protracted course and pattern of fraudulent conduct that was material to the U.S.'s decision to pay these false claims. Specifically, had the U.S. known of the falsity as to GLS's "sponsorship" payments to compliance with the TVPRA or Kuwaiti labor and immigration law, it would not have paid the "sponsorship" fees submitted under Contract 1.

506.     In addition, GLS made false claims under Contract 1 by submitting invoices for payment to the U.S. when GLS knew that it was not in compliance with the TVPRA or Kuwaiti labor and immigration law, which was a requirement for payment under Contact 1.

507.     At all times, GLS was under an affirmative duty to disclose to the U.S. facts that would, if known, disqualify GLS from contracting with the U.S.  GLS's failure to disclose its lack of compliance with the SBA mandates of the contract bid and contract as awarded, and its human trafficking, constitute false claims regarding qualification for payment and, thus, false claims for payment.

508.     Ignoring the U.S. Government's "zero-tolerance" policies with respect to prohibitions on Human Trafficking and its express obligations under the Contract, GLS trafficked Relators and their colleagues illegally into Kuwait, abused Kuwait's immigration and labor laws and, by doing so, inflicted serious harm on Relators and their colleagues.

509.    Through its trafficking activity, GLS placed Relators and their colleagues in fear of arrest, imprisonment, and expulsion, and forced Relators and their colleagues to work in deplorable and dangerous conditions.

510.    GLS's employment contracts expressly or impliedly misrepresented that employees would be working in Kuwait legally and that the conditions of employment would be lawful.

511.    GLS abused Kuwait's labor and immigration laws by ordering Relators and their colleagues to engage in "visa runs" in which they left Kuwait, flew to and entered Bahrain, and then turned around and flew back to and entered Kuwait on order to be issued renewed tourist visas.

512.    GLS caused Relators to be arrested, placed in fear of arrest, and because of such fear of wrongful arrest, caused Relators to be confined to Camps Arifjan and Buehring.  This fear was exacerbated by Relators' fear of being fired by GLS, and the harsh economic consequences that would follow.

513.    By forcing Relators and their colleagues to work in fear, without the protection of any country's laws, GLS was able to compel Relators to remain in-country and assure that GLS was in compliance with the minimum staff levels required of Contract 1.

514.    GLS inflicted additional serious harm upon Relators and their colleagues by forcing them to work in dangerous slave-like conditions.

515.    The U.S. would not have continued contracting with GLS, and would not have awarded GLS Contract 2, had it been revealed that the company was in wholesale violation of the minimum requirements for protection of its U.S.-citizen workforce.  By causing some Relators to be imprisoned and others to be in constant fear of arrest, imprisonment, deportation,

and the economic consequences of being fired, GLS created an intimidating environment wherein GLS employees were fearful of reporting GLS's abuses.

516. By knowingly, willfully or recklessly presenting claims for payment/reimbursement to the U.S. under Contract 1 for services performed contrary to the law of the TVPRA and Kuwaiti labor and immigration law, GLS has defrauded the U.S. in contravention of the False Claims Act, 31 U.S.C. §3729(a)(1)(A), to the damage of the U.S. Treasury, by causing the U.S. to pay money it was not obligated to pay.

517. In committing these wrongful acts, GLS has engaged in a protracted course and pattern of fraudulent conduct that was material to the U.S.'s decision to pay these false claims. Had the U.S. known of the falsity as to GLS's compliance with the TVPRA or Kuwaiti labor and immigration law, it would not have paid the invoices submitted under Contract 1.

518. All invoices for payment submitted by GLS for payment under Contract 2 were also false claims because GLS was ineligible to perform that contract due to its violations of the federal small business regulations, TVPRA and Kuwaiti law while performing Contract 1.

519. By knowingly, willfully or recklessly presenting claims for payment/reimbursement to the U.S. for services performed under Contract 2, GLS has defrauded the U.S. in contravention of the False Claims Act, 31 U.S.C. §3729(a)(1)(A), to the damage of the treasury of the U.S., by causing the U.S. to pay out money it was not obligated to pay.

520. In carrying out these wrongful acts, GLS has engaged in a protracted course and pattern of fraudulent conduct that was material to the U.S.'s decision to pay these false claims. Specifically, had the U.S. known of this falsity as to GLS's performance under Contract 1, it would not have paid the invoices submitted under Contract 2.

521.     Damages to the U.S. include, but are not limited to, three times the full value of all such fraudulent claims.

522.     Each invoice on Contract 1 and Contract 2 is a separate false claim; and each and every fraudulent claim is also subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 - $11,000).

523.     Defendants are jointly and severally liable for all damages under this Count associated with SBA-related false claims under Contract 1, and are jointly and severally liable for all damages under this Count associated with TVPRA/Kuwaiti law-related false claims under Contract 1 and all false claims under Contract 2.

## COUNT II
### (Violation of the False Claims Act – Material False Records and Statements, 31 U.S.C. §3729(a)(1)(B) – Against All Defendants)

524.     The allegations in Paragraphs 1-523 are incorporated in Count II as though fully stated herein.

525.     By virtue of the acts and omissions described above, Defendants agreed to make use of, and did make use of, or cause to be made use of, false records or statements to get false or fraudulent claims paid or approved by the U.S. Government, in violation of 31 U.S.C. §3729(a)(1)(B).

526.     As described above, upon information and belief, the Small Business Subcontracting Plan submitted to the U.S. by GLS contained material false statements and certifications regarding GLS's intent to actually utilize Small Business Subcontractor resources. These false statements and certifications include, but are not limited to, GLS's statement that it would make a good faith effort to comply with the Small Business Subcontracting Plan and

award particular percentages of its subcontracting work to small businesses, small disadvantaged businesses, women-owned businesses, HUBZone businesses and Service Disabled Businesses.

527. In addition, the periodic reports that GLS subsequently submitted to the U.S. Government regarding its compliance with its Small Business Subcontracting Plan, the FAR and all applicable federal small business statutes, contained material false statements and certifications. Specifically, upon information and belief, on each of these reports, which were required to be submitted on a semi-annual and annual basis, GLS certified that the work was being performed by the Small Business Defendant it listed in those reports. However, GLS knew that the work under Contract 1 was actually being performed by GLS itself.

528. Upon information and belief, the semi-annual and annual reports also knowingly and falsely certified that GLS had made a good faith effort to comply with its Small Business Subcontracting Plan, the FAR and all applicable federal small business statutes, to award particular percentages of its subcontracting work to Small Business Defendants.

529. Further, GLS falsely represented, or at a minimum, implied, when it submitted its periodic reports and claims for payment, that it was in compliance with all U.S. laws and Kuwaiti labor and immigration laws.

530. GLS knowingly made these false statements in order to obtain Contract 1, and to induce the Government to pay amounts it was not obliged to pay under Contract 1.

531. GLS also made false statements to the Commission during its August 2009 investigation of GLS and its relationship to the Small Business Defendants in order to prevent the U.S. from discovering that GLS was in material breach of Contract 1, and so the U.S. government payments would continue to be made to GLS.

532.    In addition, upon information and belief, GLS made false statements or submitted false reports indicating that it was in compliance with Kuwaiti sponsorship requirements, and by those false representations, induced the U.S. to reimburse it for "sponsorship" fees.    As discussed, GLS never obtained proper Kuwaiti sponsorship for Relators.

533.    Moreover, GLS knowingly made these false statements in order to induce the Government to award it Contract 2.  Specifically, GLS falsely certified that it was in compliance with its Small Business Subcontracting Plan under Contract 1, the FAR and all applicable federal small business statutes, as well as applicable domestic and foreign laws, including the TVPRA and Kuwaiti labor and immigration law, because, had its failure to satisfy those material requirements been disclosed to the Government, it would have been disqualified from receipt of Contract 2.

534.    Had the U.S. been aware of the material false statements and certifications, by law it could not have awarded Contract 1 or Contract 2 to GLS, and may not have paid any claims submitted pursuant to either contract.

535.    As such, the false statements and certifications that GLS made in its Small Business Subcontracting Plan, in subsequent reports to the Government, and before the Commission in August 2009, were material to the U.S.'s decision to award Contract 1 and Contract 2 to GLS, as well as its decision to pay the false claims that GLS subsequently presented pursuant to those contracts.

536.    All such false records or statements were implied by GLS or made directly to the U.S. by GLS to get false or fraudulent claims paid or approved by the U.S.

537.     As a direct and proximate result of GLS's fraudulent inducement, each and every claim presented by GLS under Contract 1 and Contract 2 is a false or fraudulent claim within the meaning of the False Claims Act.

538.     Damages to the U.S. include, but are not limited to, three times the full value of all such fraudulent claims.

539.     Each and every fraudulent claim is also subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 - $11,000).

540.     Defendants are jointly and severally liable for all damages under this Count associated with SBA-related false claims under Contract 1, and are jointly and severally liable for all damages under this Count associated with TVPR/Kuwaiti law-related false claims under Contract 1 and all false claims under Contract 2.

<u>**COUNT III**</u>

**(Violation of the False Claims Act – Reverse False Claims,
31 U.S.C. §3729(a)(1)(G) – Against All Defendants)**

541.     The allegations in Paragraphs 1-540 are incorporated in Count III by reference as though fully stated herein.

542.     After submitting the initial false claim under Contract 1, Defendants continued to submit false claims to avoid the forfeiture of GLS's contracts with the U.S., and thereby, the forfeiture of the payments it received from the U.S. under Contracts 1 and 2, thus constituting reverse false claims.

543.     GLS also made false statements to the Commission during its August 2009 investigation of GLS and its relationship to the Small Business Defendants in order to prevent the U.S. from discovering that GLS was in material breach of Contract 1.

544.    The false claims were made to avoid paying back to the U.S. penalties under GLS's contracts with the Government.

545.    Damages to the U.S. include, but are not limited to, three times the full value of all such fraudulent claims.

546.    Each and every fraudulent claim is also subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 - $11,000).

547.    Defendants are jointly and severally liable for all damages under this Count for all reverse false claims related to Contract 1, and are jointly and severally liable for all reverse false claims related to Contract 2.

## COUNT IV
**(Violation of the Trafficking Victims Protection Reauthorization Act,
18 U.S.C. §1581, et seq. – Against All Defendants)**

548.    The allegations in Paragraphs 1-547 are incorporated into Count IV by reference as though fully stated herein.

549.    Plaintiffs bring this action under the Trafficking Victims Protection Reauthorization Act ("TVPRA") 18 U.S.C. §1581, *et seq*.

550.    The U.S. has long had a policy prohibiting Government employees and contractor personnel from engaging in trafficking-in-persons activities, including severe forms of trafficking-in-persons. "Severe forms of trafficking in persons" is defined in section 103 of the TVPRA to include the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery, and sex trafficking.  22 U.S.C. §7102.

551.    Section 1595 of the TVPRA allows private citizens to bring suit against a perpetrator who has violated the TVPRA.

552.    The TVPRA states:

> Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means— (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process;  or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint, shall be punished as provided under subsection (d).

18 U.S.C. §1589(a).

553.    Moreover, 18 U.S.C. §1592 (b) states:

> Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d).

554.     The U.S. has identified certain "unlawful conduct with respect to documents in furtherance of forced labor."  18 U.S.C. §1592(a).  Section 1592(a) states:

> Whoever knowingly destroys, conceals, removes, confiscates, or possesses any actual or purported passport or other immigration document, or any other actual or purported government identification document, of another person-- . . . . to prevent or restrict or to attempt to prevent or restrict, without lawful authority, the person's liberty to move or travel, in order to maintain the labor or services of that person, when the person is or has been a victim of a severe form of trafficking in persons, as defined in section 103 of the Trafficking Victims Protection Act of 2000 [22 USCS §7102].

555.    Title 22 U.S.C. §7109a ("Trafficking Victims Protection") requires that an integrated U.S. Government database be established that provides "an effective mechanism for quantifying the number of victims of trafficking on a national, regional, and international basis . .

. ." The database shall combine "all applicable data collected by each Federal department and agency represented on the Interagency Task Force to Monitor and Combat Trafficking . . . ." *Id.*

556. Section 1593(a) establishes that in in addition to any other civil or criminal penalties authorized by law, the court shall order restitution for any TVPRA offense.

557. Under Section 1593(b)(1) the order of restitution under this section shall direct the defendant to pay the victim the full amount of the victim's losses including any costs incurred by the victim for medical services relating to physical, psychiatric, or psychological care; physical and occupational therapy or rehabilitation; necessary transportation, temporary housing, and child care expenses; lost income; attorneys' fees, as well as other costs incurred; and any other losses suffered by the victim as a proximate result of the offense.

558. Under Section 1593(b)(1), the order of restitution shall also include the greater of the gross income or value to the defendant of the victim's services including the offender's ill-gotten gains.

559. FAR 52.222-50, "Combating Trafficking in Persons," makes clear that "[t]he United States Government has adopted a zero tolerance policy regarding trafficking in persons." *Id.* at §52.222-50(b). The Federal Acquisition Regulations give notice that "Contractors and contractor employees shall not — (1) Engage in severe forms of trafficking in persons during the period of performance of the contract; . . . or (3) Use forced labor in the performance of the contract." *Id.* In addition:

> The Contractor shall — (1) Notify its employees of —  (i) The United States Government's zero tolerance policy described in paragraph (b) of this clause; and (ii) The actions that will be taken against employees for violations of this policy. Such actions may include, but are not limited to, removal from the contract, reduction in benefits, or termination of employment; and (2) Take appropriate action, up to and including termination, against

employees or subcontractors that violate the policy in paragraph (b) of this clause.

*Id.* at §52.222-50(c).

560.    FAR 52.222-50 (d)(1), "Notification," requires that "[t]he Contractor shall inform the Contracting Officer immediately of — Any information it receives from any source (including host country law enforcement) that alleges a Contractor employee, subcontractor, or subcontractor employee has engaged in conduct that violates this policy. . . ."   A contractor's failure to inform the U.S. of trafficking activity may result in "(3) suspension of contract payments; (4) Loss of award fee, consistent with the award fee plan, for the performance period in which the Government determined Contractor non-compliance; (5) Termination of the contract for default or cause, in accordance with the termination clause of this contract; or (6) Suspension or debarment."  *Id.* at (e).

561.    FAR 252.222-7002, "Compliance with Local Labor laws (Overseas)"  states, "The Contractor shall comply with all— (1) Local laws, regulations, and labor union agreements governing work hours; and (2) Labor regulations including collective bargaining agreements, workers' compensation, working conditions, fringe benefits, and labor standards or labor contract matters."  Id.  As a prerequisite to contract award, GLS was required to certify annually its compliance with host nation labor laws, through the U.S. On-Line Representations and Certifications Application ("ORCA") system.

562.    The Kuwait Private Sector Labor Law ("KPSLL") establishes "the replacement of the expatriate labor force by the national labor force – whenever it can be possible – . . . is one of the main objectives of the State that should finally be achieved." Explanatory Memorandum Law No. (6) of 2010 Concerning Private Sector Labour Law Explanatory Memorandum, pp. 45-6.

Expatriates, such as Relators, cannot work in Kuwait unless they subject themselves to Kuwait's laws.

563.     Article 10 of the KPSLL states: "The employer is banned to employ foreign labor force unless they are duly authorized by the Competent Authority to work for him."

564.     Article 10 of the KPSLL states: "An employer shall not recruit laborers from outside the country or appoint laborers from inside the country without making them to work for him."   Article 10 further states, "If it is evident that he is not actually in need of those labourers, in this case, the employer shall bear the expenses for returning the labourer to his country.  If the worker abandons coming to his work and worked for another employer, the employer shall be obliged to return the employer back to his home country, upon registering an absconding notice against the worker by his main sponsor."

565.     GLS was under contract to provide U.S. citizen linguists to INSCOM in Kuwait.

566.      Under Kuwait's immigration laws, it is illegal for a U.S. citizen to enter Kuwait for the purpose of working without first obtaining a State of Kuwait Resident Visa (known as a "Visa 18"), which, as a resident, makes that person subject to the laws of Kuwait.

567.     GLS obtained Plaintiffs' services by abusing Kuwaiti law and legal process.  It is a criminal offense to work in Kuwait without legal authorization to do so.

568.     GLS was banned from employing U.S.-hired linguists unless those linguists were duly authorized by the Kuwait to work there for GLS.

569.     Under Kuwaiti law, GLS was prohibited from recruiting linguists from the U.S. without reporting to the Kuwaiti Government that such laborers were working for GLS.

570.     Under Kuwait law, Kuwaiti companies, such as Alshora, are barred from representing to government authorities that expatriate laborers who performed no work for Alshora were Alshora's employees.

571.     Because of the coordination of immigration rules and policies between and among the members of the Gulf Cooperation Council, a deportation from Kuwait results in a travel ban into the other GCC countries.

572.     GLS told Plaintiffs that it would be responsible, as their employer, for obtaining all of the immigration approvals and work permits needed for them to work in Kuwait.  Through such statements, Plaintiffs were led to believe that GLS would act in accordance with the law in obtaining the necessary immigration approvals and necessary authorizations for Plaintiffs to work in Kuwait.

573.     In contract documents provided to Plaintiffs, GLS failed to inform them that they needed Resident Visas as a pre-condition to working legally in Kuwait.

574.     By confiscating their passports when they arrived in Kuwait, GLS effectively prevented Plaintiffs from obtaining, on their own volition, the necessary immigration and work authorizations required to work legally in Kuwait.  Further, confiscation of their passports prevented Plaintiffs from leaving the country.

575.     The sudden departure of a significant number of linguists from Kuwait would have caused GLS to be in breach of contract for failing to have sufficient linguists available to INSCOM for mission critical translation and interpretation demands.

576.     GLS's machinations with Alshora, resulted in all Visa 18 Relators and all Visa 14 Relators being subject to abrupt deportation and expulsion from the country.

577. The procedures for expelling foreign nationals working illegally in Kuwait are criminal proceedings. Thus, because of GLS's abuses of Kuwaiti law herein described, nearly the entire roster of GLS's linguists were subject to criminal charges for working illegally in the country, arrest, and immediate deportation/expulsion from Kuwait.

578. GLS had a significant financial interest in keeping Plaintiffs in Kuwait, notwithstanding the fact that they were in the country illegally, Kuwait wanted the linguists to leave the country immediately, and the linguists, once aware of the fact that they were subject to criminal prosecution for violating Kuwaiti law, also wanted to leave.

579. There were a variety of acts that GLS could have taken to evacuate the linguists from Kuwait that GLS did not take because GLS wanted to keep them there (due to the fact that the sudden deportation of the Plaintiffs would have caused GLS to be in breach of contract).

580. For example, GLS could have immediately returned the linguists' passports to facilitate their departure from Kuwait. Instead, GLS continued to hold Plaintiffs' passports, in violation of law, so that no linguist could depart Kuwait without the implicit knowledge and consent of GLS.

581. Once the illegality of the linguists' presence in Kuwait was made public, GLS could have, but did not, immediately transfer them to Camp Ali Al-Salem to board "Freedom Flights" back to the United States in order to assist the linguists to comply with Kuwaiti laws that require such persons to immediately depart from Kuwait.

582. By keeping Plaintiffs in Kuwait, in order to forestall the abrupt departure of the majority of its linguist staff and to avoid a breach and default on its contract with INSCOM, GLS caused Plaintiffs ito be in on-going violation of Kuwaiti law.

583.    GLS had an interest in Plaintiffs believing that they would be arrested if they attempted to leave the U.S. compounds.  Placing Plaintiffs in fear of arrest assured that they would remain on base, enabling GLS to continue to assert that it remained in compliance with its INSCOM contract.

584.    On information and belief, GLS intentionally placed a number of Plaintiffs in situations where GLS knew that they were likely to be arrested.  GLS did this to make a public example of linguists who strayed off the base and as a means of frightening other linguists to not attempt to leave their bases.  For example, Abdulghani was in constant communication with GLS about his planned departure from Kuwait and was assiduous about ensuring that he had received all the correct approvals prior to departing Kuwait to visit his ailing mother.  GLS deliberately did not tell him that a warrant had been issued for his arrest and that he was likely to be arrested at the airport, charged with immigration crimes, jailed, and then expelled.  GLS concealed this information because it stood to gain from Abdulghani's arrest.  GLS could use the example of his arrest as a deterrent to other linguists attempting to leave the country.  Similarly, GLS assured Zinnekah, one of the more vocal critics of GLS, that it was safe for him to leave Camp Buehring..  Yet, GLS knew that Kuwait had a warrant for his arrest.  When Zinnekah, in the company of Al-Masri, was in fact arrested, GLS removed a significant irritant to its operations and sent a strong message to the remaining linguists that it was unsafe to venture off the military bases.  On information and belief, GLS intentionally misrepresented Tucker and Mudalige, both present in Kuwait on Visa 14s, to Kuwait authorities as having been sponsored by Alshora.  On May 8, 2013, GLS transported Tucker and Mudalige to Kuwaiti CID, having misrepresented them as GLS-sponsored and knowing that they would be arrested and interrogated about their relationship with Alshora.  All three of these public arrests and the stories of mistreatment that

accompanied them advanced GLS's objective of keeping Plaintiffs in Kuwait by making them afraid to venture off the base. Yet, keeping Plaintiffs in Kuwait where the State of Kuwait was demanding compliance with Kuwait's immigration laws, including immediate departure from Kuwait, deepened Plaintiffs' legal jeopardy.

585. Through the power GLS exerted over Plaintiffs, directly and indirectly by virtue of its machinations with Alshora, GLS could dictate Plaintiffs' living conditions. GLS forced Plaintiffs to remain in Kuwait, in violation of the TVPRA, so that GLS could claim compliance with the terms of the INSCOM contract.

586. By keeping Plaintiffs in Kuwait against the demands of the State of Kuwait and against Plaintiffs' will, GLS provided contractually obligated services to INSCOM by means of threats of force, physical restraint, and threats of physical restraint.

587.

588. GLS abused Kuwaiti immigration law by requiring Plaintiffs to traffic through Bahrain in order to obtain Tourist Visas necessary to be physically present in Kuwait.

589. GLS abused Kuwait's legal processes by filing suit against Alshora, naming Plaintiffs as the plaintiffs in those lawsuits, without Plaintiffs' knowledge or informed consent. GLS exacerbated such abuse by failing to keep Plaintiffs informed of developments in their lawsuits, including the filing of counterclaims against them.

590. GLS further abused Kuwait's legal processes by coercing the Resident Visa Relator/Plaintiffs into signing false confessions to crimes they did not commit.

591. GLS further abused Kuwait's legal processes by misrepresenting Plaintiffs to Kuwaiti authorities, not as employees of the U.S. company GLS, but as the employees of a Kuwait company Alshora.

592.    Plaintiffs did not want to work under the inhumane and arduous conditions to which they were subjected by GLS, but reasonably believed that they had no choice, due to GLS's absolute control over their lives, as manifested, *inter alia*, by GLS's confiscation of their passports (which prevented their mobility while in-country, and deprived them of the ability to leave the country at will), GLS's denial of access to medical care, GLS's refusal to allow one Plaintiff to quit, one member of GLS management telling a Plaintiff that the linguists were "slaves," and GLS's refusal to allow one Plaintiff to leave Kuwait even after she had been fired.

593.    As a result of the aforementioned actions, Plaintiffs suffered serious harm, including but not limited to contracting communicable illnesses that went untreated; emotional distress and physical injuries that also went untreated; arrest by Kuwaiti law enforcement authorities; incarceration for criminal offenses; wrongful detention in Kuwait against their will; blacklisting from re-entry into Kuwait and Gulf Cooperation Council countries; and financial harm.

## PRAYER FOR RELIEF

WHEREFORE, Relators/Plaintiffs, on behalf of themselves and the U.S., pray as follows:

**As to Counts I-III (Violations of the False Claims Act)**:

A.    That this Court enter judgment against all Defendants jointly and severally in an amount equal to three times the amount of damages the U.S. has sustained in regards to Contract 1, including but not limited to, the full value of Contract 1;

B.    That this Court enter judgment against all Defendants GLS and DynCorp in an amount equal to three times the amount of damages the U.S. has sustained in regards to Contract 2, including but not limited to, the full value of Contract 2;

C.      That each Defendant be held jointly and severally liable for a civil penalty not to exceed $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, for each and every false claim it presented or caused to be presented and each false statement and record it made or caused to be made in violation of the False Claims Act under Contract 1;

D.      That Defendants be held jointly and severally liable for a civil penalty not to exceed $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, for each and every false claim presented and each false statement and record made in violation of the False Claims Act under Contract 2;

E.      That Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. §3730(d);

F.      That Relators be awarded their expenses and costs of suit, including reasonable attorneys' fees, to the extent provided by law;

G.      That Relators and the U.S. be awarded pre-judgment and post-judgment interest on all monies awarded;

H.      That Relators be granted any and all other relief set forth in the False Claims Act that was not specifically referenced above;

I.      That Relators be granted such other and further relief as may be determined by the Court to be just, equitable and proper;

**As to Count IV (Violations of the TVPRA):**

J.      That Plaintiffs be awarded damages, including compensatory and statutory damages, for the wrongful acts complained of herein, in an amount to be determined at trial;

K.      That Plaintiffs be awarded punitive or exemplary damages in an amount of which will be proven at trial;

L. That Plaintiffs be awarded their expenses and costs of suit, including reasonable attorneys' fees, to the extent provided by law;

M. That Plaintiffs be awarded pre-judgment and post-judgment interest at highest rate allowed by law;

N. That Plaintiffs be awarded all general, special, and equitable relief to which Plaintiffs are entitled by law; and

O. That Plaintiffs be granted such other and further relief as may be determined by the Court to be just, equitable and proper.

Respectfully submitted,

Joseph A. Hennessey, Esq.
Maryland Federal Bar No. 13779
The Law Office of Joseph Hennessey, LLC
2 Wisconsin Circle, Suite 700
Chevy Chase, Maryland 20815
Telephone: (301) 351-5614
Email: Jhennessey@jahlegal.com

Charles S. Fax
Maryland Federal Bar No. 2490
Rifkin, Weiner, Livingston, Levitan & Silver, LLC
7979 Old Georgetown Road, Suite 400
Bethesda, Maryland 20814
Telephone: (301) 951-0150
Telecopier: (301) 951-0172
Cell Phone: (410) 274-1453
Email: cfax@rwlls.com

Liesel J. Schopler
Maryland Federal Bar No. 17280
Rifkin, Weiner, Livingston, Levitan & Silver, LLC
225 Duke of Gloucester Street
Annapolis, Maryland 21401
Telephone: (410) 269-5066
Telecopier: (410) 269-1235
Email: lschopler@rwlls.com

110

## JURY DEMAND

Relators/Plaintiffs demand a trial by jury on all facts and issues so triable.

_____
Joseph A. Hennessey

Friday, March 25, 2016