**IN THE**
**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Southern Division**

UNITED STATES OF AMERICA *ex rel.*            )
ELGASIM MOHAMED FADLALLA, *et al.*,           )
                                              )
              Plaintiff-Relators,             )
       v.                                     )          Case No. 8:15-cv-01806-PX
                                              )
DYNCORP INTERNATIONAL LLC, *et al.*,          )
                                              )
              Defendants.                     )
_____)

**OPPOSITION OF PLAINTIFFS/RELATORS**
**ELGASIM MOHAMED FADLALLA, *et al.*, TO DEFENDANT**
<u>**DYNCORP INTERNATIONAL, LLC'S MOTION TO DISMISS**</u>

Joseph A. Hennessey
The Law Office of Joseph Hennessey, LLC
2 Wisconsin Circle, Suite 700
Chevy Chase, Maryland 20815

Charles S. Fax
Liesel J. Schopler
Rifkin Weiner Livingston LLC
7979 Old Georgetown Road, Suite 400
Bethesda, Maryland 20814
Timothy Matthews
Chimicles Schwartz Kriner & Donaldson-Smith LLP
361 West Lancaster Avenue
Haverford, Pennsylvania 19041

*Attorneys for Plaintiffs/Relators*

April 30, 2019

i

<u>OPPOSITION TO DYNCORP'S MOTION TO DISMISS</u>
**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................ 1

II.    DI'S AND GLS'S ALLEGED CORPORATE IDENTITY DO NOT SHIELD DI
       FROM LIABILITY FOR RELATORS' CLAIMS ...................................................... 2

       A.    DI is Directly Liable for all of Relators' Claims ................................... 2

       B.    DI is Liable as a Global Linguist Solutions Joint Venturer ................... 3

       C.    DI is Liable Pursuant to the Veil-Piercing/Alter-Ego Doctrine ............ 6

III.   THE PUBLIC DISCLOSURE BAR DOES NOT FORECLOSE RELATORS' FCA CLAIMS ............. 10

       A.    Pre- and Post-2010 Amendment Public Disclosure Bar ...................... 11

       B.    There is No Prior Public Disclosure of the Fraud Alleged by Relators ............... 14

             1.    *None of Defendants' Alleged Public Disclosures Exposed Relators'*
                   *Subcontracting-Based FCA Claims* ......................................... 14

             2.    *Defendants' Claimed Public Disclosures Do Not Expose Relators'*
                   *TVPRA/Kuwaiti Law-Based FCA Claims* ................................ 17

       C.    Relators' Action is not Based on, or Substantially the Same as, a Prior Public
             Disclosure ....................................................................................... 19

             1.    Relators' Action Is Not Based on a Prior Public Disclosure ................... 19

             2.    Relators' Subcontracting-Based FCA Claims are not Substantially the
                   Same as a Public Disclosure ...................................................... 20

             3.    Relators' TVPRA/Kuwaiti Law-Based FCA Claims are not Substantially
                   the Same as a Public Disclosure ................................................ 21

       D.    Relators Are Original Sources Pursuant to the Amended FCA ........................... 23

IV.    CONCLUSION ................................................................................................... 27

<u>TABLE OF AUTHORITIES</u>

**Cases**

*Blair v. Infineon Techs. AG*,
    720 F. Supp. 2d 462 (D. Del. 2010)................................................................ 6

*Bryant v. Better Business Bureau*,
    923 F. Supp. 720 (D. Md. 1996) ................................................................ 12

*C&M Cafe v. Kinetic Farm, Inc.*,
    2016 U.S. Dist. LEXIS 161262 (N.D. Cal. Nov. 18, 2016)................................ 4

*Citynet, LLC v. Frontier W. Va. Inc.*,
    2018 U.S. Dist. LEXIS 55049 (S.D.W. Va. Mar. 30, 2018).................................... *passim*

*Goodman v. Praxair, Inc.*,
    494 F.3d 458 (4th Cir. 2007) ................................................................ 12

*In re American Honda Motor Co., Dealerships Realtors Litig.*,
    941 F. Supp. 528 (D. Md. 1996) ................................................................ 6

*Khadim Alkanani v. Aegis Def. Servs., LLC*,
    286 F.R.D. 67 (D.D.C. 2012).................................................................... 7

*Kopenhaver v. Morgan*,
    2019 U.S. Dist. LEXIS 53324 (D. Md. Mar. 28, 2019).................................... 5

*Legum Furniture Corp. v. Levine*,
    217 Va. 782 (1977) ........................................................................ 4

*Lowen v. Tower Asset Management, Inc.*,
    829 F.2d 1209 (2d Cir. 1987)................................................................ 9

*United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*,
    812 F.3d 294 (3d Cir. 2016)............................................................ *passim*

*Roark v. Hicks*,
    362 S.E.2d 711 (Va. 1987)................................................................ 4

*Rockwell International Corp. v. United States*,
    549 U.S. 457 (2007)........................................................................ 25

*U.S. ex rel. Hockett v. Columbia/HCA Healthcare Corp.*,
    498 F. Supp. 2d 25 (D.D.C. 2007) ...................................................... 2, 3, 6, 10

*United States ex rel. Ackley v. IBM*,
    76 F. Supp. 2d 654 (D. Md. 1999)........................................................ 25

*United States ex rel. Ahumada v. NISH*,
    756 F.3d 268 (4th Cir. 2014) ............................................................ 25

*United States ex rel. Barth v. Ridgedale Elec., Inc.*,
    44 F.3d 699 (8th Cir. 1995) ........................................................ 24

*United States ex rel. Beauchamp v. Academi Training Ctr., LLC*,
    816 F.3d 37 (4th Cir. 2016) ............................................. 11, 17, 23

*United States ex rel. Black v. Health & Hosp. Corp.*,
    494 Fed. Appx. 285 (4th Cir. 2012) ..................................... 14, 17

*United States ex rel. Carter v. Halliburton Co.*,
    973 F. Supp. 2d 615 (E.D. Va. 2013) ................................... 22, 24

*United States ex rel. Davis v. Prince*,
    753 F. Supp. 2d 569 (E.D. Va. 2011) ........................................ 14

*United States ex rel. DeCarlo v. Kiewit/AFC Enters.*,
    937 F. Supp. 1039 (S.D.N.Y. 1996) .......................................... 24

*United States ex rel. DeKort v. Integrated Coast Guard Sys.*,
    705 F. Supp. 2d 519 (N.D. Tex. 2010) ........................................ 6

*United States ex rel. Fent v. L-3 Commc'ns Aero Tech LLC*,
    2007 U.S. Dist. LEXIS 83193 (N.D. Okla. Nov. 8, 2007) ............... 10

*United States ex rel. Grayson v. Advanced Mgmt. Tech., Inc.*,
    221 F.3d 580 (4th Cir. 2000) ............................................... 24, 25

*United States ex rel. Gugenheim v. Meridian Senior Living, LLC*,
    2018 U.S. Dist. LEXIS 47857 (E.D.N.C. Mar. 22, 2018) ............... 23

*United States ex rel. Kneepkins v. Gambro Healthcare, Inc.*,
    115 F. Supp. 2d 35 (D. Mass. 2000) .......................................... 10

*United States ex rel. Moore v. Cardinal Fin. Co., L.P.*,
    2017 U.S. Dist. LEXIS 46983 (D. Md. Mar. 28, 2017) .......... 10, 13, 26

*United States ex rel. Pfeifer v. Ela Medical, Inc.*, 2010 U.S. Dist. LEXIS 45656
    (D. Colo. Mar. 31, 2010) ........................................................... #

*United States ex rel. Polansky v. Exec. Health Res., Inc.*,
    196 F. Supp. 3d 477 (E.D. Pa. 2016) ........................................ 2, 9

*United States ex rel. Powell v. Am. Intercontinental Univ., Inc.*,
    2016 U.S. Dist. LEXIS 127598 (N.D. Ga. Sept. 20, 2016) ............... 7

*United States ex rel. Radcliffe v. Purdue Pharma L.P.*,
    737 F.3d 908 (4th Cir. 2013) ..................................................... 13

*United States ex rel. Raffington v. Bon Secours Health Sys., Inc.*,
    285 F. Supp. 3d 759 (S.D.N.Y. 2018) ........................................ 10

*United States ex rel. Rostholder v. Omnicare, Inc.*,
    745 F.3d 694 (4th Cir. 2014) .................................................................. 24

*United States ex rel. Shea v. Verizon Communs., Inc.*,
    160 F. Supp. 3d 16 (D.D.C. 2015) ................................................... 22, 23

*United States ex rel. Siewick v. Jamieson Sci. & Eng.'g, Inc.*,
    191 F. Supp. 2d 17 (D.D.C. 2002), *aff'd* 322 F.3d 738 (D.C. Cir. 2003) ........................ 10

*United States ex rel. Siller v. Becton Dickinson & Co.*,
    21 F.3d 1339 (4th Cir. 1994) .............................................................. 12, 20

*United States ex rel. Springfield Terminal Ry. v. Quinn*,
    14 F.3d 645 (D.C. Cir. 1994) .................................................................. 24

*United States ex rel. Tillson v. Lockheed Martin Energy Sys., Inc.*,
    2004 U.S. Dist. LEXIS 22246 (W.D. Ky. Sept. 29, 2004) ............................ 10

*United States ex rel. Vuyyuru v. Jadhav*,
    555 F.3d. 337 (4th Cir. 2009) ................................................................. 25

*United States v. Universal Health Servs.*,
    2010 U.S. Dist. LEXIS 116432 (W.D. Va. Oct. 31, 2010) ........................... 8, 9

*Vitol, S.A. v. Primerose Shipping Co.*,
    708 F.3d 527 (4th Cir. 2013) ............................................................ 6, 7, 8

*Wang v. FMC Corp.*,
    975 F.2d 1412 (9th Cir. 1992) ................................................................ 24

**Statutes**

18 U.S.C. § 1589 ..................................................................................... 2

18 U.S.C. §1592 ..................................................................................... 18

31 U.S.C. § 3729 ..................................................................................... 1

31 U.S.C. § 3730(e)(4)(A) (2006) ........................................................... 11

31 U.S.C. § 3730(e)(4)(A) (2010) ........................................................... 12

31 U.S.C. § 3730(e)(4)(B) (2006) ........................................................... 13

31 U.S.C. § 3730(e)(4)(B)(2) ............................................................. 13, 23

31 U.S.C.S. § 3730(e)(4)(A) .................................................................. 12

Delaware Code Ann., Tit. 6, Section 18-102 ............................................. 4

Delaware Code Ann., Title 6, Section 1-201 ............................................. 3

Delaware Code Ann., Title 6, Chapter 18, The Limited Liability Company Act.......................... 4

## Other

Associated Press, *Feds Question Iraq Interpreter Contract*, NBC NEWS
(Aug. 12, 2009, 7:33 PM) ......................................................................... 15

Elizabeth Newell Jochum, *Defense Says Extensive Outsourcing on
Iraq Linguist Contract is Jacking Up Costs*, GOVERNMENT EXECUTIVE
(Aug. 12, 2009) ......................................................................................... 15

Robert Brodsky, *Panel to Probe Subcontracting Systems,
Subcontracting Arrangements*, NEXTGOV (Aug. 11, 2009).............................. 15

Caroline Simson, *Army Translators' Distress Claims Pared in
Contractor Dispute*, LAW360 (Sept. 2, 2014, 8:19 PM)................................ 17

Cheryl K. Chumley, *100 Americans Trapped in Kuwait Over
Contract Snub*, WASH. TIMES (June 19, 2013) ..................................... 17

Cristina Corbin, *Captive in Kuwait: Contract Dispute Leaves
100 Americans Stranded on US Army Bases*, FOX NEWS (June 18, 2013)..................... 17

Dietrich Knauth, *Army Translators Seek Class Cert. In False
Imprisonment Suit*, LAW360 (Sept. 2, 2014) ..................................... 17

Elizabeth Warmerdam, *Linguists Say Dispute Trapped Them in Kuwait*,
COURTHOUSE NEWS SERV. (Oct. 8, 2013, 11:55 PM)..................................... 17

Karina Basso, *Army Translators File False Imprisonment Class
Action Lawsuit*, TOP CLASS ACTIONS (Sept. 5, 2014)..................................... 17

Richard Lardner, *Major Problems Cited in Iraq Interpreter
Contract*, NEWSDAY (Aug. 12, 2009, 9:05 PM) ............................................. 15

Ryan Abbott, *Workers Claim DynCorp Abandoned Them*,
COURTHOUSE NEWS SERV. (Sept. 25, 2013) ..................................... 17

Steven Beardsley, *American Linguists in Kuwait Seek Help from
US Courts to Return Home*, STARS AND STRIPES (Oct. 8, 2013) ..................................... 17

Stewart Bishop, *Army Translation Contractor Breached $697M Deal,
Suit Says*, LAW360 (July 16, 2013, 8:31 PM)..................................... 15

Yochi Dreazen, *No Exit: The Kafka-esque story of the U.S. Translators*
   *Being Held Against their Will in a Kuwaiti Hangar*,
   FOREIGN POLICY (Oct. 2, 2013) ....................................................................... 17

*Shee Atiká Languages, LLC v. Global Linguist Solutions, LLC*,
   No. 1:13-cv-850 (E.D. Va. July 12, 2013) [ECF No. 1]................................... 15

*Alfred Zaklit v. Global Linguist Solutions, LLC*,
   Case No. 1:14cv314 (E.D. Va. July 18, 2014) [ECF No. 102]......................... #

*Zinnekah v. Global Linguist Solutions*,
   Case No. 1:13-CV-1185 (E.D. Va.) [ECF 35].................................................. #

# I.   INTRODUCTION

Plaintiffs/Relators Elgasim Mohamed Fadlalla, *et al.* ("Relators"), by their counsel of record, for their Opposition to the Motion to Dismiss filed by Defendant DynCorp International, LLC ("DI"), state as follows:

Contemporaneously with the filing of this Opposition, Relators are filing oppositions to the Motions to Dismiss ("MTD") filed by Defendants Global Linguist Solutions, LLC, ("GLS"), AECOM National Security Programs, Inc. ("AECOM"), Thomas Wright, Inc ("T/WI"), and KMS Solutions, Inc. ("KMS").[1] Relators incorporate by reference, as though fully stated herein, the statement of facts set forth in their Opposition to GLS's MTD ("GLS Opposition").  Relators also incorporate herein by reference their arguments in their GLS Opposition that: (1) Relators adequately plead False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq*., violations; (2) Relators adequately plead false claims with respect to award and payment under Contract 2; and (3) Relators adequately plead a reverse false claims violation.

This memorandum rebuts DI's arguments that its and GLS's alleged corporate identities shield it from liability for Relators' claims and that the public disclosure bar forecloses Relators' FCA claims.

---

[1] T/WI and KMS are two of the five SBA-certified purported small business subcontractors sued in this action. Three other purported small business subcontractors, TigerSwan, Inc. ("TigerSwan"); Shee Atiká Languages, LLC ("Shee Atiká") and Invizion, Inc. ("Invizion"), have not moved to dismiss for failure to state a claim.  All of the small business defendants are referred to hereinafter as the "SBA Defendants."

1

## II.   DI's AND GLS's ALLEGED CORPORATE IDENTITY DO NOT SHIELD DI FROM LIABILITY FOR RELATORS' CLAIMS

### A.   DI is Directly Liable for all of Relators' Claims

Where a parent corporation directly participates in fraudulent claims, it is liable, under the FCA, for false claims made by a subsidiary. *See U.S. ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 60 (D.D.C. 2007) ("Relator must be able to demonstrate either that HCA is liable under a veil piercing or alter ego theory, *or that it is directly liable for its own role in the submission of false claims*." (Emphasis added)); *see also United States ex rel. Polansky v. Exec. Health Res., Inc.*, 196 F. Supp. 3d 477, 512 (E.D. Pa. 2016) ("The FCA's provisions on liability for those who cause false claims to be presented 'indicate a purpose to reach any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government.'" (Citation omitted)).   Likewise, anyone who directly participates in violations of the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. §§ 1589, *et seq.*, ("TVPRA") is liable under that statute. *Id.* at § 1589(a).

DI, based on its direct participation in the FCA and TVPRA violations alleged in this lawsuit, is directly liable for those claims.   DI's direct participation in GLS's ongoing unlawful activity saturates the sorry story: DI and GLS shared the same business address, First Amended Complaint ("FAC") ¶ 36; GLS's operating agreement authorized DI to designate managers to oversee the business and affairs of GLS, and DI personnel were responsible for day-to-day management of GLS and all instruction given to GLS employees, *id.* at ¶ 32; DI exercised management control over GLS, *id.* at ¶ 34; in performing Contract 1, DI controlled distribution of the employee handbooks to the SBA Defendants, *id.* at ¶ 38; DI controlled all "back office" support for the linguists, including time recording, expense reimbursement, and per diem reimbursement,

*id.* at ¶¶ 37, 39, 40, 42, 105, 299; all persons purportedly in the employ of GLS accessed their time through DI systems, *id.* at ¶ 40, which enabled DI to monitor Relators' pay, *id.* at ¶¶ 301, 312; DI hired and fired key GLS personnel, *id.* at ¶ 41; DI developed all training policies for GLS personnel, *id.* at ¶ 44; and DI employees (including Samuel de Sidmed, Todd Lawrence, Cheryl Robinson, Greg Williams and Bader Sultan) directly supervised Relators and oversaw or controlled Relators' visa compliance, *id.* at ¶¶ 45-46, 48, 49, 111, 316, 340.

In sum, DI was inextricably engaged with GPS in – and participated in the direct control of – the manifest frauds, violations and false claims alleged in the FAC.  DI's direct participation makes it directly liable as in *Hockett*, 498 F. Supp. 2d at 62-63.[2]

## B.    DI is Liable as a GLS Joint Venturer

A false premise underlies DI and AECOM's attempt to avoid the joint and several liability that flows from operating a joint venture together.  The false premise is that legislatively created limited liability companies, whose formalities are prescribed by statute, are mutually exclusive of traditional, common law joint ventures that are governed by partnership law.  They are not.

To be clear, joint ventures and limited liability companies are different business organizations that the State of Delaware (where "GLS, LLC" is registered) recognizes as having independent existence.  Delaware Code, Title 6, Section 1-201 (27) describes limited liability companies separately from joint ventures.  The Code defines "person" as: "an individual, corporation, business trust, statutory trust, estate, trust, partnership, **limited liability company**, association, **joint venture**, government, governmental subdivision, agency, or instrumentality, public corporation, or any other legal or commercial entity." (emphasis added).

---

[2] As a separate matter, DI's direct participation in the wrongdoing moots its misplaced veil-piercing argument (DI MTD at pp. 11-16).  But even assuming *arguendo* that DI did not participate directly, its corporate veil can still be pierced as discussed *infra* at § II(C).

3

A limited liability company is a statutorily-authorized business entity that may be created only by observing the statutory requisites for limiting the liability of its managers. *See* Delaware Commerce and Trade, Title 6, Chapter 18, "The Limited Liability Company Act" §§ 18-101 *et seq.* Among the formalities necessary to acquire the limitation of liability that characterizes a limited liability company is the intentional use of the words "limited liability company" or "LLC." *Id.* at §18-102.

Contrary to this requirement, a significant number of Relators' Foreign Service Employment Agreements ("FSAs") were entered into with GLS with no reference to "Global Linguist Solutions, LLC" or any other conspicuous notice that GLS was a limited liability company. *See* FAC ¶ 27; *see also C&M Cafe v. Kinetic Farm, Inc.*, 2016 U.S. Dist. LEXIS 161262, at *13 (N.D. Cal. Nov. 18, 2016) ("Kinetic Farm Inc.'s name, which does not include 'LLC' or 'Limited Liability Company', suggests that it is not organized as an LLC." (Citing Delaware Code Ann. Tit. 6 § 18-102)). Conspicuous public proclamation is not an empty formality, as it provides public notice that the liability for acts and omissions is limited to the statutorily-authorized business form – the very limitation of liability that DI and AECOM seek to obtain through their motions to dismiss.

By contrast, anyone may create a joint venture by mere declaration – there exist no statutory formalities to observe. A joint venture is a default business formation that is governed by general partnership law. In Virginia, where AECOM and DI both have principal places of business (FAC ¶¶ 17-18), "[l]ittle formality is required to establish a joint venture . . ." *Legum Furniture Corp. v. Levine*, 217 Va. 782, 786 (1977), and "the rules of law governing the rights, duties, and liabilities of joint venturers are substantially the same as those which govern partnerships." *Roark v. Hicks*, 362 S.E.2d 711, 714 (Va. 1987) (citation omitted); *see also* FAC ¶ 21. Both general partnership

law and Va. Code Ann. § 50-73.91 provide that the knowledge of general partners is imputed to the partnership and its members.  Further, since every partner is an agent of the partnership, the act of every partner for conducting the business of the partnership of which he is a member binds the partnership.  *Id.  See also Kopenhaver v. Morgan*, 2019 U.S. Dist. LEXIS 53324, at *8 (D. Md. Mar. 28, 2019) ("A joint venture is when two or more persons combine in a joint business enterprise for their mutual benefit with an understanding that they will share in profits and losses and have a voice in its management." (Citations and internal quotations omitted)).  Because members of a joint venture are jointly and severally liable with respect to tort claims, "a plaintiff may sue one or all of them."  *Id.* (citation omitted).

Though the Division of Corporations for the State of Delaware might list "Global Linguist Solutions" as a limited liability company, that does not negate the fact that both DI and AECOM repeatedly and systemically referred to GLS publicly, and in documentation, as a joint venture between them – and used the designation "Global Linguist Solutions" without the denomination "LLC."

In fact, given the opportunity, if not the obligation, to refer to Global Linguist Solutions as a limited liability company, both DI and AECOM *repeatedly* referred to Global Linguist Solutions as a joint venture.  Relators have documented DI's repeated description of GLS as a joint venture. FAC at ¶¶ 24-27, 30.  AECOM also repeatedly characterized its business activities with DI as a joint venture, and not a limited liability company.  Relators have documented how AECOM, through its annually filed SEC 10-K disclosure statements, repeatedly warned its investors of the threat of joint and several liability flowing from its joint ventures such as its "Global Linguists Solutions joint venture."  *See* Relators' Opposition to AECOM's MTD at § II(B).  Such representations cannot be accidental.

Given these facts, at the very least it would premature to rule on this issue on a motion to dismiss without the benefit of discovery.  For the purposes of Fed. R. Civ. P. 12 (b)(6), Relators adequately have pled the existence of a GLS joint venture as has been repeatedly and publicly declared by both DI and AECOM.

### C.  DI is Liable Pursuant to the Veil-Piercing/Alter-Ego Doctrine

As DI notes, federal common law governs veil-piercing in this case.  DI MTD at p. 11, n.15.  Generally, "[w]hether a preponderance of the evidence supports the . . . allegations, and whether justice and fairness will ultimately require that the Court pierce the corporate veil, is fact-intensive, and thus an issue to be decided later."[3]  *United States ex rel. DeKort v. Integrated Coast Guard Sys.*, 705 F. Supp. 2d 519, 547 (N.D. Tex. 2010); *see also In re American Honda Motor Co., Dealerships Realtors Litig.*, 941 F. Supp. 528, 551 (D. Md. 1996) (piercing analysis "is a fact-specific inquiry that courts often wait until summary judgment to decide"); *Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 544 (4th Cir. 2013) ("At its core, the question of whether to pierce the corporate veil is a fact-intensive inquiry, because 'the circumstances necessarily vary according to the circumstances of each case, and every case where the issue is raised is to be regarded as sui generis to be decided in accordance with its own underlying facts.'" (Citation omitted)).

As to the first step in the piercing analysis, courts look to whether "the parent exercised such control over the subsidiary that the subsidiary has become its 'mere instrumentality.'" *Hockett*, 498 F. Supp. 2d at 60 (citation omitted).  Relevant factors "include identity of ownership; commonality of officers and directors; the financial relationship between parent and subsidiary;

---

[3] At the motion to dismiss stage, "[t]he question at bar [in analyzing veil piercing] is not whether plaintiffs' claims will ultimately succeed on their merits, but whether the facts as pled are sufficient to warrant discovery."  *See, e.g., Blair v. Infineon Techs. AG*, 720 F. Supp. 2d 462, 471 (D. Del. 2010).

whether the two maintain separate books, records, offices, and the like; and whether property of one is used by the other as essentially its own." *Id.* (citation omitted). The Fourth Circuit has noted that other factors to be considered "include intermingling of funds; overlap in ownership, officers, directors, and other personnel; common office space; the degrees of discretion shown by the allegedly dominated corporation; and whether the dealings of the entities are at arm's length." *Vitol*, 708 F.3d at 544 (citation omitted). *See also Khadim Alkanani v. Aegis Def. Servs., LLC*, 286 F.R.D. 67, 72 (D.D.C. 2012) ("Considerations that factor into this inquiry are the 'nature of the corporate ownership and control; . . . comingling of funds and assets; [and] diversion of one corporation's funds to the other's uses.'" (Citation omitted) (alterations in original)).

The court in *United States ex rel. Powell v. Am. Intercontinental Univ., Inc.*, 2016 U.S. Dist. LEXIS 127598, at *26 (N.D. Ga. Sept. 20, 2016), found this first step in the federal piercing test satisfied where allegations included the parent's involvement in the subsidiary's day-to-day operations, which consisted of the parent's employees being "closely involved with, if not entirely in charge of: the hiring, firing, and compensation of [the subsidiary's] admissions staff; organizing trainings for [the subsidiary's] staff; and setting policies and productivity goals for [the subsidiary's] admissions staff."

Here, Relators adequately allege that DI exercised such control over GLS that GLS became a mere instrumentality of DI. As noted above, Relators allege that DI personnel were responsible for the day-to-day management of GLS and all instructions given to GLS employees, FAC ¶¶ 32, 34; DI controlled all "back office" support for the linguists, including time recording, expense reimbursement, and per diem reimbursement, *id.* at ¶¶ 37, 39, 40, 42, 105, 299; DI tracked Relators' pay, *id.* at ¶¶ 301, 312; DI hired and fired key GLS personnel, *id.* at ¶41; DI developed all training policies for GLS personnel, *id.* at ¶ 44; DI employees directly supervised Relators and

oversaw or controlled Relators' visa compliance, *id.* at ¶¶ 45-46, 48, 49, 111, 316, 340.  In addition, DI listed the value of Contract 1 in its June 4, 2010 SEC 10-K disclosure statement, and refers therein to GLS as one of its own "segments," *id.* at ¶ 29; DI made a statement in its June 11, 2009 SEC 10-K as to revenue earned and anticipated to be earned from Contract 1 through GLS joint venture, using the terms "our" and "we," *id.* at ¶ 30; at least as of 2009, DI and GLS had consolidated financial statements; *id.* at ¶ 31; DI funded GLS's operating capital, *id.* at ¶ 33; in 2009, DI considered its finances to be so commingled with GLS's finances that DI auditors closely examined GLS internal controls as part of the DI Sarbanes-Oxley ("SOX") audit, *id.* at ¶ 35; at all times relevant to the allegations in the FAC, DI and GLS shared the same business address, *id.* at ¶36; in performing Contract 1, DI controlled distribution of the employee handbooks to SBA Defendants, *id.* at ¶ 38; DI asserted proprietary rights to the content of GLS emails, *id.* at ¶ 43; and, in listing its property assets for the benefit of investors, DI listed "Herndon, VA Offices – GLS recruiting center GLS 11,400 [sq. ft.] [and] San Diego, CA Offices – GLS recruiting center GLS 9,400 [sq. ft.]," *id.* at ¶ 47.

DI, in arguing that Relators fail to meet this prong, relies on *United States v. Universal Health Servs*., 2010 U.S. Dist. LEXIS 116432 (W.D. Va. Oct. 31, 2010), and *Vitol, supra*.  Both cases are inapposite. The *Universal Health* court noted that "courts routinely refuse to pierce the corporate veil based on allegations limited to the existence of shared office space or overlapping management, allegations that one company is the wholly-owned subsidiary of another, or that companies are to be considered as a whole." 2010 U.S. Dist. LEXIS 116432, at *10 (internal quotations omitted).  In that case, "[a]t most, the Government's allegations suggest a close supervisory relationship between . . . the parent company . . . towards the activities of its subsidiaries." *Id.* at *11.

8

The plaintiff in *Vitol* alleged only that the fleets of the two corporations at issue had similar coloration, that they shared office space and comingled funds (an allegation premised mainly on one corporation having provided loans to the other, loans that were largely repaid).  708 F.3d at 546-48.   The Fourth Circuit found that those pleadings, at best, alleged "a close business relationship."  *Id.* at 545-48.    As evidenced by the litany of facts listed above, Relators do not merely allege supervisory relationship – they allege much more, and thus DI's reliance on *Universal Health* and *Vitol* is misplaced.  Furthermore, *Vitol* was not an FCA suit, and thus the defendant was spared the vigorous application of federal common law vindicating federal statutory goals.  *See, e.g.*, *Lowen v. Tower Asset Management, Inc.*, 829 F.2d 1209, 1220 (2d Cir. 1987) ("[I]n determining whether to disregard the corporate form, [the court] must consider the importance of the use of that form in the federal statutory scheme, an inquiry that generally gives less deference to the corporate form than does the strict alter ego doctrine of state law." (Citations omitted)).

Any of the factors considered under the first step of the federal veil-piercing test can be sufficient to show unfairness as to the second step.  *Polansky*, 196 F. Supp. 3d at 515.  The numerous factors under the first step alleged here, including identity of ownership; financial relationship between parent and subsidiary; shared records, offices and the like; intermingling of funds; overlap of personnel; common office space; and diversion of one corporation's funds to the other's uses – demonstrate the fundamental unfairness that would result if DI were permitted to shield itself from FCA and TVPRA liability.[4]

---

[4] The cases upon which DI relies to argue that Relators do not satisfy the second prong of the veil-piercing test are inapposite. *See Universal Health*, 2010 U.S. Dist. LEXIS 116432, at *11 (no piercing where analysis rested only on a "close supervisory relationship" without more); *Polansky*, 196 F. Supp. 3d at 517 (noting a conspicuous absence of facts sufficient to support "any" of the veil-piercing factors); *United States ex rel. Kneepkins v. Gambro Healthcare, Inc.*, 115 F. Supp.

Relators sufficiently plead the requisite factors for piercing the corporate veil beyond mere speculation or recitation of the elements. As such, the nature and extent of the dominion and control exercised by DI over GLS is a question of fact, not subject to resolution on a motion to dismiss. DI's motion to dismiss on piercing grounds should be denied.

## III.   THE PUBLIC DISCLOSURE BAR DOES NOT FORECLOSE RELATORS' FCA CLAIMS

Ascertaining the applicability of the FCA public disclosure bar[5] entails a three-step inquiry. *United States ex rel. Moore v. Cardinal Fin. Co., L.P.*, 2017 U.S. Dist. LEXIS 46983, at *31-34 (D. Md. Mar. 28, 2017). First, the court examines whether the relator's allegations have been publicly disclosed. *Id.* If so, the court next asks whether the lawsuit is "based upon" (or "substantially the same as")[6] the publicly disclosed allegations. *Id.* If it is, the public-disclosure bar precludes the action unless the relator is an original source of the information upon which the

_____

2d 35, 40 (D. Mass. 2000) (finding piercing allegations insufficient where only fact offered in support was that parent company was sole owner of the subsidiary); *United States ex rel. Siewick v. Jamieson Sci. & Eng.'g, Inc.*, 191 F. Supp. 2d 17, 21 (D.D.C. 2002), *aff'd* 322 F.3d 738 (D.C. Cir. 2003) (finding piercing allegations insufficient where veil piercing analysis rested solely on the status of a single individual who served both as the majority shareholder and corporate officer); *Hockett*; 498 F. Supp. 2d at 61 (rejecting piercing on mere allegation that three officers were employees of the parent corporation); *United States ex rel. Raffington v. Bon Secours Health Sys., Inc.*, 285 F. Supp. 3d 759, 769-70 (S.D.N.Y. 2018) (finding the mere allegation that a parent company "oversaw" the subsidiary, without any additional allegations of abuse of corporate separateness, insufficient for piercing); *United States ex rel. Fent v. L-3 Commc'ns Aero Tech LLC*, 2007 U.S. Dist. LEXIS 83193, at *11, 13 (N.D. Okla. Nov. 8, 2007) (the mere allegation that a parent corporation is a minority owner of the subsidiary is insufficient for piercing); *United States ex rel. Pfeifer v. Ela Medical, Inc.*, 2010 U.S. Dist. LEXIS 45656, at *40 (D. Colo. Mar. 31, 2010) (no piercing where no claim of lack of respect for corporate separateness); *United States ex rel. Tillson v. Lockheed Martin Energy Sys., Inc.*, 2004 U.S. Dist. LEXIS 22246, at *95-96 (W.D. Ky. Sept. 29, 2004) (the existence of a performance guarantee provided by parent corporation insufficient for veil piercing).

[5] 31 U.S.C. § 3730(e)(4)(A) (2006), amended by Patient Protection & Affordable Care Act, Pub. L. No. 111-148, tit. X, sec. 10104(j)(2), 124 Stat. 119, 901-02 (2010).

[6] As discussed, *infra*, the "based on" standard applies to allegations of conduct that occurred before March 23, 2010, and the "substantially the same" standard applies to conduct occurring thereafter.

lawsuit is based. *Id.* The bar "aims 'to strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits' in which a relator, instead of plowing new ground, attempts to free-ride by merely reiterating previously disclosed fraudulent acts." *United States ex rel. Beauchamp v. Academi Training Ctr., LLC*, 816 F.3d 37, 43 (4th Cir. 2016) (citation omitted).

As shown below, the public disclosure bar does not apply here because there is no prior disclosure of the fraud alleged by Relators. Further, Relators' claims are not based on or substantially the same as any prior public disclosure, and, even if they were, the bar is nevertheless inapplicable because Relators are original sources.

### A.     Pre- and Post-2010 Amendment Public Disclosure Bar

Prior to 2010, the public disclosure bar read as follows:

> *No court shall have jurisdiction* over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, *unless* the action is brought by the Attorney General or *the Person bringing the action is an original source of the information*.

31 U.S.C. § 3730(e)(4)(A) (2006) (emphasis added). This version of the public disclosure bar was a "jurisdictional limitation, . . . [which] if applicable, divest[s] the district court of subject-matter jurisdiction over the action." *United States ex rel. Radcliffe v. Purdue Pharma L.P.*, 737 F.3d 908, 916 (4th Cir. 2013).

Effective March 23, 2010, Congress, through amendment to the FCA, revised the public disclosure bar. It now provides:

> *The court shall dismiss an action* or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—
>
> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
>
> (ii) in a congressional, Government Accountability Office, or other Federal Report, hearing, audit, or investigation; or

11

(iii) from the news media,

*unless* the action is brought by the Attorney General or *the person bringing the action is an original source of the information*.

31 U.S.C. § 3730(e)(4)(A) (2010) (emphasis added).  Post-amendment, the public disclosure bar is a ground for dismissal – an affirmative defense, as to which the defendant bears the burden of proof[7] – rather than a jurisdictional bar.  *Beauchamp*, 816 F.3d at 40.  Accordingly, "[p]re-amendment, determining whether the public-disclosure bar precludes a plaintiff's claims is decided under Rule 12(b)(1) for lack of subject matter jurisdiction; post-amendment, it is treated as a motion to dismiss pursuant to Rule 12(b)(6)."[8]  *See Citynet, LLC v. Frontier W. Va. Inc.*, 2018 U.S. Dist. LEXIS 55049, at *47-48 (S.D.W. Va. Mar. 30, 2018) (citation and footnote omitted).

The 2010 FCA amendments also changed the required connection between the plaintiff's claims and the qualifying public disclosure.  Under the pre-amendment version of the statute, an action is barred if it is "based upon" a qualifying public disclosure, 31 U.S.C.S. § 3730(e)(4)(A), a standard that has been interpreted by the Fourth Circuit to mean that the plaintiff must have "actually derived" his knowledge of the fraud from the public disclosure.  *United States ex rel. Siller v. Becton Dickinson & Co.*, 21 F.3d 1339, 1348 (4th Cir. 1994).  As amended, the public-disclosure bar instead applies if substantially the same allegations or transactions were publicly

---

[7] *See Bryant v. Better Business Bureau*, 923 F. Supp. 720, 738 (D. Md. 1996); *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007).

[8] *See, e.g.*, *United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 300 (3d Cir. 2016) (acknowledging that in considering a Rule 12(b)(1) challenge for lack of subject matter jurisdiction, the court may determine its own jurisdiction by consideration of evidence outside the pleadings yet "in considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court generally considers *only* the allegations in the complaint, accepting them as true, and the defendant bears the burden of showing that the plaintiff has not stated a claim." (Citations omitted) (emphasis added)).

disclosed. *Radcliffe*, 737 F.3d at 917 (the amended bar "focuses on the similarity of the allegations of fraud rather than the derivation of the knowledge of fraud").

Additionally, the amended FCA "expanded the definition of 'original source.'" *Majestic Blue Fisheries*, 812 F.3d at 300.  Under the pre-2010 FCA, an "original source" is defined as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information."  31 U.S.C. § 3730(e)(4)(B) (2006).  As defined in the post-2010 FCA, an "original source" is an individual who either:

> (i) prior to a public disclosure under subsection (e)(4)(A), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.[9]

Thus, under the post-amendment version of 31 U.S.C. § 3730(e)(4)(B)(2), a relator need not possess "direct . . . knowledge" of the fraud to qualify as an original source.

The amended bar is not retroactive, resulting in the application of the pre-2010 amendment public disclosure bar to conduct that occurred before March 23, 2010, and the post-amendment bar to conduct occurring thereafter.  *Moore*, 2017 U.S. Dist. LEXIS 46983, at *30.  "If a complaint alleges a continuing course of fraud occurring both before and after March 23, 2010, the pre-amendment version governs conduct occurring before that date, and the post-amendment version governs conducts occurring thereafter."  *Id.* (citation omitted).

---

[9] The observably incorrect sequence of numbering in (i) and (2) appears in the statute. *See* 31 U.S.C. § 3730(e)(4)(B).

**B.      There is No Prior Public Disclosure of the Fraud Alleged by Relators**

A disclosure, to be considered a prior public disclosure of a fraud alleged in an FCA suit, must contain either: "(1) an allegation of fraud; or (2) a false state of facts and a true state of facts from which fraudulent activity may be inferred." *United States ex rel. Davis v. Prince*, 753 F. Supp. 2d 569, 581 (E.D. Va. 2011) (citing cases); *see also United States ex rel. Black v. Health & Hosp. Corp.*, 494 Fed. Appx. 285, 291 (4th Cir. 2012) (unpublished) ("where a public disclosure has occurred, 'the critical elements exposing the [alleged fraud]' are already placed in the public domain" (citation omitted)).  Without the fraud or its critical elements being publicly disclosed, "'the government [is not] on notice to the possibility of fraud,'" *Davis*, 753 F. Supp. 2d at 581 (citation omitted), and public disclosure bar is inapplicable.

1.     *None of Defendants' Alleged Public Disclosures Exposed Relators' Subcontracting-Based FCA Claims*

Relators' SBA-based FCA claims are premised on the fact that the SBA Defendants were not *bona fide* small businesses and performed <u>no</u> work under Contract 1.  *See* GLS Opposition § II (A).[10]  The purported prior public disclosures cited by Defendants – the August 12, 2009 hearing

---

[10] *See also* FAC ¶¶ 81-82, 86 (SBA Defendants were affiliates of GLS, and therefore could not be treated as SBA entities under Contract 1); *id.* at ¶ 94 (SBA Defendants did not have *any* meaningful role in the performance of Contract 1); *id.* at ¶ 117 (GLS was performing *all* of the requested work); *id.* at ¶ 116 (GLS usurped the SBA Defendants' subcontract performance); *id.* at ¶ 493 (GLS used SBA Defendants as fronts for services provided directly by GLS, and that the subcontracts with the SBA Defendants were a sham); *id.* at ¶ 494 (GLS rotated the Relators at will among the SBA Defendants, requiring Relators to sign new employment contracts from time to time, to further the illusion that the SBA Defendants employed Relators and were properly performing subcontracting duties); *id.* at ¶ 497 (GLS paid the SBA Defendants for work not performed by them, and then illegally passed that cost on to the U.S. by making false claims for reimbursement).

SBA Defendants did not keep time records, process foreign service employment agreements or process payment for their alleged employees.  FAC ¶¶ 105, 107, 170.  SBA Defendants did not know, at any given time, which Relators were on their payrolls; the amount of their businesses' revenue; the percentage of work their businesses were ostensibly performing; whether the work

by the Commission on Wartime Contracting in Iraq and Afghanistan ("CWC Hearing"), certain media reports about the CWC Hearing,[11] and the complaint in *Shee Atiká Languages, LLC v. Global Linguist Solutions, LLC*, No. 1:13-cv-850 (E.D. Va. July 12, 2013) [ECF No. 1] as well as an article about that case[12] – do not disclose that fraud or its critical elements.  Accordingly, there is no qualifying prior public disclosure of Relators' subcontracting-based FCA claims, and the public disclosure bar is inapplicable to those claims.

The CWC Hearing, which was a "case study" and "not an accusatory proceeding," Aug. 12, 2009, CWC Hearing Transcript ("CWC Transcript"),[13] at p. 1, focused on the high costs of the GLS contract, and questioned whether outsourcing certain roles, such as payroll, to subcontractors, unnecessarily increased the cost of Contract 1.[14]  While there were claims that some subcontractors

---

was being satisfactorily performed; the status and locales of their work assignments; or what they were owed. *Id.* at ¶ 115.  It follows that GLS falsely represented and certified that it was complying with its Small Business Contracting Plan, the FAR, and applicable federal small business statutes. *Id.* at ¶¶ 69-86, 492, 496, 498-502, 526-28, 531, 542-43.

[11] Associated Press, *Feds Question Iraq Interpreter Contract*, NBC NEWS (Aug. 12, 2009, 7:33 PM); Elizabeth Newell Jochum, *Defense Says Extensive Outsourcing on Iraq Linguist Contract is Jacking Up Costs*, GOVERNMENT EXECUTIVE (Aug. 12, 2009); Robert Brodsky, *Panel to Probe Subcontracting Systems, Subcontracting Arrangements,* NEXTGOV (Aug. 11, 2009); Richard Lardner, *Major Problems Cited in Iraq Interpreter Contract*, NEWSDAY (Aug. 12, 2009, 9:05 PM).

[12] Stewart Bishop, *Army Translation Contractor Breached $697M Deal, Suit Says*, LAW360 (July 16, 2013, 8:31 PM).

[13] Available at https://cybercemetery.unt.edu/archive/cwc/20110930032251/http://www. Wartime contracting.gov/images/download/documents/hearings/20090812/Transcript-Linguist_Support_ Contracts_20090812.pdf.

[14] CWC Hearing Transcript, at p. 2 (focus on "policies for determining that subcontracting arrangements are providing value commensurate with costs and our methods for providing effective monitoring of contractor performance"); *id.* at p. 15 ("[I]f you look at the numbers and the functions that are being performed by the subcontractors, one does have to ask what is the value?"); *id.* at p. 21 ("It is a legitimate cost, it is a payroll function.  Payroll functions need to be done.  Do they need to be done by 12 different subcontractors with their own G&A, with their own profit, their own fee?  I think that is a good question to ask.").

were hired just to perform payroll services for their *bona fide* employees that they "leased" to GLS, there was no accusation that a small business subcontractor was contracted to do *nothing*; or was not personally performing the functions for which it was contracted; or that linguists were not *bona fide* employees of the small business subcontractors.  *Id.* at p. 15 ("[I]f you look at the . . . *functions that are being performed by the subcontractors* . . ." (Emphasis added)); *id.* at p. 28 ("payroll function sounds like it is actually somewhat meaningful"); *id.* at p. 51 (GLS agreeing that "[e]very one of these subcontractors is performing all of the functions that they have been responsible for performing"); *id.* at p. 54 ("GLS is basically leasing the linguists from these subcontractors"); *id.* ("Sixty percent of the linguist [GLS] provide[s] are provided through the subcontracts and they are employees of those subcontractors."); CWC Hearing Statement of John W. Houck, GM[15] (stating that the functions contracted to the small business subcontractors included personal security administration, human resources administration (benefits, HRIS, employee relations), casualty assistance, financial administration (timekeeping, payroll, invoicing), and direct deposit).

As the case study performed at the CWC Hearing – as well as the news stories about the CWC that Defendants cite – "do[ ] not address any of the allegations of fraud contained in the complaint," *Citynet*, 2018 U.S. Dist. LEXIS 55049, at *55, none is a "public disclosure" barring Relators' subcontracting-based FCA claims.  *Id.* (finding that a case study that did not address the fraud allegations in relator's complaint was not a public disclosure within the meaning of the FCA).

The *Shee Atiká* complaint and one news story cited about that case do not allege or imply that the subcontractors performed no functions under Contract 1 or were not *bona fide* small businesses.  To the contrary, the *Shee Atiká* complaint alleges that it is a *bona fide* small business

---

[15]    Available    at    https://cybercemetery.unt.edu/archive/cwc/20110930032235/http://www.wartimecontracting.gov/images/download/documents/hearings/20090812/Mr_John_Houck _GLS_Statement_08-12-09.pdf.

that performed functions under its subcontract.  FAC ¶¶ 6, 10, 13, 51-52, 78.  Thus, despite being in the public domain, the *Shee Atiká* complaint and the one cited story about it, like the CWC Hearing, did not "put the government on notice of the likelihood of fraudulent activity," *Black*, 2011 U.S. Dist. LEXIS 32220, at \*18, and thus is not a prior public disclosure under the FCA.

<div align="center">

2.    *Defendants' Claimed Public Disclosures Do Not Expose Relators'*
*TVPRA/Kuwaiti Law-Based FCA Claims*

</div>

Defendants argue that the following purported public disclosures bar Relators' TVPRA/Kuwaiti law-based FCA claims: news stories about Relators' detention/visa crisis in Kuwait;[16] the complaint in *Alfred Zaklit v. Global Linguist Solutions, LLC*, Case No. 1:14cv314 (E.D. Va. July 18, 2014) [ECF No. 102], and certain news stories about it;[17] and the complaint in *Zinnekah v. Global Linguist Solutions*, Case No. 1:13-CV-1185 (E.D. Va.) [ECF No. 35], and certain news stories about it.[18]  As an initial matter, neither the *Zaklit* nor the *Zinnekah* lawsuit is a public disclosure because the government was not a party to either litigation.  *See* 31 U.S.C. §3730(e)(4)(A)(i).  The only relevant inquiry is whether public disclosures by members of the news media created a "public disclosure."  They did not.

---

[16] Cheryl K. Chumley, *100 Americans Trapped in Kuwait Over Contract Snub*, WASH. TIMES (June 19, 2013), Cristina Corbin, *Captive in Kuwait: Contract Dispute Leaves 100 Americans Stranded on US Army Bases*, FOX NEWS (June 18, 2013).

[17] Dietrich Knauth, *Army Translators Seek Class Cert. In False Imprisonment Suit*, LAW360 (Sept. 2, 2014); Elizabeth Warmerdam, *Linguists Say Dispute Trapped Them in Kuwait*, COURTHOUSE NEWS SERV. (Oct. 8, 2013, 11:55 PM); Karina Basso, *Army Translators File False Imprisonment Class Action Lawsuit*, TOP CLASS ACTIONS (Sept. 5, 2014); Caroline Simson, *Army Translators' Distress Claims Pared in Contractor Dispute*, LAW360 (Sept. 2, 2014, 8:19 PM).

[18] Ryan Abbott, *Workers Claim DynCorp Abandoned Them*, COURTHOUSE NEWS SERV. (Sept. 25, 2013); Yochi Dreazen, *No Exit: The Kafka-esque story of the U.S. Translators Being Held Against their Will in a Kuwaiti Hangar*, FOREIGN POLICY (Oct. 2, 2013); Steven Beardsley, *American Linguists in Kuwait Seek Help from US Courts to Return Home*, STARS AND STRIPES (Oct. 8, 2013).

Relators' TVPRA/Kuwait law-based FCA claims are premised on Defendants fraudulently seeking payment under Contract 1[19] when they were disqualified from contract performance due to their violations of the TVPRA, Kuwaiti law and NISPOM regulations.  FAC ¶¶ 7, 126-33, 143, 503, 529, 532-33.  There was no prior news media coverage of Relators' allegations that GLS, in contravention of 18 U.S.C. §1592, confiscated Relators' passports;[20] abused Kuwaiti law by misrepresenting Relators as Alshora's low-wage employees;[21] abused Kuwaiti law by having some Relators work illegally without Resident Visas or work permits;[22] abused Kuwaiti and international law by forcing Relators to confess to crimes they had not committed as a condition for exiting Kuwait;[23] abused Kuwaiti law by tricking Relators into signing powers of attorney that GLS had used to file lawsuits against Alshora;[24] threatened Relators who resisted powers of attorney and false confessions;[25]engaged in SBA fraud by misrepresenting SBA Defendants as

---

[19] GLS also fraudulently sought payment under Contract 2, as it was unqualified to perform that contract due to its violations of federal small business regulations and National Security Program Operations Manual ("NISPOM") regulations.

[20] FAC ¶¶ 11, 182-83, 191-92, 194, 197, 201, 215, 219-20, 229, 245, 248-49, 265, 267, 272, 280-81, 292, 295, 315-16, 318, 325, 364, 370, 373-74, 388, 391, 400, 408-09, 416, 419, 441, 444-45, 447, 452, 478, 482, 574 and 580.

[21] *Id.* at ¶¶ 120-21, 124, 126, 129-30, 163, 182, 197-200, 206, 238-39, 250, 269, 271, 290, 305, 333, 341, 359-60, 364, 370, 392, 410.

[22] *Id.* at ¶¶ 143-45, 182, 425, 428-29.

[23] *Id.* at ¶¶ 12, 122-23, 158-59, 182-83, 252-54, 296, 364, 373.  Four Relators refused to sign these false confessions and were barred from returning to the United States.  *Id.* at ¶¶ 159, 253, 257-58, 350.

[24] *Id.* at ¶¶ 150-57.

[25] *Id.* at ¶ 151.

Relators employers;[26] and abused Kuwaiti law by refusing to expatriate Relators once Kuwaiti

authorities learned that Relators were not Alshora employees.[27]

The news stories cited by Defendants do not allege or imply that the sponsorship

relationship between GLS and Alshora was illegal or that GLS was violating Kuwaiti law and the

TVPRA.  Rather, they simply claim that the linguists were trapped in Kuwait as a result of a

"business dispute,"[28] and that Alshora (not GLS) confiscated the linguists' passports and was to

blame for the linguists' predicament.[29]

## C.   Relators' Action is not Based on, or Substantially the Same as, a Prior Public Disclosure

   1.    *Relators' Action Is Not Based on a Prior Public Disclosure*

Relators' action is not precluded under the pre-amendment version of the public disclosure

bar because it is not based on a prior public disclosure, *i.e.*, Relators did not "actually derive" their

knowledge of Defendants' fraud from a public disclosure.  The false claims alleged in the FAC

---

[26] *Id.* at ¶¶ 190, 193, 198, 202, 210-18, 232-34, 287-89, 297-98, 311.

[27] *Id.* at ¶ 138.

[28] Yochi Dreazen, *Investigation: No Exit,* FOREIGN POLICY (Oct. 2, 2013, 11:55 PM), https://foreignpolicy.com/2013/10/02/no-exit-3/; Cristina Corbin, *Captive in Kuwait: Contract Dispute Leaves 100 Americans Stranded on US Army Bases*, FOX NEWS (June 18, 2013),

https://www.foxnews.com/world/captive-in-kuwait-contract-dispute-leaves-100-americansstranded-on-us-army-bases ("commercial dispute").

[29] Cheryl K. Chumley, *100 Americans Trapped in Kuwait Over Contract Snub*, WASH. TIMES (June 19, 2013), https://www.washingtontimes.com/news/2013/jun/19/100-americans-trapped-kuwait-overcontract-snub/; Cristina Corbin, *Captive in Kuwait: Contract Dispute Leaves 100 Americans Stranded on US Army Bases*, FOX NEWS (June 18, 2013), https://www.foxnews.com/world/captive-in-kuwait-contract-dispute-leaves-100-americansstranded-on-us-army-bases; Karina Basso, *Army Translators File False Imprisonment Class Action Lawsuit,* TOP CLASS ACTIONS (Sept. 5, 2014), https://topclassactions.com/lawsuit-settlements/lawsuit-news/39752-translators-file-false-imprisonment-class-action-lawsuit-gls/.

are predicated on the direct independent knowledge of Relators, which they secured from personal observation and interface with fellow employees of Defendant(s).  *See* GLS Opposition § II(A)(1) (discussing grounds for Relators' knowledge of their subcontracting-related FCA allegations prior to March 23, 2010); *id.* at § II(C)(1) (discussing grounds for Relators' knowledge of their TVPRA/Kuwaiti law-related FCA allegations prior to March 23, 2010).   Because Relators' allegations are not "actually derived from" from a public disclosure, *Siller*, 21 F.3d at 1348, it is immaterial whether their allegations are "similar (or even identical) to those already publicly disclosed."  *Id.* ("[I]t is self-evident that a suit that includes allegations that happen to be similar (even identical) to those already publicly disclosed, but were not actually derived from those public disclosures, simply is not, in any sense, parasitic.").

As Relators' allegations of fraudulent conduct before March 23, 2010, are not based on a prior public disclosure, the public disclosure bar does not apply to those claims.  Likewise, as discussed below, Relators' allegations of fraudulent conduct after March 23, 2010, are not substantially the same as a public disclosure, and thus the bar does not apply to those claims.

2.      *Relators' Subcontracting-Based FCA Claims are not Substantially the Same as a Public Disclosure*

As stated above, Relators claim that GLS fraudulently sought payment from the U.S. for work allegedly done by SBA Defendants when, in reality, (i) they did not perform that work, and (ii) they were not *bona fide* SBA entities for purposes of Contract 1.  And, as discussed, the prior public disclosures cited by Defendants – the CWC Hearing, certain media reports thereabout, and the *Shee Atiká* complaint as well as one media report thereabout – do not make those allegations.  Accordingly, Relators' action is not substantially the same as any of those prior public disclosures, and the public disclosure bar is inapplicable.  *See*, *e.g.*, *Citynet*, 2018 U.S. Dist. LEXIS 55049, at *54 ("Although Exhibits B, C, and D are public disclosures under one or both versions of the FCA,

they need not be discussed further inasmuch as they do not contain any allegations or transactions of fraud contained in the complaint.").

        3.     *Relators' TVPRA/Kuwaiti Law-Based FCA Claims are not Substantially the Same as a Public Disclosure*

As noted, Relators' TVPRA/Kuwait law-based FCA claims are premised on Defendants fraudulently seeking payment under Contract 1[30] when not qualified to perform the contract due to Defendants' conduct violative of the TVPRA, Kuwaiti law and NISPOM regulations.  FAC ¶¶ 7, 126-33, 143, 503, 529, 532-33.  As detailed above, the news stories cited by Defendants merely state that the linguist were trapped in Kuwait as a result of a "business dispute,"[31] and that Alshora (not GLS) confiscated the linguists' passports and was to blame for the linguists' predicament.[32] Those allegations are not substantially the same as Relators' allegations that the "sponsorship" relationship between GLS and Alshora was illegal and that GLS was violating Kuwaiti law and the TVPRA.  Accordingly, they do not bar Relators' TVPRA/Kuwaiti-law based FCA claims.

---

[30] GLS also improperly sought payment under Contract 2, as it was unqualified to perform that contract due to its violations of federal small business and NISPOM regulations.

[31] Yochi Dreazen, *Investigation: No Exit,* FOREIGN POLICY (Oct. 2, 2013, 11:55 PM), https://foreignpolicy.com/2013/10/02/no-exit-3/; Cristina Corbin, *Captive in Kuwait: Contract Dispute Leaves 100 Americans Stranded on US Army Bases*, FOX NEWS (June 18, 2013),https://www.foxnews.com/world/captive-in-kuwait-contract-dispute-leaves-100-americansstranded-on-us-army-bases ("commercial dispute").

[32] Cheryl K. Chumley, *100 Americans Trapped in Kuwait Over Contract Snub*, WASH. TIMES (June 19, 2013),  https://www.washingtontimes.com/news/2013/jun/19/100-americans-trapped-kuwait-overcontract-snub/; Cristina Corbin, *Captive in Kuwait: Contract Dispute Leaves 100 Americans Stranded on US Army Bases*, FOX NEWS (June 18, 2013), https://www.foxnews.com/world/captive-in-kuwait-contract-dispute-leaves-100-americansstranded-on-us-army-bases; Karina Basso, *Army Translators File False Imprisonment Class Action Lawsuit,* TOP CLASS ACTIONS (Sept. 5, 2014), https://topclassactions.com/lawsuit-settlements/lawsuit-news/39752-translators-file-false-imprisonment-class-action-lawsuit-gls/.

The *Zaklit* case, as well as the stories discussing it, claim that GLS violated Kuwaiti immigration laws by failing to obtain sponsorship for the linguists *after* GLS's contract with Alshora expired.[33]  These allegations do not assert or imply the fraud alleged by Relators here – that the "sponsorship" relationship with Alshora was illegal, and that as a result of GLS's immigration violations and other acts alleged by Relators in this matter (both before and after GLS terminated its contract with Alshora), GLS was in violation of the TVPRA.  Accordingly, Relators' action is not "substantially the same" as *Zaklit* or media reports about that case.

To reiterate, the *Zinnekah* action is not a public disclosure because the government was not a party.  31 U.S.C. §3730(e)(4)(A)(i). Yet, even if – contrary to law – the prior *Zinnekah* action were deemed to be a public disclosure, that action would not preclude this FCA case.  That is because Relators were the plaintiffs in that case and the source of the allegations made therein. *See United States ex rel. Carter v. Halliburton Co.*, 973 F. Supp. 2d 615, 629 (E.D. Va. 2013) (explaining that the argument that a relator's own prior lawsuit disqualifies her as a relator is untenable because "the public disclosure bar is designed to eliminate parasitic lawsuits . . . and Defendants in essence argue that [relator] should be treated as a parasite of himself. This is illogical."); *see also United States ex rel. Shea v. Verizon Communs., Inc.*, 160 F. Supp. 3d 16, 28 (D.D.C. 2015) (explaining that a relator's own prior lawsuit cannot preclude an FCA claim because

---

[33] *Alfred Zaklit v. Global Linguist Solutions, LLC*, Case No. 1:14cv314 (E.D. Va. July 18, 2014) [ECF No. 102], at ¶ 28; Elizabeth Warmerdam, *Linguists Say Dispute Trapped Them in Kuwait*, Courthouse News Serv. (Oct. 8, 2013, 11:55 PM), https://www.courthousenews.com/linguists-say-dispute-trapped-them-in-kuwait/; Caroline Simson, *Army Translators' Distress Claims Pared in Contractor Dispute*, Law360 (Sept. 2, 2014, 8:19 PM), https://www.law360.com/articles/572639/army-translatorsseek-class-cert-in-false-imprisonment-suit.

the "allegations in the 2007 Complaint came from Shea himself."  He did not "opportunistically" rely "on the unsealing of [his own] the 2007 Complaint.").

As no public disclosure is substantially the same as the allegations in the FAC, Relators' action is not foreclosed by the public disclosure bar, and no further analysis is needed.  *See Beauchamp*, 816 F.3d at 47 ("Having concluded that no qualifying public disclosure occurred within the meaning of the FCA, [the court need not] address Relators' alternative arguments that they were original sources of the information." (Citation omitted)); *Shea*, 160 F. Supp. 3d at 28 n.4 ("Because the Court concludes that the essential elements of Shea's fraud allegations were not publicly disclosed, it need not consider whether Shea was an 'original source' under § 3730(e)(4)(A).").

### D.    Relators Are Original Sources Pursuant to the Amended FCA

Even if, *arguendo*, the Court found that Relators' allegations were substantially the same as a prior public disclosure, this action is not foreclosed by the public disclosure bar because Relators are original sources pursuant to the amended FCA – they have "knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions."[34]  31 U.S.C. § 3730(e)(4)(B)(2).  *See also United States ex rel. Gugenheim v. Meridian Senior Living, LLC*, 2018 U.S. Dist. LEXIS 47857, at *13 (E.D.N.C. Mar. 22, 2018) (finding that plaintiff was an original source where his information "is independent of and materially adds to the publicly disclosed information" by identifying the alleged fraud (citation omitted)); *Citynet*, 2018 U.S. Dist. LEXIS 55049, at *77 ("[T]he court has determined that the information Citynet has obtained from

---

[34] Contrary to Defendants' assertion, Relators voluntarily provided the information on which this lawsuit is premised to the Government before filing this action.  On March 23, 2015, Relators filed an Initial Disclosure Statement with U.S. Department of Justice.  Relators complaint was filed under seal nearly three months later on June 19, 2015.

its independent investigation materially adds to the public disclosures such that it qualifies as an original source.").

Knowledge is deemed "independent" where it "is not dependent on public disclosure." *United States ex rel. Grayson v. Advanced Mgmt. Tech., Inc.*, 221 F.3d 580, 583 (4th Cir. 2000) (citations omitted). "'Further, while a relator does not need to have . . . independent knowledge of all the information on which a qui tam action is based, the relator must have . . . independent knowledge of the facts necessary to plead a plausible fraud claim.'" *Carter*, 973 F. Supp. 2d at 629-630 (quoting *Prince*, 753 F. Supp. 2d at 583).

Here, Relators' knowledge was not dependent on public disclosures; rather, they acquired knowledge of their FCA allegations independently through their employment with Defendants, interactions with fellow employees and their own research.  *See United States ex rel. Rostholder v. Omnicare, Inc.*, 745 F.3d 694, 700 (4th Cir. 2014) (finding that relator had independent knowledge of the fraud where, among other things, his knowledge was based on "his conversations with other employees in the Toledo building, his personal familiarity with the repackaging operations, and his own independent research"); *see also United States ex rel. DeCarlo v. Kiewit/AFC Enters.*, 937 F. Supp. 1039, 1049 (S.D.N.Y. 1996):

> DeCarlo had independent knowledge of Kiewit's allegedly fraudulent conduct, obtaining information and making first-hand observations during the course of his employment on the Project. *See Wang v. FMC Corp.*, 975 F.2d 1412, 1417 (9th Cir. 1992) (fact of subsequent public disclosure "does not rob [plaintiff] of what he saw with his own eyes"); *United States ex rel. Barth v. Ridgedale Elec., Inc.*, 44 F.3d 699, 703 (8th Cir. 1995) (the "direct" knowledge required under the False Claims Act is knowledge "marked by absence of an intervening agency," "unmediated by anything but [plaintiff's] own labor" and seen by plaintiff "with his own eyes" (quoting *United States ex rel. Springfield Terminal Ry. v. Quinn*, 14 F.3d 645, 656 (D.C. Cir. 1994); *Wang v. FMC Corp.*, 975 F.2d at 1417)). DeCarlo is the type of plaintiff envisioned by the qui tam provisions of the False Claims Act.

As in *DeCarlo*, Relators' independent knowledge makes them "the type of plaintiff envisioned by the qui tam provisions of the False Claims Act." *Id.*[35]

As noted, in addition to having independent knowledge, relators, to be original sources, must allege facts that materially add to the publicly disclosed allegations or transactions, that is,

---

[35] The case law cited by Defendants in support of their argument that Relators lack independent knowledge is inapposite. In *Rockwell International Corp. v. United States*, 549 U.S. 457 (2007), the putative relator attempted to use jurisdiction from one scheme for which he had independent knowledge to confer jurisdiction on a completely different scheme for which he did *not* have independent knowledge given that the events occurred *after his employment with the defendant*. *Rockwell* also concerned the pre-2010 FCA. Under the post-amendment FCA, Relators' knowledge need not be direct. *See*, *supra*, § III(A). *Grayson,* 221 F.3d 580, likewise concerned the pre-2010 FCA, to say nothing of the fact that the putative relators were actually lawyers for one of two companies which filed bid protests and learned of the alleged fraud from the other company's bid protest. *Id.* at 582-83.

*United States ex rel. Ackley v. IBM*, 76 F. Supp. 2d 654 (D. Md. 1999), besides concerning the pre-2010 FCA, did not address the issue of independent knowledge as the relator was disqualified for having failed to voluntary disclose the information to the Government before filing suit. *See id.* at 666.

*United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d. 337 (4th Cir. 2009), is inapplicable to this case because the putative relator had sworn, under oath, that he was not an original source. *Id.* at 343. No such facts degrade Relators' claims.

Neither *United States ex rel. Ahumada v. NISH*, 756 F.3d 268 (4th Cir. 2014), or *Citynet*, 2018 U.S. Dist. LEXIS 55049, stands for the proposition that a relator must have direct and independent knowledge of the actual claims process in order to state a FCA claim, as DI argues. DI MTD, at 20-21. In *Ahumada*, the trial court found that the relator had offered "no basis on which he could have known such detailed information directly" because the invoices in question "were issued only after he left" his employment. In *Citynet*, 2018 U.S. Dist. LEXIS 55049, at *68-69, the court found that the relator's allegations of fraud were different from the fraud alleged in specific counts. That court, in reference to the language cited by DI, stated:

> The court cannot say that Citynet has materially contributed to these public disclosures. While Citynet has made allegations pertaining to fraud relating to other parts of the grant application and billing, these do not "materially add" to the Count I and Count V allegations. The public disclosures described above contained information that Frontier and its employees did not plan to build the middle mile network contemplated in the WVEO grant application but instead intended to build and indeed built a last mile network that was inaccessible to competitors.

*Id.*

that "contribute significant additional information to that which has been publicly disclosed so as to improve its quality." *Majestic Blue Fisheries*, 812 F.3d at 306; *id.* at 307 ("a relator materially adds to the publicly disclosed allegation or transaction of fraud when it contributes information – distinct from what was publicly disclosed – that adds in a significant way to the essential factual background: 'the who, what, when, where and how of the events at issue'" (citation and footnote omitted)).

Relators' allegations in this case materially add to the publicly disclosed allegations or transactions.  As for the subcontracting-based fraud, Relators materially add that SBA Defendants performed no role whatsoever under Contract 1 (<u>not even payroll</u>) and that Relators were not *bona fide* employees of the SBA Defendants, which in fact were not *bona fide* SBA subcontractors of GLS for purposes of Contract 1, but rather, GLS affiliates.  As for the TVPRA/Kuwaiti law-based fraud, Relators materially add that: (i) GLS's sponsorship relationship with Alshora was illegal, and involved GLS falsifying employment agreements between Relators and Alshora; (ii) GLS brought certain linguists into Kuwait illegally on tourist visas; and (iii) GLS subjected Relators to serial employment contract signings, causing complete confusion as to who was their actual employer.  *See Majestic Blue Fisheries*, 812 F.3d at 306-08 (finding that the information that the relator learned through discovery in a wrongful death action, including "information such as what specific individuals were involved in the alleged fraud and how they initiated and perpetrated the alleged transgression," materially added to the public disclosures, and therefore the relator was an original source).[36]

---

[36] Defendants' cases are inapposite.  The AECOM MTD, at 28, cites *Majestic Blue Fisheries*, 812 F.3d 294, in arguing that Relators fail to materially add to the publicly disclosed allegation or transaction of fraud.  However, as noted, the court in that case found that the relator's allegations materially added to the publicly disclosures.  *Id.* at 306-08.  The GLS MTD, at 30, relies on *Moore*, 2017 U.S. Dist. LEXIS 46983.  However, the relators in *Moore* acknowledged that the plea

Because Relators are original sources under the amended FCA, their action is not barred by the amended public disclosure bar.

**IV.   CONCLUSION**

For the reasons discussed above, Defendant DI's Motion to Dismiss should be denied. Should the motion be granted, however, it should be without prejudice, and Relators should be granted leave to file a Second Amended Complaint.

<div style="margin-left:40%">

Respectfully submitted,

/s/ Joseph A. Hennessey
Joseph A. Hennessey, Esq.
The Law Office of Joseph Hennessey, LLC
2 Wisconsin Circle, Suite 700
Chevy Chase, Maryland 20815
Telephone: (301) 351-5614
Email: jhennessey@jahlegal.com

/s/ Charles S. Fax
Charles S. Fax
Rifkin Weiner Livingston LLC
7979 Old Georgetown Road, Suite 400
Bethesda, Maryland 20814
Telephone: (301) 951-0150
Cell Phone: (410) 274-1453
Email: cfax@rwllaw.com

/s/ Liesel J. Schopler
Liesel J. Schopler
Rifkin Weiner Livingston LLC
225 Duke of Gloucester Street
Annapolis, Maryland 21401
Telephone: (410) 269-5066
Email: lschopler@rwllaw.com

/s/ Timothy Matthews

</div>

---

agreement in a prior criminal case covered all the transactions in the case, *id.* at *30, and the court found that relators proffered no knowledge that is independent of and materially adds to the information contained in the plea agreements. *Id.* at *35. That case is not pertinent here, where, as detailed above, the FAC contributes significant additional information to that which has been publicly disclosed so as to improve its quality. *Majestic Blue Fisheries*, 812 F.3d at 306.

27

Timothy Mathews
Chimicles Schwartz Kriner & Donaldson-Smith LLP
361 West Lancaster Avenue
Haverford, Pennsylvania 19041
Telephone: (610) 642-8500
TimothyMathews@chimicles.com
*Admitted Pro Hac Vice*

Steven A. Schwartz
Chimicles Schwartz Kriner & Donaldson-Smith LLP
361 West Lancaster Avenue
Haverford, Pennsylvania 19041
Telephone: (610) 645-4720
steveschwartz@chimicles.com
*Pro Hac Vice Application Pending*

April 30, 2019