IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| *ex rel.* ELGASIM MOHAMED FADLALLA, | ) | |
| Relator, *et al.* | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 8:15-CV-01806 |
| | ) | |
| DI INTERNATIONAL LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>DEFENDANT DYNCORP INTERNATIONAL LLC'S REPLY TO RELATORS' OPPOSITION TO DYNCORP INTERNATIONAL'S MOTION TO DISMISS</u>

Jan Paul Miller, Maryland USDC – 05257
Claire M Schenk (Admitted *Pro Hac Vice*)

THOMPSON COBURN LLP
One US Bank Plaza
St Louis, MO 63101
314-552-6000
Fax: 314-552-7000
jmiller@thompsoncoburn.com
cschenk@thompsoncoburn.com

*Attorneys for Defendants*

## TABLE OF CONTENTS

I.      RELATORS FAIL TO ALLEGE THE SPECIFIC FACTS NEEDED TO PIERCE
        THE CORPORATE VEIL OF GLS AND REACH DI........................................................1

        A.      Relators Do Not Satisfy the First Prong of the Alter Ego Test.............................2

        B.      Relators Cannot Meet the Second Prong of the Alter Ego Test ............................3

        C.      GLS is a Properly Incorporated LLC and is not a Joint Venture............................5

II.     THE FCA ALLEGATIONS MUST BE DISMISSED UNDER THE FCA'S
        PUBLIC DISCLOSURE BAR .........................................................................................8

        A.      The Pre-2010 Allegations in the FAC are "Based on" Public Disclosures
                and the Post-2010 Allegations are "Substantially Similar" to Public
                Disclosures.............................................................................................................8

        B.      Relators Are Not Original Sources ......................................................................15

        C.      The FAC Does not Allege that Relators Voluntarily Disclosed their
                Information to the Government Before Filing the Present Complaint ..................17

III.    RELATORS FAIL TO STATE A CLAIM THAT DI IS DIRECTLY LIABLE.............17

IV.     RELATORS MISSTATE THE APPLICABLE STATUTE OF LIMITATIONS.............19

V.      CONCLUSION..............................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*,
   2012 WL 1869416 (Del. Ch. May 16, 2012) ............................................................6

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................................2

*C & M Café v. Kinetic Farm, Inc.*, 2016 WL 6822071 (N.D. Cal. Nov. 18, 2016),
   DI ...........................................................................................................................7

*Cochise Consultancy Inc. v. United States ex rel. Hunt*, ___U.S. ___, 2019 WL
   2078086 (2019) .....................................................................................................19

*Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003) ....................................................2

*Fl. R&D Fund Investors, LLC v. Fl. BOCA/Deerfield R&D Investors, LLC*, 2013
   WL 4734834 (Del. Ch. Aug. 20, 2013) .................................................................6

*Guobadia v. Irowa*, 103 F.Supp.3d 325 (E.D.N.Y. 2015) ..........................................19

*In re Amer. Honda Motor Co., Inc. Dealership Relations Litig.*, 941 F.Supp. 528
   (D. Md. 1996) ........................................................................................................7

*Johnson v. Flowers*, 814 F.2d at 980-81 ...................................................................7

*Kirno Hill Corp. v. Holt*, 618 F.2d 982 (2d Cir. 1980) ...............................................2

*Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209 (2d Cir. 1987) ................................4

*Marrero v. Nguyen-Stevenson*, 2014 WL 11870199 (C.D. Cal. Nov. 21, 2014) ...........4

*Papsan v. Allain*, 478 U.S. 265 (1986) ...................................................................10

*U.S. ex rel. Scollick v. Narula*, 215 F.Supp.3d 26 (D.D.C. 2016) ..............................18

*United States ex rel. Ackley v. Int'l Business Machines Corp.*, 76 F.Supp.2d 654
   (D. Md. 1999) ......................................................................................................17

*United States ex rel. Ahumada v. Nat'l Industries for the Severely Handicapped*,
   756 F.3d 268 (4th Cir. 2014) .................................................................................8

*United States ex rel. Black v. Health & Hosp. Corp. of Marion County*, 494 Fed.
   Appx. 285 (4th Cir. 2012) .....................................................................................8

*United States ex rel. Dekort v. Integrated Coast Guard Sys.*, 705 F.Supp.2d 519 .........7

*United States ex rel. Gilbert v. Virginia College, LLC*, 305 F.Supp.3d 1315 (N.D. Al. 2018) .........................................................................................................15

*United States ex rel. Grant v. United Airlines*, 912 F.3d 190 ......................................18

*United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F.Supp.2d 25 (D.D.C. 2007) .................................................................................................2, 18

*United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294 (3d Cir. 2016) ..............................................................................................16

*United States ex rel. O'Keeffe v. Sverdup Corp.,* 131 F.Supp.2d 87 (D.Mass.2001) ...................10

*United States ex rel. Oliver v. Philip Morris USA Inc.*, 826 F.3d 466 (D.D.C. 2016) .........................................................................................................9

*United States ex rel. Polansky v. Exec. Health Resources*, 196 F.Supp.3d 477 (E.D. Pa. 2016)...................................................................................................5

*United States ex rel. Raffington v. Bon Secours Health Sys., Inc.*, 285 F.Supp.3d 759...................................................................................................................7

*United States ex rel. Ryan v. Endo Pharma., Inc.*, 27 F.Supp.3d 615 (E.D. Pa. 2014) ........................................................................................................16

*United States ex rel. Siewick v. Jamieson Science and Eng'g, Inc.*, 191 F.Supp.2d 17.....................................................................................................................3

*United States ex rel. Sonnier v. Standard Fire Ins. Co.*, 84 F.Supp.3d 575 (S.D. Tx. 2015)................................................................................................15, 16

*United States ex rel. Winkelman v. CVS Caremark Corp.*, 118 F.Supp.3d 412 (D. Mass. 2015)................................................................................................8, 10

*United States v. Marcus*, 487 F.Supp.2d 289 (E.D.N.Y. 2007), *rev'd on other grounds*, 628 F.3d 36 (2d Cir. 2010) ..................................................................19

*United States v. Universal Health Servs., Inc.*, 2010 WL 4323082 (W.D. Va. Oct. 31, 2010) .....................................................................................................3, 4

*Vitol, S.A. v. Primerose Shipping Co., Ltd.*, 708 F.3d 527 (4th Cir. 2013)................................3, 7

*World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc., et al*, 530 F.Supp.2d 486 (S.D.N.Y. 2007) ..............................................................................................4

**Statutes and Constitutional Provisions**

18 U.S.C. § 1589 (2008) .............................................................................................18

31 U.S.C. § 3730(e)(4)(A) (2012) ...................................................................................15

31 U.S.C. § 3730(e)(4)(B) (2006) (amended 2010)........................................................15

31 U.S.C. § 3730(e)(4)(B)(i)-(ii) (2012).........................................................................17

31 U.S.C. § 3731(b)(2) ....................................................................................................19

DEL. CODE ANN. § 18-102 ................................................................................................6

DEL. CODE ANN. § 18-201(a)(1) .......................................................................................6

DEL CODE ANN. § 18-201(a)(1)-(b) ..................................................................................1

**Rules**

Rule 9(b) ..........................................................................................................................18

**Other Authorities**

Associated Press (August 12, 2009), available at
   https://www.newsday.com/news/nation/major-problems-cited-in-iraq-
   interpreter-contract-1.1365630 (last visited May 22, 2019) ...................................14

https://www.courthousenews.com/workers-claim-DI-abandoned-them/ (last
   visited, May 21, 2019) ............................................................................................14

**DEFENDANT DYNCORP INTERNATIONAL LLC'S REPLY TO RELATORS'**
**OPPOSITION TO DYNCORP INTERNATIONAL'S MOTION TO DISMISS**

Defendant DynCorp International LLC ("DI") is a separate corporate entity from Global Linguist Solutions LLC ("GLS") and does not belong in this litigation. Plaintiff/Relators' ("Relators") First Amended Complaint ("FAC") does not allege facts sufficient to pierce the corporate veil between DI and GLS. The FAC should also be dismissed under the public disclosure bar of the False Claims Act ("FCA") because the basis of the FAC was previously disclosed in public hearings (as shown in the chart below) and the media, and Relators fail to show that they are an original source.[1] Nor do Relators adequately allege that DI is responsible for any violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA"). For these reasons, DI respectfully requests that this Court grant its Motion to Dismiss.[2]

**I.      RELATORS FAIL TO ALLEGE THE SPECIFIC FACTS NEEDED TO PIERCE THE CORPORATE VEIL OF GLS AND REACH DI**

There is no basis to pierce the corporate veil in this case. DI and AECOM formed GLS, a Delaware limited liability company ("LLC"), to serve as the vehicle for their corporate collaboration to provide linguistic support on various federal government contracts. *See* DI Memorandum In Support of its Motion at 11-13 ("DI Motion"); 6 DEL. CODE ANN. § 18-201(a)(1)-(b); 18-303. On July 20, 2006, GLS became a fully formed entity, completely separate from DI, and remains an active Delaware corporation. The FAC asserts, without explanation, that DI dominates the affairs of GLS and that GLS is a "joint venture" between DI and AECOM. FAC at ¶¶ 19-20. Relators' arguments that DI and GLS are not separate entities fall into two categories: (1) DI provides back office support for some GLS functions, and (2) DI's references

---

[1] DI notes that the United States filed a Statement of Interest and will respond only to the issues raised by the United States that apply specifically to DI.

[2] DI incorporates by reference the arguments in GLS's and AECOM's respective reply briefs.

to GLS as a "joint venture" show it is not an LLC. *See* FAC at ¶¶ 20-49; Opposition to DI's

Motion to Dismiss ("DI Opp'n") at 2-5. In its first category of arguments, Relators attempt to

pierce the corporate veil; the second category of arguments seeks to avoid the corporate veil

entirely. Neither set of arguments contains "sufficient factual matter . . . to state a claim to relief

that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Disregarding the corporate form is a rare exception to the well-settled rules of

incorporation and limited liability. *See, e.g., Dole Food Co. v. Patrickson*, 538 U.S. 468, 475

(2003). Relators allege that "DI is Liable Pursuant to the Veil-Piercing/Alter-Ego Doctrine," DI

Opp'n at 6, but do not allege adequate facts to support an "alter ego" claim. The "alter ego" test

contains two prongs, (1) a "unity of interest and ownership," and (2) whether an inequitable

result will follow from respecting the corporate form. *United States ex rel. Hockett v.*

*Columbia/HCA Healthcare Corp.*, 498 F.Supp.2d 25, 60 (D.D.C. 2007); DI Motion at 11-12. In

order to establish that GLS is an alter ego of DI, Relators must demonstrate that DI used GLS "to

perpetrate a fraud" or that DI has "so dominated and disregarded [GLS's] corporate form that

[GLS] primarily transacted [DI's] personal business rather than its own corporate business."

*Kirno Hill Corp. v. Holt*, 618 F.2d 982, 985 (2d Cir. 1980).

### A.     Relators Do Not Satisfy the First Prong of the Alter Ego Test

Relators allege that DI's provision of a few "back office" functions demonstrates "unity

of interest and ownership" between DI and GLS such that GLS ceases to be a separate company.

FAC at ¶¶ 36-47. Relators' Opposition repeats these allegations of: a shared address; DI

designation of managers, performance of management functions, and distribution of a handbook

to the subcontractor defendants; DI control of back office support for the linguists; the hiring and

firing of GLS personnel; DI development of training policies for GLS personnel; and DI employee supervision of Relators' visa compliance.[3] DI Opp'n at 2-3.

　　　　These allegations do not demonstrate "unity of ownership and interest" sufficient to pierce the corporate veil under the first prong of the alter ego test. Finding that a company is the alter ego of another company requires more than showing some involvement by the parent with the subsidiary. "[C]ourts routinely refuse to pierce the corporate veil based on allegations limited to the existence of shared office space or overlapping management, allegations that one company is the wholly-owned subsidiary of another, or that companies are to be 'considered as a whole.'" *United States v. Universal Health Servs., Inc.*, 2010 WL 4323082 at *4 (W.D. Va. Oct. 31, 2010) (internal quotations and citations omitted); *see also*, *Vitol, S.A. v. Primerose Shipping Co., Ltd.*, 708 F.3d 527, 545-46 (4th Cir. 2013) (allegations of "fleet interconnectedness . . . simply do not rise to the level of creating a reasonable belief to support the claim of alter ego"); *United States ex rel. Siewick v. Jamieson Science and Eng'g, Inc.*, 191 F.Supp.2d 17 (finding sole proprietor entirely responsible for all aspects of an LLC was not the alter ego of LLC). Numerous other cases, cited in DI's Motion to Dismiss, support the principle that a high standard is applied to Plaintiffs seeking to pierce the corporate veil. DI Motion at 12-15. Relators' Opposition provides little argument distinguishing these precedents, or showing why they are inapposite. *See* DI Opp'n at 9, n. 4. Therefore, Relators do not meet the first prong of the alter ego test.

## B.　　Relators Cannot Meet the Second Prong of the Alter Ego Test

　　　　The second prong of the alter ego test requires a Plaintiff to demonstrate that an inequitable result would follow, or that Plaintiff would be prejudiced if the Court respected the

---

[3] These allegations also serve as the only basis for Relators' claim that DI is "directly liable" for the submission of false claims. This argument is addressed *infra*, section IV.

corporate form. Without such a showing, courts routinely refuse to disregard the corporate form.
*See*, *e.g.*, *Marrero v. Nguyen-Stevenson*, 2014 WL 11870199 at *6 (C.D. Cal. Nov. 21, 2014)
(granting summary judgment against alter ego claims where plaintiff failed to show any
undercapitalization, commingled funds, or disregard for corporate formalities); *Universal Health
Servs.*, 2010 WL 4323082 at *4 ("[A] well-pled veil-piercing action alleges not only that an
entity in the corporate structure has committed a fraud for which the parent should be vicariously
liable, but also that parental control is utilized to perpetuate a fraud or other wrong.") (internal
quotation and citation omitted).

Relators make no attempt to demonstrate how the facts they allege satisfy this
requirement. *See* DI Opp'n at 6-10. Instead, they simply cite *Lowen v. Tower Asset Mgmt., Inc.*,
829 F.2d 1209, 1220 (2d Cir. 1987) and assert that federal common law provides less deference
to the corporate form. DI Opp'n at 9. In *Lowen*, fiduciary companies operating a pension plan
selected self-dealing transactions that violated the Employee Retirement Income Security Act
("ERISA") statute. *Id.* at 1211-12, 1216-17. The Second Circuit pierced the veil of the fiduciary
corporations, finding the corporations and the individuals joint and severally liable. *Id.* at 1220.
*Lowen* has no facts in common with the present case. Relators have not alleged that DI unfairly
benefitted from any of GLS's business transactions, that DI has control over writing or
submitting proposals for GLS, or anything else that could be interpreted as controlling GLS's
business decisions. In short, none of the facts upon which the Second Circuit based its decision
in *Lowen* are similar to this case.[4]

---

[4] Also, *Lowen* is not an FCA case. The standards for piercing the corporate veil for fiduciaries
involve an entirely different set of legal questions than piercing the corporate veil under the
FCA. *See, e.g.*, *World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc., et al*, 530 F.Supp.2d
486 (S.D.N.Y. 2007) (fiduciary duties do not apply to arms-length business relationships).

Relators claim that, "[a]ny of the factors considered under the first step of the federal veil-piercing test can be sufficient to show unfairness as to the second step," citing *United States ex rel. Polansky v. Exec. Health Resources*, 196 F.Supp.3d 477 (E.D. Pa. 2016). DI Opp'n at 9. To the extent that Relators claim they need satisfy only the first prong of the alter ego test, *Polansky* does not support that claim. In *Polansky*, the Court dismissed relator's attempt to pierce the corporate veil because it "made no reference to undercapitalization, breaches of corporate formalities, dividend nonpayment, insolvency, siphoned funds, nonfunctioning officers or a lack of corporate records." *Id.* at 516-17. In doing so, the Court emphasized that "Relator must also allege facts to support an element of injustice or fundamental unfairness." *Id.* at 517. Similar to *Polansky*, Relators in this case fail to allege that an injustice or fundamental unfairness would occur if the Court respects the corporate form. To the contrary, GLS is a going concern with its own working capital, its own bank accounts, its own employees and officers, and everything else required to make it a separate company. Relators' failure to allege any abuse of GLS's corporate form by DI merits dismissal of Relators' claims against DI.

### C.      GLS is a Properly Incorporated LLC and is not a Joint Venture

As shown above, GLS is an LLC, and is not a "joint venture" partnership in corporate form. Relators cite references to GLS as a "joint venture" in a press release and in DI's 10-K filings as evidence that GLS is not an LLC. FAC at ¶¶ 22-30; DI Opp'n at 5. Relators also appear to claim that there is a "Global Linguist Solutions" joint venture, because DI referenced GLS without including "LLC." *See* DI Opp'n at 5. Relators have not provided any support for their proposition that an LLC can be transformed into a joint venture where a parent company fails to specify the LLC designation in every instance. Relators also fail to support their contention that referencing a "joint venture" in a filing with the Securities and Exchange Commission

transforms an LLC into a joint venture.[5] Relators also mischaracterize the Delaware requirements for an LLC, asserting that the constant use of "LLC" or "limited liability company" is a talisman for maintaining the corporate form. DI Opp'n at 4. The Delaware Code does not require such formalistic and meaningless compliance. 6 DEL. CODE ANN. § 18-102. Rather, the statute requires that the "name of each limited liability company *as set forth in its certificate of formation*,[6] [s]hall contain the words 'Limited Liability Company' or the abbreviation 'L.L.C.' or the designation 'LLC.'" *Id.* at §18-102(1) (emphasis added). "A limited liability company formed under this chapter shall be a separate legal entity, the existence of which as a separate legal entity shall continue until cancellation of the limited liability company's certificate of formation." *Id.* at § 18-201(b). The clear language of the statute is unavoidable—once GLS's certificate of formation as an LLC was filed with the Secretary of State of Delaware, GLS continues "as a separate legal entity" until its certificate is cancelled. GLS's certificate of formation as an LLC was filed in 2006 and has not been cancelled. Therefore, GLS is an active LLC under Delaware law.

Similarly, Relators allege that, because GLS's agreements with Relators did not contain the "LLC" designation "or any other conspicuous notice," GLS must not be a limited liability company. DI Opp'n at 4. As shown above, Delaware does not require an LLC to continuously

---

[5] The Delaware Court of Chancery uses the shorthand phrase "joint venture" to refer to a subsidiary company formed by other companies for a specific purpose, even if the companies are LLCs in form. *See Fl. R&D Fund Investors, LLC v. Fl. BOCA/Deerfield R&D Investors, LLC*, 2013 WL 4734834 at *1 (Del. Ch. Aug. 20, 2013) (referencing an action under "the Joint Venture's limited liability company agreement"); *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, 2012 WL 1869416 at *2 (Del. Ch. May 16, 2012) (referencing "five joint ventures . . . . Each [of which] is a Delaware limited liability company").
[6] The "certificate of formation" must be executed and "filed in the office of the Secretary of State and set forth: (1) The name of the limited liability company." 6 DEL. CODE ANN. § 18-201(a)(1).

refer to itself as an LLC in order to maintain its corporate form. Relators cite *C & M Café v. Kinetic Farm, Inc.*, 2016 WL 6822071 at *5 (N.D. Cal. Nov. 18, 2016), DI Opp'n at 4, but nothing in that case relates to the constant use of "LLC" as a requirement to retain the corporate form. In that case, the Court found that because no party alleged the enterprise was an LLC under Delaware law, nor did its name include "LLC" or "Limited Liability Company," Plaintiffs could not use the Delaware LLC statute to make liable individuals operating an enterprise that was not an LLC. *Id.* at *5.

Regardless of Relators' discussion about the ease of creating a joint venture, DI Opp'n at 3-5, no "Global Linguist Solutions" joint venture entity was ever brought into existence and Relators have offered no evidence that it exists. Relators' reliance on the law of joint ventures or partnerships is misplaced because GLS is a separate company and was an LLC at all times during the instant contracts. As an LLC, GLS's shareholders receive a "strong presumption" of limited liability. *Johnson v. Flowers*, 814 F.2d at 980-81; *see supra*, section I.A; *see* DI Motion at 11-12.

Because Relators have not alleged sufficient facts to pierce the corporate veil between DI and GLS, DI should be dismissed from this litigation.[7] *E.g.*, *United States ex rel. Raffington v. Bon Secours Health Sys., Inc.*, 285 F.Supp.3d 759, 770 ("Raffington cites no case law (and we

---

[7] The remaining cases cited by Relators do not support their argument. In *Vitol*, the Fourth Circuit dismissed the attempt to pierce the corporate veil. "[W]e agree with the district court that Vitol's allegations were insufficient to pass the reasonable belief test." 708 F.3d 545. "At best, Vitol has made allegations with particularity only to support a reasonable belief that the two fleets maintain a close business relationship." *Id.* Similarly, in *In re Amer. Honda Motor Co., Inc. Dealership Relations Litig.*, 941 F.Supp. 528 (D. Md. 1996), the Court found that "Plaintiffs' allegations are not sufficient to permit them to proceed on a theory of alter ego liability." *Id.* at 552. In *United States ex rel. Dekort v. Integrated Coast Guard Sys.*, 705 F.Supp.2d 519, 546-57, relator made numerous allegations not present here, including inadequate capital and that the parent companies caused the subsidiary to commit fraud.

are aware of none) that an allegation that a parent 'oversaw' a subsidiary suffices for a finding of 'complete domination.'").

## II.     THE FCA ALLEGATIONS MUST BE DISMISSED UNDER THE FCA'S PUBLIC DISCLOSURE BAR

Relators' FCA claims should be dismissed pursuant to the FCA's public disclosure bar because (1) the allegations are based on or substantially similar to prior public disclosures, and (2) the Relators have not alleged sufficient facts to merit applying the original source exception. "A public disclosure of fraud is deemed to have 'occur[red] when the essential elements exposing the particular transaction as fraudulent find their way into the public domain.'" *United States ex rel. Black v. Health & Hosp. Corp. of Marion County*, 494 Fed. Appx. 285, 291 (4th Cir. 2012); *United States ex rel. Winkelman v. CVS Caremark Corp.*, 118 F.Supp.3d 412, 421 (D. Mass. 2015). "Once a defendant files a motion to dismiss based on the public-disclosure bar, the relator bears the burden of proving by a preponderance of the evidence that the bar does not apply." *United States ex rel. Ahumada v. Nat'l Industries for the Severely Handicapped*, 756 F.3d 268, 274 (4th Cir. 2014).

### A.     The Pre-2010 Allegations in the FAC are "Based on" Public Disclosures and the Post-2010 Allegations are "Substantially Similar" to Public Disclosures

Before Relators' filed the instant suit, numerous public hearings by the Commission on Wartime Contracting ("Commission"), articles about the Commission hearings, and other articles about the contracts at issue disclosed allegations "substantially similar" to those in the FAC. As shown in the chart below, the Commission hearing extensively discussed GLS's subcontracting, the limited value added by small business subcontractors, and the high costs to the Government. Because these disclosures are public and because Relators have not adequately alleged that they are an original source or that their pre-2010 allegations are not "based on" these public disclosures, their claims are barred by the statute.

Relators claim "direct and independent knowledge . . . secured from personal observation and interface with fellow employees." DI Opp'n at 20. Such knowledge, they allege, is not "actually derive[d]" from the public disclosures, so their pre-2010 allegations are not barred under the pre-2010 public disclosure bar. *Id.* at 19-20. For their post-2010 allegations, Relators similarly assert that their current "action is not substantially the same as any of those prior public disclosures." They also attempt to distinguish their current allegations from the *Zaklit* and *Zinnekah* litigations. *Id.* at 17, 20-23.

Relators' claims that their pre-2010 allegations are not derived from the public disclosures ring hollow in view of their admission that they learned of their claims "through . . . their own research." DI Opp'n at 24. It was necessary for Relators to research their claims because they were many steps removed from the contracting process. This lack of firsthand knowledge of GLS's small business subcontracting underscores that Relators are not, in fact, an original source. *United States ex rel. Oliver v. Philip Morris USA Inc.*, 826 F.3d 466, 477 (D.D.C. 2016) ("[I]t is not Oliver's investigation but his lack of firsthand knowledge prompting his investigation that precludes his original source status."). Relators were not involved in drafting any of the proposals, or managing any of the contracts; they do not allege that they were so involved. Rather, Relators are, by their own admission, interpreters who worked in deployed field positions. FAC ¶¶ 5, 16.

Relators never explain how they acquired their allegedly "independent knowledge" to plead their claims related to small business contracting when none of them were in positions that involved contracting, managing contract performance, or contract accounting. Similarly, Relators were not involved with the small business subcontractors or the subcontracting process in the contracts at issue. They were not employed in GLS's or any of the subcontractors' offices that

would have been involved in the contracting process, nor do they allege that they were so involved. For Relators to have the independent knowledge to allege that a business registered with the SBA is not acting as an independent contractor would, again, require some insight into the program management, contracting office, or contract accounting functions of some of these subcontractors. Relators do not allege that they had the necessary access for such insights.

While Relators attempt to distinguish the Commission hearing and earlier litigations from the present case, the differences between the testimony at the Commission hearing and Relators' allegations are not significant. *See* DI Opp'n at 14-17, 21-23. The Commission hearing on August 12, 2009 is fatal to any FCA claims "based upon" or "substantially similar" to the facts discussed in that public hearing. Relators allege, without any specifics, that GLS President John Houck's testimony in the Commission hearing consisted of "false statements" as an attempt to withstand the public disclosure bar.[8] FAC at ¶¶ 164-77; *see* DI Opp'n at 14-19. Even assuming, for the sake of argument, that Mr. Houck testified falsely (which Relators provide no factual statements to support), the testimony of multiple Government officials would still count as a public disclosure of "substantially similar" facts—enough to demonstrate that the Government was on notice of the fraud alleged by Relators. *Winkelman*, 118 F.Supp.3d at 422 (dismissing allegations under the public disclosure bar despite public reports not explicitly mentioning violations of the same health care programs); *United States ex rel. O'Keeffe v. Sverdup Corp.,* 131 F.Supp.2d 87, 96 (D.Mass.2001) ("While [the public disclosure] is not identical to Relator's allegation, it is substantially similar to it and gave the government the heads up . . .").

---

[8] DI agrees with the United States that materiality is a holistic inquiry and is aware that the Relator alleged falsity by GLS at the August 2009 hearing. Although we are at the "motion to dismiss stage," the Court may take judicial notice of information in the public record to show what information was available to the Government, which reflects the Government's knowledge. *Papsan v. Allain*, 478 U.S. 265, 268 n.1 (1986).

For example, Relators claim their allegations that (1) GLS hired "small business subcontractor[s] . . . to do nothing;" (2) the small business subcontractors were "not personally performing the functions for which it was contracted;" and (3) "linguists were not bona fide employees of the small business subcontractors" were not previously disclosed to the public. DI Opp'n at 16. In fact, every single one of those allegations is included in the transcript of the Commission hearing, along with implications that the Government may reexamine its small business contracting policies because of the additional cost and little value added by these small business subcontractors. A review of testimony from John Isgrigg, INSCOM's Deputy Director for Contracting, and April Stevenson, Director of the Defense Contract Audit Agency, demonstrates that Relators' allegations have provided no additional substance.

The following are excerpts from the testimony of Mr. Isgrigg and the section of the FAC to which they relate:

| | |
|---|---|
| "INSCOM noted GLS had only provided approximately 80 percent of the contract requirement for linguist[s], but were burning funds at a rate congruent with 100 percent fill rate. This over burn signaled a possible significant problem with GLS's spending." Tr. at 6. | FAC ¶¶ 30, 57-66, 140 |
| "GLS would request the consent to subcontract, and they would have a statement in their request saying this is why they wanted to do it, but the level of subcontracting in a commodity market that is linguist support, we are not building aircraft here, this is not very technical and require a vast range of skills. . . . it was counterintuitive to me why they were making the decisions to subcontract so much of this work out." Tr. at 12. | FAC ¶¶ 7-9, 13-14, 50-54, 57-90, 91-119 |
| To Mr. Isgrigg by Commissioner Tiefer: "GLS went around telling the linguists that INSCOM cut their salaries and telling MNF [Multi-National Force] that INSCOM cut their salaries, and, instead, it was absolutely untrue, and as a result, we lost linguists which we desperately needed?" Tr. at 17. | FAC ¶¶ 15, 91-119 |

| | |
|---|---|
| To Mr. Isgrigg by Commissioner Ervin: " . . . there is a listing out of the functions that GLS and all the subcontractors allegedly perform in this contract. If you look at it, really . . . the only unique function that all of the subcontractors, and not just the 12 that we have talked about, but all of them provide is what is called advisory management support, which one could argue really is no support at all, really. And, so, even that, my question is: Aside from the small business concerns, which Commissioner Zakheim raised . . . I think we have established pretty clearly here that there is something very, very troubling, indeed, about this contract" Tr. at 23. | FAC ¶¶ 7-9, 13-14, 36-54, 57-119 |

The following are excerpts from the testimony of Ms. Stephenson and the section of the FAC to

which they relate:

| | |
|---|---|
| "As of the date of this testimony, the primary function of 12 of those 18 subcontractors total[ed] $2.8 billion is [*sic*] payment of payroll for the GLS linguists. For example, the subcontractor Shee Atika . . . pays the linguists with the exception of local nationals in theater based on payroll information that is provided by GLS. For local nationals, Shee Atika provides GLS a check, and GLS then pays the local nationals in theater in cash." Tr. at 7. | FAC ¶¶ 7-9, 13-14, 36-54, 57-119 |
| "These 12 subcontractors do not hire, manage, or interact with the linguists other than to pay the amount stipulated by GLS. Of the 12 subcontractors, 9 are small businesses." Tr. at 8. | FAC ¶¶ 7-9, 13-14, 36-54, 57-119 |
| "GLS uses the same business systems as DynCorp International for all of its functions, including accounting, billing, [and] purchasing . . ." *Id.* | FAC ¶¶ 7-9, 30-32, 36-49 |
| "This integrated team management approach . . . requires that GLS retain a majority of the linguist management capabilities. As we have heard, they do all of the recruiting, the hiring, the training, and, essentially, the management on the ground. The subcontractors are responsible for seemingly very little." Tr. at 9. | FAC ¶¶ 7-9, 13-14, 30-32, 36-54, 57-119 |
| "[W]e are in the process of auditing the costs on this contract . . . . They do appear to be legitimate costs for payroll preparation purposes. However, one would ask is it the appropriate add-on level for payroll processing or is there a more efficient way to process the payroll, and is the add-on cost . . . is that an amount that we are comfortable from a public policy perspective of paying for engaging subcontracts?" *Id.* | FAC ¶¶ 7-9, 13-14, 36-54, 57-119 |
| To Ms. Stephenson by Commissioner Tiefer: "I am going to be slightly exaggerating and call them do-nothing subcontractors. That would show up in cost and pricing. That they are being paid much more than they are worth. . . . the biggest subcontractor, L-3, although it did a little work, was mostly making large amounts of money in add-ons and what is called overhead, which just means the corporate headquarters are fattening their salaries, that this was a combination of a prime company, the prime contractor, was a combination of the subcontractors | FAC ¶¶ 7-9, 13-14, 36-54, 57-119 |

| | |
|---|---|
| basically seeing the taxpayer as a cash cow and the prime contractor, GLS, covering up for them. Would you comment?" Tr. at 15. | |
| ". . . if you look at the numbers and the functions that are being performed by the subcontractors, one does have to ask what is the value? . . . Whether that was appropriate or not, I really have to defer to INSCOM on the functions of it, but I think that the numbers do jump out and you have to ask is that an appropriate amount to pay for that function?" *Id.* | FAC ¶¶ 7-9, 13-14, 36-54, 57-119 |
| To Ms. Stephenson by Commissioner Zakheim: "Do you think that the reason that they are doing this is because they had to meet a 35 percent small business goal and they really did not want the small businesses to do anything but to satisfy the government? . . . that is outside the scope of the hearing, but maybe that says something about our small business goals and the way we do things by the book in a strange kind of way. Could you comment on that?" Tr. at 21-22. | FAC ¶¶ 7-9, 13-14, 36-54, 57-119 |
| "'Strange kind of way,' I think is a good way of putting it. It is a legitimate cost, it is a payroll function. Payroll functions need to be done. Do they need to be done by 12 different subcontractors with the own G&A, with their own profit, their own fee? I think that is a good question to ask." Tr. at 22. | FAC ¶¶ 7-9, 13-14, 36-54, 57-119 |

This testimony by United States Government officials mirrors the allegations of Relators that (1) GLS subcontracted extensively to small businesses for the linguist contract; (2) GLS used these subcontracts to fulfill the 35% small business subcontracting requirement; (3) many of the small business subcontractors performed only payroll, and only by moving money around; (4) GLS did "all of the recruiting, the hiring, the training, and, essentially, the management on the ground. The subcontractors are responsible for seemingly very little;" (5) the subcontractors did not hire, recruit, manage, or interact with the linguists and were "do-nothing subcontractors;" (6) the Government's costs were substantially increased because of GLS's extensive subcontracting, many subcontractors "are paid much more than they are worth," and are "making large amounts of money in add-ons and what is called overhead;" and (7) "advisory management support" is "really is no support at all." As noted above, these allegations constitute almost the entirety of Relators' FCA allegations in the FAC concerning improper subcontracting.

Relators' claims that the Government would not have awarded Contract 2 if it had been aware of the subcontracting situation that GLS had created are similarly barred by the public

disclosures at the Commission hearing. FAC ¶¶ 91-119. As recounted above, the Government was concerned that GLS was paying significant amounts of money to small business subcontractors performing virtually no functions under the contract. Despite this critical discussion of GLS's performance, however, Government officials explicitly decided not to replace GLS.[9]

While Relators allege that DI relies on the *Zaklit* and *Zinnekah* litigations to show public disclosures related to the TVPRA claims, DI Opp'n at 17-23, DI's Motion actually relies on media reports about those litigations and the allegations included in them. The news articles referenced in AECOM's and DI's Motions for Summary Judgment summarize the allegations from both litigations. *See, e.g.*, DI's Motion at fn. 16-18, 28-29; AECOM's Motion at 20-24. In addition, a September 2013 article[10] about the *Zinnekah* litigation describes their allegations that (1) DI "duped" them into signing false confessions that they violated Kuwaiti immigration laws; (2) GLS did not pay the linguists for their training; (3) they were "confined within a DI training facility and are not free" to come and go; (4) GLS entered into a deal with Al Shora to sponsor the linguists, but backed out; (5) GLS failed to tell the linguists they were in violation of Kuwaiti immigration law; (6) Al Shora informed the Kuwaiti government that sponsorship was ending; (7) "certain plaintiffs" were arrested and jailed by Kuwait for violating labor and immigration laws; (8) some linguists were "confined to U.S. military bases for over three months" and were not able to work, to leave Kuwait, or to seek medical care. *Id.*; *see* FAC ¶¶ 120-159. Because

---

[9] Richard Lardner, "Major problems cited in Iraq interpreter contract," Associated Press (August 12, 2009), available at https://www.newsday.com/news/nation/major-problems-cited-in-iraq-interpreter-contract-1.1365630 (last visited May 22, 2019).
[10] Ryan Abbott, "Workers Claim DI Abandoned Them," Courthouse News (Sept. 25, 2013), https://www.courthousenews.com/workers-claim-DI-abandoned-them/ (last visited, May 21, 2019).

these articles are "from the news media," and publicly disclosed nearly identical allegations to those in the FAC, all of these allegations fall squarely within the post-2010 public disclosure bar. 31 U.S.C. §3730(e)(4)(A) (2012); *see* DI Motion at 17-19.

Based on these public disclosures, none of Relators' FCA allegations can survive a Motion to Dismiss under the public disclosure bar. The similarities between the FAC and the Commission hearing testimony and numerous media reports are more than substantial—the allegations are virtually identical to the publicly disclosed information. Therefore, unless Relators can show they are the original source of the information, their claims are barred.

### B.      Relators Are Not Original Sources

Relators do not even argue that they are original sources under the FCA before it was amended in 2010. *See* DI Opp'n at 23. Contract 1 was signed in 2007 and many of the small business subcontracts under Contract 1 similarly predate the period when Relators claim to be an original source. DI Motion at 4; *see infra*, section II.A. While they do claim to be an original source under the amended FCA, Relators fail to allege adequate facts to qualify for that exception. *See* 31 U.S.C. § 3730(e)(4)(B) (2006) (amended 2010). To be an original source after the 2010 amendments, a relator must have knowledge "independent of and [that] materially adds to the publicly disclosed allegations or transactions," and must have "voluntarily provided the information to the Government before filing an action" under the FCA. *United States ex rel. Gilbert v. Virginia College, LLC*, 305 F.Supp.3d 1315, 1325-26 (N.D. Al. 2018). "The burden is on the Relators to show that the information and allegations they discovered were qualitatively different information than what had already been discovered and not merely the product and outgrowth of publicly disclosed information." *United States ex rel. Sonnier v. Standard Fire Ins. Co.*, 84 F.Supp.3d 575, 591 (S.D. Tx. 2015).

In order to be an original source, "the relator's investigation either must translate into some additional compelling fact, or must demonstrate a new and undisclosed relationship between disclosed facts, that puts a government agency on the trail of fraud, where that fraud might otherwise go unnoticed." *Sonnier*, 84 F.Supp.3d at 591 (internal quotations omitted). "So to 'materially add[ ]' to the publicly disclosed allegation or transaction of fraud, a relator must contribute significant additional information to that which has been publicly disclosed so as to improve its quality." *United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 306 (3d Cir. 2016). The entirety of the allegations that Relators claim they added to the public disclosures is "the SBA Defendants performed no role whatsoever under Contract 1," GLS's relationship with Al Shora was illegal, and Relators were uncertain about the identity of their employer. DI Opp'n at 26. Relators do not specify how these claims "materially add" to the facts already in the public domain, nor do these allegations add substantially to the facts about GLS's contracting and subcontracting practices, or about Relators' misfortunes in the Middle East, discussed *supra*, section II.A. While Relators claim that the Government was not "on the trail of fraud" before the current suit, the 2009 Commission hearing shows that numerous Government officials were skeptical of GLS's subcontracting practices and questioned whether they were proper expenditures from the public fisc. Such skepticism aligns with the purposes of the FCA, which is to draw government attention to fraudulent and questionable draws on the federal treasury. And, "once the government knows the essential facts of a fraudulent scheme, it has enough information to discover related frauds." *United States ex rel. Ryan v. Endo Pharma., Inc.*, 27 F.Supp.3d 615, 626 (E.D. Pa. 2014).

Relators similarly claim that their participation in the *Zaklit* and *Zinnekah* litigations show their status as original sources, DI Opp'n at 22, but much of DI's and AECOM's public

disclosure evidence predates those lawsuits. *See* DI Motion at 7-8; *supra*, section III.A. Relators provide no new facts to show that they are original sources under the amended FCA, but simply restate that "they acquired knowledge of their FCA allegations independently through their employment with Defendants, interactions with fellow employees and their own research." DI Opp'n at 24. To the extent this claim is based on the pre-2010 FCA, with its requirement that allegations not be "based on" public disclosures, Relators have not alleged they are an original source under that statute.

      C.      **The FAC Does not Allege that Relators Voluntarily Disclosed their Information to the Government Before Filing the Present Complaint**

In addition to being an original source for materially important information, Relators must also have voluntarily disclosed their information to the Government before filing the FAC. *See* DI Motion at 21; *United States ex rel. Ackley v. Int'l Business Machines Corp.*, 76 F.Supp.2d 654, 668 (D. Md. 1999). Relators claim, in their Opposition to DI, that they voluntarily disclosed their information a mere three months before filing this Complaint. DI Opp'n at 23, n. 34. This point is unsupported by any provision within the FAC and is not information subject to judicial notice by the Court, so it is not properly considered by the Court in deciding this Motion. Therefore, Realtors cannot be considered original sources because of their failure to disclose voluntarily to the Government before filing. 31 U.S.C. §3730(e)(4)(B)(i)-(ii) (2012).

**III.      RELATORS FAIL TO STATE A CLAIM THAT DI IS DIRECTLY LIABLE**

Relators allege, at the outset of their Opposition, that "DI is Directly Liable for all of Relators' Claims" because it participated in GLS's false claims. DI Opp'n at 2. In doing so, Relators do not provide any allegations beyond the "back office" functions cited in their attempt to pierce the corporate veil. *See supra*, section II.A.1; DI Opp'n at 2-3. DI providing those few support functions to a subsidiary does not create direct liability for any false claims by that

- 17 -

subsidiary. To be directly liable for an FCA violation requires that a party be "directly involved in submitting false claims or causing them to be submitted to the government." *Hockett*, 498 F.Supp.2d at 62; *see U.S. ex rel. Scollick v. Narula*, 215 F.Supp.3d 26, 38-39 (D.D.C. 2016) (dismissing direct liability because relators failed to show that "defendants directly made false statements," "directly presented false claims or made false statements or records," or caused any such claims to be submitted); DI Motion at 22-25. Relators do not allege, and have not provided factual allegations that, DI was involved in submitting any claims to the Government—whether false or accurate—that were material to payment under Contract 1 or Contract 2.[11] The "back office" functions upon which Relators rely to attempt to pierce the corporate veil nowhere allege that DI presented false claims, made false claims in any statements or records, caused any false claims to be submitted, or made any false statements to the Government. *See supra*, section II.A.1; DI Opp'n at 2-3. Nor have Relators alleged that DI possessed knowledge under the FCA. *See* DI Motion at 24.

Similarly, these same "back office" functions do not support DI's direct liability for a TVPRA violation. 18 U.S.C. §§ 1589, *et seq.* (2008); DI Motion at 26-29. To allege that DI directly violated the TVPRA, Relators would have to allege sufficient facts to show that DI was specifically responsible for Relators' misfortunes in theater in the Middle East. "[T]here must be a nexus or connection between the alleged victims' provision of labor and services and at least

---

[11] The United States notes that specific false claims are not required to be pled in the 4th Circuit and that some indicia of reliability that an actual false claim was presented to the government is adequate. Under the standard described by the United States, the FAC is nevertheless inadequate because Relators' allegations do not supply that indicia of reliability. *United States ex rel. Grant v. United Airlines*, 912 F.3d 190, 199 ("Rule 9(b)'s heightened pleading standard requires that plaintiffs connect the dots . . . between the alleged false claims and government payment.") This indicia of reliability is particularly lacking as to DI because there are no indications that there was a "billing and payment structure" in place that would have involved DI in the submission of claims (or alternatively false statements in support of claims).

one . . . type of force." *United States v. Marcus*, 487 F.Supp.2d 289, 210 (E.D.N.Y. 2007), *rev'd on other grounds*, 628 F.3d 36 (2d Cir. 2010); *see Guobadia v. Irowa*, 103 F.Supp.3d 325, 334 (E.D.N.Y. 2015) (a violation occurs "where it is intended to cause a person to believe that, if she did not perform such labor or services, she or another individual would suffer serious harm."). Relators fail to provide allegations showing that DI is directly liable for any of the bad experiences they had during their employment with GLS. In fact, Relators were employees under Foreign Service Agreements that informed them of the possible risks of accepting a position as a translator in a conflict zone. *See* DI Motion at 26-29. Because of these Agreements, Relators' have not even alleged a violation of the TVPRA against GLS, much less against DI. *Id.*

Based on these failings in the FAC, Relators' allegations that DI is directly liable for any FCA or TVPRA violations related to the linguist contract must be dismissed.[12]

## IV.    RELATORS MISSTATE THE APPLICABLE STATUTE OF LIMITATIONS

Relators' Notice of Supplemental Authority broadly asserts that the Supreme Court held in *Cochise Consultancy Inc. v. United States ex rel. Hunt*, ___U.S. ___,  2019 WL 2078086 (2019), that the FCA's "ten-year statute of limitations" applies whether or not the government has intervened in the case. Relators' Statement does not clarify the potential applicability of 31 U.S.C. §3731(b)(2), which allows a limitations period for three years after the United States official "charged with responsibility to act" knows or should have known the relevant facts. *Id.* As discussed *supra*, section II.A, the Commission hearing demonstrates that the relevant United

---

[12] None of the points advanced by the United States as to DI change the fact that Relators failed to supply sufficient allegations to support a claim under the FCA or TVPRA. DI notes that the United States did not argue that Relators have adequately stated a claim. The fact that the United States has articulated its position regarding three discrete points as to FCA authority as described by DI does not alter the conclusion that Relators' allegations fall far short of supplying the detail necessary to sustain a claim under the FCA.

States officials were aware of problems with the contracts at issue by at least August 12, 2009.

Therefore, the three-year statute of limitations was triggered then, and ended at least by August

12, 2012. Relators did not file the FAC within this period, nor do they explain why they are

entitled to a ten-year limitations period under the FCA.

**V.      CONCLUSION**

     For the reasons stated above, this Court should dismiss DI from the present litigation.

Dated: May 30, 2019                 */s/   Jan Paul Miller*           
                                    Jan Paul Miller, Maryland USDC – 05257
                                    Claire M Schenk (Admitted *Pro Hac Vice*)
                                    THOMPSON COBURN LLP
                                    One US Bank Plaza
                                    St Louis, MO 63101
                                    314-552-6000
                                    Fax: 314-552-7000
                                    jmiller@thompsoncoburn.com
                                    cschenk@thompsoncoburn.com

                                    *Attorneys for DI*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of May, 2019, that the foregoing was served via the

Court's electronic filing system.


By  */s/   Jan Paul Miller*
       Jan Paul Miller, Maryland USDC – 05257
       THOMPSON COBURN LLP
       One US Bank Plaza
       St Louis, MO 63101
       314-552-6000
       Fax: 314-552-7000
       jmiller@thompsoncoburn.com