**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

UNITED STATES OF AMERICA *ex rel.*     &ast;
ELGASIM MOHAMED FADLALLA, *et al.*,
&ast;

     Plaintiff-Relators,
&ast;

   v.                                    Civil Action No. 8:15-cv-01806-PX
&ast;

DYNCORP INTERNATIONAL LLC, *et al.*,
&ast;

     Defendants.

&ast;&ast;&ast;

## MEMORANDUM OPINION

This *qui tam* action concerns the provision of translators to assist our armed forces in the

Middle East.  Pending before the Court are seven motions to dismiss filed by Defendants

TigerSwan, Inc. (ECF No. 64), AECOM National Security Programs, Inc. (ECF No. 80), KMS

Solutions, LLC (ECF No. 81), DynCorp International, LLC (ECF No. 83), Global Linguist

Solutions, LLC (ECF No. 85), Thomas/Wright, Inc. (ECF No. 100), and Shee Atika Languages,

LLC (ECF No. 129).  The motions are fully briefed, and no hearing is necessary.  *See* Loc. R.

105.6.  For the following reasons, the motions are GRANTED in part and DENIED in part.

### I.    Background

Relators'[1] false claims allegations arise out of the performance of two government

contracts awarded to Global Linguist Solutions, LLC ("GLS") by the Commander, Headquarters,

United States Army Intelligence and Security Command ("INSCOM").  ECF No. 9 ¶ 2.  Relators

are 29 United States citizens who worked for GLS under one or both of the contracts "as

security-cleared linguists, translators and interpreters for U.S. military and intelligence-gathering

---

[1] While the individuals bringing this suit are properly "Plaintiffs" for their Trafficking Victims Protection
Reauthorization Act claim and "Relators" for their False Claims Act claims, the Court will refer to them as
"Relators" throughout to avoid confusion.

operations in the Middle East." *Id.* ¶ 5.

## A. Subcontractor Fraud Scheme

On December 5, 2007, INSCOM selected GLS as the "proposed awardee" of Contract W911W4-08-D-0002 ("Contract 1"), a $4.645 billion contract of an indefinite duration and quantity for "the provision of linguists to support U.S. military and intelligence-gathering efforts in the Middle East." *Id.* ¶¶ 59–61.  To be awarded Contract 1, GLS had to submit a "Small Business Subcontracting Plan." *Id.* ¶¶ 69, 70.  This plan included a statement of total dollars to be subcontracted to various categories of small businesses, to include those owned by veterans, women, and those considered "disadvantaged" businesses.  *Id.* ¶¶ 69, 77.  GLS was required to submit reports at the close of each fiscal year, in which it would note any subcontract awards to small disadvantaged business.  The contract also specifically stated that GLS' failure "to comply in good faith with its subcontracting plan" would amount to a "material breach." *Id.* ¶ 79.  Relators assert that the small business subcontract provisions were designed to "enhance the ability of small businesses to perform the contracts and provide the services needed to enhance the *competition* necessary to promote a free marketplace" as envisioned in the Aid to Small Business Act.  *Id.* ¶ 73 (emphasis in original).

In bidding for Contract 1, GLS entered into "Teaming Agreements" with Small Business Defendants KMS Solutions, LLC ("KMS"), Shee Atika Languages, LLC ("Shee Atika"), Thomas/Wright, Inc. ("Wright"), TigerSwan, Inc. ("TigerSwan"), and Invizion, Inc. ("Invizion").  *Id.* ¶¶ 8, 83.  GLS next represented to INSCOM "that it intended to utilize the Small Business Defendants in accordance with the subcontracting requirements of Contract 1." *Id.* ¶ 84.  However, in practice, and through the Teaming Agreements, the Small Business Defendants acted as "GLS affiliates" and not "*bona fide* independent small business entities."

*Id.* ¶ 86. As part of GLS' contracting scheme, GLS performed all of the contract work while giving the appearance that the Small Business Defendants performed the same work under the subcontracts. *Id.* ¶ 88.

As part of the scheme, GLS had Relators sign various employment contracts to make it appear, falsely, that one of the Small Business Defendants was the Relator's employer. Each Relator executed multiple employment contracts, seriatim, within a matter of months. *See, e.g., id.* ¶¶ 190, 230–32. GLS managers interacted with Relators almost exclusively, not the Small Business Defendants who nominally appeared on the employment contracts. *Id.* ¶ 94. GLS oversaw the recruitment and hiring process, paid for Relators' training, coordinated background investigations and medical testing, determined where Relators were deployed, and managed Relators' transportation to Kuwait. *Id.* ¶¶ 96–111. When these "transfers" occurred, GLS often told Relators to not worry and that nothing about their employment would change, except they would now be paid by the new subcontractor. *Id.* ¶¶ 261, 278–79, 283, 310, 340, 405. Small Business Defendants, in turn, "did not know, at any given time, which Relators were on their payrolls." *Id.* ¶ 115. Accordingly, "GLS received unjustified payments from the U.S. by falsely representing its employees, including Relators, as working for the Small Business Defendants, outsourcing task orders to them, and earning fees for such outsourced work." *Id.* ¶ 117.

In the National Defense Authorization Act for Fiscal Year 2008, Congress established the Commission on Wartime Contracting in Iraq and Afghanistan ("CWC") to investigate "fraud, waste, abuse and mismanagement of wartime government contracts." *Id.* ¶ 164. On August 12, 2009, the CWC "held a hearing on linguist support services provided by GLS," calling GLS President John Houck to testify. *Id.* ¶ 165. In questioning Houck on the role of the subcontractors, Houck falsely testified that GLS was "leasing" linguists from the Small Business

Defendants. *Id.* ¶ 167. Houck also stated that 60% of the linguists were employed by subcontractors, and that only 40% were GLS employees, when in fact GLS employed almost all linguists. *Id.* According to Relators, Houck's false testimony "thwart[ed] discovery . . . of GLS's material breaches of Contract 1 and false claims thereunder." *Id.* ¶ 177.

On July 11, 2011, INSCOM awarded Contract No. W911W4-11-D0004 ("Contract 2") to GLS for $9.7 billion. *Id.* ¶ 92. Like Contract 1, Contract 2 "calls for provision of similar linguistic, interpretation and translation services for U.S. military personnel and other agencies, only on a global basis." *Id.* ¶ 4. In submitting its proposal for Contract 2, GLS "falsely represented that it had complied with Contract 1," including the small business contracting requirements. *Id.* ¶ 92. Relators aver that INSCOM awarded Contract 2 to GLS, relying at least in part on these false representations. *Id.* ¶¶ 4, 180.

### B. Work Visa Fraud Scheme with Alshora

Under Contract 1, GLS was responsible for ensuring that employees such as Relators secured necessary travel documents, and that all personnel, including subcontractors, complied with "Host Country, local and international laws and regulations . . . applicable to the contractor in the area of operations." *Id.* ¶ 65. As part of this contractual obligation, GLS represented that performance under Contract 1 complied with Kuwaiti labor and immigration laws. *Id.* ¶ 506. However, foreign nationals must obtain a Resident Visa to work in Kuwait, and businesses owned by foreign nationals cannot serve as employers. *Id.* ¶¶ 127–28.

To circumvent Kuwait's prohibition on GLS employing the Relators directly, GLS subcontracted with Alshora International General Trading and Contracting Company ("Alshora"), a Kuwaiti owned business, for Alshora to obtain Resident Visas for GLS employees in exchange for a "sponsorship fee." *Id.* ¶ 124. Beginning December 9, 2009, "Alshora and

GLS obtained Relators' signatures on documents purporting to identify Relators as Alshora employees." *Id. ¶* 129. To further this scheme, GLS forced Relators to open bank accounts in Kuwait and then deducted from Relators' pay an amount for Alshora to deposit into the Kuwait accounts all to make it appear as if Relators worked for Alshora. *Id. ¶* 130. GLS also held Relators' passports for weeks or months at a time and without explanation, thus preventing Relators from leaving Kuwait or venturing off the U.S. military bases to which they were assigned. *Id. ¶¶* 194–97, 201, 219, 229, 249, 265, 373, 391, 419.

In late 2012, the business relationship between GLS and Alshora began to deteriorate and GLS planned to find a different Kuwaiti company to assist in the performance of Contract 2. *Id.* ¶ 134. GLS notified Alshora on January 10, 2013 to expect final payment under the subcontract on February 17, 2013. *Id.* ¶ 135. This notice prompted Alshora to demand that the linguists who had been issued Resident Visas "report to Alshora to have those visas cancelled" prior to February 17. *Id. ¶¶* 136–37. Although GLS agreed to send linguists to the Alshora office to process the visa cancellations, GLS did not comply with the plan, which would have required their linguists to leave Kuwait and return to the United States. *Id. ¶¶* 138–40. When the linguists, including certain Relators ("Resident Visa Relators"), failed to cancel their visas, Alshora "reported to Kuwaiti authorities that these linguists—its alleged 'employees'—had abandoned their worksites." *Id.* ¶ 141.

Under Kuwaiti law, abandonment of a worksite amounts to the criminal offense of "absconding." *Id.* ¶ 142. During this time, Alshora also learned that other GLS linguists, including certain Relators ("Non-Resident Visa Relators") had been working in Kuwait without having obtained Resident Visas. *Id.* ¶ 143. GLS never obtained Resident Visas for a number of linguists, who entered Kuwait on tourist visas and, unbeknownst to the linguists, worked in

violation of Kuwaiti law.  *Id.* ¶¶ 316–19, 395–96, 440–43.  Alshora reported these linguists "to Kuwaiti authorities as working illegally in Kuwait."  *Id.* ¶ 145.

As a consequence of Alshora reporting the Relators to Kuwaiti authorities, Kuwait "ordered that Relators immediately stop work for the U.S. military and intelligence forces in Kuwait" as of February 19, 2013.  *Id.* ¶ 146.  As a further consequence, affected Relators faced arrest if they tried to leave the country.  *Id.* ¶ 149.  One Relator was in fact arrested en route to Jordan to visit his ill mother.  *Id.* ¶¶ 235–38.

In April 2013, GLS transported Resident Visa Relators to the Kuwaiti Ministry of Labor and Social Affairs, and demanded they execute Powers of Attorney ("POAs") with the false promise of being issued new visas.  *Id.* ¶¶ 150–53.  GLS instead used the POAs to file civil complaints in Resident Visa Relators' names against Alshora for unpaid wages and without the Relators' knowledge or consent.  *Id.* ¶¶ 154–55.  Alshora, in turn, filed counterclaims against the Relators, seeking damages for the "allegedly frivolous filing" of Relators' complaints.  *Id.* ¶ 156.

As to the criminal "absconding" charges, GLS also coerced the Resident Visa Relators into signing false confessions with the promise that they would be allowed to leave Kuwait.  *Id.* ¶ 158.  However, unbeknownst to the Relators, the "confessions" resulted in their immediate expulsion from Kuwait and they were banned from reentering any member nation of the Gulf Cooperation Council.[2]  *Id.* ¶ 159.  Those Relators who refused to sign confessions were detained for months before finally being released.  *Id.*

Relators further allege "inhumane" treatment they suffered by being forced to stay in "overcrowded, unsanitary, and dangerous living conditions" while stationed in Kuwait.  *Id.* ¶¶ 182–83.  While private contractors generally live off base in private housing or on base in

---

[2] Gulf Cooperation Council Member Nations include Bahrain, Kuwait, Oman, Qatar, Saudi Arabia and the United Arab Emirates.  ECF No. 9 ¶ 12.

structures built by their employers, Defendants placed Relators on bases in overcrowded tents not built to serve as permanent quarters for large numbers of long-term residents. *Id.* ¶¶ 185–87. Relators recount living in tents infested with rodents, bed-bugs, lice and mites. *Id.* ¶¶ 185–87, 274. Relators did not receive any medical care despite their having sustained a number of serious injuries. *Id.* ¶¶ 186, 346.

### C.  Procedural History

Based on the above-described scheme, Relators filed this *qui tam* action on behalf of the United States under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.* The FCA generally assigns liability to "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the United States. *Id.* § 3729(a)(1)(A). Private parties, known as *qui tam* relators, may bring FCA actions on behalf of the United States. The FCA provides the United States an opportunity to investigate the claims and choose whether to intervene in the Relators' place or allow Relators to proceed with the litigation. *Id.* § 3730(b). After prolonged investigation and deliberation in this case, the United States declined to intervene. *See* ECF No. 29.

In the Amended Complaint, Relators assert three FCA counts against prime contractor GLS and subcontractors Invizion, KMS, Shee Atika, TigerSwan, and Wright for false claims related to Contracts 1 and 2. *See* ECF No. 9 ¶¶ 488–547. Relators aver AECOM National Security Programs, Inc. ("AECOM") and DynCorp International, LLC ("DynCorp") are liable as joint owners of GLS. *Id.* ¶ 20. Relators further bring one count under the Trafficking Victims Protection Reauthorization Act ("TVPRA") concerning Relators' treatment and work conditions in Kuwait. *Id.* ¶¶ 548–93. On May 21, 2019, the Clerk entered default as to Defendant Invizion for failure to plead or otherwise defend. ECF No. 132. The other seven Defendants have moved

to dismiss the Amended Complaint on several grounds, each discussed below.  *See* ECF Nos. 64, 80, 81, 83, 85, 100, 129.

## II.    Standards of Review

Defendants challenge the Amended Complaint on jurisdiction and sufficiency grounds, implicating Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6).  Rule 12(b)(1) motions challenge a court's authority to hear the matter.  *See Jones v. Calvert Group, Ltd.*, 551 F.3d 297, 300–01 (4th Cir. 2009).  The plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence.  *Lovern v. Edwards*, 190 F.3d 648, 654 (4th Cir. 1999).  In determining whether jurisdiction exists, "the court may look beyond the pleadings and the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue."  *Khoury v. Meserve*, 268 F. Supp. 2d 600, 606 (D. Md. 2003) (internal marks and citation omitted).  Where the defendant contends that the complaint "simply fails to allege facts upon which subject matter jurisdiction can be based," the Court construes the factual allegations as true and most favorably to the plaintiff.  *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).  Whether the Court retains subject matter jurisdiction must be decided before reaching the merits of the case.  *Jones v. Am. Postal Workers Union*, 192 F.3d 417, 422 (4th Cir. 1999).

Where personal jurisdiction is lacking, dismissal of the claims may also be warranted.  *Lightfoot v. Cendant Mortg. Corp.*, 137 S. Ct. 553, 562 (2017).  Pursuant to Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of establishing personal jurisdiction by a preponderance of the evidence.  *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003).  In deciding a Rule 12(b)(2) motion, the court is "permitted to consider evidence outside the pleadings."  *All Risks, Ltd. v. Butler*, No. GLR-15-3146, 2016 WL 4435477, at *2 (D. Md. Aug. 22, 2016) (internal citations omitted).

A motion brought pursuant to Rule 12(b)(6) tests the sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). The Court accepts "the well-pled allegations of the complaint as true," and construes all facts and reasonable inferences most favorably to the plaintiff. *See Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). To survive a motion to dismiss, a complaint's factual allegations "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). The Court may also grant a 12(b)(6) motion on statute of limitations grounds, but "only if the time bar is apparent on the face of the complaint." *Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017) (citation and internal quotations omitted).

In ruling on a Rule 12(b)(6) motion, the Court generally may not consider extrinsic evidence. *Zak v. Chelsea Therapeutics, Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) ("Consideration of extrinsic documents by a court during the pleading stage of litigation improperly converts the motion to dismiss into a motion for summary judgment."). However, the Court may consider documents attached to pleadings if "integral to and explicitly relied on in the complaint" and the plaintiff does not challenge the documents' authenticity. *Id.* at 606–07 (quoting *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)).

### III.    Personal Jurisdiction

Two Small Business Defendants, TigerSwan and Shee Atika, contend that dismissal for lack of personal jurisdiction is warranted under Rule 12(b)(2) because they lack "minimum contacts" with this forum. ECF No. 64-1 at 1; ECF No. 129-1 at 13–15. TigerSwan more particularly argues that it has conducted no business in Maryland and that mere corporate registration and compliance with Maryland's unemployment laws does not amount to "minimum

contacts" sufficient to confer personal jurisdiction. ECF No. 64-1 at 9–11. Shee Atika similarly contends that "minimum contacts" with the state are lacking because it had always been an Alaska limited liability company prior to its dissolution and never operated in Maryland. ECF No. 129-1 at 14–15. TigerSwan and Shee Atika, however, advocate for their dismissal under the wrong standard.

Although courts routinely determine whether personal jurisdiction is proper under a "minimum contacts" theory, *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–72 (1985), where, as here, a federal statute authorizes nationwide service of process, a "national contacts" standard applies. *Autoscribe Corp. v. Goldman & Steinberg*, 47 F.3d 1164, 1164 (4th Cir. 1995) (table decision). In this context, "so long as the assertion of jurisdiction over the defendant is compatible with due process, the service of process is sufficient to establish the jurisdiction of the federal court over the person of the defendant." *Hogue v. Milodon Eng'g, Inc.*, 736 F.2d 989, 991 (4th Cir. 1984). A defendant contesting personal jurisdiction under this standard must demonstrate that trying its case in the forum would violate its Fifth Amendment due process rights and that "extreme inconvenience or unfairness . . . would outweigh the congressionally articulated policy evidenced by a nationwide service of process provision." *Becker v. Noe*, No. ELH-18-00931, 2019 WL 1415483, at *18 (D. Md. Mar. 27, 2019) (quoting *Trs. of the Plumbers & Pipefitters Nat'l Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 444 (4th Cir. 2015)); *see also* 4 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1068.1 (4th ed. 2019) (noting substantial deference is given to Congress' choice to include a nationwide service provision).

Under the FCA, nationwide service of process is accomplished by summons, which "as required by the Federal Rules of Civil Procedure shall be issued by the appropriate district court

and served at any place within or outside the United States." 31 U.S.C. § 3732(a). Accordingly, the Court considers TigerSwan and Shee Atika's national contacts with the United States rather than minimum contacts with the state of Maryland in determining whether it has personal jurisdiction over these Defendants. *Cf. United States v. Hobbs*, No. 16CV236, 2018 WL 1368325, at *6 (N.D. W. Va. Mar. 16, 2018) ("The Court discerns no reason why the Fourth Circuit would not adopt the national contacts test in the context of an FCA action such as this one.").

TigerSwan maintains sufficient contacts with the United States for this Court to exercise personal jurisdiction. TigerSwan is qualified as a small business under the United States Small Business Association. ECF No. 64-1 at 3. It formed as a corporation in Colorado, converted to a limited liability company in Delaware, and is registered in Maryland. *Id.* at 2–3. TigerSwan made payments to the Maryland Unemployment Insurance Department on behalf of a resident employee in Maryland. *Id.* at 4. Further, all back-office management duties arising from Contract 1 were conducted at TigerSwan's headquarters in North Carolina. *Id.* at 3–4. TigerSwan meets the minimum standard for contacts with the United States to establish the Court's personal jurisdiction.

Shee Atika similarly meets the national contacts test. Shee Atika was a limited liability company organized under the laws of Alaska and was 51% owned by an Alaska Native Corporation and 49% by an individual who resides in New Hampshire. ECF No. 129-5 ¶¶ 5, 6, 8. Shee Atika "received certifications from the United States Small Business Association" (*id.* ¶ 9) and had around 20 employees who worked in the United States on Contract 1, located in Alaska, North Carolina, and Virginia. *Id.* ¶ 22. The Court maintains personal jurisdiction over both Defendants for the FCA claims.

TigerSwan and Shee Atika alternatively contend that even if they meet the national contacts standard, notions of fairness and convenience should bar the Court from exercising personal jurisdiction. TigerSwan avers that, as a small business with no other connection to the forum state, litigation in this forum would unduly burden the corporation. ECF No. 75 at 5. Shee Atika similarly contends that, as a business no longer in operation that was located thousands of miles away in Alaska, litigating the case in Maryland would be "constitutionally unreasonable." ECF No. 129-1 at 16–17. The Court finds that the proffered inconveniences alone do not defeat personal jurisdiction.

Only in "highly unusual cases" will "inconvenience . . . rise to a level of constitutional concern." *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 627 (4th Cir. 1997). This is especially so where "[m]odern means of communication and transportation" have undoubtedly lessened the burden and expense of litigation. *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 947–48 (11th Cir. 1997); *Becker*, 2019 WL 1415483, at *18 (dismissing Fifth Amendment concerns where the inconvenience was related to costs of travel); *see also ESAB Grp.*, 126 F.3d at 627 (finding that personal jurisdiction was established despite some inconvenience to the defendants but refusing to decide issues of proper venue). Although the Court is, and will remain, sensitive to Defendants' concerns, FCA litigation will proceed in this forum as to TigerSwan and Shee Atika. The motion to dismiss on this ground is denied.

Similarly, the Court will exercise pendant jurisdiction over the TVPRA claims. Pendent personal jurisdiction is proper where the claims arise under a "common nucleus of operative fact." *See Burt v. Maasberg,* No. ELH-12-0464, 2013 WL 1314160, at *36 (D. Md. Mar. 31, 2013) (quoting *ESAB Grp.*, 126 F.3d at 628). The FCA and TVPRA claims arise from a common nucleus of operative facts concerning the implementation of Contract 1. *See*

*Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 452 F. Supp. 2d 621, 626, 628 (D. Md. 2006), *aff'd*, 273 F. App'x 256 (4th Cir. 2008) (stating multiple claims arising from the same insurance policy arose from a common nucleus of operative fact); *Orteck Int'l Inc. v. TransPacific Tire & Wheel, Inc.*, No. DKC 2005-2882, 2006 WL 2572474, at *9 (D. Md. Sept. 5, 2006) (exercising pendent personal jurisdiction over claims arising from a single sale). Thus, the Court may extend personal jurisdiction over TigerSwan and Shee Atika to the TVPRA claims. *See ESAB Grp.*, 126 F.3d at 628–29. As TigerSwan's motion to dismiss solely challenged personal jurisdiction, its motion is denied. ECF No. 64.

## IV. FCA Claims (Counts I–III)

Counts One through Three of the Amended Complaint allege violations of three separate FCA provisions. In Count I, Relators aver that "Defendants knowingly presented, or caused to be presented, false and/or fraudulent claims for payment or approval by the U.S. Government, in violation of 31 U.S.C. § 3729(a)(1)." ECF No. 9 ¶ 489. In Count II, Relators aver that Defendants knowingly made, used, or caused to be made or used, "false records or statements to get false or fraudulent claims paid or approved by the U.S. Government, in violation of 31 U.S.C. § 3729(a)(1)(B)." *Id.* ¶ 525. In Count III, Relators allege a "reverse false claim," whereby Defendants knowingly made false statements to avoid having to pay an amount owed to the Government, in violation of 31 U.S.C. § 3729(a)(1)(G). *Id.* ¶ 542.

Relators' FCA claims are grounded in two primary factual theories. First, Relators assert that GLS falsely claimed to the Government that GLS had employed Small Business Defendants when, in actuality, the subcontractors were "fronts" for GLS which provided the services pursuant to the Contracts with the Government. *Id.* ¶ 493. Relators contend that the Small Business Defendants "knowingly participat[ed]" in this scheme and thus "caused each of these

false claims to be presented." *Id.* ¶ 499.  Relators assert that had the Government "known of the falsity as to GLS's compliance with its Small Business Subcontracting Plan, the [Federal Acquisition Regulation], and applicable federal small business statutes, the Government may not have paid the invoices submitted under Contract 1." *Id.* ¶ 502.

Second, Relators allege that GLS falsely represented to the Government that it was in compliance with the TVPRA and Kuwaiti labor and immigration laws, including improper "sponsorship" fees paid to Alshora under Contract 1.  *Id.* ¶ 503.  GLS' false statements under Contract 1 were made "to induce the Government to award it Contract 2."  *Id.* ¶ 533.  Relators also allege that invoices submitted for payment under Contract 2 constitute distinct false claims "because GLS was ineligible to perform that contract due to its violations of the federal small business regulations, TVPRA and Kuwaiti law while performing Contract 1."  *Id.* ¶ 518.

## A.  Public Disclosure Bar

Defendants AECOM, DynCorp, GLS, KMS, Shee Atika, and Wright (hereinafter, "Defendants")[3] principally argue that Relators' FCA claims are foreclosed by the FCA's public disclosure bar.  *See* ECF No. 80-1 at 26.  The FCA's public disclosure bar "aims to strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits in which a relator, instead of plowing new ground, attempts to free-ride by merely reiterating previously disclosed fraudulent acts."  *U.S. ex rel. Beauchamp v. Academi Training Ctr.*, 816 F.3d 37, 43 (4th Cir. 2016) (internal marks and citation omitted).  The statute, therefore,

---

[3] The Defendants each join and adopt the motions of GLS, AECOM, and DynCorp.  *See* ECF No. 81-1 at 2; ECF No. 83-1 at 10–11; ECF No. 85-1 at 15; ECF No. 100-1 at 2 n.1; ECF No. 129-1 at 1 n.1.; ECF No. 141 at 6 n.1. Unless specified below, arguments apply to all six Defendants, regardless of the motion in which it was raised.  The Court notes that AECOM and GLS ask the Court to disregard any argument Relators incorporate by reference into their opposition memoranda rather than state in full, asserting Relators have exceeded their page limits.  *See* ECF No. 141 at 6 n.1; ECF No. 142 at 1 n.1.  However, Defendants are guilty of the same practice.  Thus, the Court declines to penalize Relators when in fact they were only responding in kind to Defendants' voluminous pleadings made even more voluminous through their own "incorporation by reference."

"disqualifies private suits based on fraud already disclosed in particular settings—such as

hearings, government reports, or news reports—unless the relator meets the definition of an

'original source' under the FCA." *Id.* at 39.

The FCA claims in this case implicate two versions of the public disclosure bar. Prior to

2010, the FCA public disclosure provision read:

> No court shall have jurisdiction over an action under this section based upon the
> public disclosure of allegations or transactions in a criminal, civil, or administrative
> hearing, in a congressional, administrative, or Government Accounting Office
> report, hearing, audit, or investigation, or from the news media, unless the action is
> brought by the Attorney General or the person bringing the action is an original
> source of the information.

31 U.S.C. § 3730(e)(4)(A) (2005). An "original source" was further defined as "an individual

who has direct and independent knowledge of the information on which the allegations are based

and has voluntarily provided the information to the Government before filing an action under this

section which is based on the information." *Id.* § 3730(e)(4)(B).

The pre-2010 version of the statute "operated as a jurisdictional limitation—the public-

disclosure bar, if applicable, divested the district court of subject-matter jurisdiction over the

action." *U.S. ex rel. May v. Purdue Pharma L.P. (May I)*, 737 F.3d 908, 916 (4th Cir. 2013).

The "relator bears the burden of proving that the public disclosure bar does not preclude his FCA

action." *U.S. ex rel. May v. Purdue Pharma L.P. (May II)*, 811 F.3d 636, 639–40 (4th Cir.

2016).

On March 23, 2010, Congress amended the provision to clarify the sources of public

disclosure. This public disclosure provision, operative today, now reads:

> The court shall dismiss an action or claim under this section, unless opposed by
> the Government, if substantially the same allegations or transactions as alleged in
> the action or claim were publicly disclosed—
>
> (i)        in a Federal criminal, civil, or administrative hearing in which the

Government or its agent is a party;

(ii)     in a congressional, Government Accountability Office, or other Federal
         report, hearing, audit, or investigation; or

(iii)    from the news media,

unless the action is brought by the Attorney General or the person bringing the
action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A) (2010).

The "original source" definition was also amended to include an individual who either:

(i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed
to the Government the information on which allegations or transactions in a claim
are based, or (2) who has knowledge that is independent of and materially adds to
the publicly disclosed allegations or transactions, and who has voluntarily provided
the information to the Government before filing an action under this section.[4]

*Id.* § 3730(e)(4)(B).

Unlike the previous public disclosure bar, the 2010 amendment is no longer jurisdictional

and instead operates as "effectively, an affirmative defense." *Beauchamp*, 816 F.3d at 40. The

amendment also "changed the required connection between the [relator's] claims and the public

disclosure." *Id.* Where previously the statutory bar required a showing that a relator "actually

derived" his knowledge from the public disclosure, under the amendment the bar now applies "if

substantially the same allegations or transactions were publicly disclosed" as those averred by

the relator. *Id.* (citations omitted).

The amendment also "expanded" the statute's definition of the "original source"

exception to the bar. *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d

294, 299 (3d Cir. 2016). In the pre-2010 version, the relator had to demonstrate "direct"

knowledge of the information and disclosure to the Government in advance of filing suit. The

---

[4] The incorrect sequence of numbering in (i) and (2) appears in the statute. *See* 31 U.S.C. § 3730(e)(4)(B).

post-2010 version no longer requires a showing of direct knowledge so long as the relator demonstrates that he shared with the Government pre-suit information that is "independent" of the public disclosures and that "materially adds" to the information that had been publicly disclosed. *Id.*

### i. Subcontractor Fraud Claims

Because the 2010 amendments are not retroactive, the Court must apply the pre-2010 version of the statute to any alleged conduct that occurred before March 23, 2010 and the post-2010 version to the conduct that occurred after that date. *See May I*, 737 F.3d at 918; *Citynet, LLC ex rel. U.S. v. Frontier W. Va. Inc.*, No. 14-15947, 2018 WL 1582527, at *15 (S.D. W. Va. Mar. 30, 2018). Here, the conduct underpinning the subcontractor-related FCA claims straddle both versions of the public disclosure bar in that Contract 1 remained in effect from 2007 to at least 2012. *See* ECF No. 9 ¶ 134. Under either version of the public disclosure bar, the disclosures are public, but relators are permitted to sue as original sources.

Defendants argue that the August 12, 2009 hearing before the CWC (the "CWC Hearing") and surrounding media coverage, as well as news reports of Shee Atika's federal lawsuit against GLS in 2013, preclude suit over the subcontracting claims.[5] ECF No. 80-1 at 28, 29 n.15. Regarding the CWC Hearing, the parties do not dispute that under either version of the statute, the hearing constitutes a "congressional . . . report, hearing, audit, or investigation" and the cited newspaper articles are "news media." 31 U.S.C. § 3730(e)(4)(A); *see also Beauchamp*,

---

[5] As to the pre-2010 version, under Rule 12(b)(1), the Court may consider matters outside of the Complaint without converting the motion to dismiss into one for summary judgment. Moreover, even under the 2010 amendment, "a court may take judicial notice of matters of public record without transforming the motion to dismiss into a motion for summary judgment." *Hedley v. ABHE & Svoboda, Inc.*, No. RDB-14-2935, 2015 WL 4626880, at *2 n.5 (D. Md. July 31, 2015). Accordingly, the Court takes judicial notice of the CWC Hearing transcript, as well as the public court filings and newspaper articles cited by Defendants. *See James v. Acre Mortg. & Fin., Inc.*, 306 F. Supp. 3d 791, 797–99 (D. Md. 2018), *rev'd and remanded on other grounds sub. nom Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535 (4th Cir. 2019).

816 F.3d at 43 n.6 ("Courts have unanimously construed the term 'public disclosure' to include websites and online articles.").  However, Relators respond that the disclosures are not material because they do not disclose the "fraud or its critical elements."  ECF No. 121 at 21–22.  In Relators' view, the relevant "fraud" for purposes of this analysis is that the Small Business Defendants "were not *bona fide* small businesses and performed <u>no</u> work under Contract 1."  *Id.* at 21 (emphasis in original).

The fallacy of this argument is that neither version of the stature requires that "the public disclosure matches *with specificity* the allegations made by a *qui tam* relator."  *U.S. ex rel. Black v. Health & Hosp. Corp. of Marion Cty.*, 494 F. App'x 285, 294 (4th Cir. 2012) (emphasis in original).  This prong of the public disclosure bar "is satisfied if the disclosure 'put[s] the Federal Government on notice of a potential fraud.'"  *Id.* (quoting *Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 291 (2010)).  The CWC Hearing meets this standard.

Chairman Thibault announced the hearing's "focus" would be the "structure, operation, and oversight of [Contract 1], which involves extensive subcontracting," and includes "the potential for significant added cost that may or may not reflect proportional added value."  *Commission on Wartime Contracting in Iraq and Afghanistan: Hearing on Linguist Support Services in Theater*, at 1 (Aug. 12, 2009) (hereinafter, "CWC Transcript").[6]  The Chairman underscored that "every linguist out there . . . wears a GLS badge and is managed and supervised by GLS employees, regardless of who is doing their payroll."  *Id.* at 2.  Commissioners and other testifying witnesses explicitly questioned the propriety and efficiency of paying subcontractors for seemingly playing such a small role.  *Id.* at 4, 10, 21.  News reports covering the event

---

[6] Available at https://cybercemetery.unt.edu/archive/cwc/20110930032251/http://www.wartimecontracting. gov/images/download/documents/hearings/20090812/Transcript-Linguist_Support_Contracts_20090812.pdf.

referred to the hearing as a "scathing review . . . from government officials who described tens of millions of dollars in questionable costs and poor management" and reporting that the "sole role of a dozen" subcontractors was payroll.  *Feds question Iraq interpreter contract*, NBC News, Aug. 12, 2009.[7]  Another article quoted a commissioner's reference to the subcontracting structure as "ridiculously set up."  Elizabeth Newell Jochum, *Defense Says Extensive Outsourcing on Iraq Linguist Contract is Jacking Up Costs*, Government Executive, Aug. 12, 2009.[8]  These disclosures certainly put the Government on notice of a potential fraud surrounding GLS' use of its subcontractors.

As to the Shee Atika lawsuit, Defendants cite to one news article describing the complaint that Shee Atika filed in federal court against GLS, asserting breach of their subcontracting agreement.  *See* Stewart Bishop, *Army Translation Contractor Breached $697M Deal, Suit Says*, Law360, July 16, 2013.[9]  The article details the complaint allegations—that GLS failed to "award the subcontractor enough work to satisfy" the subcontract's "guaranteed work share provision."  *Id.*  Moreover, the article concluded that Shee Atika's "role as a subcontractor was key to GLS satisfying requirements that specified minimum percentages of the prime contract's revenue go to small businesses or small disadvantaged businesses."  *Id.*  This article similarly could put the Government on notice of GLS using subcontractors as "fronts."   Thus, both categories of documents are covered by the statutes.

However, the bar to suit does not apply unless the Relators' allegations are "based upon" these public disclosures, as to pre-2010 conduct, and "substantially the same" as the disclosures

---

[7] Available at http://www.nbcnews.com/id/32393792/ns/world_news-mideast_n_africa/t/feds-question-iraq-interpreter-contract/#.XVsLRWdYbKK.
[8] Available at https://www.govexec.com/defense/2009/08/defensesays-extensive-outsourcing-on-iraq-linguist-contract-is-jacking-up-costs/29745/.
[9] Available at https://www.law360.com/articles/457435/army-translationcontractor-breached-697m-deal-suit-says.

with respect to post-2010 conduct.  The United States Court of Appeals for the Fourth Circuit

interprets the pre-2010 language narrowly; only where the "relator's *knowledge* of the fraud was

actually derived from the public disclosure" will the provision preclude suit.  *May I*, 737 F.3d at

919 (emphasis in original) (citing *U.S. ex rel. Siller v. Becton Dickinson & Co.*, 21 F.3d 1339,

1347–48 (4th Cir. 1994)).  Where such knowledge is even "*partly based* upon prior public

disclosures," further FCA litigation is barred.  *Black*, 494 F. App'x at 295 (emphasis in original)

(quoting *U.S. ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 351 (4th Cir. 2009)).

     The Relators' allegations are at least partly based on the CWC Hearing testimony and

news articles.  One hearing commissioner explicitly questioned whether GLS subcontracted to so

many small businesses "because they had to meet a 35 percent small business goal and they

really did not want the small businesses to do anything but to satisfy the government."  CWC

Transcript, at 22.  Another hearing commissioner noted that the "only unique function" of the

subcontractors was to provide "advisory management support, which one could argue really is no

support at all."  *Id.* at 23.  Moreover, Relators cite directly to the CWC Hearing for the

proposition that GLS was incentivized to appear to be subcontracting services to profit from the

"fee on fee" system.  ECF No. 9 ¶¶ 174–75.  The Court finds the allegations sufficiently "based

upon" prior public disclosures for purposes of the pre-amendment bar.

     The post-2010 bar applies where "substantially the same allegations or transactions were

publicly disclosed."  *May I*, 737 F.3d at 917.  Although the Fourth Circuit has not yet interpreted

this new language, "other circuits look to whether the disclosures provide enough information so

that the government could investigate the case and . . . make a decision whether to prosecute."

*Citynet*, 2018 WL 1582527, at *20 (internal marks and citations omitted).  As the Court finds the

stricter "based upon" standard is met, the broader "substantially similar" test is certainly met

here.

The Relators describe the CWC's mandate as investigation of "fraud, waste, abuse and mismanagement" in government contracts. ECF No. 9 ¶ 164. The focus of the CWC Hearing was on GLS' hiring of, what one commissioner referred to as, "do-nothing subcontractors." CWC Transcript, at 15. The news articles also discuss potential misuse of small business subcontractors. The public disclosures provided sufficient information that the Government could investigate GLS' conduct further and, thus, meet the "substantially the same" standard.

Having found the CWC hearing and surrounding publicity is sufficient to constitute "public disclosures" under both versions of the FCA, the Court next turns to whether Relators may nonetheless proceed as "original sources" of the same information. Under either version of the statute, and to escape the public disclosure bar, Relators must demonstrate that they "voluntarily provided the information to the Government" before they filed the FCA action. 31 U.S.C. § 3730(e)(4)(B). This requirement may not be satisfied "through an ambiguous assertion that leaves open to question whether the plaintiff actually reported information relating to any particular claim or concerning any particular defendant." *U.S. ex rel. Ahumada v. NISH*, 756 F.3d 268, 276 (4th Cir. 2014). The showing is easily met here.

Relators specifically contend that they "are original sources who provided evidence to the U.S. of such misconduct." ECF No. 9 ¶ 6. Relators further attest that they "voluntarily provided the information on which this lawsuit is premised to the Government" on March 23, 2015, three months before filing this action. ECF No. 121 at 30 n.34; *see U.S. ex rel. Ackley v. Int'l Bus. Machs. Corp.*, 76 F. Supp. 2d 654, 668 (D. Md. 1999) (finding disclosure at least 30 days before suit "reasonable in nearly every case").

Under the pre-2010 version of the statute, a relator must also prove that the relator has "direct and independent knowledge of the information on which the allegations are based and has

voluntarily provided the information to the Government." 31 U.S.C. § 3730(e)(4)(B) (2005). "A relator's knowledge is 'direct' if he acquired it through his own efforts, without an intervening agency, and it is 'independent' if the knowledge is not dependent on public disclosure." *Black*, 494 F. App'x at 295–96 (internal marks and citation omitted). Relators do "not need to have direct and independent knowledge of all the information on which a *qui tam* action is based;" rather, "the relator must have direct and independent knowledge of the facts necessary to plead a plausible fraud claim." *U.S. ex rel. Carter v. Halliburton Co.*, 973 F. Supp. 2d 615, 630 (E.D. Va. 2013) (citation omitted).

Relators have averred facts related to GLS' fraudulent subcontracting practices about which they had direct and independent knowledge. Relators were forced to sign contracts with a series of different subcontractors within a matter of months. Relators also knew that despite changing employers, GLS continued to assure them that nothing would change about the terms or conditions of their employment. One Relator, Louai Salim, describes GLS' brazen attempt to identify Relators by "colored cards" as employees of certain subcontractors. ECF No. 9 ¶ 306. At an employment orientation, all linguists holding that same colored card were told they would "work" for TigerSwan. *Id.* After that day, Salim never again interacted with a TigerSwan supervisor, only with GLS staff. *Id.* ¶ 309. Although nominally "employed" by various subcontractors, Relators never met or interacted with the subcontractors, or witnessed the subcontractors performing any work. Relators' direct experiences with GLS and the subcontractors do not hinge on any of the prior public disclosures.

Under the post-2010 amendment, the statute abandons the "direct" knowledge requirement and requires only that the relator's knowledge "is independent of and materially adds to" the claims. 31 U.S.C. § 3730(e)(4)(B) (2010). A relator "materially adds" to the public

disclosures "when it contributes information . . . that adds in a significant way to the essential factual background: 'the who, what, when, where and how of the events at issue.'" *Majestic Blue Fisheries*, 812 F.3d at 307 (citation omitted).

Relators' personal, firsthand experiences with GLS' subcontracting scheme materially adds to the factual background of the FCA fraud. The Amended Complaint paints a vivid picture of each Relator's personal experience with the fraud scheme, alleging facts that not only corroborate information publicly disclosed, but that also breathe important life into proving the scheme with admissible evidence. Accordingly, as original sources to the subcontracting-based FCA claims, Relators' GLS subcontractor claims will proceed.

### ii. TVPRA and Alshora Claims

The Court next turns to the FCA claims based on GLS' alleged violations of the TVPRA and Kuwaiti law. The Amended Complaint allegations—confiscation of passports, failure to provide work visas, and Alshora reporting Relators as absconders and subsequent arrests— largely took place after 2010. Thus, the post-2010 amendment applies to these claims. Similar to the subcontracting scheme, although certain disclosures fall within the statute, the Relators may proceed because they qualify as original sources of the FCA-related evidence.

Defendants point to disclosure arising from two previously filed civil actions brought by linguists, including certain Relators, against GLS, DynCorp, and AECOM, alleging violations of Kuwaiti immigration laws. *See Zinnekah v. Global Linguist Sols., LLC,* Case No. 1:13-cv-01185 (E.D. V.A.); *Zaklit v. Global Linguist Sols., LLC,* Case No. 1:14-cv-314 (C.D. Cal.). Defendants argue that the news coverage of these suits constitutes public disclosures. The Court agrees.

Media coverage of a 2013 Virginia suit describes the dispute between GLS and Alshora, and reports that GLS was "breaking Kuwaiti law for a business advantage that placed all the risk

on employees." Steven Beardsley, *American Linguists in Kuwait Seek Help from US Courts to Return Home*, Stars and Stripes, Oct. 8, 2013.[10]  The articles also described how linguists were trapped in Kuwait as a result of the Alshora fallout for fear of arrest.  *Id.*; *see also* Yochi Dreazen, *Investigation: No Exit,* Foreign Policy, Oct. 2, 2013.[11]

As for a 2014 suit filed in California, news coverage described the deprivation of adequate medical care and substandard conditions that GLS linguists were forced to endure during their employment.  *See* Dietrich Knauth, *Army Translators Seek Class Cert. In False Imprisonment Suit*, Law360, Sept. 2, 2014.[12]  The media further reported that linguists "did not know when they were hired that their employment with GLS would be unlawful in Kuwait and leave them confined against their will."  Karina Basso, *Army Translators File False Imprisonment Class Action Lawsuit*, Top Class Actions, Sept. 5, 2014.[13]  These articles put the Government on notice that Defendants effectively abandoned linguists to languish in deplorable conditions and with no way to leave Kuwait without risking arrest and detention.

Relators' allegations are also "substantially the same" as the prior public disclosures. The articles covered how "GLS's actions and legal dispute with Al Shora made plaintiffs and other linguists fugitives in a foreign country."  Knauth, *Army Translators Seek Class Cert. In False Imprisonment Suit*.  These public disclosures describe specific allegations against multiple Defendants of Kuwaiti law violations, the same factual allegations that underlie Relators' claims.

That said, Relators shared with the Government information and evidence that they had acquired independently of news media.  The lion's share of the Amended Complaint is based on

---

[10] Available at https://www.stripes.com/american-linguists-in-kuwait-seekhelp-from-us-courts-to-return-home-1.245844.
[11] Available at https://foreignpolicy.com/2013/10/02/no-exit-3/.
[12] Available at https://www.law360.com/articles/572639/army-translators-seek-class-cert-infalse-imprisonment-suit.
[13] Available at https://topclassactions.com/lawsuit-settlements/lawsuit-news/39752-translators-file-false-imprisonment-class-action-lawsuit-gls/.

Relators' firsthand experiences with Defendants in Kuwait. Such information, no doubt, "materially adds" to that disclosed in the public domain. Relators convey that they were forced to essentially participate in a sham employment arrangement with Alshora. The Amended Complaint further describes, in great detail, how certain Relators were brought into Kuwait illegally on tourist visas, and how they suffered behind Defendants' seizure of Relators' passports, delays in travel arising from related arrest warrants and even arrest and detention. Thus, while Relators' TVPRA/Kuwaiti law-based claims were previously disclosed, the claims survive because Relators are original sources. Dismissal is denied on this ground.

### B. Sufficiency of Pleading

Defendants next challenge the sufficiency of Relators' FCA claims under Rule 12(b)(6), arguing that Relators fail to satisfy the heightened pleading standard applicable to claims sounding in fraud. Federal Rule of Civil Procedure 9's requirement that "the circumstances constituting fraud" be stated "with particularity" applies to FCA claims. Fed. R. Civ. P. 9(b). Accordingly, Relators "must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 432 (4th Cir. 2015) (citation omitted); *see also U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008) ("the 'who, what, when, where, and how' of the alleged fraud"). Even under this heightened standard, "[a] court should hesitate to dismiss a complaint . . . if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Smith*, 796 F.3d at 432 (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)).

### i. Counts I and II

To state a claim under the FCA, Relators must allege sufficient facts by which the Court could plausibly infer that (1) Defendants made false statements or engaged in a fraudulent course of conduct; (2) with the requisite knowledge; (3) the statements or conduct was material; and (4) caused the government to pay out money or to forfeit monies due on a "claim." *U.S. ex rel. Rostholder v. Omnicare, Inc.*, 745 F.3d 694, 700 (4th Cir. 2014) (quoting *Harrison*, 176 F.3d at 788).

The parties agree that the majority of Relators pursue their claims under two broad theories of liability. First, the "false certification" theory encompasses instances where a government contractor was required to comply with certain contractual terms and where the defendant falsely certified that it had complied. *Harrison*, 176 F.3d at 786. An alternate theory is that Defendants obtained a contract through "fraudulent inducement," that is through "false statements or fraudulent conduct." *Id.* at 787. Because the FCA is "intended to reach all types of fraud, without qualification, that might result in financial loss to the Government," the Court construes these theories broadly. *Id.* at 788 (quoting *United States v. Neifert–White Co.*, 390 U.S. 228, 232 (1968)). Taking each theory in turn, the Court finds Relators' detailed Amended Complaint satisfies the Rule 9(b) standard with respect to Counts I and II.[14]

---

[14] Defendants broadly attack Relators' Amended Complaint for pleading certain allegations "on information and belief." *See* ECF No. 83-1 at 31. While the "clear intent of Rule 9(b) is to eliminate fraud actions in which all the facts are learned through discovery after the complaint is filed," the Court is satisfied that the "information and belief" allegations meet Rule 9(b). *Harrison*, 176 F.3d at 789. These allegations serve the role of "connect[ing] the dots" between the many facts based on Relators' personal experience and the facts where they understandably lack access to necessary information. *U.S. ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 199 (4th Cir. 2018) ("We only conclude that Rule 9(b)'s heightened pleading standard requires that plaintiffs connect the dots, even if unsupported by precise documentation, between the alleged false claims and government payment."); *see also U.S. ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 206 n.29 (D.D.C. 2011) (finding relator's "information and belief" pleadings satisfy Rule 9(b)).

### a. Subcontracting-Based Claims

Beginning with the subcontracting-based claims, Relators have adequately alleged each of the four elements to satisfy an FCA claim. "To satisfy this first element of an FCA claim, the statement or conduct alleged must represent an objective falsehood." *Wilson*, 525 F.3d at 376. Statements may be expressly or impliedly false, and even "half-truths—representations that state the truth only so far as it goes, while omitting critical qualifying information—can be actionable misrepresentations." *United States v. Triple Canopy, Inc.*, 857 F.3d 174, 178 (4th Cir. 2017) (quoting *Universal Health Servs., Inc. v. U.S. ex rel Escobar*, 136 S. Ct. 1989, 2000 (2016)), *cert. dismissed*, 138 S. Ct. 370 (2017).

Defendants contend that Relators have failed to allege an "objectively false" claim by relying on "broad contract language" and "general policy aims." ECF No. 85-1 at 19. The Court disagrees. The Amended Complaint avers that during the bidding for Contract 1, GLS entered into agreements with the Small Business Defendants to represent to the Government that GLS would meet certain levels of small business participation so as to win the contract. But GLS did not fulfill the promise, and instead worked in concert with the Small Business Defendants to have Relators enter into a series of sham employment agreements with Small Business Defendants. The Amended Complaint additionally avers that GLS President Houck testified falsely at the CWC Hearing as to which entity in fact employed the linguists, with the objective of sustaining the fraud. But for the false representations regarding the subcontractors' work, INSCOM would not have awarded Contract 1 or Contract 2 to GLS. The Amended Complaint pleads sufficiently objective falsehoods about the role of the small businesses to survive challenge as to the first element. *See, e.g.*, *U.S. ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 198–99 (D.D.C. 2011) (relators adequately pled FCA clam where prime contractor was

performing functions of purported subcontractor).

As to the second element, the false claims or statements must be made "knowingly." 31 U.S.C. § 3729(a)(1)(A)–(B). The FCA defines "knowingly" as "actual knowledge," "deliberate ignorance of the truth or falsity of the information," or "reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). Relators must "show only that the defendant had *knowledge* of the illegality of its actions, rather than *specific intent* to defraud." *U.S. ex rel. Oberg v. Penn. Higher Educ. Assistance Agency*, 912 F.3d 731, 735 (4th Cir. 2019) (emphasis in original).

Defendants argue Relators improperly rely on "collective knowledge," rather than pleading that "a particular employee or officer acted knowingly." ECF No. 85-1 at 21 (quoting *United States v. Fadul*, No. 11-0385-DKC, 2013 WL 781614, at *9 (D. Md. Feb. 28, 2013)). However, Defendants rely almost exclusively on authority reviewing the sufficiency of the knowledge prong at the summary judgment stage, not on a motion to dismiss. *See Fadul*, 2013 WL 781614, at *9. At the motion to dismiss stage, general averments of actual knowledge are sufficient to survive challenge. *U.S. ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013) (quoting Fed. R. Civ. P. 9(b)). This is especially appropriate where the Amended Complaint details the lengths that GLS went to create and maintain the sham employment arrangement.

As to the allegations that the Government would not have entered into Contract 2 but for Defendants' false statements under Contract 1, Defendants argue that the "government knowledge inference" negates the requisite scienter. ECF No. 83-1 at 33. Under Defendants' theory, where "the government knows and approves of the particulars of a claim for payment before that claim is presented, the presenter cannot be said to have knowingly presented a

28

fraudulent or false claim." *U.S. ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 289 (4th Cir. 2002) (citation omitted). In *Becker*, the Fourth Circuit affirmed summary judgment where the defendant had followed the Government's instructions and therefore could not be said to have knowingly made a false record. *Id.* Defendants contend that the same result applies here because the Government learned of the alleged subcontracting issues after GLS' testimony at the CWC Hearing and yet allowed Contract 1 to proceed and further awarded Contract 2.

Defendants' argument is fundamentally flawed. The Amended Complaint avers that GLS President Houck *lied* at the CWC Hearing when he asserted that large percentage of linguists were employed by subcontractors. The Court must not only accept this averment as true, but also construe it most favorably to Relators. The Court cannot, therefore, infer that the Government learned the *truth* about the sham subcontractor agreements based on *lies* promulgated during the hearing.

As to the third element, materiality, the alleged false or fraudulent statements must be material to the Government's decision to award the contract. *See Harrison*, 176 F.3d at 785 ("Liability under each of the provisions of the False Claims Act is subject to the further, judicially-imposed, requirement that the false statement or claim be material."). A statement is material if it "has a natural tendency to influence agency action or is capable of influencing agency action." *Id.* (internal marks and citation omitted). While materiality under the FCA is a "demanding" standard, the Court's analysis "cannot rest on a single fact or occurrence as always determinative." *Escobar*, 136 S. Ct. at 2001–03 (internal marks and citation omitted).

Defendants contend that the Relators must allege facts demonstrating that the fraudulent statements go to the "essence of the bargain" with the Government. But this is just one of

several ways in which materiality may be shown. *Id.* at 2003 n.5. The Court will not hold Relators to Defendants' restrictive view of materiality.

Defendants also assert that since the Government knew of the sham subcontracting practices by virtue of the CWC Hearing, the subcontracting terms must not have been material. Defendants' argument again falls flat. It is simply implausible to conclude that after the CWC Hearing, as alleged, the Government knew the truth about the subcontracting fraud. But more fundamentally, as to materiality, the CWC Hearing highlights that the subcontracting arrangement was indeed material to the contract award. The hearing focused on the Government's expenditure of significant funds to subcontractors under Contract 1 and to GLS for facilitating the subcontracting work and questioned the efficiency of the arrangement. Put simply, the purpose of the hearing was to explore the very cover-up GLS perpetrated before, during, and since. *See Triple Canopy*, 857 F.3d at 176 ("Triple Canopy's own elaborate cover-up suggested that the contractor realized the materiality of the marksmanship requirement."). The statements made to secure the Government contracts, as pleaded, are material.

As to the fourth and final element, the FCA "requires the presence of a claim—a call upon the government fisc—for liability to attach." *Harrison*, 176 F.3d at 785. Because the FCA was "not designed to punish every type of fraud committed upon the government," presentment of a false claim to the government is a "central question." *Id.* The FCA defines "claim" as "any request or demand, whether under a contract or otherwise, for money or property . . . that . . . is presented to an officer, employee, or agent of the United States." 31 U.S.C. § 3729(b)(2)(A)(i).

The Fourth Circuit has recognized two ways to adequately plead presentment of a claim under Rule 9(b). *Grant*, 912 F.3d at 197. Relators may aver "with particularity that specific false claims actually were presented to the government for payment," or plead "a pattern of

conduct" that would have necessarily led to the submission of false claims. *Id.*

Defendants argue that Relators must plead the specifics of the submission of any false claim or risk dismissal. ECF No. 85-1 at 29–30. Again, the Defendants set the pleading bar too high. The Amended Complaint, read as a whole and most favorably to Relators, easily allows the inference that GLS would have submitted false claims to the Government. First and most obviously, the Amended Complaint sets out the sham subcontracting arrangement designed to ensure that GLS was awarded Contracts 1 and 2. Second, the Amended Complaint details the ongoing nature of the contractual relationship between GLS and the Government to provide linguistic services in exchange for getting paid on the Contracts. The Court may plausibly infer, therefore, that GLS had to continue making false claims to receive payment. Counts I and II with respect to the subcontracting fraud will not be dismissed.

### b. Implied Certification Claims

The Court next turns to those FCA claims that are based on an "implied certification" theory. Relators may satisfy the element of falsity by plausibly averring that the defendant "impliedly certifies compliance with all conditions of payment" when the defendant fails to disclose a "violation of a material statutory, regulatory, or contractual requirement." *Escobar*, 136 S. Ct. at 1995. Under this theory, liability attaches where "the claim does not merely request payment, but also makes specific representations about the goods or services provided;" and "the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Id.* at 2001.

The Amended Complaint alleges that GLS submitted claims to the Government for reimbursement of Alshora's services, presented as valid "sponsorship" fees, when in fact Alshora was used as a front to make it appear that linguists were employed with a Kuwaiti based

company so as to circumvent Kuwaiti labor and immigration laws. *See* ECF No. 9 ¶ 504. As part of this scheme, the Amended Complaint alleges that GLS violated the TVPRA's forced labor provision by confiscating Relators' passports and abusing the Kuwaiti legal process, thereby subjecting Relators to threats of arrest, detention, and deportation.

In this respect, the Amended Complaint survives challenge. The Contract was obtained and performed against the backdrop of the Government's "zero tolerance policy regarding trafficking in persons." ECF No. 9 ¶ 559 (quoting Federal Acquisition Regulation ("FAR") § 52.222-50(b)). Accordingly, the Court may plausibly infer that to obtain the Contracts and to receive payment, GLS had to impliedly certify compliance with the TVPRA. The Amended Complaint provides scores of instances, as more fully detailed below, where GLS participated in violating the TVPRA when its relationship with Alshora fell apart. At this stage, the TVPRA false claims theory will proceed.

The Amended Complaint also avers Contract 1 specifically required that GLS "maintain and administer a security program in accordance with the National Industrial Security Program Operations Manual (NISPOM) DoD 5220.22M." ECF No. 9 ¶ 160. The NISPOM regulations, in turn, required GLS to certify that it was not under "foreign ownership, control or influence," in that no foreign business had the power "to direct or decide matters affecting the management or operations of that company in a manner which . . . may adversely affect the performance of classified contracts." *Id.* Yet according to the Amended Complaint, GLS knowingly ceded power and control to Alshora to dodge Kuwaiti labor and employment law while also certifying to the Government the opposite. When GLS' relationship with Alshora deteriorated, Alshora was able to halt the essential national security work of the linguists by reporting Relators to Kuwaiti authorities, who then issued a "stop-work" order. The Amended Complaint, therefore,

sufficiently states a false certification claim with regard to NISPOM regulations.

### ii. Count III

The Court next turns to Count III, the "reverse false claim" against Defendants under 31 U.S.C. § 3729(a)(1)(G). This FCA provision imposes liability on anyone who makes a false statement "material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). Thus, "reverse false claims facilitate the improper withholding of money or property to which the United States is legally entitled." *U.S. ex rel. Landis v. Tailwind Sports Corp.*, 160 F. Supp. 3d 253, 255 (D.D.C. 2016).

Defendants contend that Relators have failed to plead an "obligation" to state a reverse false claim. ECF No. 85-1 at 32–33. The Court agrees. The FCA defines "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3). An obligation under this provision envisions a specific duty outlined in a contract or statute, not "[c]ontingent obligations—those that will arise only after the exercise of discretion by government actors." *Landis*, 160 F. Supp. 3d at 268.

The Amended Complaint avers, without elaboration, that "false claims were made to avoid paying back to the U.S. penalties under GLS's contracts with the Government." ECF No. 9 ¶ 544. Construed most favorably to Relators, the theory of liability rests on the proposition that had the Government known of Defendants' FCA violations, the Defendants would be required to reimburse the Government for monies disbursed under the contract. However, as a

matter of law "the Government's ability to pursue reimbursement for overpayments or fraudulently induced payments does not constitute an 'obligation.'" *Landis*, 160 F. Supp. 3d at 269. Relators cannot properly allege a reverse false claim that is premised on the same conduct as Relators' claims under 31 U.S.C. §§ 3729(a)(1)(A) and (a)(1)(B). *U.S. ex rel. Branscome v. Blue Ridge Home Health Servs., Inc.*, No. 16-00087, 2018 WL 1309734, at *5 (W.D. Va. Mar. 13, 2018); *see also United States v. Berkeley Heartlab, Inc.*, 247 F. Supp. 3d 724, 733 (D.S.C. 2017) ("And of course, if the conduct that gives rise to a traditional presentment or false statement action also satisfies the demands of section 3729(a)(1)(G), then there would be nothing 'reverse' about an action brought under that latter section of the FCA.") (citation omitted). Accordingly, Relators fail to plead an "obligation" owed to the Government. The Court dismisses Count III as to all Defendants.

### iii. FCA Claims as to the Small Business Defendants

Small Business Defendants KMS, Wright, and Shee Atika separately challenge Relators' FCA claims as relying on "deficient group pleading" and failing to plead with particularity each of the subcontractors' involvement. *See* ECF No. 81-1 at 7. The FCA's provisions "indicate a purpose to reach any person who knowingly assisted in causing the government to pay claims which were grounded in fraud." *U.S. ex rel. Westrick v. Second Chance Body Armor, Inc.*, 266 F. Supp. 3d 110, 126 (D.D.C. 2017) (citation omitted). Such claims must, therefore, be pleaded with particularity as required under Rule 9(b) of the Federal Rules of Civil Procedure. *See also U.S. ex rel. Brooks v. Lockheed Martin Corp.,* 423 F. Supp. 2d 522, 526 (D. Md. 2006) (internal marks and citation omitted) ("[W]hen a relator raises allegations of fraud against multiple defendants, the complaint must apprise each defendant of the specific nature of his or her participation in the fraud." ), *aff'd in part, dismissed in part,* 237 F. App'x 802 (4th Cir. 2007).

Relators' allegations satisfy this standard as to KMS, Wright, and Shee Atika.

The Amended Complaint avers that GLS entered into agreements with KMS, Wright, and Shee Atika to provide subcontracting services under Contract 1 but instead GLS performed the work. The Small Business Defendants, including the three subcontractors at issue, entered sham employment agreements with the linguists to further the scheme. *See* ECF No. 9 ¶¶ 260, 278, 284, 297, 438. Although the Small Business Defendants "employed" the linguists, they performed no role as employers. The sole purpose of the Small Business Defendants was to make it appear as if GLS met the small business participation requirements set forth in Contract 1. The Small Business Defendants' knowing participation was essential to the fraud and resulted in the Government overpaying GLS and these subcontractors. *See Mann v. Heckler & Koch Def., Inc.*, 639 F. Supp. 2d 619, 629 (E.D. Va. 2009) (quoting *U.S. ex rel. Marcus v. Hess*, 317 U.S. 537, 543 (1943)) (The Supreme Court has held "that the 'taint' of fraud caused by defendants who knowingly participated in a collusive bidding process 'entered into every' payment made under the contracts that eventually resulted from the bidding process."). The FCA claims in Counts I and II against the Small Business Defendants survive challenge.

### iv.  FCA Claims as to AECOM and DynCorp

Defendants AECOM and DynCorp, partners and shareholders of GLS, a limited liability company, assert they must be dismissed from the action. ECF No. 80-1 at 13; ECF No. 83-1 at 20. Relators name as Defendants both "Global Linguist Solutions, LLC, . . . a Delaware-registered limited liability company" headquartered in Virginia, and a purportedly separate entity called "Global Linguist Solutions." ECF No. 9 ¶¶ 19, 20. The Amended Complaint describes DynCorp as majority shareholder of Global Linguist Solutions, LLC, but asserts that Global Linguist Solutions is a "joint venture between DynCorp and AECOM." *Id.* Defendants contend

Global Linguist Solutions, LLC is a limited liability company in which DynCorp owns a 51% interest and AECOM owns a 49% interest, and no other entity exists.[15]  ECF No. 83-1 at 10 & n.1.  In the Amended Complaint, AECOM's liability rests solely on a joint venture theory.  ECF No. 9 ¶ 21.  DynCorp's liability, in contrast, is also alleged under an alter ego theory.  *Id.* ¶ 28.

Beginning with AECOM, Relators have not adequately pleaded the existence of a "joint venture" that extends liability to each by virtue of the corporate relationship.  To support the existence of a joint venture, Relators rely solely on AECOM and DynCorp's reference to GLS as a "joint venture" in Security Exchange Commission filings and press releases.  *Id.* ¶¶ 22–30.  These allegations, however, are insufficient to transform a properly registered limited liability company, with protections against suit as to its members, into a general partnership without such protections.

The term "joint venture" is often used colloquially to describe a variety of business organizations, including a limited liability company ("LLC").  *See* Allen S. Gutterman, *Business Transactions Solutions* § 248:22 ("Once the parties have agreed to enter into a joint venture, they must decide upon the form of legal entity that will be used . . . (e.g., corporations, general or limited partnerships, and limited liability companies).").  Relators jointly refer to the LLC and the "joint venture" throughout as "GLS," without differentiating between the conduct of these allegedly separate entities.  But nowhere does the Amended Complaint attribute any specific acts conferring liability to AECOM.  The Court, therefore, must dismiss claims against AECOM.[16]  However, dismissal will be without prejudice, and the Court will permit amendment of pleadings to include adding parties after discovery is underway.

---

[15] GLS also asserts it "is a limited liability company and does not operate any separate entity named "Global Linguist Solutions."  ECF No. 85 at 1.

[16] The Court also dismisses "Global Linguist Solutions" because it is not an entity separate from GLS, LLC.

DynCorp's theoretic liability requires a different analysis. Relators allege that, even absent the existence of a joint venture, DynCorp may be held liable for GLS' misconduct because the two corporations are alter egos of one another. ECF No. 9 ¶ 28. Consequently, argues Relators, liability is extended to DynCorp as the parent company of GLS by piercing the corporate veil.

While courts generally will not disregard the corporate form, where the parent company "so dominated the subsidiary corporation as to negate its separate personality," the subsidiary is more properly considered "the parent's alter ego, agent, or mere instrumentality." *U.S. ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 60 (D.D.C. 2007) (citation omitted). As Relators' claims are brought under the FCA, "federal law . . . controls the veil-piercing question." *Id.*

This inquiry is twofold. First, the Court must determine whether a "unity of interest" exists between the two entities sufficient to permit treatment of the two entities as one. *Id.* Next, the Court considers whether doing so would produce "an inequitable result." *Id.* "The first element looks to which formalities have been followed to maintain separate corporate identities, and the second element looks to the basic issue of fairness under the facts." *United States v. Universal Health Servs.*, Inc., No. 07-00054, 2010 WL 4323082, at *3 (W.D. Va. Oct. 31, 2010) (citation omitted).

With regard to the first element, courts consider a number of factors to assess the strength of the "unity of interest." They include "identity of ownership; commonality of officers and directors; the financial relationship between parent and subsidiary; whether the two maintain separate books, records, offices, and the like; and whether property of one is used by the other as essentially its own." *Hockett*, 498 F. Supp. 2d at 60.

Relevant here, the Amended Complaint asserts that DynCorp personnel managed the day-to-day operations of GLS, shared the same business address as GLS, controlled "back office" support for GLS' linguists, hired and fired GLS personnel, and developed training policies for GLS personnel. *See* ECF No. 9 ¶¶ 32–44. Relators also allege that certain personnel who held themselves out as GLS management were actually DynCorp representatives involved in managing the Relators in Kuwait. *Id.* ¶ 48. Taking these averments as true and most favorably to Relators, the Amended Complaint satisfies the first element of the "unity of interest" test.

Similarly, as to the second element, the Amended Complaint alleges sufficient facts making dismissal of DynCorp at this stage an "inequitable" result. DynCorp appears to have engaged in the FCA violations hand-in-hand with GLS. The Court will not permit DynCorp to escape liability at this early stage and under such "a fact-intensive inquiry." *Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 544 (4th Cir. 2013). The motion to dismiss is denied as to DynCorp.

### C. Statute of Limitations

Defendants lastly contend that the Relators' FCA claims are barred by the statute of limitations. The Court cannot agree.

An FCA civil action cannot be filed: "(1) more than 6 years after the date on which the [FCA violation] is committed, or (2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed, whichever is last." 31 U.S.C. § 3731(b). Although the Fourth Circuit has not addressed what constitutes a "violation" to trigger the limitations period, the majority of Circuits have found the violation occurs at the submission of a

false claim rather than the date of payment. *U.S. ex rel. Dugan v. ADT Sec. Servs., Inc.*, No. DKC 2003-3485, 2009 WL 3232080, at *4 (D. Md. Sept. 29, 2009); *see, e.g. United States v. Rivera*, 55 F.3d 703, 707 (1st Cir. 1995); *United States v. Ueber*, 299 F.2d 310, 312–13 (6th Cir. 1962).

Defendants argue that, under the FCA's six-year statute of limitations, any FCA claim based on conduct that occurred before June 19, 2009 is barred. ECF No. 85-1 at 38.[17] Relators respond that they are entitled to equitable tolling due to GLS' "on-going scheme of concealment." ECF No. 120 at 23. Under the fraudulent concealment doctrine, "where a plaintiff has been injured by fraud and remains in ignorance of it . . . the bar of the statute does not begin to run until the fraud is discovered." *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946) (internal marks omitted). "This equitable doctrine is read into every federal statute of limitation," and Courts have specifically applied it to the FCA. *Id.*; *see also United States v. Uzzell*, 648 F. Supp. 1362, 1367 (D.D.C. 1986) (applying equitable tolling to the FCA); *United States v. CFW Const. Co., Inc.*, 649 F. Supp. 616, 619–20 (D.S.C. 1986) (same). The Relators must show that Defendants "concealed facts that are the basis of [Relators'] claim;" and despite "the exercise of due diligence," the facts were not discovered "within the statutory period." *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 122 (4th Cir. 1995).

Alternatively, Relators contend they are entitled to the extended limitations period set out in § 3731(b)(2). This provision of the FCA allows claims to be brought as many as 10 years after the violation, so long as the action is brought within three years of when certain

---

[17] AECOM separately contends any conduct prior to March 25, 2010 is barred, asserting the Amended Complaint does not relate back to the original complaint because it was filed under seal. ECF No. 80-1 at 37 & n.24. The FCA requires Relators to file their *qui tam* complaint under seal. 31 U.S.C. § 3730(b)(2). AECOM provides no authority to support such an argument and the Court finds no principled reason to credit it. Thus, Relators' suit commenced when they filed the original complaint under seal. *See, e.g.*, *U.S. ex rel. Gohil v. Aventis, Inc*., No. 02-2964, 2017 WL 85375, at *6 n.14 (E.D. Pa. Jan. 10, 2017) (finding no "support for the defendants' argument that the sealing provision of the FCA should somehow prevent the court from allowing amended complaints to 'relate back'").

Government officials knew or should have known the relevant facts. 31 U.S.C. § 3731(b)(2).

This provision applies to relator-initiated suits where the Government has declined to intervene.

*See Cochise Consultancy, Inc. v. U.S. ex rel. Hunt*, 139 S. Ct. 1507, 1512 (2019).

The Court may dismiss an action on limitations grounds at the motion to dismiss stage

"only if the time bar is apparent on the face of the complaint." *Semenova v. Md. Transit Admin.*,

845 F.3d 564, 567 (4th Cir. 2017) (internal marks and citation omitted). As pled, Relators may

be entitled to equitable tolling or to the FCA's extended limitations period. Whether the statute

of limitations bars suit amounts to an affirmative defense that Relators need not rebut in the

Amended Complaint. Further, as an affirmative defense, Defendants bear the burden of

establishing the dates of violations as relevant to the six-year limitations period and when

Government officials were on notice for purposes of the extended limitations provision. Thus,

dismissal of any of Relators' FCA claims arising prior to June 2009 is not warranted.

## V.     TVPRA Claims (Count IV)

In Count IV, Relators allege standalone violations of the TVPRA as to Relators' forced

labor and documentary servitude. ECF No. 9 ¶¶ 548–93. The TVPRA, 18 U.S.C. §§ 1581 *et*

*seq.*, prohibits peonage, slavery, and trafficking in persons. The statute provides a civil cause of

action to "[a]n individual who is a victim of a [TVPRA] violation." 18 U.S.C. § 1595(a).

Relators specifically assert TVPRA violations of Section 1589 and Section 1592. The Court

considers each in turn.

### A.  Section 1589 (Forced Labor)

Relators allege Defendants violated the TVPRA prohibition of "forced labor" through

abuse of Kuwaiti immigration and labor laws. *See* ECF No. 9 ¶¶ 552, 588–93. A defendant is

liable under § 1589 of the TVPRA if she "knowingly provides or obtains the labor or services of

a person" by any of the following means:

> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

> (2) by means of serious harm or threats of serious harm to that person or another person;

> (3) by means of the abuse or threatened abuse of law or legal process; or

> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

18 U.S.C. § 1589(a). Under § 1589, "Congress intended to reach cases in which persons are held in a condition of servitude through nonviolent coercion, as well as through physical or legal coercion." *Muchira v. Al-Rawaf*, 850 F.3d 605, 617 (4th Cir. 2017) (internal marks and citation omitted), *as amended* (Mar. 3, 2017), *cert. denied*, 138 S. Ct. 448 (2017).

Defendants move to dismiss Relators' § 1589 claim on sufficiency grounds pursuant to Rule 12(b)(6). Unlike the heightened pleading standard applied to the FCA, TVPRA claims are governed by Rule 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Relators must plead facts sufficient to sustain the claim "rather than a blanket assertion, of entitlement to relief." *Twombly*, 550 U.S. at 555 n.3. "[A] formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further factual enhancement" will not suffice. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal marks and citation omitted).

As to GLS, Relators state a TVPRA claim under § 1589(3) for knowingly obtaining their labor "by means of the abuse or threatened abuse of law or legal process." "Forced labor" generally involves demanding or conditioning labor in "squalid or otherwise intolerable living conditions, extreme isolation (from family and the outside world)" or "threats of inflicting harm

upon the victim or others (including threats of legal process such as arrest or deportation)." *Muchira*, 850 F.3d at 618–19. "The confiscation of an immigrant's passport and threats of arrest are common threats of legal process resorted to by traffickers and others who seek to instill fear in persons and force them to labor against their will." *Id.* at 623; *see also Lipenga v. Kambalame*, 219 F. Supp. 3d 517, 525 (D. Md. 2016) (rejecting dismissal where defendant "allegedly confiscated [plaintiff's] passport and threatened to call the police and have her deported"); *Kiwanuka v. Bakilana*, 844 F. Supp. 2d 107, 115 (D.D.C. 2012) ("[M]any courts have determined that threats of deportation constitute a condition of servitude induced through abuse of the legal process.").

Viewing the evidence most favorably to Relators, the Amended Complaint details a pattern of GLS confiscating Relators' passports for weeks, months, and even years, without explanation. For Non-Resident Visa Relators, GLS brought them to Kuwait on tourist visas and forced them to work without proper documentation. For the Resident Visa Relators, GLS forced them to sign fraudulent employment contracts with Alshora to obtain visas that failed to meet the needs of Relators, who should have been classified as highly skilled workers. GLS then allowed their employees' visas to be cancelled by Alshora, compromising Relators' legal work status and subjecting them to arrest warrants. Relators were then effectively held against their will, as they could not leave base for fear of arrest or deportation.

Moreover, GLS coerced certain Relators to sign false criminal confessions in Kuwait. Relator Edward Youkhana recounts a GLS manager referring to linguists as "slaves" when he complained about such treatment. ECF No. 9 ¶ 364. Relators allege GLS undertook these actions intentionally to force Relators to remain in Kuwait to work so that GLS would not be in breach of its contract with the Government. Accordingly, with respect to GLS, Relators have

stated a § 1589 claim.

Defendants DynCorp, AECOM, KMS, Wright, and Shee Atika argue that Relators fail to state a claim as to them because, as alleged, GLS is solely responsible for the relevant conduct. Relators respond that these Defendants are liable under § 1589(b), which "holds not just primary offenders accountable but also anybody who knowingly 'benefits, financially or by receiving anything of value, from participation in a venture which has engaged in' forced labor." *Bistline v. Parker*, 918 F.3d 849, 873 (10th Cir. 2019) (quoting 18 U.S.C. § 1589(b)). Although "venture" is not defined in that provision, the TVPRA uses the term elsewhere to mean "any group of two or more individuals associated in fact, whether or not a legal entity." *Id.* (quoting 18 U.S.C. § 1591(e)(6)); *see also Ricchio v. McLean*, 853 F.3d 553, 556 (1st Cir. 2017) (using § 1591(e)(6) definition for analysis of §1589(b)).

As to DynCorp, Relators allege "DynCorp personnel . . . directly supervised Relators who were, in turn, represented to the U.S. Army as being under GLS management." ECF No. 9 ¶ 48. Relators assert these individuals were responsible for some of the conduct directly at issue here, including confiscation of passports in Kuwait. *See id.* ¶¶ 195, 199, 271, 316–17, 409. Viewing the evidence most favorably to Relators, these allegations are sufficient to state a claim that DynCorp was a part of venture with GLS and knowingly benefited from the venture's forced labor.

While this provision saves Relators' claims with respect to DynCorp, the § 1589 claims against AECOM, KMS, Wright, and Shee Atika must be dismissed. Relators' Complaint does not include a single allegation that any of these Defendants knew at all about GLS' treatment of Relators in Kuwait regarding their living conditions, passport confiscation or other matters involving the bitter disputes with Alshora. Relators contend "AECOM's knowledge is imputed

through its partnership with [DynCorp] and its status as a joint venturer in GLS."  ECF No. 122 at 10.  As discussed above, however, Relators have failed to plead the existence of a joint venture apart from the GLS LLC.

As to the Small Business Defendants, Relators assert "knowledge is established from their reckless disregard of the legality of Relators' presence in Kuwait."  ECF No. 123 at 7.  But Relators do not allege Small Business Defendants were "well aware of the crimes being committed against" Relators.  *Bistline*, 918 F.3d at 876.  Thus, even under a "venture" theory, Relators have failed to state a § 1589 claim against AECOM, KMS, Wright, and Shee Atika. The claim will be dismissed as to these Defendants.

### B.  Section 1592 (Confiscation of Passports)

Relators further allege that Defendants violated § 1592 of the TVPRA, which applies to anyone who "knowingly destroys, conceals, removes, confiscates, or possesses any actual or purported passport" of another:

> (1) in the course of a violation of section . . . 1589 . . .
>
> (2) with intent to violate section . . . 1589 . . . or
>
> (3) to prevent or restrict or to attempt to prevent or restrict, without lawful authority, the person's liberty to move or travel, in order to maintain the labor or services of that person, when the person is or has been a victim of a severe form of trafficking in persons, as defined in section 103 of the Trafficking Victims Protection Act of 2000.

18 U.S.C. § 1592(a).  Defendants argue that, unlike the statute's forced labor provision, § 1592 does not apply extraterritorially.  ECF No. 85-1 at 39.  Thus, Defendants assert, Relators' § 1592 claims premised on the confiscation of passports in Kuwait must be dismissed for lack of subject matter jurisdiction.

In 2000, Congress enacted the TVPRA "to combat trafficking in persons, a contemporary

manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims." *Roe v. Howard,* 917 F.3d 229, 235–36 (4th Cir. 2019) (quoting TVPRA, Pub. L. No. 106-386 § 102(a), 114 Stat. 1464, 1466) (codified at 22 U.S.C. § 7101(a)). Relators contend that denying extraterritorial application of § 1592 to their passport confiscation in Kuwait, committed in the context of a forced labor offense, would work an illogical result and "would frustrate the will of Congress." ECF No. 122 at 17. Neither party views this case through the proper analytical framework for determining whether a federal statute applies extraterritorially. *See RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2101 (2016).

It is a longstanding principle of American law that "in general, United States law governs domestically but does not rule the world." *Id.* at 2100 (internal marks and citation omitted). Congress, however, maintains "the undisputed authority to apply its laws beyond the territorial boundaries of the United States." *Roe*, 917 F.3d at 240 (internal marks and citation omitted). To determine whether Congress has exercised such authority, courts look to the canon of statutory interpretation known as the "presumption against extraterritoriality," which provides that "[a]bsent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." *RJR Nabisco*, 136 S. Ct. at 2100 (citing *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010)).

In *RJR Nabisco*, the Supreme Court articulated a "two-step framework for analyzing extraterritoriality issues." 136 S. Ct. at 2101. First, the Court must "ask whether the presumption against extraterritoriality has been rebutted—that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially." *Id.* To answer this question, "courts look to the text of the statute, but 'an express statement of extraterritoriality is not

45

essential.'"  *Roe*, 917 F.3d at 240 (quoting *RJR Nabisco*, 136 S. Ct. at 2102).  The structure, history, and context of the statute are also relevant to the inquiry.  *Id.*

"If the first step reveals that a statute—or a specific statutory provision—has extraterritorial effect, our analysis is complete.  If, on the other hand, the first step shows that a statute does not apply extraterritorially, a court must proceed to the second step identified in *RJR Nabisco*."  *Roe*, 917 F.3d at 240 (citation omitted).  Step two requires determining whether the case itself "involves a domestic application of the statute . . . by looking to the statute's 'focus.'"  *RJR Nabisco*, 136 S. Ct. at 2101.  "[I]f the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory."  *Id.*

Defendants contend that because Congress has not expressly announced that § 1592 shall be applied abroad, this Court lacks jurisdiction to consider the claims here.  The Defendants are correct that in 2008, Congress amended the TVPRA to make clear the extraterritorial reach of certain provisions.  *See* William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, 122 Stat. 5044.  The 2008 amendment provides in relevant part:

> In addition to any domestic or extra-territorial jurisdiction otherwise provided by law, the courts of the United States have extra-territorial jurisdiction over any offense (or any attempt or conspiracy to commit an offense) under section 1581, 1583, 1584, 1589, 1590, or 1591 if—
>
> (1) an alleged offender is a national of the United States . . .

18 U.S.C. § 1596(a).  Defendants argue that Congress' failure to include § 1592 in the amendment must be construed as a clear statement against its extraterritorial application.

The Court need not decide this question as presented because pursuant to 18 U.S.C. § 3271(a), Defendants, as government contractors, may be held liable for § 1592 offenses committed abroad.  In the 2006 reauthorization of the TVPRA, Congress found that "[t]he

involvement of employees and contractors of the United States Government . . . in trafficking in persons, facilitating the trafficking in persons, or exploiting the victims of trafficking in persons is inconsistent with United States laws and policies and undermines the credibility and mission of United States Government programs in post-conflict regions." *See* Trafficking Victims Protection Reauthorization Act of 2005, Pub. L. No. 109-164, 119 Stat. 3558 (effective Jan. 10, 2006).

Consistent with this finding, Congress expanded the TVPRA's extraterritorial reach by enacting § 3271 which reads:

> Whoever, while employed by . . . the Federal Government outside the United States, engages in conduct outside the United States that would constitute an offense under chapter 77 . . . of this title if the conduct had been engaged in within the United States or within the special maritime and territorial jurisdiction of the United States shall be punished as provided for that offense.

18 U.S.C. § 3271(a). The phrase "employed by the Federal Government outside the United States" expressly includes anyone employed "as a Federal contractor . . . or as an employee of a Federal contractor" who is "present outside of the United States in connection with such employment" and is "not a national of or ordinarily resident in the host nation." 18 U.S.C. § 3272(1).

Defendants were Government contractors, present outside of the United States in connection with performance of Contracts 1 and 2, and were not nationals of Kuwait. *See* 18 U.S.C. § 3272(1). The misconduct, as pleaded, occurred outside the United States, and the documentary servitude provision, § 1592, is a Chapter 77 offense. Thus, pursuant to § 3271, § 1592 applies extraterritorially to Defendants.

In this respect, the Fourth Circuit decision in *Roe v. Howard*, guides this Court. 917 F.3d at 245. There, the Fourth Circuit was called to decide whether the TVPRA's civil remedy

provision, § 1595, reaches "conduct that comes within the extraterritorial predicates of the [TVPRA]." *Id.* at 243. The Court held that the remedy provision applied to the claims against the defendant, a State Department employee who violated the TVPRA overseas. Critically, the Court reasoned that § 3271 "manifests an unmistakable congressional intent to apply extraterritorially" the remedies provision where the defendant met the requirements of § 3271. *Id.* at 244 (citation omitted); *see also id.* ("If a plainer indication was needed, Congress included § 3271 in chapter 212A, titled 'Extraterritorial Jurisdiction Over Certain Trafficking in Persons Offenses.'").[18] The same result is warranted here. "Because a finding of extraterritoriality at step one will obviate step two's 'focus' inquiry," the Court's analysis ends. *RJR Nabisco*, 136 S. Ct. at 2101 n.5.

Although the TVPRA claim under § 1592 survives as to GLS and DynCorp, the Court cannot say the same for Defendants AECOM, KMS, Shee Atika, and Wright. This is because Relators have not pleaded any facts which support a plausible inference that these Defendants possessed the requisite knowledge to commit the offense. *See* 18 U.S.C. § 1595(a) (liability attaches to party who "knowingly benefits . . . from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter"). Indeed, none of the alleged facts establish that any of these named Defendants knew that the Relators' passports had been confiscated or kept from them. Nor is it plausible to assume otherwise when considering that Relators' main theory of liability rests on these Defendants acting, essentially, as dummy corporations by which GLS perpetrated its subcontracting fraud scheme on the Government. Accordingly, the § 1592 claims are dismissed as to AECOM, KMS, Shee Atika,

---

[18] The Court notes the Fourth Circuit's analysis involved a claim under § 1589, which now has explicit extraterritorial application under § 1596, regardless of whether the defendant is a government employee. *Roe*, 917 F.3d at 244. The conduct in *Roe*, however, occurred prior to the 2008 amendment which expanded § 1589's extraterritorial reach. *Id.*

and Wright.

## C. Available Remedies

Defendants raise two final arguments regarding the availability of certain remedies under the TVPRA.  First, Defendants assert that, to the extent Relators are seeking damages for "emotional distress and physical injuries" suffered in Kuwait (ECF No. 9 ¶ 593), such claims are "preempted" by the Defense Base Act, 42 U.S.C. §§ 1651 *et seq.  See* ECF No. 80-1 at 38 n.27.  Second, Defendants contend that Relators improperly seek restitution under § 1593 of the TVPRA.  *Id.* at 43 n.30.

### i.  The Defense Base Act

The Defense Base Act ("DBA") "provides relief to employees of government contractors whose death or injuries occurred while accompanying military forces overseas."  *Brink v. Cont'l Ins. Co.*, 787 F.3d 1120, 1122 (D.C. Cir. 2015).  The DBA "builds upon and incorporates provisions of the Longshore Act, which was enacted to provide workers' compensation coverage to maritime employees."  *Id.*  Both the DBA and the Longshore Act "contain exclusivity provisions stating that employer liability under the statutes 'shall be exclusive and in place of all other liability.'"  *Id.* at 1123 (quoting 33 U.S.C. § 905(a); 42 U.S.C. § 1651(c)).  The DBA's statutory scheme represents a compromise, whereby "employees relinquish any common-law tort claims in exchange for the guarantee of a practical and expeditious statutory remedy for their workplace injuries."  *Sickle v. Torres Advanced Enter. Sols., LLC*, 884 F.3d 338, 348 (D.C. Cir. 2018) (internal marks and citation omitted).

Important to this analysis, the DBA covers accidental injuries that arise out of and during the course of employment.  33 U.S.C. § 902(2) (Longshore Act) (defining "injury" as "an accidental injury or death arising out of and in the course of employment").  Claims arising from

conduct outside a plaintiff's course of employment are not subject to the DBA's preemptive effect. *Sickle*, 885 F.3d at 348; *see also Jones v. Halliburton Co.*, 791 F. Supp. 2d 567, 584 (S.D. Tex. 2011) (sexual assault by coworker in Iraq did not constitute "condition of employment," and thus DBA did not preclude common law assault claims). One of the fundamental questions in this case, therefore, will be whether Defendants' alleged misconduct may be construed as within or beyond the scope of Relators' employment.

Viewing the Amended Complaint allegations as true and most favorably to Relators, the Court cannot conclude the claims arise in the course of Relators' employment. GLS used Relators as pawns in a fraudulent scheme designed to mislead the Government as to which entity actually "employed" them. GLS also perpetrated a companion shell game with Alshora to circumvent Kuwaiti laws, which resulted in Relators being held in inhumane conditions, without travel documents, and at risk for arrest, detention, and prosecution if they tried to cross the Kuwaiti border. No employee could predict that working as a translator would entail unwitting participation in a sinister scam where the employer becomes captor and abuser. These risks are not reasonably foreseeable to linguists serving the U.S. military abroad, even in a war zone.

Defendants rely heavily on *Brink v. Continental Insurance Co.* for the proposition that the DBA preempts Relators' TVPRA claims. In *Brink,* the Court held that the DBA preempted plaintiffs' RICO claims but in a starkly different context. 787 F.3d at 1126–28. There, plaintiffs' RICO claims were premised on the theory that defendants had conspired to deny DBA claims and delay payments owed under the DBA. *Id.* at 1127. Given that the conspiracy's primary objective was to circumvent the DBA, the Court in *Brink* easily concluded that the DBA provided the exclusive remedy for any liability arising as a result. *Id.* (citing 33 U.S.C. §§ 914, 931). Relators' claims, by contrast, have nothing to do with circumventing payments under the

DBA. Thus, *Brink* does not advance the analysis.

The Court recognizes, however, that discovery will add dimension to which entities were Relators' actual employers and Relators' reasonably foreseeable job risks. The Court, therefore, leaves open the possibility that the DBA applies to certain of the claims on a more factually robust record.

### ii. Restitution under the TVPRA

Finally, the Complaint pleads the availability of restitution under § 1593 of the TVPRA. ECF No. 9 ¶¶ 556–58. Defendants contend the TVPRA's mandatory restitution provision applies only to criminal cases. ECF No. 80-1 at 43 n.30. Section 1593 provides that "in addition to any other civil or criminal penalties authorized by law, the court shall order restitution for any offense" under the TVPRA. 18 U.S.C. § 1593(a). Nothing in the text of the statute suggests that restitution applies solely to criminal cases, and other courts have awarded restitution in civil prosecutions. *See Lipenga*, 219 F. Supp. 3d at 530; *Lagasan v. Al-Ghasel*, 92 F. Supp. 3d 445, 457 (E.D. Va. 2015). Accordingly, the Court denies Defendants' motion regarding the availability of restitution.

### VI. Conclusion

For the foregoing reasons, Defendants' motions to dismiss are GRANTED in part and DENIED in part. A separate Order follows.

9/4/2019 _____                 _____/S/_____
Date                                         Paula Xinis
                                                  United States District Judge