IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA EX REL., | * | |
| ELGASIM MOHAMED FADLALLA, *et al.*, | * | |
| | * | |
| Plaintiff-Relators, | * | |
| | * | |
| v. | * | Civil Action No. 8:15-cv-01806-PX |
| | * | |
| DYNCORP INTERNATIONAL, LLC *et al*., | * | |
| | * | |
| Defendants. | * | |

**MEMORANDUM OPINION**

Pending before the Court is the motion to dismiss the Second Amended Complaint as to Defendant AECOM National Security Programs, Inc. ("AECOM").[1] ECF No. 300. The issues are fully briefed, and no hearing is necessary to resolve this motion. *See* D. Md. Loc. R. 105.6. For the following reasons, the motion is DENIED.

**I.   BACKGROUND**

Plaintiff-Relators ("Relators") bring this *qui tam* action pursuant to the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA") against Defendants TigerSwan, Inc. ("TigerSwan"), KMS Solutions, LLC ("KMS"), Thomas/Wright, Inc. ("Thomas/Wright"), Shee Atika Languages, LLC ("Shee Atika"), DynCorp International, LLC ("DynCorp"), Global Linguist Solutions, LLC ("GLS"), and AECOM National Security Programs, Inc. ("AECOM"). Relators also bring one count pursuant to the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. §§ 1581 *et seq.* ("TVPRA") against Defendants GLS, DynCorp, and AECOM. ECF No. 286 ¶¶ 589–633. The Court previously summarized the relevant factual and procedural background at length in its

---

[1] On August 27, 2010, AECOM purchased McNeil Technologies, Inc. ("MTI") and subsequently changed its name to AECOM National Security Programs, Inc. ECF No. 286 ¶ 19. AECOM then changed its name to Amentum National Security Programs, Inc. ECF No. 300-1 at 1 n.1. For clarity, the Court refers to Defendant as "AECOM."

September 5, 2019 Memorandum Opinion and Order (ECF No. 145), all of which is incorporated by reference herein.  ECF No. 145 at 1–7.

This motion solely concerns the sufficiency of the Second Amended Complaint as to defendant AECOM.  Previously, the Court dismissed AECOM from the suit because Relators failed to make plausible that the corporation engaged in a "joint venture" with defendants GLS and DynCorp such that liability extended to it.  ECF No. 145 at 36.  After some discovery, Relators filed the Second Amended Complaint to cure the defects in its claims against AECOM.  *See* ECF No. 286.

In that regard, the Second Amended Complaint alleges that AECOM, together with DynCorp and MTI, "exercised such total control and domination over GLS" that it was merely an "instrumentality in obtaining revenue from military contracts in the Middle East" for the other defendant corporations.  ECF No. 286 ¶ 20.  The Second Amended Complaint more particularly avers that AECOM would find "small businesses willing to accept the terms and conditions for inclusion in GLS's bid" and sought out multiple subcontractors that agreed to be "under the direction and control" of AECOM.  ECF No. 286 ¶¶ 23–29.  AECOM, with DynCorp, also selected GLS' Board of Managers, controlled the terms of their employment, set the rates and benefits paid to GLS employees; and maintained the exclusive right to appoint GLS' president, vice president, secretary, and treasurer, and played an active role in GLS' "crisis management."  *Id.* ¶¶ 32–51.  AECOM and DynCorp controlled the day-to-day operations of GLS and exercised joint approval over GLS' annual budget, staff training protocols, and the decision to add offices overseas.  *Id.* ¶¶ 40, 43–45.

AECOM allegedly also knew about, and was directly involved in, the mistreatment of the linguists in Kuwait.  On March 16, 2013, GLS President Ken Tolleson sent an email to AECOM

and DynCorp executives that he witnessed "suffering among the linguists."  ECF No. 286 ¶¶ 192, 195 ("Tolleson Email").  Tolleson reported that the linguists' passports had been confiscated, subjecting the linguists to potential arrest should they attempt to leave Kuwait.  *Id.* ¶¶194–99.  Tolleson also observed that should the linguists return to the United States, GLS would be unable to fill its contract, resulting in financial loss to GLS, DynCorp, and AECOM.  *Id.*  In turn, Gregory Stevens, an employee of an "AECOM Joint Venture Company," as well as other AECOM employees, continued to coordinate the response to the "Kuwait government manhunt" for the linguists, ultimately resulting in Stevens' instruction that the linguists sign false confessions in order to leave Kuwait.  *Id.*  Accordingly, "AECOM was not only aware that the linguists were suffering from GLS's abuse of Kuwait's laws but also orchestrated [it]."  *Id.* ¶ 199.

Based on these added facts, Relators replead AECOM's liability as to the FCA and TVPRA claims.  ECF No. 286 ¶¶ 528–81, 589–633.  AECOM renews its motion to dismiss, contending that the averred facts are still insufficient to confer liability.  ECF No. 300-1 at 6.  For the reasons below, the Court disagrees with AECOM and denies the motion.

## II.     STANDARD OF REVIEW

A motion brought pursuant to Rule 12(b)(6) tests the sufficiency of the complaint.  *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).  The Court accepts "the well-pled allegations of the complaint as true," and construes all facts and reasonable inferences most favorably to the plaintiff.  *See Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).  To survive a motion to dismiss, a complaint's factual allegations "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal

citations omitted).

In reviewing a Rule 12(b)(6) motion, the Court generally may not consider extrinsic evidence. *Zak v. Chelsea Therapeutics, Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) ("Consideration of extrinsic documents by a court during the pleading stage of litigation improperly converts the motion to dismiss into a motion for summary judgment."). However, the Court may consider documents attached to pleadings if "integral to and explicitly relied on in the complaint" and the plaintiff does not challenge the documents' authenticity. *Id.* at 606–07 (quoting *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)).

## III. ANALYSIS

AECOM principally contends that the Second Amended Complaint falls far short of plausibly averring sufficient corporate identity to disregard the "corporate separateness" of AECOM as a minority owner of GLS. ECF No. 300-1 at 13–15. AECOM alternatively argues that as to the TVPRA claims, the facts do not make plausible the requisite "knowledge" requirement to sustain the claims. *Id.* at 30. In support of its position, AECOM urges the Court to consider information included in four exhibits attached to its motion: A GLS Operating Agreement (ECF No. 300-2); a February 8, 2007 Written Action of the Members of Global Linguist Solutions, LLC (ECF No. 300-3); an August 2, 2006 Exclusive Teaming Agreement Between McNeil Technologies, Inc. and Thomas/Wright, Inc. (ECF No. 300-4); and the Tolleson Email (ECF No. 300-5).

Documents attached to a motion to dismiss may be considered "so long as they are integral to the complaint and authentic." *Philips v. Pitt Cnty Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). The document must "be central or integral to the claim in the sense that its very existence, and not the mere information it contains, gives rise to the legal rights asserted."

4

*Walker v. S.W.I.F.T. SCRL*, 517 F. Supp. 2d 801, 806 (E.D. Va. 2007).  "[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached . . ., the exhibit prevails." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (quoting *Fayetteville Inv'rs v. Com. Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991)).  If a plaintiff "attaches documents and relies upon the documents to form the basis for a claim or part of a claim, dismissal is appropriate if the document negates the claim."  *Id.* (quoting *Thompson v. Illinois Dep't of Prof'l Regul.*, 300 F.3d 750, 754 (7th Cir. 2002)).

Although Relators and AECOM both submit an array of documents with their memoranda, neither ask this Court to convert the dismissal motion into one for summary judgment.  *Cf.* Fed. R. Civ. P. 12(d) (court retains discretion to convert 12(b)(6) or 12(c) motion into Rule 56 motion for summary judgment); *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007) ("It is well settled that district courts may convert a Rule 12(b)(6) motion to dismiss into a Rule 56 motion for summary judgment.").  The Court thus confines its analysis to the facts averred and the documents expressly incorporated by reference into the Second Amended Complaint.

The Court considers the Agreements used to form GLS as well as those that govern its operations to be integral to the Complaint; namely, the Subcontracting Agreement between GLS and AECOM (formerly named McNeil) (ECF Nos. 286 ¶ 49; 307-4); the GLS Operating Agreement (ECF Nos. 286 ¶ 46; 300-2); and the Teaming Agreement between DynCorp and AECOM to create GLS (ECF Nos. 286 ¶¶ 21–28; 307-1).  The Tolleson Email is also expressly incorporated into the Second Amended Complaint.  *See* ECF Nos. 286 ¶¶ 192–97; 300-5.  The Court finds the remaining documents as either not integral to the Complaint or, even if integral, simply not dispositive to the analysis.  The Court next turns to the sufficiency of the claims as

5

pleaded.

First with regard to the FCA claims, Relators pursue AECOM solely on the theory that it is the alter ego of GLS.  ECF No. 286 ¶ 541.  An alter ego theory of liability is hardly an easy road to travel.  Generally, corporate formalities should be observed.  *Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 544 (4th Cir. 2013).  But where the parent company "so dominated the subsidiary corporation as to negate its separate personality," the subsidiary may be more properly considered "the parent's alter ego, agent, or mere instrumentality."  *U.S. ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 60 (D.D.C. 2007) (citation omitted).  Courts in that situation, "will not hesitate" to pierce the corporate veil where justice so requires. *Vitol SA*, 708 F.3d at 544.

The alter ego analysis is two pronged.  First, at the pleading stage, the proponent of piercing the corporate veil must make plausible a "unity of interest" between the two entities such that they should be treated as one.  *Hockett*, 498 F. Supp. 2d at 60.  A "unity of interest" may be established through showing common ownership or officers and directors, or sharing property, finances, personnel, or infrastructure.  *Id.*  The Court must next ascertain the fairness of piercing the veil.  *United States v. Universal Health Servs., Inc.*, No. 07-00054, 2010 WL 4323082, at *3 (W.D. Va. Oct. 31, 2010).

Viewing the allegations most favorably to Relators, the Second Amended Complaint makes plausible a "unity of interest" between AECOM and GLS.  Relators aver that AECOM and DynCorp created GLS so to compete for U.S. military contracts.  ECF No. 286 ¶ 29. Further, the Second Amended Complaint makes plausible that AECOM and DynCorp controlled the selection and removal of GLS' Board of Managers and retained exclusive power to bind GLS in any such contract with the U.S. Military.  *Id.* ¶¶ 30, 35–37.  Regarding day-to-day operations,

6

AECOM evidently kept a tight rein on GLS. *Id.* ¶ 49 (AECOM demanding GLS pay certain salaries and fringe benefits); *id.* ¶ 51 (GLS required to submit weekly operation reports); *id.* ¶¶ 43–45 (AECOM and DynCorp approving GLS budget, training protocols, oversight of additional offices); *id.* ¶ 41 (AECOM approval on loans to GLS); *id.* ¶ 38 (AECOM with DynCorp having exclusive right to appoint and remove GLS officers at will). Taking these allegations as true and most favorably to Relators, this is sufficient to satisfy the "unity of interest" element.

Similarly, the Second Amended Complaint pleads enough facts to render at least the potential that veil piercing will be equitable. Realtors aver that DynCorp and AECOM together created GLS to secure sham subcontracts with the U.S. military. ECF No. 286 ¶¶ 20–21, 533. These allegations alone are sufficient to allow the claim to proceed to discovery. This is especially prudent when considering that piercing the corporate veil is such a "a fact-intensive inquiry," the Court finds it improper to dismiss AECOM without further factual development. *Vitol*, 708 F.3d at 544.

AECOM, in response, presses that it is a "minority owner" of GLS, and so should escape any alter ego theory of liability. ECF No. 300-1 at 17. But this corporate formality alone does not defeat the well pleaded allegations that AECOM exerted actual control over GLS. The twin considerations—"unity of interest" and "basic fairness"—require factual development of how the corporations operated *in practice,* not just on paper. *See DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 685 (4th Cir. 1976). Considering the alleged involvement of AECOM in both GLS' managerial structure and day to day operations of GLS, combined with its purported level of control over GLS and its employees, Relators' claim survives challenge.

AECOM next presses that Realtors' allegations are "misleading over-and misstatements" taken from the GLS "governing documents," which in its view, save AECOM from being

7

considered GLS' alter ego.  ECF No. 300-1 at 19–21; *see also* ECF Nos. 300-2, 300-3.  AECOM also disputes Realtors' characterization of the degree to which AECOM controlled GLS.  ECF No. 300-1 at 22–23.  AECOM's arguments, however, are far more appropriate for resolution at trial, or at least on summary judgment, once a full factual record is established.  But they hardly persuade the Court that the Second Amended Complaint fails to make plausible AECOM's status as the alter ego of GLS.  *Cf. Burkes v. Dylewski*, No. 1:14-cv-22079-UU, 2016 WL 9526692, at *6 (S.D. Fla. May 3, 2016) (declining to dismiss corporate defendant from FCA claim because "[w]hether [defendant] is directly liable for any alleged violation of the FCA, based on its own actions or under an alter ego theory, is more appropriately addressed at the summary judgment stage.").  The motion to dismiss as to the alter ego theory of liability is thus denied.

For the TVPRA claim, AECOM takes a different tack.  It argues that the Second Amended Complaint claim fails to make plausible AECOM's knowledge sufficient to confer liability under the statute.  ECF No. 300-1 at 30–32.  The TVPRA prohibits peonage, slavery, and trafficking in persons and provides a private right of action for any "individual who is a victim of a [TVPRA] violation."  18 U.S.C § 1595(a).  A defendant may be liable under the TVPRA if it "knowingly provides or obtains the labor or services of a person" by means of "force, threats of force, physical restraint, or threats of physical restraint to that person or another person"; "serious harm or threats of serious harm to that person or another person"; "abuse or threatened abuse of law or legal process"; or "any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint." 18 U.S.C. § 1589(a).

In creating such cause of action "Congress intended to reach cases in which persons are held in a condition of servitude through nonviolent coercion, as well as through physical or legal

8

coercion."  *Muchira v. Al-Rawaf*, 850 F.3d 605, 617 (4th Cir. 2017) (internal marks and citation omitted).  Relevant here, the TVPRA "holds not just primary offenders accountable but also anybody who knowingly 'benefits, financially or by receiving anything of value, from participation in a venture which has engaged in' forced labor."  *Bistline v. Parker*, 918 F.3d 849, 873 (10th Cir. 2019) (quoting 18 U.S.C. § 1589(b)).  While "venture" is not defined in that provision, the TVPRA uses the term elsewhere to mean "any group of two or more individuals associated in fact, whether or not a legal entity."  *Id.* (quoting 18 U.S.C. § 1591(e)(6)); *see also Ricchio v. MclEan*, 853 F.3d 553, 556 (1st Cir. 2017) (using § 1591(e)(6) definition for analysis of § 1589(b)).

Relators allege that AECOM violated § 1589(a)(3) through knowingly obtaining their labor "by means of the abuse or threatened abuse of law or legal process."  ECF No. 286 ¶¶ 15, 593.  "Forced labor" generally involves demanding or conditioning labor in "squalid or otherwise intolerable living conditions, extreme isolation (from family and the outside world)" or through "threats of inflicting harm upon the victim or others (including threats of legal process such as arrest or deportation)."  *Muchira*, 850 F.3d at 618–19.  "The confiscation of an immigrant's passport and threats of arrest are common threats of legal process resorted to by traffickers and others who seek to instill fear in persons and force them to labor against their will."  *Id.* at 623; *see also Lipenga v. Kambalame*, 219 F. Supp. 3d 517, 525 (D. Md. 2016) (rejecting dismissal where defendant "allegedly confiscated [plaintiff's] passport and threatened to call the police and have her deported"); *Kiwanuka v. Bakilana*, 844 F. Supp. 2d 107, 115 (D.D.C. 2012) ("[M]any courts have determined that threats of deportation constitute a condition of servitude induced through abuse of the legal process.").

Unlike Realtors' First Amended Complaint, the Second Amended Complaint has pleaded

that AECOM was part of GLS' venture to knowingly benefit from Realtors' forced labor in Kuwait. Relators allege that AECOM knew about the treatment of the linguists in Kuwait and threats of deportation, and directly coordinated the response in Kuwait, including forcing the linguists to sign false confessions as a precondition to leave the country. ECF No. 286 ¶¶ 193–99. According to Relators, AECOM had been fully informed that the linguists were no longer working legally and risked imprisonment at any moment. *Id.* Relators also allege AECOM had been kept informed of the linguists' poor living conditions through regular communication from AECOM's agent, Gregory Stevens. *Id.* Nonetheless, AECOM, united with DynCorp and GLS and elected to keep the linguists in Kuwait and with an understanding that removing the linguists would jeopardize fulfilling the terms of the Contract. *Id.*

The Second Amended Complaint also avers that Stevens, as "Manager Host Nation Liaison Combat Support Associates (an AECOM Joint Venture Company)" directly coordinated the GLS response to the escalating situation with Alshora. ECF No. 286 ¶ 194. The Second Amended Complaint avers that Stevens and others learned from Tolleson the dire circumstances the linguists faced.[2] *Id.* ¶ 195. Stevens, in turn, approved the "strategy" of the linguists' signing false confessions to leave Kuwait after clearing it with AECOM and DynCorp. *Id.* ¶ 198–99. Viewing the facts most favorably to Relators, AECOM's liability under § 1589 is plausible.

AECOM, for its part, engages in a factual tit-for-tat not proper at the motion to dismiss stage. It specifically challenges the allegation that Stevens represented AECOM such that "by and through" Stevens, AECOM had knowledge of the linguists' conditions in Kuwait. ECF No. 300-1 at 32–33. Stevens held a managerial position and is included on the Tolleson Email,

---

[2] The email notes that Alshora, "either illegally or by contriving circumstances to create situations favorable to their purpose," has "used power and influence against the US citizen linguists[,] causing them to fear arrest and/or deportation," and that linguists have been "confined" against their will to their work locations. The email concludes "these innocents (linguists) should not be held as barter." ECF No. 300-5 at 2–3.

ostensibly sent to those in decision-making positions. ECF Nos. 286 ¶¶ 194–199; 300-5. This alone is makes plausible that he is an agent of AECOM sufficient to confer liability to the corporation.

AECOM similarly takes issue with the significance of the Tolleson Email, contending that it alone does not make plausible a TVPRA violation. ECF No. 300-1 at 32–35. But AECOM again improperly asks the Court to weigh the evidence as to Realtors' allegations. Relators have plausibly alleged facts that "through Stevens and others" AECOM knew that the linguists were working in violation of Kuwaiti law, living in deplorable conditions, and being threatened with deportation. ECF No. 286 ¶¶ 194–99. At this stage, Relators have alleged a claim for relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

For similar reasons, Relators' TVPRA allegations under § 1592 survive challenge. Section 1592 prohibits knowing destruction, confiscation, or possession of any passport of another either in the course of a § 1589 violation, with intent to violate § 1589, or to prevent or restrict a person's ability to travel "in order to maintain the labor or services of that person, when the person is or has been a victim of a severe form of trafficking in persons, as defined in section 103 of the Trafficking Victims Protection Act of 2000." 18 U.S.C. § 1592(a). Like Relators claims under § 1589, liability attaches under this section to a party who "knowingly benefits . . . from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a).

Relators allege the Tolleson Email had informed AECOM "that Plaintiff's passports had been taken from them," and that should the linguists leave Kuwait and return to the United States, AEOCM, DynCorp, and GLS would face financial loss. ECF No. 286 ¶ 195. Admittedly, as AECOM points out, the Tolleson Email makes no mention of "passports" specifically. *See*

11

ECF No. 300-5.  But the email makes plain that AECOM knew the linguists were not free to leave Kuwait.  *See id.*  Considering the degree of control that Relators allege AECOM had over GLS, and the consistent level of communication between AECOM, DynCorp, GLS, Stevens, Tolleson, and others, Realtors' allegations are enough at this stage to support the inference that AECOM knew the linguists' passports had been confiscated, and the linguists were being threatened with deportation.  Combined with Relators' § 1589 allegations, Relators' § 1592 claims will proceed.

### IV.  CONCLUSION

For the foregoing reasons, the motion to dismiss is denied.  A separate order follows.


| March 9, 2022 | /s/ |
|---|---|
| Date | Paula Xinis |
| | United States District Judge |