# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA, *ex rel.*                        \*
ELGASIM MOHAMED FADLALLA, *et al.*,           \*

                                      \*

         Plaintiffs,                        \*

                                      \*        Civil Action No. 8:15-cv-01806-PX

      v.                              \*

                                      \*

DYNCORP INTERNATIONAL LLC, *et al.*,           \*

                                      \*

         Defendants.                      \*

                                    \*

                                 \*\*\*

## MEMORANDUM OPINION

This *qui tam* action, brought by 28 relators (the "Relators"),[1] concerns the award of a long-term linguistic services contract to assist the United States' wartime efforts in the Middle East post-911. Pending are the parties' cross motions for summary judgment, ECF No. 568 & ECF No. 573. Defendants DynCorp International, LLC ("DynCorp"), Global Linguists Solutions, LLC ("GLS"), AECOM National Security Programs, Inc. ("AECOM"), and the subcontractor-Defendants, Shee Atika Languages, LLC ("Shee Atika"), KMS Solutions, LLC ("KMS"), TigerSwan, Inc. ("TigerSwan"), and Thomas Wright, Inc. ("Wright") (collectively, "Small Business Defendants" or "subcontractors")[2] argue that summary judgment must be granted in their favor on the alleged False Claims Act ("FCA") violations (Counts I and II) because Relators do not qualify as "original sources" sufficient to proceed under the FCA. ECF No. 571. Defendants alternatively contend that even if Relators are the original sources of the information, they have

---

[1] The Relators are Elgasim Mohamed Fadlalla, Ramzi Zinnekah, Maher Al-Masri, Majdi Abdulghani, Haidar Al-Saidi, Sadiq Al-Saidi, Sinan Marrogy, Neil Magi, Faycal Maroufi, Kidar Mohammad Al-Safar, Mahmoud Ali Luttfi, Nimna L. Jayasinghe Mudalige, Naveep Kaur Tucker, Waiel Samy Mansour, Samah Fikri, Hamid Skili, Saad Kabbaj, Nada Malek, Louai Salim, Antonio Antar, Akhtar Hayat, Haider Al-Nakash, Parcham Khoshaba Mikhaiel, Edward Youkhana, Ali Elsebaey, Noureldin Muhsen, Maryan Mure and Tebyan Al Nawasreh.

[2] The Court refers to the GLS, Dyncorp, AECOM and Small Business Defendants collectively as "Defendants."

failed to adduce sufficient evidence to prove any false claims to the Government in connection with the contract bids. ECF No. 574. GLS, Dyncorp and AECOM[3] also move for summary judgment on the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. §§ 1581, *et seq*., ("TVPRA") claim (Count IV) because no evidence suggests GLS ever compelled Relators to work against their will. ECF No. 572.

The motions are fully briefed, and no hearing is necessary. D. Md. Loc. R. 105.6. Because Relators are not the original sources of information for their FCA claims, summary judgment is granted in Defendants' favor as to Counts I and II. Judgment is also granted in GLS' favor on the TVPRA claim (Count IV) because the Relators have adduced no evidence that Defendants forced them to work or held their passports against their will. Lastly, because judgment is granted in favor of Defendants on all claims, the Relators' summary judgment motion, ECF No. 573, is denied.

## I.    Background

The United States Army's Intelligence and Security Command ("INSCOM" or "the Army")'s practice of contracting for linguist services dates to 1999, when it first awarded a five-year, $4.5 million contract to L-3 Corporation ("L-3"). ECF No. 571-4 at 38. In the wake of the September 11, 2001, terrorist attacks, the United States' demand for linguistic services increased exponentially to support military missions in the Middle East. By the time the L-3 contract ended in 2005, INSCOM needed nearly 9,000 linguists to provide services in such varied languages as Arabic, Baluchi, Bengali, Nepalese, Pashtu, Somali, Tagalog, Tamil, Turkish, Kurdish, Hindi, Farsi and French to support effective communication with the local populations. ECF No. 571-4

---

[3] Relators allege that Dyncorp and AECOM "established GLS to serve their interests," and that each maintained control over GLS. ECF No. 286 ¶¶ 19–51. For ease, the Court will refer only to GLS for the TVPRA claim as GLS had been the sole signatory on the linguistic services contract at the heart of this case.

at 34–35 & 38.  *See also* ECF No. 576-3 at 11.  INSCOM, in turn, re-bid a new $4.65 *billion* linguist services' contract.  ECF No. 571-4 at 34 & 38; ECF No. 576 at 14; ECF No. 576-3 at 4–14.

The proposal for the new contract prioritized bids that included domestic small business subcontractors as part of its scope of work.  ECF No. 576-3 at 5.  INSCOM further required that any bid include an "acceptable Small Business Subcontracting Plan," wherein at least "25% of [the] contract value" would be subcontracted to qualifying small businesses.  *Id.* at 21 & 133.  More particularly, the bid had to secure "a minimum 5% each to Small Disadvantaged Businesses and Woman-Owned Businesses" and "3% to Hub Zone Businesses and Service Disabled Veteran Owned [businesses]."  *Id.* at 99.  Bidders who could credibly allocate 35% of the proposed contract services to small business subcontractors were given a bid "advantage."  ECF No. 576-8 at 7; ECF No. 576 at 4–5; ECF No. 576-3 at 129.

GLS rightly figured that L-3 maintained the advantage of incumbency.  ECF No. 576-8 at 9; ECF No. 576-12 at 10.  And unlike L-3, GLS had no qualifying small business partners.  ECF No. 576-12 at 13 & 15; ECF No. 576-1 at 3.  So GLS set out to attract the requisite small business participation by courting insiders and "proteges" of GLS executives.  *See* ECF No. 576-1 at 4.  *See also* ECF No. 576-3 at 129.  Specifically, GLS entered into "teaming agreements" for linguistic subcontracting services with the following subcontractors: (1) Wright, a small woman-owned and disadvantaged engineering firm, the majority of which was owned by the sister of a GLS executive; (2) KMS, owned principally by the wife of a GLS executive; (3) TigerSwan, a disabled-veteran owned business founded by a friend of GLS' president; and (4) Invision, a small disadvantaged business owned by close associates of GLS.  ECF No. 576 at 9–13 & 20; ECF No. 576-38 at 4–5; ECF No. 576-10 at 12–13; ECF No. 576-39 at 4; ECF No. 576-2 at 5; ECF No. 576-46; ECF No.

576-51 at 7–13; ECF No. 576-53; ECF No. 573-81; ECF No. 573-82 at 3–15.  GLS eventually

added a fifth subcontractor, Shee Atika, an Alaskan Native corporation.  ECF No. 577-18 at 7;

ECF No. 573-106 at 177; ECF No. 573-276 at 20.

GLS won the bid and performed on the contract (the "Contract") for several years.  ECF

No. 576 at 25; ECF No. 573-109 at 11.  The events that followed the award of the Contract form

the basis of this case.  Broadly, Relators allege that GLS' performance under the Contract

perpetrated a fraud on the United States (the "Government") in two main ways.  First, Relators

contend that GLS included the Small Business Defendants to obtain the Contract, but no

subcontractor performed actual work relative to the amount billed to the Government for their

"payroll" services (the "subcontractor fraud").  Second, that GLS conspired with its Kuwaiti-based

subcontractor, Alshora International Company ("Alshora"), to misrepresent that Alshora was the

linguists' "employer" as a way to circumvent Kuwaiti employment law.  Relatedly, Relators

contend that once its relationship with Alshora soured, thus jeopardizing the Relators legal status

in Kuwait, GLS held the linguists travel documents to secure continued labor under the Contract

(the "Alshora crisis").  The Court details the facts relevant to each.

A.    **Subcontractor Fraud**

Relators allege that GLS defrauded the Government by essentially using the Small

Business Defendants as a front and paying them a "fee" for the "value" added by their nominal

inclusion in the Contract.  ECF No. 576-1 at 4.  *See also* ECF No. 573-134 at 11.  But really, say

Relators, GLS did all the work on the Contract and thus reaped the benefit of the added "costs"

billed to the Government.  For example, GLS controlled all on-boarding of linguists, ECF No.

578-1 at 3, administration of employee benefits, ECF No. 576-34 at 3, salary levels, ECF No. 576-

32 at 15, and timekeeping, ECF No. 576-15 at 8.  *See also* ECF No. 576 at 30.  To paper over the

fraud, GLS nominally assigned the linguists to each Small Business Defendant that was "responsible only for handling minor paperwork and processing payroll for linguists." ECF No. 573-1 at 2. The Small Business Defendants were directed to use GLS' payroll system to report employee timekeeping to GLS who, in turn, paid the linguists for their hours worked. ECF No. 573-150 at 11–12; ECF No. 578-1 at 5–6; ECF No. 576 at 31 & 34. GLS provided copies of the actual timesheets to the Small Business Defendants only later, if at all. ECF No. 578-12 at 3–4 ("The subcontractors have no means of viewing the timesheets of their linguists unless [GLS' team partner, ITMA] downloads the timesheets and sends the timesheets to the subcontractor."); ECF No. 578-18 at 12 & 27 (listing timesheets that GLS had not yet sent to Shee Atika that were more than 45 days past due); ECF No. 578-19 at 2 (KMS reflecting that GLS had failed to send 15 weeks of timesheets in 2012).

GLS would also periodically "migrate," or transfer, linguists from one Small Business Defendant to another to manipulate the "fill rates," or staffing requirements per the Contract's terms. ECF No. 573-14 at 53–54. Each Relator signed several employment contracts with Small Business Defendants during their tenure with GLS, sometimes more than one subcontractor within the same year.[4] But this, too, was a facade to make it appear as if the Small Business Defendants were involved with "contract administration," when in fact, GLS controlled substantially all of it. Thus, Relators always considered GLS their employer. *See, e.g.*, ECF No. 584-32 at 5:14–16 (Al-Saidi explaining that during the migration process, GLS represented "everything will stay the same

---

[4] *See* ECF No. 584-7 at 3 (Al Masri); ECF No. 584-12 at 3–4 (Fadlalla); ECF No. 584-6 at 3–7 (Abdulghani); ECF No. 584-8 at 3–7 (Al-Safar); ECF No. 584-9 at 3–6 (Haidar Al-Saidi); ECF No. 584-10 at 3–6 (Sadiq Al-Saidi); ECF No. 584-11 at 3 (Elsebaey); ECF No. 584-13 at 3–6 (Fikri); ECF No. 584-14 at 3 (Hayat); ECF No. 584-15 at 3–6 (Kabbaj); ECF No. 584-16 at 3–7 (Luttfi); ECF No. 584-17 at 3–7 (Magi); ECF No. 584-18 at 3 (Mansour); ECF No. 584-19 at 3–7 (Maroufi); ECF No. 584-20 at 3–7 (Marrogy); ECF No. 584-21 at 3–7 (Mickhaiel); ECF No. 584-22 at 3–7 (Mudalige); ECF No. 584-23 at 3–6 (Muhsen); ECF No. 584-24 at 3–7 (Mure); ECF No. 584-25 at 3–6 (Skili); ECF No. 584-27 at 3–6 (Zinnekah); ECF No. 584-37 at 4:20–5:12 (Hayat); ECF No. 583-1 at 3–7 (Al-Nakash); ECF No. 583-2 at 3–7 (Antar); ECF No. 583-3 at 3–8 (Malek); ECF No. 583-4 at 3–8 (Salim).

. . . it's still under GLS, business as usual . . .").

As with most government contracts, the Government periodically audited the contractor performance for efficiency and transparency.  In early 2009, the Defense Contract Audit Agency ("DCAA") discovered that the linguists were employed directly for GLS without "subcontractor involvement."  ECF No. 573-14 at 10, 11 & 41.  As the DCAA put it, "we're wondering what exactly is the subcontractor doing on these contracts?  And whether the amounts that we were paying were appropriate then to the subcontracts."  *Id.* at 12.  The DCAA ultimately concluded that most subcontractors had provided very little support under the Contract.  *Id.* at 27 & 41.  As DCAA's Regional Audit Manager, Angela Moomand, described, "there was really no . . . separate identification of the employees who were GLS employees and maybe who were contract employees."  ECF No. 573-14 at 11.  Moomand also observed that GLS employees "were all carrying . . . GLS badges.  They were filling out GLS time sheets, and it appeared like there were no real subcontractor involvement overseas."  *Id.  See also id*. at 45 ("The result of the audit [revealed] various issues.  The first issue that . . .  the amounts that were being billed did not have any relation to the actual cost.  They were . . . billing . . . at the ceiling set in the subcontract, but . . . their actuals were much lower.").  Based on DCAA's findings, INSCOM rejected payment for GLS' pending $200 million invoice.  ECF No. 573-14 at 35, 45 & 47.  *See also* ECF No. 571-4 at 66.

DCAA next brought this issue to the United States Congressional Commission on Wartime Contracting ("CWC" or "the Commission"), a bipartisan body of House and Senate members tasked with fiscal oversight of wartime contracts in the Middle East.  ECF No. 573-14 at 50–51.  On August 12, 2009, the CWC held a public hearing on the Contract with particular focus on the propriety of GLS' "extensive subcontracting."  ECF No. 571-4 at 34.  *See also* ECF No. 573-14 at

52.   The opening comments of the Commission's Chair, Mike Thibault, summarized that the inquiry would focus on the "very heavy use of subcontractors, even though GLS does all of the recruiting, all of the vetting, all the hiring, all the training, and the field management of linguists. That in the simplest terms, every linguist out there . . . wears a GLS badge and is supervised by GLS employees, regardless of who is doing their payroll."  ECF No. 571-4 at 35.  The CWC heard from high-ranking INSCOM contracting officers, the Director of DCAA, as well as several GLS witnesses.  *Id.*   The Commission members expressed great concern that GLS had billed the Government $556 million to pay the Small Business Defendants for doing nothing more than ministerial payroll.  ECF No. 571-4 at 35–36, 41, 45 & 48.  One CWC member emphasized that if the Contract were paid as GLS intended, GLS would reap nearly $2.8 billion of government funds purportedly for the subcontractors "to move payroll around." *Id.* at 54.  Another Commissioner inquired whether GLS had onboarded the subcontractors merely to "meet [the] 35 percent small business goal" but "did not want the small business to do anything but to satisfy the government[.]" *Id.  See also id*. at 95 (Commissioner Tiefer characterizing the role of L-3 as "a do-little subcontractor for the amount of money you get.").

      Media coverage of the CWC hearing followed.  One article referred to the hearing as a "scathing review . . . from government officials who described tens of millions of dollars in questionable costs and poor management." *Feds question Iraq interpreter contract*, NBC News, Aug. 12, 2009.[5]  The report described how dozens of GLS subcontractors "do not hire, manage or interact with the linguists other than to pay the amount stipulated by GLS." *Id.*  Another article detailed that the DCAA audit uncovered GLS' earmarking of $2.9 billion—or 64 percent—of a $4.64 billion contract to 18 subcontractors, 12 of which solely "perform payroll functions for GLS

---

[5] Available at http://www.nbcnews.com/id/32393792/ns/world_news-mideast_n_africa/t/feds-question-iraqinterpreter-contract/#.XVsLRWdYbKK.

linguists."  Elizabeth Newell Jochum, *Defense Says Extensive Outsourcing on Iraq Linguist Contract is Jacking Up Costs,* Government Executive, Aug. 12, 2009.[6]  The article continued, "So far, GLS has billed the government for $816 million of the contract.  Of the money billed, $81.8 million represents add-on costs such as fringe, overhead and general administrative profits attributable to the subcontractors.  If that trend continues, DCAA expects that as much as 12 percent—or $556 million—of the total contract could go toward add-on expenses for subcontractors performing payroll functions."  *Id.*

The DCAA and CWC were not the only ones to sound the alarm on GLS' subcontractor scheme.  In July 2013, Shee Atika filed a federal lawsuit against GLS, claiming that GLS did not comply with the subcontract's "Guaranteed Work Share Provision" because Shee Atika never received sufficient work to fulfill the promised payment of 15% of the total contract revenue.  ECF No. 571-4 at 281.  Shee Atika further accused GLS of not paying "any portion of such award fees . . . much less the 15% to which [Shee Atika was] contractually entitled."  *Id.* at 282.  This lawsuit, in turn, sparked renewed media interest in GLS' misuse of subcontractors.  *See* ECF No. 125 at n.7–9; Stewart Bishop, *Army Translation Contractor Breached $697M Deal, Suit Says*, Law360, July 16, 2013 ("Shee Atika maintains its role as a subcontractor was key to GLS satisfying requirements that specified minimum percentages of the prime contract's revenue go to small businesses or small disadvantaged businesses because of Shee Atika's status as a 'Native Corporation' pursuant to the Alaska Native Claims Settlement Act.").  Nonetheless, INSCOM ultimately awarded GLS a second contract to continue its linguist services in 2011, apparently, "based on GLS's claims that it had substantially performed" on the first contract.  ECF No. 571-3 at 429.

---

[6] Available at https://www.govexec.com/defense/2009/08/defensesays-extensive-outsourcing-on-iraq-linguistcontract-is-jacking-up-costs/29745/.

B.    **The Alshora Crisis**

Separate from the subcontractor fraud, Relators contend that GLS violated Kuwaiti immigration regulations to employ U.S. citizen linguists on overseas military installations. Under Kuwaiti law, non-Kuwaiti citizens working in the country must be "sponsored" by a "state-sanctioned private company to provide . . . the handling of visas and residency." ECF No. 572-3 at 549:18–25. When GLS first assumed responsibility for the Contract, it outsourced the "sponsorship" of linguists to Alshora, a Kuwaiti based firm, as did GLS' predecessor, L3. ECF No. 588-4; ECF No. 572-3 at 843. To facilitate the lawful employment of the U.S. citizen linguists in Kuwait, the Alshora subcontract (the "Alshora Agreement") acknowledged that "GLS employees (U.S. hired) under Alshora are considered Alshora employees under the Kuwaiti law." ECF No. 588-4 at 9; ECF No. 572-3 at 788. The Alshora Agreement further delegated to Alshora the responsibility of securing for the linguists work and residency visas, civil identification cards, drivers' licenses, and any other necessary permission from the Kuwaiti government. ECF No. 588-3 at 2–3 & 5; ECF No. 572-3 at 866; ECF No. 572-4 at 6, 11–15, 17–18, 34 & 58; ECF No. 572-5 at 21; ECF No. 588-4 at 25–26; ECF No. 588-7 at 1; ECF No. 571-4 at 142.

Although Relators allege that GLS "hid" this sponsorship arrangement from INSCOM, the evidence says otherwise. GLS initially sought specific permission from INSCOM to engage Alshora as the linguists' sponsor, as had L-3. ECF No. 572-3 at 841 (submission for "consent to subcontract with Alshora" on August 7, 2008). GLS next forwarded to INSCOM a summary of expected expenditures associated with Alshora's services. ECF No. 572-3 at 842 & 847–49. And GLS ultimately disclosed to INSCOM the Alshora Agreement in 2010 as part of a separate audit. ECF No. 572-3 at 867, 869–70 & 780–839.

To secure linguists' proper travel and work documents, Alshora would periodically require

GLS to collect the linguists' U.S. passports to be used for securing or renewing work visas.  ECF No. 572-3 at 10:6–25, 56:2–20, 57:6–23, 66:14–25, 67:2–10, 68:10–20, 131:6–12, 132:2–24, 165:7–22, 166:2–9, 167:2–11, 187:6–25 & 327:3–21.  In the ordinary course, however, linguists could and did request their passports for travel and obtained them quickly without incident.  ECF No. 572-3 at 12:14 (Abdulghani had access to passport before Alshora incident); *id.* at 265:17 (Malek had passport almost "at all times"); *id.* at 55:13–56:20 (Al-Nakash was never without passport for more than two weeks at a time until Alshora crisis); *id.* at 113:15–18 (Antar never had concerns about ability to access passport before 2013); *id.* at 132:2–18 (Elsebaey could not recall specific instances from 2011 to 2013 when passport was withheld after it was requested); *id.* at 33:14–15 (Al-Masri accessed passport for leave); *id.* at 164:1–13 (Fadlalla same); 250:4–251:10 (Luttfi same); 289:19–290:7 (Mansour same); *id.* at 366:17–367:8 (Muhsen same).  *See also id.* at 497:2–4 (GLS site manager stating "[I]f [linguists] wanted their passport[s] . . . I would never hold their passports."); *id.* at 534:8–535:3 & 538:1–539:17 (GLS President stating GLS immediately returned passports to linguists once Alshora gave them back).

Alshora performed under its agreement with GLS until late 2012.  As the Alshora Agreement was up for renewal, GLS opened it for a rebid.  ECF No. 572-3 at 901–03.  GLS invited Alshora to submit a bid, which Alshora declined.  *Id.* at 901–02.  GLS ultimately awarded the sponsorship subcontract to Alshora's direct competitor, Kuwait Resources House ("KRH"), and notified Alshora in writing that its services were terminated effective February 17, 2013.  ECF No. 572-4 at 6 & 12; ECF No. 588-18 at 3–4.  Alshora, in turn, took umbrage at its termination and immediately began retaliating against GLS.  The linguists, regrettably, were caught in the crossfire.

Beginning in February 2013, Alshora took steps in rapid succession to render the GLS linguists unable to work or leave the U.S. military installations without risking detention and

prosecution by the Kuwaiti government.  First, Alshora refused to transfer sponsorship of the linguists' work visas to KRH unless GLS agreed to pay Alshora $22 million.  ECF No. 572-5 at 119; ECF No. 588-5 at 3–4.  *See also* ECF No. 572-2 at 77 (Alshora Agreement expressly providing for visa transfer upon GLS demand).  Because GLS would not pay, Alshora demanded cancellation of the current visas, which required the linguists to depart Kuwait and reinitiate the visa process anew with KRH.  ECF No. 572-5 at 64–65.  Alshora also collected the linguists' passports under the auspices of cancelling the visas, and then refused to return the passports to the linguists.  ECF No. 572-4 at 12 & 24–25.  *See also* ECF No. 588-18 at 1.  Alshora lastly worked with the Kuwaiti military to pull the linguists' permission to reenter the military installations if the linguists went off-base.  ECF No. 588-22 at 1–2.  This meant that leaving the base risked refusal of reentry.  *Id*. at 2.  As a result, the linguists were stripped of all travel documents and could not safely venture off base until the standoff was resolved.  ECF No. 572-4 at 12, 24–29 & 81; ECF No. 588-33 at 2.

Because of this, INSCOM issued a "stop work" order on March 13, 2013.  This order directed to GLS that all U.S. citizen linguists could no longer perform work because they had no legitimate work authorization from the Kuwaiti government.  ECF No. 588-57 at 2; ECF No. 572-4 at 40; ECF No. 588-45 at 2.  INSCOM also required the linguists to turn in their access badges to the military bases in which they resided.  ECF No. 572-4 at 40.  *See also* ECF No. 588-57 at 2.  However, GLS still paid the linguists their regular salaries, for which INSCOM reimbursed GLS under the "requirements of the contract."  ECF No. 588-57 at 2.  *See also* ECF No. 572-3 at 7:1–13 (Abdulghani); *id.* at 74:1–25 (Al Nakash); *id.* at 332:14–17 (Mikhaiel) (all confirming that GLS paid them during the time they were unable to work).

Around the same time, Alshora declared 100 linguists to be "absent from work," and

brought criminal absconding charges against them.  ECF No. 572-5 at 21; ECF No. 572-4 at 81–82; ECF No. 588-45 at 2; ECF No. 588-41 at 2.  INSCOM and GLS, in turn, advised the linguists to remain on the military bases to avoid arrest and detention by the Kuwaiti authorities.  ECF No. 589-11 at 1.  *See also* ECF No. 588 at 13.  Nonetheless, despite the grave risk, Relators often left the base to run errands, visit family, seek outside medical care, and even have fun.  ECF No. 572-3 at 29:17–30:14, 171:5–9, 219:19–220:12, 247:6–18, 269:1–25, 349:6–23, 352:21–353:10 & 438:19–440:10.

But GLS' warning was warranted.  Several linguists were arrested and held by Kuwaiti authorities after leaving base.  Relator Abdulghani, for example, requested emergency leave on May 6, 2013, to visit his ailing mother in Jordan.  ECF No. 588-31 at 3.  GLS approved the request and returned his passport.  ECF No. 589-19 at 2–6.  Immigration officials, however, arrested and interrogated Abdulghani on absconding charges.  *Id.* at 10; ECF No. 588-31 at 3 (noting Kuwaiti officials interrogated Abdulghani regarding failure to report to work with Alshora for 30 days).  Abdulghani was detained for several days, only to return to the United States on May 17, 2013.  ECF No. 588-31 at 3; ECF No. 572-5 at 123.

Similarly, Relators Tucker and Mudalige were arrested on May 8, 2013, in connection with the absconding charges.  ECF No. 588-32 at 1; ECF No. 588-33 at 2–3.  Kuwaiti officials confiscated their passports, interrogated them about the circumstances surrounding their visa cancellations, and accused them of intending to "run away" from their assigned employment.  ECF No. 588-33 at 3; ECF No. 588-35 at 3–5.  After a night in detention, GLS' counsel secured the exit visas for Tucker and Mudalige and advised that they leave Kuwait immediately.  ECF No. 572-5 at 118 & 120; ECF No. 588-33 at 4; ECF No. 583-35 at 3–5.  Both arrived in the United States on May 11, 2013.  ECF No. 588-33 at 4; ECF No. 588-35 at 5.

Relators Zinnekah and Al-Masr, too, were arrested and detained after having gone into town for coffee. ECF No. 588-36 at 1; ECF No. 572-5 at 12. Although GLS sought to secure their immediate release, ECF No. 588-37 at 2, they were held for seven days in small, dirty cells with food fit only for a "dog." ECF No. 572-5 at 12–13. GLS, in response, reemphasized to the linguists that they should not leave their assigned military bases to avoid arrest for absconding. ECF No. 572-3 at 501:15–22; ECF No. 572-4 at 69 & 433; ECF No. 572-5 at 21; ECF No. 588-36 at 1. GLS also met with the Zinnekah and Al-Masr while they were held in custody, lodged U.S. State Department complaints about the Relators' detention, and eventually secured their return to the United States. ECF No. 572-5 at 14.

Those linguists who heeded warnings and remained on base during the Alshora crisis suffered miserable living conditions. They were housed in make-shift tents infested with roaches and other vermin, with only intermittent power and no ventilation. ECF No. 589-16 at 2–3; ECF No. 589-5 at 13; ECF No. 589-6 at 3–4; ECF No. 589-9 at 12–16. The bases did, however, provide Relators with beds, storage for their belongings, and access to bathrooms, dining halls, exercise and medical facilities. ECF No. 589-6 at 3. *See also* ECF No. 589-17 at 1.

The Relators also had been forewarned that harsh living conditions may come with accepting this wartime assignment. Their employment agreement advised that "your assignment or travel to the host country will [possibly] entail some degree of personal hardship and danger." ECF No. 572-9 at 5. The agreement also forewarned of austere living conditions; that the assignment "carries the risk of bodily harm/death," and that travel "could be significantly restricted, delayed or made more difficult by operational requirements of the military or by restrictions imposed by civil authorities or the Employer relating to safety concerns." *Id.*

As for INSCOM's awareness of and participation in the Alshora crisis, GLS immediately

13

informed INSCOM contracting officers of Alshora's retaliatory actions. ECF No. 572-3 at 880 (GLS email to INSCOM detailing the status of KRH sponsorship and the issues that began to arise with Alshora). GLS also provided regular, even daily, updates to these officers of GLS' progress in securing the linguists travel documents and safe passage out of Kuwait. *Id.* at 886; ECF No. 572-5 at 115 & 125. Contracting officers Mark Brown ("Brown") and Gervasio Ortiz-Lopez ("Ortiz-Lopez") met regularly with Relators and spoke frequently with GLS representatives. ECF No. 572-4 at 77–78; ECF No. 572-6 at 62. Brown and Ortiz-Lopez checked on the Relators' living conditions often, and while less than ideal, attested that Relators lived comparably to military personnel living on base. ECF No. 572-4 at 78; ECF No. 572-6 at 63. Neither Brown nor Ortiz-Lopez observed anyone from GLS try to obstruct, hinder or delay the restoration of linguists' legal status in Kuwait. ECF No. 572-6 at 63; ECF No. 572-4 at 78. GLS also never forced linguists to work, and neither contracting officer suspected as much. ECF No. 572-4 at 79; ECF No. 572-6 at 63. *See also* ECF No. 572-5 at 114–41.

In July 2013, a few Relators were able to leave Kuwait after Alshora withdrew the absconding charges. ECF No. 572-9 at 84; ECF No. 572-6 at 78. Others left in October 2013 by bribing Alshora officials. ECF No. 572-3 at 151:8–152:15. Eventually, all Relators departed Kuwait on their own accord. Eight Relators—Al-Masri, Fadlalla, Fikri, Hayat, Kabbaj, Luttfi, Mansour, and Skili—returned to work for GLS. ECF No. 572-3 at 36:22–37:11 (Al-Masri); *id.* at 160:6–161:13 (Fadlalla); *id.* at 181:10–183:22 (Fikri); *id.* at 198:12–204:17 (Hayat); *id.* at 23:9–22 (Kabbaj); *id.* at 243:9–244:8 (Luttfi); *id.* at 293:8–295:22 & 298:3–302:4 (Mansour); *id.* at 413:16–414:4, 420:1–425:10 & 435:2–17 (Skili).

The linguists, including many of the Relators, also pursued a pair of lawsuits against GLS in the fall of 2013, alleging a host of claims arising from the Alshora crisis. *See Zinnekah v. Global*

*Linguist Sols., LLC*, Case No. 1:13-cv-01185 (E.D.V.A.); *Zaklit v. Global Linguist Sols., LLC*, Case No. 1:14-cv-314 (C.D. Cal.). Media coverage followed the suits, detailing how Relators were being "effectively imprisoned" on the two military bases in Kuwait "because of a nasty and complicated business dispute" between GLS and Alshora. Yochi Dreazen, *The Kafka-esque story of the U.S. translators being held against their will in a Kuwaiti hangar*, Foreign Policy, Oct. 2, 2013.[7] The articles explained that GLS' original purpose in hiring Alshora was to ensure compliance with labor and immigration laws in Kuwait. *See* Steven Beardsley, *American linguists in Kuwait seek help from US courts to return home*, Stars and Stripes, Oct. 8, 2013 ("Kuwaiti law requires all foreign businesses hire a local firm as its agent, or sponsor, in the country, responsible for immigration paperwork and some aspects of payroll.").[8] But that Alshora retaliated against the linguists for going with a "cheaper" alternate sponsor firm. *Id*.

One article featured the Relators' arrest and detention in Kuwaiti jails. Steven Beardsley, *American linguists in Kuwait seek help from US courts to return home*, Stars and Stripes, Oct. 8, 2013 ("Nine contractors were arrested outside the posts after Al Shora declared the linguists on its rolls absentee and turned their names over to Kuwaiti police. Some were held for days in jail cells before being deported").[9] For those confined to the bases, the reports described their "makeshift barracks" as "infested with bedbugs," with "the nearest bathrooms [] in trailers several minutes away," noting that linguists are not permitted to "access the bases' military hospitals or leave the country for personal emergencies." Yochi Dreazen, *The Kafka-esque story of the U.S. translators being held against their will in a Kuwaiti hangar*, Foreign Policy, Oct. 2, 2013.[10] *See also* Dietrich

---

[7] Available at https://foreignpolicy.com/2013/10/02/no-exit-3/.
[8] Available at https://www.stripes.com/news/2013-10-08/american-linguists-in-kuwait-seek-help-from-us-courts-to-return-home-1842651.html1.
[9] Available at https://www.stripes.com/news/2013-10-08/american-linguists-in-kuwait-seek-help-from-us-courts-to-return-home-1842651.html1.
[10] Available at https://foreignpolicy.com/2013/10/02/no-exit-3/.

Knauth, *Army Translators Seek Class Cert. In False Imprisonment Suit*, Law360, Sept. 2, 2014 (detailing the linguists class action on behalf of "120 American translators who were allegedly mistreated and forced to remain on a military base after signing contracts to provide linguist services to the U.S. Army").[11]

The media also exposed the linguists' view that GLS was the true culprit behind their predicament. According to the linguists, GLS "br[oke] Kuwaiti law for a business advantage that placed all the risk on employees." Steven Beardsley, *American linguists in Kuwait seek help from US courts to return home*, Stars and Stripes, Oct. 8, 2013.[12] The same articles also highlighted U.S. involvement in efforts to secure the linguists' release, and that the U.S. was "doing what they can for the contractors," but emphasized that in their view, "the entire crisis boils down to a fight between two private companies." Yochi Dreazen, *The Kafka-esque story of the U.S. translators being held against their will in a Kuwaiti hangar*, Foreign Policy, Oct. 2, 2013.[13] One particular INSCOM spokesperson said, "the military was working with the State Department to find a way to get the contractors out of Kuwait," but stressed that "the current situation regarding the American linguists in Kuwait is a legal matter under Kuwaiti law." *Id.*

## II. Procedural History

### A. Relators' Pre-Suit Disclosures

On March 23, 2015, Relators, through counsel, hand-delivered to the Department of Justice ("DOJ") a 91-page "Disclosure Statement" with 600 pages of supporting documents. *See* ECF No. 571-3 at 415; ECF No. 583 at 9. Three months later, Relators served the identical Disclosure

---

[11] Available at https://www.law360.com/articles/572639/army-translators-seek-class-cert-in-false-imprisonment-suit.
[12] Available at https://www.stripes.com/news/2013-10-08/american-linguists-in-kuwait-seek-help-from-us-courts-to-return-home-1842651.html1.
[13] Available at https://foreignpolicy.com/2013/10/02/no-exit-3/.

Statement on the U.S. Attorneys' Office and DOJ along with a copy of their qui tam Complaint. ECF No. 571-3 at 415. Relators next filed their lawsuit in this District on June 19, 2015. ECF No. 1.

The Disclosure Statement reads like a well-supported advocacy piece. ECF No. 571-3 at 415; ECF No. 583 at 15. It identifies seven discrete "claims" of GLS' fraud on the Government: (1) misrepresenting in the Contract bid that Small Business Defendants would substantively perform on the Contract; (2) misleading the Government that the subcontractors had been performing substantive services on the Contract; (3) lying during the CWC hearing to cover up the GLS subcontracting scheme by claiming the Small Business Defendants were performing legitimate payroll services; (4) colluding with Alshora to make it appear that the linguists were Alshora employees so to circumvent Kuwaiti law, the breakdown of which "interfered" with the Contract performance by precipitating the March 2013 "stop work" order; (5) withholding details about the Alshora crisis to extract from Relators forced labor by taking their passports and restricting their movements; (6) creating a "fake" narrative that Alshora was extorting GLS to pay several million dollars; and (7) securing a second linguistic services contract by falsely claiming it had performed on the first. ECF No. 571-3 at 425–29.

Fairly read, however, very little of the Disclosure Statement includes non-public, first-hand knowledge from Relators relevant to the claims. Although the entirety of the "investigation" is described as that of the Relators, it is impossible to discern what, if anything, the Relators learned (and when) from their "investigation," as opposed to counsel's own efforts or as part of the robustly reported audits, lawsuits and the CWC hearing. Occasionally, the Disclosure Statement specifically describes named Relators' "experiences," but it otherwise ascribes information learned after the Relators left Kuwait as "an independent investigation into the facts of their employment,"

that their lawyer conducted. ECF No. 571-3 at 458. The Relators, however, appear to have performed no investigation of their own.

The Disclosure Statement also includes vague assertions about Relators' collective knowledge with no detail as to who among the 28 Relators possessed relevant information and the specific content of the same. ECF No. 571-3 at 510 (announcing generally that "Relators will testify that GLS and not Alshora confiscated and held Relators passports"); *id.* at 480 ("Relators will testify that scores of military and intelligence gathering missions were canceled" during the Alshora crisis); *id.* at 465 ("Relators will testify that periodically, and with no advanced notice, GLS would summon Relators to report to their GLS managers" who would present them with "new" contracts to sign); *id.* at 473 ("Relators forced to sign 'new' contracts by GLS will testify that" when they asked, "GLS managers would assure them that 'nothing would change.'"). Aside from brief descriptions of certain named Relators having signed serial employment contracts with subcontractors while working for GLS, the Disclosure Statement is an exercise in generalities when it comes to detailing what any particular Relator knew or experienced. *Id.* at 461–72.

## B. Relators' Post-Complaint Filings

Nonetheless, after Relators filed the *qui tam* suit, the Government investigated their claims for three years, during which the Relators amended the Complaint once. ECF No. 9. On September 24, 2018, the Government elected not to intervene, thus paving the way for Relators to proceed on the Government's behalf. ECF No. 29 at 2.

The Amended Complaint alleged three Counts under the FCA arising from GLS' subcontractor fraud and misrepresentations associated with the Alshora crisis. ECF No. 9 ¶¶ 488–547, and one violation of the TVPRA premised on GLS' supposed confiscation of Relators' passports and associated confinement to the military bases. *Id.* ¶¶ 488–547 & 548–93. On

18

September 5, 2019, the Court granted dismissal as to the "reverse" FCA count (Count III).  ECF No. 145 at 34.  As to the remaining FCA claims, however, the Court concluded that as a matter of law, the subcontractor fraud and the Alshora crisis had been publicly disclosed before Relators filed suit in June 2015, thus subjecting the claims to dismissal under the "public disclosure bar." *Id.* at 18–19 & 23–24.  Relevant to the subcontractor fraud, the Court found the August 12, 2009, CWC hearing and associated media coverage amply alerted the United States to the events giving rise to the fraud.  *Id.* at 13 & 18–21.  Likewise, the Court concluded that contemporaneous media reports on the Alshora crisis robustly described that GLS was "breaking Kuwaiti law for a business advantage that placed all the risk on [Relators]"; that GLS effectively abandoned linguists to languish in deplorable conditions; and that GLS worked in concert with Alshora to circumvent Kuwaiti immigration and labor law.  *Id.* at 23–24.  Nonetheless, the Court allowed the claims to proceed because Relators had plausibly averred an exception to the public disclosure bar—that they had been "original sources" of the information which would, if proven, save the claims.  *See id.* at 23 & 25.

For the next four and a half years, the parties engaged in protracted and contentious discovery.  *See* ECF Nos. 214–546.  In the interim, Relators filed a Second Amended Complaint, which made no substantive changes save for expanding on the factual predicate concerning the close corporate relationship of Defendants AECOM, DynCorp and GLS.  ECF No. 286-1 ¶¶ 19, 21 & 29–32.  Discovery ultimately ended on July 19, 2024, ECF No. 546, followed by cross motions for summary judgment, ECF No. 568 & ECF No. 573.  *See also* ECF No. 246.

## III.    Legal Standard

Summary judgment is appropriate when the Court, construing all evidence and drawing all reasonable inferences in the light most favorable to the non-moving party, finds no genuine dispute

exists as to any material fact, thereby entitling the movant to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see In re Family Dollar FLSA Litig.*, 637 F.3d 508, 512 (4th Cir. 2011). Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

"In responding to a proper motion for summary judgment," the opposing party "must present evidence of specific facts from which the finder of fact could reasonably find for him or her." *Venugopal v. Shire Lab'ys*, 334 F. Supp. 2d 835, 840 (D. Md. 2004), *aff'd sub nom.*, 134 F. App'x 627 (4th Cir. 2005) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986) and *Celotex*, 477 U.S. at 322–23). Genuine disputes of material fact are not created "through mere speculation or the building of one inference upon another." *Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)). Where a party's statement of a fact is "blatantly contradicted by the record, so that no reasonable jury could believe it," the Court credits the record. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"Where, as here, cross motions for summary judgment are filed, a court must 'evaluate each party's motion on its own merits, taking care [in each instance] to draw all reasonable inferences against the party whose motion is under consideration.'" *Snyder ex rel. Snyder v. Montgomery Cty. Pub. Sch.*, CV DKC-2008-1757, 2009 WL 3246579, at *5 (D. Md. Sept. 29, 2009) (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)). The Court must deny both motions if it finds a genuine issue of material fact precludes resolution, "[b]ut if there is no genuine dispute and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A Wright & Miller's FEDERAL PRACTICE & PROCEDURE § 2720 (4th ed. 2020).

With this standard in mind, the Court turns first to Defendants' motion.

## IV.    Analysis

### A.  FCA Claims (Counts I & II)

Defendants first contend that FCA claims concerning the purported "subcontractor fraud" fail because Relators cannot demonstrate they were original sources of the information underlying the claims.  ECF No. 572.  The FCA "imposes civil liability for presenting false or fraudulent claims for payment to the federal government." *United States ex rel. John Doe v. Credit Suisse AG*, 117 F.4th 155, 158 (4th Cir. 2024) (citing 31 U.S.C. §§ 3729-3733).  The purpose of the FCA is to "protect the funds and property of the Government." *Rainwater v. United States*, 356 U.S. 590, 592 (1958).  Thus, after a private party brings such fraud or mismanagement to the Government's attention, the Government as the "real party in interest," may pursue the suit on its own behalf. *United States ex rel. Eisenstein v. N.Y.C.*, 556 U.S. 928, 930 (2009).  Or if it declines, the individual plaintiff or "relator" may pursue the claims in the name of the United States. *See* 31 U.S.C. § 3730(b)(4), (c)(3).   If the relator is successful in her suit, she may share in the ultimate recovery awarded to the Government. 31 U.S.C. § 3730(d). *See United States ex rel. Bunk & Ammons v. Gov't Logistics N.V.*, 842 F.3d 261, 265 n.3 (4th Cir. 2016); 31 U.S.C. § 3730(d). Accordingly, for a relator to succeed on a qui tam claim, she must demonstrate: (1) "there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a 'claim')." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 788 (4th Cir. 1999).

"However, a qui tam suit is of no help to the government if the alleged fraud has already been uncovered by the time the relator's suit is filed." *United States ex rel. Schnupp v. Blair*

*Pharmac*y, No. CV ELH-17-2335, 2025 WL 375927, at *13 (D. Md. Jan. 28, 2025) (relying on *Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 294–95 (2010)). Known as the "public disclosure bar," the FCA "disqualifies private suits based on fraud already disclosed in particular settings—such as hearings, government reports, or news reports—unless the relator meets the definition of an 'original source' under the FCA." *United States ex rel. Beauchamp v. Academi Training Ctr.*, 816 F.3d 37, 39, 43 (4th Cir. 2016) (internal marks and citation omitted).

Congress amended the FCA in 2010 to include changes to the public disclosure bar. Because the Relators' FCA claims span from 2006 through 2013, both versions of statute are implicated, so the Court describes each. The pre-2010 version amounted to a jurisdictional prerequisite for suit, depriving this Court of subject matter jurisdiction where the claims were based on public disclosure of "allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media." 31 U.S.C. § 3730(e)(4)(A) (2005). The 2010 amendment, in contrast, no longer casts the bar in jurisdictional terms, but nonetheless requires dismissal of an "action or claim . . . if substantially the same allegations or transactions as alleged . . . were publicly disclosed in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or from the news media." 31 U.S.C. § 3730(e)(4)(A) (2010).

Both versions of the statute, however, include an important exception. An action based on public information is not barred if "the person bringing the action is an original source of the information." 31 U.S.C. § 3730(e)(4)(A). This means that even though this Court already concluded as a matter of law that the underlying factual predicate of the claims had been publicly

disclosed, Relators could nonetheless pursue the claims if they could prove they were "original sources" of the underlying facts.  The relator bears the burden of showing that she is an original source.  *See United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 343 (4th Cir. 2009); *United States ex rel. Colquitt v. Abbott Lab'ys*, 858 F.3d 365, 373 (5th Cir. 2017) (citing *United States ex rel. Jamison v. McKesson Corp*., 649 F.3d 322, 326 (5th Cir. 2011)) (internal citations omitted).

In the pre-2010 version, an "original source" is one who had "direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information."  31 U.S.C. § 3730(e)(4)(B) (2005).  According to the 2010 amendment, an original source is one who "(1) prior to the public disclosure . . . voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) [] has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section."  31 U.S.C.  § 3730(e)(4)(B) (2010).

Notably, both original source requirements demand that the relators demonstrate their disclosure to the Government was "voluntarily" made.  31 U.S.C.  § 3730(e)(4)(B).  Defendants first argue that because Relators submitted their Disclosure Statement pursuant to a different statutory provision that sets out *required* disclosures, *see* 31 U.S.C § 3730(b)(2), the single statement cannot also be considered "voluntary."  ECF No. 571 at 11–12.  To be sure, § 3730(b)(2) reads that "[a] copy of the complaint and written disclosure of substantially all material evidence and information the person possesses *shall be* served on the Government. . . ." prior to Relators' filing suit.  Thus, say Defendants, a document that Relators were required to submit cannot also be one they submitted by choice, or "voluntarily."  ECF No. 571 at 11–12.

Defendants buttress their position with well-reasoned, out-of-circuit authority that as a matter of statutory interpretation, a *single* submission served pursuant to a "mandatory" disclosure requirement cannot also be considered a "voluntary" one. *See United States ex rel. Omni Healthcare, et al., v. U.S. Oncology, Inc.*, No. 23-1334-cv, 2024 WL 4751635, at *3 (2d Cir. Nov. 12, 2024); *United States v. Bank of Farmington*, 166 F.3d 853, 866 (7th Cir. 1999). *See also United States ex rel. King v. Hillcrest Health Ctr., Inc.*, 264 F.3d 1271, 1280 (10th Cir. 2001) (quoting *Bank of Farmington*, 166 F.3d at 866). *But see United States ex rel. Babalola v. Sharma*, 746 F.3d 157, 163 (5th Cir. 2014). Additionally, at least one Court in this District has held the same. *See United States ex rel. Schnupp*, 2025 WL 375927, at *2 (collecting cases). But there, the question was whether *one* submission under the "mandatory" disclosure provision could also satisfy the voluntary requirement. *Id.* Here, the Relators may have used the same document twice, but they did technically provide the statement in satisfaction of the "voluntary" disclosure, and then seemed to resubmit the same document with the Complaint to satisfy the mandatory disclosure. ECF No. 583 at 9. With two submissions separated in time and the latter accompanied by the Complaint, the Court cannot conclude that the first should not be considered "voluntary."[14]

Regardless, Relators' claims cannot proceed because the information provided still does

---

[14] On this, Relators (or counsel) may be too clever by half. In an otherwise meticulously crafted submission, the Disclosure Statement cites "31 USCS § 3730 *(e)(B)(2)*" as the statutory basis for submitting the statement to the Government. ECF No. 571-3 at 423. But no such statutory provision exists. Rather, this "mis-citation" seems to be an amalgam of the voluntary disclosure provision, § 3730*(e)(4)(B)(2),* and the mandatory disclosure provision, § 3730*(b)(2).* The Court finds it hard to believe that the mistake was wholly accidental, given how important both disclosures are to the survival of the case. What is more, the Disclosure Statement does little to clarify for the Court which information can be attributed to any given Relator's knowledge or experience. Whether a relator is an "original source," thus avoiding the public disclosure bar, turns on the relator's independent, daresay firsthand, information that is otherwise *not* publicly disclosed, aimed at elucidating whether the relator added any value to the information already in the public domain. By contrast, the mandatory disclosure provision compels the relator to turn over "substantially all material *evidence*" supporting the Complaint, regardless of its source, to assist the Government in assessing the strength of the case. *See* § 3730(b)(2) (emphasis added). Thus, to submit one monolithic statement that does not faithfully identify what "information" comes from any given Relator renders it far more difficult to determine whether the Relators are indeed original sources. Perhaps this was by design. Because, as more fully explained below, the evidence viewed most favorably to Relators confirms they added little new information beyond what had already been disclosed in a variety of public source information.

not render them original sources under either statutory provision. The Court considers each separately.

<h3 style="text-align:center"><i>i.</i>        <b>Pre-2010 "Original Source" Exception to Public Disclosure Bar</b></h3>

Under the pre-2010 "original source" exception to the public disclosure bar, a relator must demonstrate that she had "direct and independent knowledge of the information" on which the allegations are based." 31 U.S.C. § 3730(e)(4)(B). *See also United States ex rel. Vuyyuru*, 555 F.3d at 353. "A relator's knowledge is 'direct' if he acquired it through his own efforts, without an intervening agency, and it is 'independent' if the knowledge is not dependent on public disclosure." *United States ex rel. Ahumada v. NISH,* 756 F.3d 268, 276 (4th Cir. 2014). *See also Grayson v. Adv. Mgmt. Tech., Inc.*, 221 F.3d 580, 582 (4th Cir. 2000) ("We have interpreted 'based upon' to be synonymous with 'derived from.'").

Information about which the relator had no direct or independent knowledge, such as that obtained from a third party, will not suffice. *See United States ex rel May v. Pursue Pharma, L.P.*, 811 F.3d 636, 642–43 (4th Cir. 2016). *See also United States v. N.Y. Med. Coll.*, 252 F.3d 118, 121 (2d Cir. 2001) (relator does not have direct and independent knowledge, and therefore is not an original source, if a third party is the source of the "core information" upon which the qui tam complaint is based); *United States ex rel. Ahumada*, 756 F.3d at 278 (relator did not have direct knowledge and was thus not an original source where the relator was told the information from a third party); *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 921 (7th Cir. 2009) (relator did not have independent knowledge and was thus not an original source where information came from attorney, and relator asserted attorney client privilege to prevent the Court from determining how lawyer learned of information). This is because the FCA "is not designed to encourage lawsuits by individuals like the Relators who (1) know of no useful new information about the

scheme they allege, and (2) learned of the relevant facts through knowledge their attorney acquired." *United States ex rel. May*, 811 F.3d at 643.[15]

When viewing the record most favorably to Relators, no evidence demonstrates that they possessed "direct and independent" knowledge of facts sufficient to support the subcontractor fraud claim. The Disclosure Statement amounts to an artfully crafted narrative that takes great pains *not* to make clear what information comes from Relators firsthand experiences versus information gathered by their counsel's "independent investigation." ECF No. 571-3 at 458. The Disclosure Statement, for example, does not include a single Relator's declaration or sworn statement which would have clearly delineated what the *Relator* knew about the fraud based on his own experiences or his own due diligence.

Sure, certain passages of the Disclosure Statement appear to directly attribute the information to Relators' experiences at GLS. But even so, such passages are limited. The passages collectively convey only the Relators' having signed employment agreements with several subcontractors while working for GLS. ECF No. 571-3 at 466–72. Nothing in the statement describes any Relator's independent or firsthand accounts of what GLS had represented to the Government in connection with Contract, what role the subcontractors played in fulfilling the Contract, or what GLS told the Government concerning the same. And this makes eminent sense. The Relators were linguists, there to perform a discrete, albeit vital, function. They were not contract managers, or work in billing, procurement, or accounting. Thus, they had no experience or insight into how GLS used the subcontractors to perpetrate a fraud on the Government. *Cf. United States ex rel. Ahumada,* 756 F.3d at 276 ("Ahumada worked at NCED for only six months

---

[15] Despite Relators' argument to the contrary, *United States. ex rel. Paranich v. Sorgnard*, 396 F.3d 326, 332 (3d Cir. 2005), does not say otherwise. In fact, the Court expressly declined to reach whether "Paranich's knowledge was 'direct' given the role his attorney played in the investigation," and instead affirmed dismissal because the disclosure was not voluntary. *Id.* at 341.

in 2004, so it is far from clear how he gained *direct* knowledge of the NISH visits in 1999, 2002 and 2005") (emphasis in original).

It is no surprise, therefore, that the Relators uniformly attest they knew nothing more about GLS' alleged fraud beyond signing seriatim employment contracts with the named subcontractors. *See, e.g.*, ECF No. 584-7 at 3; ECF No. 584-12 at 3–4; ECF No. 584-37 at 7:3–8, 8:17–9:3; ECF No. 584-44 at 14:3–15:20, 19:1–17; ECF No. 584-48 at 3:7–4:7; ECF No. 584-49 at 13:3–14:2; ECF No. 584-51 at 4:6–5:13; ECF No. 584-52 at 3:5–4:19.   Relator Al-Masri, for example, admitted he knew nothing about "how or why GLS selected the subcontractors that it did," and instead learned about the fraud from his lawyer.  ECF No. 571-3 at 12:7–21:24.  Relator Al-Safar, likewise, knew nothing about the terms and conditions of the Contract with the Government, or how GLS selected or used its subcontractors.  ECF No. 571-3 at 69:4–71:3.  Relators Haidar Al-Saidi, Fikri, Hayat, Luttfi, Malek, Maroufi, Marrogy, Mudilage, Muhsen, Mure, Tucker, Fadlalla, Kabbaj, Mansour, Mikhaiel, Skili, Zinnekah, Al-Nakash and Abdulghani testified to the same.  *See* ECF No. 571-3 at 100:19–103:17 (Hadir Al-Saidi had no knowledge of GLS' contracts or the CWC hearing); *id.* at 152:4–153:22 (Fikri had no knowledge of the CWC and confirmed his answers to interrogatories "came from" his lawyer); *id.* at 162:10–165:21 (Hayat had no knowledge of GLS' contract with the Government, GLS' subcontracts with Small Business Defendants, or the CWC apart from that known by his lawyer); *id.* at 187:7–189:1 (Luttfi had no knowledge of GLS' subcontracts with Small Business Defendants, confirming only that his "lawyer knows about it" because of lawyer's "own investigation"); *id.* at 219:20–224:17 (Malek had no knowledge of representations made by GLS to the Government or CWC but knows "for a fact that [Relator's] counsel did lots of investigation . . ."); *id.* at 250:10–252:7 (Maroufi had no knowledge of GLS' contract with the Government, GLS' subcontracts with Small Business

Defendants, the CWC, or the lawsuit brought by Shee Atika prior to being informed by lawyer); *id.* at 264:3–266:21 (Marrogy confirmed his interrogatory answers as to GLS' contract performance based on "lawyer's investigation," not his personal knowledge); *id.* at 299:3–306:10 (Mudalige had no personal knowledge of GLS contract or subcontracts outside of that which attorney provided); *id.* at 319:6–10 & 320:2–6 (Muhsen had no knowledge of GLS misrepresentations to Government or how Small Business Defendants were selected but relied on "attorney" to discover "all these facts"); *id.* at 346:25–349:12 (Mure took no steps to investigate and did not personally provide information to the DOJ; the "lawyer is taking care of this case"); *id.* at 371:2–376:19 (Tucker relied on lawyer's investigation and promise to report findings "based on that investigation"); ECF No. 584-35 at 20:10–22 (Fadlalla could not recall how he learned information outside of personal experiences); ECF No. 584-38 at 8:2–9:4 (Kabbaj's input was based on his "experience" and "collaboration" with other GLS linguists); ECF No. 584-42 at 16:5–25 (Mansour had no personal knowledge of GLS' subcontracts other than that discovered by counsel); ECF No. 584-50 at 7:11, 14:3–15:3 (Mikhaiel had no direct knowledge of fraud allegations outside of personal experience as employee under GLS management); ECF No. 584-51 at 3:1–5:13 (Skili same); ECF No. 584-53 at 6:16–23 (Zinnekah had no knowledge of GLS' representations to the Government apart from what he learned during "the course of this litigation"); ECF No. 584-29 at 6:2–23 (Al-Nakash only heard about GLS' approach to contracts through his lawyer); ECF No. 584-28 at 5:3–14 (Abdulghani knowledge was limited to personal observations as linguist).

Accordingly, Relators' collective testimony reflects that they had suspected something was amiss, but they had no insight as to the substance of the fraud. *United States ex rel. Vuyyuru*, 555 F.3d at 353 ("mere suspicion" of fraud "simply does not carry [the] burden of proving that [relators

are] entitled to original source status"). *See also United States ex rel. Black v. Health & Hosp. Corp. of Marion Cnty.*, 494 F. Appx 285, 296 (4th Cir. 2012) (rejecting relator's contention that he had direct and independent knowledge where relator "never had access to the books and records of defendants" but merely "knew in [his] gut" that defendants' conduct was illegal) (internal quotation marks omitted). In other words, Relators' personal experiences as GLS employees may have caused them to question GLS' practice of migration, but Relators, "never connected [their] knowledge" to "an actual claim upon the public fisc by any of the Defendants." *United States ex rel. Vuyyuru*, 555 F.3d at 353. Without some showing that Relators had "direct and independent knowledge" of GLS' alleged false representations to the Government, they cannot be considered original sources. *Id. See also United States ex rel. Schumann v. Astrazeneca Pharm. L.P.*, 769 F.3d 837, 845–46 (3rd Cir. 2013) (original source must have actual knowledge of the alleged misrepresentation); *United States ex rel. Carter v. Halliburton Co.*, 973 F. Supp. 2d 615, 630 (E.D. Va. 2013) (citation omitted). Because Relators have failed to show they were "original sources" under the pre-2010 version of the FCA, the public disclosure bar defeats the claims.

### ii.      Post-2010 "Original Source" Exception to Public Disclosure Bar

Nor do the Relators fare better under the 2010 amendment. There, an original source is one who "has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action." 31 U.S.C. § 3730(e)(4)(B) (2010). A "'relator's knowledge . . . is independent if the knowledge is not dependent on public disclosure.'" *United States ex rel. Ahumada*, 756 F.3d at 276 (quoting *Grayson*, 221 F.3d at 583). The Fourth Circuit has yet to expound on the meaning of "materially adds" within the original source exception, so this Court looks to its sister circuits for guidance.

"Materially adds" has been interpreted as "[o]f such a nature that knowledge of the item would affect a person's decision-making," or information that is "significant," or "essential." *United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 211–12 (1st Cir. 2016) (citing Black's Law Dictionary, 1124 (10th ed. 2014)); *United States ex rel. Advocs. for Basic Legal Equal., Inc. v. U.S. Bank, N.A.*, 816 F.3d 428, 431 (6th Cir. 2016) (same); *United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 756 (10th Cir. 2019) (same). A relator may "materially add" to the public disclosures by contributing "significant additional information" of which "adds in a significant way to the essential factual background: the who, what, when, where and how of the events at issue.'" *United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 306–07 (3d Cir. 2016). *See also United States ex rel. Paulos v. Stryker Corp.*, 762 F.3d 688, 694–95 (8th Cir. 2014) (information "materially adds" to something when it "substantially" or "considerably" "improve[s] or alter[s] its quality or nature") (quoting New Oxford American Dictionary 18, 1079 (3d ed. 2010)). By contrast, if "the public disclosures are already sufficient to give rise to an inference of fraud, cumulative allegations do not materially add to the public disclosures." *United States ex rel. Jacobs v. JP Morgan Chase Bank, N.A.*, 113 F.4th 1294, 1303 (11th Cir. 2024). The same is true for "[b]ackground information and details that help one understand or contextualize a public disclosure." *Id.* Merely supplying "detail or color to previously disclosed elements of an alleged scheme is not materially adding to the public disclosures." *United States ex rel. Winkelman*, 827 F.3d at 213.

Collectively, Relators' information does not add materially to the gravamen of the fraud as already laid out in DCAA's audit, the CWC hearing, Shee Atika's lawsuit, and the accompanying news reports. The CWC hearing concerned GLS' "very heavy use of subcontractors," even though GLS was the linguists' employer in every sense of the word. ECF

No. 571-4 at 35.  It also focused on whether GLS brought the subcontractors on simply to meet the "35% small business goal" but "did not want the small business[es] to do anything to satisfy the government[.]"  *Id.* at 54.  Likewise, the press repeated the same concerns regarding the value of Contract despite minimal subcontractor involvement.  *See supra*, at 7–8.  And the Shee Atika lawsuit revealed that GLS used Shee Atika to win the Contract but did not provide the subcontractor with the amount of work that GLS represented to the Government it would.  ECF No. 571-4 at 281–82.

The Relators know this much—their Disclosure Statement admits that the Shee Atika lawsuit aided their independent investigation.  ECF No. 571-3 at 459–60 (describing the lawsuit as providing "valuable insight to the relationship between GLS, Shee Atika, and what are now the other SBA Defendants named in this disclosure."). The only "new" information that, most charitably, can be ascribed to Relators is their description of having signed seriatim employment contracts with the subcontractors.  Given the wealth of already disclosed public information concerning the subcontractor fraud, Relators' personal experiences add little to the "who, what, when, where and how" of the fraud supposedly perpetrated on the Government.  Thus, the information provided is neither "essential" nor a "significant" contribution to the information already in the public domain.

In short, under either version of the "original source" exception to the public disclosure bar, Relators have failed to adduce sufficient evidence to sustain their burden.  The information known to them does not materially add to that already known to the Government at the time of suit, nor is their information direct and independent.  Thus, the public disclosure bar applies, and the Court must grant summary judgment in Defendants' favor.

B.  **TVPRA Claim (Count IV)**

Turning to the TVPRA claim, the Relators allege that during the Alshora crisis, GLS took a series of extraordinary steps to confine Relators to the U.S. military installations and force them to work so that GLS could continue to get paid under the Contract.  ECF No. 286 ¶¶ 589–627. Specifically, Relators fault GLS for (1) confiscating their passports so they could not leave the country; (2) "intentionally" placing Relators "in situations where they were likely to be arrested" if they went off base, thus keeping them confined to the base to avoid arrest or criminal prosecution; (3) and forcing them to work under "inhumane and arduous conditions," such that Relators "reasonably believed they had no choice, due to GLS' absolute control over their lives." *See also* ECF No. 588 at 12–13, 19 & 21.

Defendants make the refreshingly straightforward argument that no evidence demonstrates GLS had engaged in any conduct necessary to sustain the TVPRA claim because GLS never forced Relators to work.  ECF No. 572 at 19–22.  Viewing the record most favorably to Relators, the Court must agree with Defendants.

Congress enacted the TVPRA to "reach cases in which persons are held in a condition of servitude through nonviolent coercion, as well as through physical or legal coercion."  *Muchira v. Al-Rawaf*, 850 F.3d 605, 617 (4th Cir. 2017), *as amended* (Mar. 3, 2017), *cert. denied*, 138 S. Ct. 448 (2017) (internal marks and citation omitted).  The TVPRA's forced labor provision prohibits an employer from "knowingly" providing or obtaining "the labor or services of a person,"

> (1)  by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
>
> (2)  by means of serious harm or threats of serious harm to that person or another person;
>
> (3)  by means of the abuse or threatened abuse of law or legal process; or

> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

18 U.S.C. § 1589(a). Nor can an employer knowingly destroy, conceal, or confiscate an employee's passport in connection with a forced labor claim. 18 U.S.C. § 1592(a).

Fundamentally, the TVPRA claim depends on whether the employer compelled an employee to *work* in any manner prohibited under the statute. *Muchira*, 850 F.3d at 605 (the gravamen of the TVPRA claim is "whether an employer's conduct was sufficiently serious to coerce the victim to provide labor or services against her will."). Thus, the central inquiry remains whether the employer did anything to make the employee work against her will.

When viewing the record most favorably to the Relators, no evidence supports that the Relators worked at all during the Alshora crisis, let alone against their will. Almost immediately, INSCOM issued a stop work order for all GLS linguists for whom Alshora was responsible until the crisis was resolved. ECF No. 588-57 at 2; ECF No. 572-4 at 40; ECF No. 588-45 at 2. *See also Vinayagam v. Malpani*, Civ. No. 22-6 (DJN), 2022 WL 4131197, at *12 (E.D. Va. July 29, 2022) (dismissal of TVPRA claim because plaintiff alleged "that Defendants benched her – the exact opposite of forcing her to work"). GLS still paid the Relators, as it was contractually obligated to do, and the Army compensated GLS in turn. ECF No. 588-57 at 2. But no evidence contradicts that until the Relators left Kuwait later in 2013, they were paid to "do nothing." *See, e.g.*, ECF No. 572-3 at 332:14. *See also id.* at 14:14–17 (Abdulghani affirming that he did not work during the Alshora fallout, and yet, received his full paycheck); *id.* at 40:20–25 (Al-Masri confirming same); *id.* at 52:1–25 (Al Nakash confirming no work was completed during this time); *id.* at 86:25–87:11 (Al-Safar admitting he did not work but that if he could have, he would've because he "wanted to work"); *id.* at 206:11–19 (Hayat stating GLS never tried to force him to

work).  Thus, the TVPRA claims cannot survive challenge.

But even if the Relators did perform work during this period, nothing suggests that GLS attempted to extract work by any means prohibited by the TVPRA.  When viewing the record most favorably to the Relators, nothing demonstrates that GLS, either alone or in concert with Alshora, took and kept the Relators passports for the purpose of eliciting labor.  Rather, Alshora acted alone to prevent Relators from obtaining their passports, and in doing so, effectively prevented Relators from working and infringed upon the linguists' mission in Kuwait.  *See supra*, at 10–11.  It was GLS that worked with the relevant U.S. stakeholders to effectuate the return of the passports.  ECF No. 572-3 at 534:16–535:3 (GLS President stating, "I had a direct role in . . . securing those passports . . . and sent them right back to the linguists.").  To be sure, the record reflects that GLS, INSCOM officers, and the U.S. Embassy did not always agree on the best course of action to break the Alshora logjam.  ECF No. 588-44 at 2–5.  But that does not imply that GLS knowingly or intentionally withheld Relators' passports for purposes of securing their forced labor.

Relators also seem to aver that GLS violated the TVPRA because GLS "obtained Plaintiffs' services by abusing Kuwaiti law and legal process."  ECF No. 286 ¶¶ 608–15.  The TVPRA's abuse-of-law provision "requires proof that the defendant 'knowingly' abused the law or legal process as a means to *coerce* the victim to provide labor or services against [their] will."  *Muchira*, 850 F.3d at 622–23 (citing 18 U.S.C. § 1589(a)) (emphasis in original).  Relators have adduced no evidence to suggest that GLS knowingly abused Kuwaiti immigration and visa processes to "force" Relators to work.  *See supra*, at 11–13.  Even if GLS did not strictly comply with Kuwaiti law, INSCOM knew it, and the arrangement with Alshora appeared to be they only way work visas could be secured for U.S. citizens like Relators.  *Cf. United States ex rel. Hawkins v. ManTech Int'l Corp.*, 1:15-cv-02105-ABJ, ECF No. 144 at 24 (D.D.C. Aug. 29, 2025) ("[E]ven if [relator's]

sponsorship was not compliant with Kuwait's immigration procedures, there is no evidence that [defendant] intended to use the country's administrative visa process for any purpose other than to obtain the required work visas for the plaintiffs.").

Nor did GLS confine Relators to the military bases against their will to extract their labor. Alshora, no doubt, made sure the Relators faced the peril of arrest and prosecution if they ventured off base. ECF No. 572-4 at 82. GLS and the Army warned the Relators of the same. ECF No. 589-11 at 1. *See also* ECF No. 588 at 13. But GLS never demanded that Relators stay on base, as is evident by Relators' frequent forays beyond the military installations. *See supra*, at 12. And there is certainly no evidence to suggest that GLS' warnings to Relators about the dangers of leaving had been part of a greater plan to keep them confined to the bases. *See United States ex rel. Hawkins*, 1:15-cv-02105-ABJ, ECF No. 144 at 25 (recognizing that defendant put its employees "at risk of significant legal consequences, including arrest, by requiring them to make repeated visa runs and by leaving the workers without their original passports for extended periods of time" but still finding no violation of the TVPRA because relators could not show "an intent on the company's part to force the employees to remain at the company against their will").

Lastly, no evidence supports that GLS compelled Relators to live in horrible conditions as a function of their labor. Putting aside that GLS had not forced the Relators to stay on base at all, GLS had forewarned Relators the job could entail austere and dangerous living conditions. ECF No. 572-9 at 5. And yet, each Relator voluntarily signed up to work for GLS. The living conditions, therefore, were the byproduct of the larger military mission, as Relators well knew. Nor did GLS control or manage the on-base living conditions, the Army did. ECF No. 572-4 at 78 (Ortiz-Lopez stating, "The U.S. Army assigned and managed on-base housing for linguists in Kuwait. GLS did not have any role or responsibility for assigning or managing on-base housing.").

On this record, Relators simply cannot adduce any evidence that GLS knowingly confined Relators to unusually squalid living conditions to force them to work. Thus, the Court grants summary judgment in favor on the TVPRA claim.[16]

In sum, none of the claims survive challenge. As to the FCA claims, Defendants have convinced the Court that Relators cannot defeat the public disclosure bar because they are not original sources of the information supporting the FCA claims either as to the subcontractor fraud or the Alshora crisis. Nor have Relators adduced any evidence that GLS ever forced them to work at all, let alone in violation of the TVPRA. Thus, the Court grants summary judgment on all claims in Defendants' favor.

## V.     Remaining Motions

Because no claim will proceed, the Court denies as moot GLS' request for an adverse inference to be drawn at summary judgment on account of Relators' spoliation of evidence, ECF No. 535 at 4–5. The Court also denies the Relators' cross motion for summary judgment, ECF No. 573, and denies as moot GLS' motion to Strike Opinions of Relators Expert, Joseph Jordan, ECF No. 595. Lastly, the Court grants the parties' motions to seal at ECF Nos. 569, 579, 582, 585, 587, 590, 593, 599, 605 and 617. Although the Court presumes the public's free and unfettered access to court records, *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978), this docket is replete with

---

[16] The Relators also sandwich into the FCA Counts I and II alleged false claims premised on the same conduct underlying the TVPRA allegations. Relators aver that GLS committed fraud in withholding from the Government its violation of the TVPRA and "Kuwaiti law," the disclosure of which would have "disqualified" them as government contractors. *See* ECF No. 286 ¶¶ 547, 557 & 570–72 (GLS misrepresented that the linguists would be "working in Kuwait legally and that the conditions of employment would be lawful"). *See also id.* ¶¶ 553–56 (GLS "confining" Relators to the base and "forcing" them to work in fear and in "dangerous and slave like conditions"). Because Relators did not adduce any evidence that GLS violated the TVPRA or "Kuwaiti law," then any FCA claim derivative of those allegations necessary fails. Additionally, to the extent Relators maintain that GLS "hid" from the Government the terms of the Alshora Agreement, which Relators say amounts to an "illegal" end-run around Kuwaiti labor laws, that claim fails on the merits because the record amply demonstrates that INSCOM was acutely aware of the terms of the Alshora Agreement and gave GLS permission to subcontract with Alshora nonetheless. ECF No. 572-3 at 841–42 & 847–49.

36

sensitive material concerning military contracts during wartime, as well as private health and other protected information particular to the Relators.  This information, woven throughout the robust briefing, simply cannot be easily redacted.  Thus, because no mechanism short of sealing will protect the parties' privacy interests, the sealing motions are granted.

## VI.    Conclusion

Based on the foregoing, Defendants' motion for summary judgment is granted in their favor on the FCA and TVPRA claims.  Relators' cross motion is denied.  A separate Order follows.


September 29, 2025                                    /s/
Date                                            Paula Xinis
                                              United States District Judge